## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LYDIA GASKIN, <u>et al.</u>, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 94-CV-4048 (E.D.Pa.) |
| | : | |
| COMMONWEALTH OF | : | (JUDGE ROBRENO) |
| PENNSYLVANIA, | : | |
| DEPARTMENT OF EDUCATION, | : | |
| | : | |
| Defendants. | : | |

### <u>ORDER</u>

AND NOW, this _____ day of _____, 2003, upon consideration of the

Plaintiffs' Motion for Summary Judgment and the response of Defendants thereto, it is hereby

ORDERED that Plaintiffs' Motion is GRANTED.

By _____, 2003, Defendants shall defendants to submit a proposed

remedial plan to the plaintiffs and the Court. At a minimum, the plan shall include the following

actions and remedial measures to be carried out by the defendant officials of the Pennsylvania

Department of Education:

(a)     Policies and clear directives to local educational agencies stating how placement

decisions and decisions about the provision of supplementary aids and services

must be made;

(b)     A redesigned compliance monitoring system that is capable of determining whether

students with disabilities have been unnecessary removed from regular class when

their education in regular class could be achieved satisfactorily with supplementary

aids and services;

(c) A set of benchmarks or performance expectations to guide local school districts in assuring that students with disabilities, including those whose disabilities are most severe, are included in regular class to the maximum extent appropriate;

(d) A redesigned special education plan approval process requiring local school districts to set performance goals for

    (1) Enhancing inclusion in regular class of students with disabilities, including those whose disabilities are most severe;

    (2) Providing opportunities for students with significant disabilities to be educated in district-operated classes in students' home schools;

(e) A training and technical assistance plan emphasizing on-site guided practice by PDE and its professional development partners to develop the capacity within local school districts to meet reasonable performance goals for the inclusion of students with disabilities in regular class, by developing the skills of school district personnel in the following areas:

    (1) Modifying curricula within general education classrooms

    (2) Using differentiated instruction and multiple intelligences strategies to facilitate inclusion of all students with all disabilities;

    (3) Using cooperative groups to teach all students with disabilities;

    (4) Incorporating functional skills into curricula.

    (5) Individualizing data collection techniques.

    (6) Using positive behavior management strategies in general education classes.

(7)     Developing collaborative partnerships between special and general educators to support students with disabilities in general education classrooms.

(8)     Developing social relationships between students with and without disabilities.

(9)     Using family centered planning strategies.


_____
                          Honorable Eduardo C. Robreno
                          United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LYDIA GASKIN, <u>et al.</u>,    :
  Plaintiffs,     :
          :
    v.      :  NO. 94-CV-4048 (E.D.Pa.)
          :
COMMONWEALTH OF PENNA.  :  (JUDGE ROBRENO)
DEPARTMENT OF EDUCATION,  :
  Defendants.     :

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs respectfully move this Court for Summary Judgment on their claims under the Individuals with Disabilities Education Act, 20 U.S.C. § 1412(a)(4) (formerly § 1414(a); 1412(a)(5) (formerly § 1412 (5)(B); § 1412(a)(11) and 34 C.F.R §§ 300.550, 300.552, 300.553, 300.556 and 300.600; 20 U.S.C. § 1453(c)(3)(D); Title II of the American with Disabilities Act, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d); and Section 504 of the Rehabilitation Act, <u>as amended</u>, 29 U.S.C. §§ 720 and 794 and regulations promulgated thereunder, 34 C.F.R. Part 104.

The undisputed facts and legal argument in support of the motion are set forth in the accompanying Memorandum of Law.

         Respectfully Submitted,
         Public Interest Law Center of Philadelphia

         _____
         Judith A. Gran
         Barbara E. Ransom
         125 South Ninth Street, Suite 700
         Philadelphia, PA 19107
         Tel: (215) 627-7100
         Fax: (215) 627-3183

Dated: July 23, 2003     Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LYDIA GASKIN, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 94-CV-4048 (E.D.Pa.) |
| | : | |
| COMMONWEALTH OF | : | (JUDGE ROBRENO) |
| PENNSYLVANIA, | : | |
| DEPARTMENT OF EDUCATION, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Statement of Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  Federal and State Statutes and Regulations Require the Pennsylvania
        Department of Education to Ensure That All Students with Disabilities in
        the Commonwealth Are Educated with Students Who Do Not Have
        Disabilities to the Maximum Extent Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.  Defendant PDE Has Failed to Ensure That the Individual Plaintiffs Receive
        a Free Appropriate Education in the Least Restrictive Environment . . . . . . . . . 13

    C.  Students with Disabilities, Including Those Whose Disabilities Are Most
        Severe, Can Be Educated Satisfactorily in Regular Classes with
        Supplementary Aids and Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

    D.  According to the Pennsylvania Department of Education's Own
        Educational Placement Data,  Students with Significant Disabilities Are
        Disportionately Excluded from the Regular Class . . . . . . . . . . . . . . . . . . . . . . . 70

    E.  The Placement Practices of School Districts Throughout the
        Commonwealth Place Students with Significant Disabilities at
        Disproportionate Risk of Being Excluded from Regular Classes in
        Neighborhood Schools . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

    F.  PDE's Failure to Ensure That Students with Significant Disabilities Are
        Educated in Their Home Schools with Their Peers Has Harmed Many
        Members of the Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

    G.  The United States Department of Education, in Every Recent Monitoring
        of Special Education Services in Pennsylvania, Has Found Serious
        Violations of the Requirement That Students Be Educated with Students
        Who Do Not Have Disabilities to the Maximum Extent Appropriate . . . . . . . . 100

    H.  PDE Has Abdicated its Responsibility to Assure That Students with
        Disabilities Are Educated in Regular Class with Supplementary Aids and
        Services to the Maximum Extent Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . 123

I.      The Pennsylvania Department of Education Has Not Used the Federal Funds Dedicated to its Comprehensive System of Personnel Development to Assure That Teachers Develop the Skills to Educate Students with Significant Disabilities in Regular Class to the Maximum Extent Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

III.   Legal Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

     A.     Plaintiffs Have Sustained the Burden for Obtaining  Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

     B.     Defendants Have Failed in Their Obligation to Ensure That All the Commonwealth's  Children with Disabilities Are Educated with Students Who Do Not Have Disabilities to the Maximum Extent Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

          1.     The Pennsylvania Department of Education Has Primary Responsibility to Assure That Students with Disabilities in Pennsylvania Are Educated in Regular Class with Supplementary Aids and Services to the Maximum Extent Appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

          2.     The Individuals with Disabilities Education Act Requires that All Students With Disabilities, Including Those Whose Disabilities Are Most Severe, Be Educated With Students Who Do Not Have Disabilities to the Maximum Extent Appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

          3.     The Pennsylvania Department of Education Has Endorsed the Legal Requirement that Educational Agencies Must Adopt Promising Practices that Can Enable Students with Disabilities to be Included in Regular Class to the Maximum Extent Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

          4.     Applying the <u>Oberti</u> Standards, the Pennsylvania Special Education Appeals Panel Holds That Students with Significant Disabilities Can Benefit from Education in Regular Class with Supplementary Aids and Services. . . . . . . . . . . . . 191

5.    The Pennsylvania Department of Education Has
      Violated Its Duty Under The Individuals With
      Disabilities Education Act to Assure That Students
      With Disabilities Are Educated With Children Who
      Do Not Have Disabilities to The Maximum Extent
      Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

C.    PDE Has Aided and Perpetuated Discrimination  Against
      Members of the Plaintiff Class Solely on the Basis of Their
      Disabilities and the Severity of Their Disabilities, in
      Violation of Section 504 of the Rehabilitation Act and the
      Americans with Disabilities Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

IV.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LYDIA GASKIN, et al.,                    :
                                         :
    Plaintiffs,                          :
                                         :
      v.                               :    NO. 94-CV-4048 (E.D.Pa.)
                                         :
COMMONWEALTH OF                          :    (JUDGE ROBRENO)
PENNSYLVANIA,                            :
DEPARTMENT OF EDUCATION,                 :
                                         :
    Defendants.                          :


## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

This case was filed by twelve students in local school districts in Pennsylvania who had been denied the right to be educated in regular classes with supplementary aids and services. The Pennsylvania Department of Education, as the state educational agency, has the responsibility and authority to assure that those local educational agencies and others throughout the Commonwealth provide "the whole range" of supplementary aids and services to students with disabilities in regular classes and train their personnel to deliver these services adequately. The individual plaintiffs are joined by eleven organizations which have advocated for students with disabilities throughout the Commonwealth.

The complaint was filed on June 30, 1994 as a class action on behalf of all those children who are now or will be identified as an eligible student under 20 U.S.C. § 1412(a)(1)(A) and 22

Pa. Code § 14.1 and who have been denied the opportunity to receive a free appropriate

education in regular classrooms with individualized supportive services or have been placed in

regular education classrooms without the supportive services, individualized instruction and

accommodations they need to succeed in the regular classroom. Plaintiffs' claims arise under the

Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-14185 (IDEA); Section

504 of the Rehabilitation Act 29 U.S.C. § 794 and Title II of the Americans with Disabilities Act

(ADA), 42 U.S.C. §§ 12131-12134 against defendant the Pennsylvania Department of Education

(PDE). The class was certified on June 12, 1995.

Plaintiffs brought this case because the Pennsylvania Department of Education has

violated its statutory duty to ensure that students with disabilities are educated with their peers

who do not have disabilities to the maximum extent appropriate. As a consequence, plaintiffs and

other members of the class have been removed from regular classes and schools even though they

could satisfactorily be educated in regular classes with the use of supplementary aids and services.

Further, PDE has failed to assure that plaintiffs and class members who are placed in regular class

for at least part of the school day receive the supplementary aids and services they need to

succeed in regular class.

Plaintiffs will demonstrate that they are entitled to summary judgment because PDE's

violation of these statutory mandates is plain from the undisputed facts. Although the evidence

will establish statutory violations by PDE that affect all members of the class, those violations

affect most starkly and categorically the members of the class whose disabilities are severe:

children with retardation, autism, emotional disabilities, physical disabilities and multiple

disabilities.[1] For these students, the facts concerning PDE's those violations are particularly clear and undisputed. Students with those disabilities are the most likely to be placed in separate and self-contained classes and most likely to be placed out of district, in classes operated by an intermediate unit, or away from their home school. They benefit less than other students from the current training and technical assistance initiatives of PDE's Bureau and Special Education. PDE's data on educational placement show that students with the most significant disabilities, especially retardation, emotional disabilities and multiple disabilities are making little progress in gaining access to regular class, that they lag significantly behind their counterparts in other states, and that wide geographical variations in access to regular class exist throughout the Commonwealth. Yet PDE is doing little to change this situation and has no clear goal for increasing these students' opportunities to be educated in regular class.

 The undisputed facts will show that PDE has failed to assure compliance with the integration mandates of governing federal law because the systems through which it exercises general supervision of special education services in Pennsylvania are incapable of doing so:

•        PDE's compliance monitoring system is not designed to identify, let alone to correct, noncompliance with the requirement that students be educated in regular class with supplementary aids and services to the maximum extent appropriate.

•        In carrying out its monitoring and compliance activities, PDE adheres to an unwritten but clear policy that it will not examine or analyze placement decisions made by

---

[1]Plaintiffs recognize that other educational classifications include students whose disabilities are severe. Learning disabilities may be severe, as the examples of plaintiffs John Forte and Sam Luckenbill illustrate, and emotional disabilities and retardation also range from mild to severe. It is only on average that certain disabilities are regarded as more "severe" than others.

school districts' Individualized Education Program (IEP) teams for compliance with the governing substantive legal standards.

•       In its plan approval process, PDE automatically approves any configuration of special education services proffered by the district, even when the district's program consists entirely of separate special education classes.

•       PDE's comprehensive system of personnel development is not designed to develop the skills teachers need to instruct students with significant disabilities in regular classes because it relies primarily on large group, didactic training with very little sustained follow-up technical assistance.

•       PDE does not require that local school districts' comprehensive systems of personnel development make provision for training in the skills that school district staff need to instruct students with significant disabilities in regular class. Indeed, PDE's current plan approval process does not require that local school district's Comprehensive Systems of Personnel Development address the training and professional development in inclusive practice at all.

a school district excludes students with certain disabilities from regular class means that no matter how categorically

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     FEDERAL AND STATE STATUTES AND REGULATIONS REQUIRE THE PENNSYLVANIA DEPARTMENT OF EDUCATION TO ENSURE THAT ALL STUDENTS WITH DISABILITIES IN THE COMMONWEALTH ARE EDUCATED WITH STUDENTS WHO DO NOT HAVE DISABILITIES TO THE MAXIMUM EXTENT APPROPRIATE.

1.     The Pennsylvania Department of Education ("PDE") is the department of the Commonwealth specifically charged with administering the public school educational process. 22 Pa. Code § 1.3(b).

2.     The statutory and regulatory framework for special education in Pennsylvania is found in Chapter 14 of the Pennsylvania Code and the Individuals With Disabilities Education Act. 20 U.S.C. §§ 1400-1491; 34 C.F.R. § 300 ("IDEA").

3.     There are 3,248 public schools in the Commonwealth, serving 1,821,627 students in grades K through 12.  Exh. 186: Status Report on Education in Pennsylvania, a Statistical Summary 2002 ("Status Report") at  Tables 1 and 43.

4.     In Pennsylvania, 227,846 (12.5%) of the public school students receive special education services under Part B of the IDEA. Exh. 187: Pennsylvania Report of Children with Disabilities Receiving Special Education Part B, Individuals with Disabilities Education Act, as amended (April 24, 2002) Reported to OSEP for the 2001-2002 School Year - Table 1 at Section C.  Of this number:

    1.     3,969 (1.7%) have an autism classification;

    2.     27,682 (12.2%) have a mental retardation classification;

    3.     2,476 (10.9%) have a multiple disabilities classification;

    4.     1,143 (5%) have an orthopedic impairment (physical disability) classification;

    5.     21,143 (9.3%) have an emotional disturbance classification; and,

    6.     126,594 (55.6%) have a specific learning disability classification.

Id.

5.      There are 117,164 certified public school teachers in Pennsylvania.  Status Report at i.  Of that number, 18,147 (15.5%) are certified as special education teachers.  Exh. 188: Pennsylvania Number and Type of Teachers Employed (in Full Time Equivalency) to Provide Special Education and Related Services for Children with Disabilities, Ages 6-21 Reported to OSEP for the 2001-2002 School Year - Table 2, Section B.

6.      Special education is defined as specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability.  34 C.F.R. § 300.26(a)(1).

7.      The IDEA vests responsibility for oversight of special education programs in a State Education Authority ("SEA").  20 U.S.C. § 1412(a)(11);  34 C.F.R. § 300.600.

8.      PDE, as the SEA, has general supervisory responsibility over the provision of special education services and oversight responsibility to ensure that all students entitled to receive special education and related services under the IDEA receive a free, appropriate public education ("FAPE").  34 C.F.R. § 300.141.

9.      PDE's general supervisory responsibility for special education includes the following:

> 1.    General supervision and oversight of all educational programs for exceptional students and early intervention programs within the Commonwealth;
>
> 2.    Assuring that educational programs for exceptional children meet state and federal requirements;
>
> 3.    The establishment of administrative procedures for ongoing monitoring of program implementation, including evaluation of the effectiveness of special education services and programs, taking corrective action and ensuring the provision of appropriate programs for exceptional students;
>
> 4.    The imposition of sanctions upon public agencies to ensure that special

education plans are submitted as required, approved in a timely manner, implemented as specified and evaluated accordingly;

5. The establishment and maintenance of a comprehensive special education information system that allows for the monitoring of service delivery of school districts and intermediate units;

6. The exercise of appropriate and responsible fiscal oversight and control;

7. The evaluation and approval of teacher education programs leading to the certification of professional personnel in the schools;

8. The annual review of teacher certification regulations to report on needed revisions;

9. The dissemination of information about promising practices and the promotion of their use;

10. Review of special education plans, budget and plans for comprehensive personnel development submitted by local school districts and disapproval of plans and budgets that fail to assure that the services and programs of the district are adequate in quantity and variety to meet the needs of persons of every exceptionality.

34 C.F.R. § 300.600(a).

10. Within the Commonwealth, there are 501 public school districts and 29 Intermediate Units. These entities serve as Pennsylvania's Local Educational Agencies ("LEAs") under the IDEA. Status Report at i.

11. The IDEA defines a LEA as a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools. 20 U.S.C.§ 1401(15); 34 C.F.R. § 300.18(a).

12. PDE, as the SEA, is responsible for ensuring that LEAs in Pennsylvania comply with the mandates and substantial procedural guidelines of the IDEA. 20 U.S.C. § 1412(a)(11); 34 C.F.R. § 300.600(a)(2).

13. PDE provides guidance to LEAs relating to the Pennsylvania School Code, state board of education regulations and standards, and federal law and regulations through Basic Education Circulars ("BECs"). Exh. 184: PDE Basic Education Circular Introduction and User's Guide.

14. The IDEA requires students who qualify for special education to be educated to the maximum extent appropriate with students who do not have disabilities. This is sometimes called the Least Restrictive Environment ("LRE") mandate or the integration mandate. 20 U.S.C. § 1412 (a)(5); 34 C.F.R. § 300.550(b)(1). The LRE mandate states "that to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled." Id.

15. The mandate further states that "special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.550(b)(2).

16. Placement decisions for a qualified student under the IDEA are made through the development of an Individualized Education Program ("IEP"). An IEP is a written statement that is developed, reviewed and revised by the parents; a regular education teacher; a special education teacher; a representative of the LEA; other qualified individuals; and, if appropriate, the child.

These individuals constitute the "IEP team." 20 U.S.C. § 1414(a)(2); 34 C.F.R. § 300.344(a).

17.    PDE is responsible for ensuring that each LEA develop and implement an IEP for each child with a disability served by that LEA. 20 U.S.C. § 1414(a)(4), (a)(10)(B); 34 C.F.R. § 300.341(a).

18.    PDE is responsible for ensuring that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.551(a). The continuum must include alternative placements such as instruction in regular classes, and must make provision for supplementary support services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.551(b)

19.    PDE is responsible for ensuring that placement decisions are made by a group of persons who are knowledgeable about the child, the meaning of the evaluation data, and the placement options. PDE must also ensure placement decisions are made in conformity with the LRE mandate; and, unless the IEP of a child with a disability requires some other arrangement, that the child is educated in the school that he or she would attend if nondisabled. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.552(a), (b) and (c).

20.    PDE is responsible for ensuring that a child with a disability is not to be removed from education in age appropriate classrooms solely because of needed modifications in the general curriculum. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.552(e).

21.    PDE has set forth its understanding of the LRE provisions in an "Inclusion of Special Education Students" BEC ("Inclusion BEC"). Exh. 185:BEC 22 Pa. Code § 342.42(c).

22.    The Inclusion BEC, sets forth the governing rationale for inclusive special

education in Pennsylvania:

> First, contact with nondisabled peers can have positive social effects both on children with disabilities and on their classmates. Second, education with nondisabled peers can have positive learning effects. For many, the result is that children with disabilities learn more in inclusive environments.

Inclusion BEC at ¶A.

23.     PDE defines inclusion as "much more than ensuring the mere physical proximity between students with and without disabilities. The term means full participation and equality as part of a group, leading to a sense of belonging within the community at large." Id., at ¶B.

24.     With respect to placement decisions, PDE states that "an inclusive placement is not dependent on a prediction that there will be an incremental or additional benefit from inclusion. A child need not prove his or her way into a regular class or regular school building. Rather, the benefits test is simply whether an appropriate education can be provided in the regular environment." Id., at ¶E.

25.     PDE further states that the status quo is not the measuring factor in making a placement decision "In order to assess whether an appropriate education can be provided in a regular class, one must look at that environment in two ways: (1) as it is, and (2) as it might be when augmented with supplementary aids and services. Thus, the fact that a child may not be able to succeed in a class as it is does not mean that inclusion is not feasible. The feasibility of inclusion is to be assessed in light of the services that can be brought to the child." Id.

26.     "Supplementary aids and services [include] all of the modifications and innovations of which a school district is reasonable capable. This covers a wide variety of techniques. Implementing these techniques in order to facilitate inclusion is both required and desirable." Id.,

at ¶F.

27.     PDE states that "schools must become prepared to do what the profession as a whole is capable of doing in the area of inclusion...once success in inclusion is achieved somewhere in the profession, increased capacity should be replicated throughout the field," Id., at ¶D.

28.     Inclusion is not limited to the classroom environment, but includes nonacademic and extracurricular activities such as meals, recess periods, athletics, special interest groups and clubs, transportation and recreational activities.  PDE's responsibilities include ensuring that each child with a disability participates with nondisabled children in nonacademic and extracurricular activities to the maximum extent appropriate to the needs of that child.   20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.553.

29.     PDE is required to have a Comprehensive System of Personnel Development in place to prepare and train teaching professionals.  20 U.S.C. § 1412(a)(4); 34 C.F.R. § 300.135(a).

30.      To facilitate inclusion, PDE must use its Comprehensive System of Personnel Development adequately to prepare and train teaching professionals to provide students with disabilities the supports they need in regular classes so that "increased capacity [will] be replicated throughout the field." Inclusion BEC at D.

31.     PDE is required to ensure that teachers and administrators in all public agencies are fully informed about their responsibilities for implementing the LRE requirements and are provided with the technical assistance and training necessary to assist them in this effort.  20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.555.

32.     PDE is responsible for monitoring the activities of LEAs to ensure that FAPE in the LRE is provided to each eligible student.  If a LEA makes placements that are inconsistent with FAPE, PDE must review the LEA's justification for its actions and assist in planning and implementing corrective action.  20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.556.

33.     The United States Department of Education ("DOE") has the authority to monitor compliance on the part of states with IDEA.  DOE administers this function through its Office of Special Education Programs ("OSEP").  20 U.S.C. § 1402(a).

34.     OSEP monitored special education services in Pennsylvania and issued formal reports to PDE on the violations it found in 1996, 1999 and 2002.

35.     In its report issued on February 16, 1999, OSEP found that PDE had failed adequately to exercise general supervision over special education services in Pennsylvania, including enforcement to secure compliance with the requirements of IDEA. OSEP made PDE's receipt of Fiscal Year 1999 IDEA Part B grant funds subject to special conditions requiring compliance with findings of areas of needed improvement. Exh. 212:OSEP  Monitoring Report of February 16, 1999 at 17-18.

36.     As a consequence of those findings, PDE was required to develop and implement a Corrective Action Plan. Id.

37.     In October, 2000, OSEP again conducted a compliance monitoring review of Pennsylvania's practices related to delivery of Part B services.  OSEP found that students were excluded from the regular educational environment for reasons other than the nature or severity of their disabilities, in violation of 34 C.F.R. § 300.550(b).  Exh. 212: OSEP February 2, 2002 Monitoring Report at 33.

38.     PDE's Fiscal Year 2000 IDEA part B grant award was again released subject to special conditions.  Specifically, OSEP determined that PDE had not ensured that its process for verifying the completion of local school district corrective actions resulted in the effective correction of identified noncompliance.  Id., at 48.

### B.     DEFENDANT PDE HAS FAILED TO ENSURE THAT THE INDIVIDUAL PLAINTIFFS RECEIVE A FREE APPROPRIATE EDUCATION IN THE LEAST RESTRICTIVE ENVIRONMENT.

39.     Plaintiff LYDIA GASKIN, a student with Down Syndrome, is eligible for and has received special education and related services from the Carlisle Area School District (CASD).  Lydia has retardation, low muscle tone and difficulties with fine motor control and coordination.  Cplt. at ¶ 8; Answer at ¶ 8.

40.     Lydia attended preschool programs in Carlisle including a regular nursery school.  When she reached kindergarten age in 1989, her parents enrolled her in CASD and asked the district to place her in a regular kindergarten with support and related services.  CASD offered the Gaskins three placement choices:  a Multihandicapped Assessment class operated by the intermediate unit; a class for trainable mentally retarded (TMR) children in a middle school; and regular kindergarten with no supplementary aids and services.  The district informed the Gaskins that it could place Lydia in a regular kindergarten, but could not provide her with supplementary aids and services when she entered the CASD's school. Cplt. at ¶ 10; Answer at ¶ 10.

41.     Lydia's parents have taken a variety of actions to counteract the CASD's refusals to provide a FAPE in the LRE for their daughter, including:

> 1.     petitioning the CASD to provide an inclusive education for Lydia; (Exh. 91 Gaskin letters to CASD)

2. seeking redress through the due process avenue (Nov. 27, 1991); (Exh. 91 Gaskin due process requests)

3. filing complaints with defendant PDE (Nov. 28, 1991, May 1 and 20, 1992); (Exh.91 Gaskin letters to PDE)

4. filing a complaint with the United States Department of Education, Office of Civil Rights; (Exh. 91 Gaskin letter to OCR)

5. participating in this class action litigation.

42.     The parents rejected a CASD proposed program in which Lydia would be mainstreamed in regular classes for only 36% of the school day and which would require her to go in and out of the regular classroom 27 times per week.  For 51% of the school day Lydia would be somewhere other than a regular class and the remaining 13% of the day would be occupied by lunch and recess.  Cplt. at ¶ 15.

43.     On June 19, 1992, the Special Education Appeals Panel, affirming the decision of the hearing officer, held that Lydia's full inclusion in regular class was inappropriate because she would not be able to master the regular academic curriculum. In rejecting the evidence that supplementary aids and services, including a modified curriculum, would enable Lydia to meet her educational goals within the matrix of the regular class, the Panel looked not to Lydia's educational needs but to the integrity of the regular education curriculum:

> What concerns this Panel, and what we do not believe served
> Lydia's interests at all, is that the specific supplementary aids and
> curriculum modifications desired by the parents would lead to Lydia
> being included only in a physical sense ....we do not agree that the
> type of program growing out of [the modifications suggested by the
> parents] would result in "inclusive" education in its intended sense.
> Even though it is beyond question that education for Lydia is not
> the same as it may be for her nonhandicapped peers, we believe that
> evaluation of these supplementary aids and modifications must
> consider the realization that there are still academic purposes to

14

regular education. Those purposes have a place in deciding whether inclusion is appropriate for a particular child in individual subject areas, since presumably they are part of the benefit that is to be obtained from being "included" in regular education.[2]

Pennsylvania Special Education Appeals Panel Opinion No. 565-A at 15-16.

44.    In so holding, the Appeals Panel did not inquire whether Lydia could benefit from being educated in the regular class with supplementary aids and services by accomplishing her own educational goals; rather, it assumed that even if she could meet the goals in her own IEP in the regular class, inclusion would still be inappropriate as long as she was not achieving the same academic benefit as the 'regular' students.  Cplt. at ¶ 19; Answer at ¶ 19.

45.    In spite of the parents' persistently beseeching PDE for its support, defendant took no action as the state education agency to ensure that Lydia received FAPE in the LRE with supplementary aids and services, and this inaction resulted in Lydia's unnecessary segregation and loss of educational benefit.  Mr. Gaskin made repeated phone calls in an attempt to get PDE to intervene when the district resolutely refused to implement the Appeals Panel's Order. An official of the Department of Education, rather than use the power of PDE as the SEA, recommended that the family go into federal court over the "obvious violation of the IEP."  Exh. 14: Gaskin Depos. at 251; Exh. 91: Gaskin May 20, 1992 letter to PDE with Apgar's testimony.

46.    After this case was filed, the Gaskins persisted in seeking more inclusion for Lydia

---

[2]The Appeals Panel rendered its decision before the decision of the Court of Appeals in Oberti v. Board of Education of the Borough of Clementon,, 995 F.2d 1204 (3d Cir. 1993), which made clear that inclusion should not be made contingent on a child's ability to master the academic demands of the general education curriculum, and before the 1997 amendments to the Individuals with Disabilities Education Act required that all students with disabilities be provided with opportunities to participate and progress in the general curriculum. In more recent cases, the Appeals Panel has abandoned the reasoning it employed in Lydia Gaskin's case in favor of the Oberti standards.  See infra, Section II, Legal Argument.

through the IEP process and were successful in reducing the amount of pull-out time to approximately one hour a day. However, the district's inexperience in providing supplementary aids and services in regular class to a student with Lydia's disabilities and it unwillingness to obtain technical assistance from outside experts affected the quality and effectiveness of Lydia's program. In January 2000, Kristen Guare, plaintiffs' expert, who had observed Lydia's program, spoken to her family, teachers and support staff and participated in her IEP meetings over the course of several years, reviewed Lydia's program. Ms. Guare's prior observations had revealed that Lydia's aide often acted as a barrier between her and her classmates and that opportunities for Lydia to be included were missed. Ms. Guare reported that Lydia's aide stayed glued to her like velcro and provided assistance when it would be more appropriate for Lydia to work it out on her own or to have another student help her. Ms. Guare found that Lydia was in an environment with her typically developing peers, but isolated from them by a lack of "opportunities for interactions." She was seated with her aide in the back of or in a corner of the class and is given a parallel curriculum as the chosen method of instruction. Exh. 51: Guare Jan. 2000 Report on Gaskin.

47.     The Gaskins regularly and repeatedly asked the school district to obtain technical assistance from the Pennsylvania Training and Technical Assistance Network (PaTTAN), the contractor through which the Bureau of Special Education provides training and technical assistance, or other qualified sources of technical assistance in inclusive practice. Typically, the district did not respond to these requests. Finally, however, on January 2, 2003, at the request of the parents, the district requested that Mary Benton, an employee of the Capital Area Intermediate Unit (not PaTTAN) observe Lydia's program in order to provide technical

assistance and identify additional instructional strategies to support Lydia in her regular education classes. Exh. 91:Mary Benton's 01/02/03 Inclusion Observation Report of Lydia Gaskin.

48.     Ms. Benton observed Lydia in Geometry, Food Service and English and found that she was receiving varying levels of inclusion in her classes: in Food Service, Lydia was able to appropriately interact with her peers in group activity; in Geometry, she utilized adapted tests but would routinely leave the room when the teacher gave the class directions for the tests; and, there was a substitute teacher in English where Lydia listened to a story and recorded in her journal. Id.

49.     Ms. Benton recommended that the district reinforce Lydia's independence by relying less on an aide, having Lydia keep a homework chart and a checklist to be organized, and have Lydia use the bathroom before or after the test taking instructions were given. Although it was obvious that Lydia had developed a strategy to avoid being in class – the observer noted that this occurred in other classes – when test taking instructions where being given, Ms. Benton's suggestions did not provide much insight or support for her teachers. She made no suggested curricular modifications or instructional strategies. Id.

50.     Although the district accepted Ms. Benton's evaluation as sufficient to meet the parents' request for an outside evaluation and technical assistance regarding Lydia's inclusion, the parents requested additional observation and technical assistance be provided to Lydia's teachers by the Intermediate Unit and PaTTAN consistent with their original request for personnel "who have the expertise and background of successfully setting up High School full inclusion programs for children with Mental Retardation." Ms. Benton's short time with Lydia did not address the parents' original concerns. Exh. 91: Apgar's 01/29/03 letter to Joseph Gaskin; Exh. 91: Gaskin's 02/11/03 letter to David Apgar.

51. The district did not ask PaTTAN to evaluate Lydia's program, nor did it provide technical assistance. Instead, the district advised Mr. Gaskin to explore transition services with the Department of Public Welfare MH/MR caseworker. Exh. 91: Apgar's 04/03/03 letter to Joseph and Karen Gaskin.

52. Mr. Gaskin conducted his own evaluation of Lydia's program on March 11, 2003. Because Lydia's aide was absent, a substitute aide assisted in the programming that day. Mr. Gaskin found that Lydia's aide provided no instructional support during study hall, provided limited instructional support during Basic Study class, and impeded inclusion during lunch. Lydia was included in Gym, Food and Nutrition and English class. He found that Geometry and Sociology instruction failed to use modified or adapted strategies, and that Lydia was not included in class discussion. Exh. 91: Gaskin's 03/11/03 letter to Judith Gran, Esq.

53. On March 28, 2003, the district re-evaluated Lydia. Her WIAT scores were remarkable in the areas of listening comprehension and oral expression:

| Basic Reading | 43 | Numerical Operations | 40 |
| Math Reasoning | 44 | **Listening Comprehension** | **69** |
| Spelling | 49 | **Oral Expression** | **92** |
| Reading Comprehension | 40 | Written Expression | 48 |

The evaluation concluded that Lydia needed greater emphasis on reading comprehension. The district also recommended that instruction be delivered in a resource room. In the social/emotional area, the evaluator noted that Lydia's stubbornness is thought to be triggered by frustration, but that she was easily redirected. Further, Lydia has been developing appropriate

skills in her interactions with peers.  Exh. 91: Gaskin 3/28/03 Evaluation Report.

54.  Lydia's ability to learn has not been fully exploited by the district.  After having been fully included in regular class for more than 80% of the school day since elementary school, her scores in listening comprehension and oral expression approach or even surpass those of her typically developing peers.  However, as Ms. Guare observed, Lydia has been denied an appropriate education by the condescending attitude of her teachers who reserve a spot for Lydia in the back of the room.  The teachers "didn't include Lydia because the other students were so far above her in ability.  Her slowness in responding caused them to avoid calling on her....  As a result, Lydia sat in the back of the classroom at a separate table with the aide."  The teacher also stated that she "gave" Lydia a B, not based on her IEP goals, but rather so that she would make honor roll and "everyone would laugh."  Exh. 51: Guare Jan. 2000 Report on Gaskin at 2-4.

55.  In spite of the fact that Lydia has been included for all but one hour per day since first grade, the Gaskins still must struggle to assure that the district includes Lydia, which places a heavy burden on the family.  The district insists that a segregated program is in Lydia's best interest and only reluctantly has agreed to the inclusion for which her family struggles.  Lydia's remarkable scores in listening comprehension and oral expression are indications that she has gained significant benefit from the programing that her family struggles to keep in place.  Exh. 14: Gaskin Depos. at 243; Exh. 91: Gaskin 04/17/03.letter to David Apgar.

56.  On April 7, the parents requested clarification of the reading instruction that the district was providing to Lydia (Lydia's need for specialized reading instruction was the principal reason asserted by the district as a reason for Lydia's removal from regular class) and requested evaluation by the I.U. and PaTTAN of the district's reading program.  Exh. 91:Gaskin's 04/07/03

letter to David Apgar.

57.     The district responded in the same tone that it has since the parents prevailed in their battle to obtain a FAPE for Lydia – reading comprehension skills support was provided through Lydia's inclusion, at parents' request, in regular education classes.  No mention of additional supports were noted.  Exh. 91:Apgar's 04/17/03 letter to Joseph and Karen Gaskin.

58.     Mr. Gaskin testified about the "Herculean effort" that it took to get Lydia "gym class for one day out of the entire year" following the due process and appeal process.  The entire battle to include Lydia has put and continues to put a tremendous strain on the family.  Exh.14: Gaskin Depos. at 253-254.

59.     Plaintiff JOHN FORTE, at the time of the complaint was eighteen years old and a student in the Bensalem Township School District (BTSD).  John has severe learning disabilities including dyslexia.  Because of his difficulty reading and "his limited resources for coping with stress," John's self-esteem and emotional health has suffered.   Cplt. at ¶ 27; Answer at ¶ 27; Exh. 94: Selznick Evaluation; Exh.94: Forte Depos. at 17-18; Exh.95: Forte's Answers to First Set of Interrogatories at 16-18.

60.     John's parents have taken a variety of actions to counteract the BTSD's attempts to deny their son a FAPE in the LRE including:

1.      seeking redress through the due process avenue (Nov., 1990; July, 1994);

2.      through the courts of the Commonwealth of Pennsylvania;
3.      filing complaints with defendant PDE (11/08/1991, 5/15/1992, 10/06/94)

(Exh. 94);

4.      participating in this class action litigation.

61.     John was first identified as an exceptional student in 1982, by the staff of Neshaminy School District. He was classified as "brain injured" and placed in an approved private school, the Summit School. In 1983, John was transferred to the Wordsworth Academy, another approved private school, where he remained until 1988. Cplt. at ¶ 28; Answer at ¶ 28.

62.     Wordsworth failed completely to address John's dyslexia and inability to read. Instead of instruction in primary reading skills, he was made to read the same paragraph over and over again, or to write the same sentence--"I will ignore the immature behavior of others"--over and over. He made virtually no educational progress at all in the time he was there. Cplt. at ¶ 28.

63.     The parents petitioned the BTSD to remove John from Wordsworth Academy because the school, which the family thought provided educational services for children with learning disabilities, actually provided services to students with emotional disturbances. Exh. 94: Forte Depos. at 13-14.

64.     The district placed John in a learning disabilities (now called learning support) class in a district middle school in a class of twelve exceptional students with very diverse needs. However, John's special education teacher was unable to individualize the classroom instruction to meet his specific learning disabilities, and his reading disorder – a specific learning disability in word attack or word decoding skills – was not addressed. Rather, the students were all given a standard reading program. The students were not achieving on grade level, the curricular expectations were lowered, and the program was geared toward the lowest common denominator. Cplt. at ¶¶ 29 and 30; Answer at ¶¶ 29 and 30; Exh. 94: Forte NORA; Exh. 94: Barsky Report.

65.     The parents obtained psychotherapy for John, despite BTSD's categorical policy

and practice of refusing to provide psychotherapy to students enrolled in the regular schools of the district:

> Any child who must have consistent psychological counseling cannot be serviced in our on-site programs. They must be in an approved private school where that is available to them.

Testimony of BTSD's Director of Pupil Personnel Services and Instruction at the Due Process Hearing in Exh. 73: Special Education Appeals Panel, No. 526 at 6.

66.    The Appeals Panel found that John did not "require a special-education program as intense or restrictive as would be provided by an approved private school" and ordered BTSD to provide the psychotherapy. Cplt. at ¶ 32; Exh.73: Panel Decision at 6-7.

67.    Because John did not receive "specific designed instruction for his reading, math, English, or the computer," "can't write a real sentence; math, he has to use a calculator," he received little educational benefit from the time he spent in the approved private schools and the long-term effect has been both, emotionally, socially and economically devastating. Exh.94: Forte Depos. at 21-23; Exh.95: Forte Responses to First Set of Interrogatories at 5, 11 and 16.

68.    In spite of an IQ of at least 110 and the intellectual ability to complete college courses, John has had limited employment opportunities – driving a mini van for a vending machine company where "it's twelve hours a day he's putting in" (Exh. 94: Forte Depos at 19-20). John has been denied the opportunity to reach his potential because of PDE's failure to ensure that he receive an appropriate education.

69.    Plaintiff HASSAN ADIB SABREE, at the time of the filing of the complaint was a 14-year-old student with Down Syndrome in the Philadelphia School District (PSD) in a life skills support class at the Roxborough High School. Cplt. at ¶ 43; Exh.31: Sabree Depos. at p. 24.

70.     During Hassan's entire school career, the school district never offered him the opportunity to be a member of a classroom with nondisabled students.  His reading instruction focused on teaching him to read sight words in isolation, rather than mastery of a functional reading curriculum. He was not taught to write, perform mathematical calculations or to use money.  Despite the parent's repeated requests to the PSD from the time Hassan began kindergarten that he be included "for him to learn how to read, for him to learn how to write cursive and print ... to participate in extracurricular activities," the response was always a flat "no."  Id. at 24-26; Cplt. at 44-45 and 48; Exh. 31: Sabree Depos. at 82-83; Exh. 98: Sabree Responses to First Set of Interrogatories at 10, 17 and 18.

71.     Hassan's IEP identified his ability to count from 1 to 100 for "eons;" however, there were no goals for him to learn basic arithmetic or how to count money.  Further, some of the Functional Academics, PSD repeatedly, at least from middle school through high school, identified the same survival words and resultantly applied the same academic goals.  Cplt. at 49-50; Exh. 31: Sabree Depos. at 91-92.

72.     Throughout his entire school career, the PSD resisted his mother's attempts to ensure that Hassan had opportunities to model the behavior of age-appropriate nondisabled peers; the PSD went so far as to oppose having him participate at lunch, in gym or at recess with his typically developing peers.  In fact, he lost appropriate social skills that his mother instilled in him at home. Exh. 31: Sabree Depos. at 100-102, 127.  When Hassan began high school, the PSD refused to provide him with school tokens because – although Hassan has used public transportation since he was 10 years old – the district felt that he should ride the yellow school bus that is provided for children with disabilities.  Unlike other students in his high school, Hassan

– like his typically-developing peers – used public transportation rather than the yellow school bus. Id. at 48, Exh. 31: Sabree Depos. at 112-114; Sabree Responses to First Set of Interrogatories at 11 and 16.

73.     Hassan received Extended School Year (ESY) services as part of the compensatory education that he was awarded because of the PSD's failure to provide him an itinerant teacher for the 1997-1998 school year. This was the same year in which Hassan had at least four changes of teachers in his special education classroom. Exh.98: Sabree Sixth Set of Interrogatories at 1.

74.     Hassan's mother has taught him to work on a computer, to use public transportation, use money, shop on his own, pay his way at movies, recite identifying information and his social security number, buy the newspaper, wash and dry his clothes at the laundromat, and shop at the supermarket. Since he was five years old, Hassan has participated in typical camp programs through the YMCA and Boys' Club of Philadelphia. He was fully included in the Rites of Passage program, a Saturday program at Temple University that teaches school-age children about African history and becoming a responsible member of one's community. Hassan's mother taught him how to read the signs and how to behave in public. This gave him some opportunity to interact with typical teenagers and develop a level of independence to offset another of the PSD's moves to keep him segregated from his typically developing peers. Cplt: at ¶ 51; Exh. 97: Transition Times, Vol. 1 No. 2, Winter 1999 at 1.

75.     Because she was unfamiliar with Down Syndrome, Hassan's mother accepted the PSD's attitude that children with Down Syndrome could not learn to read and acquiesced to the district's position that Hassan would never be able to read. It was not until she began to

participate in advocacy organizations did she realize that her son had untapped potential and he was unnecessarily limited by a lack of education. Exh. 31: Sabree Depos. at, 120-121. As Ms. Sabree noted:

> [The PSD] always presented it as a negative fact that he's on this level and he's not able to achieve – when I insisted on public transportation, they were adamant, "Oh, he's on a four-year-old level of speech. He can't do that. He can't do that." And he's been doing it since he was 10. And he's doing it now. If I would have listened to the doctor and put him away, at age 35, he'll have the mentality of a five-year-old. He won't ever be able to cross the street by himself. And if I were to put him away, he wouldn't be able to take public transportation now. Id. At 135-136.

76. In February 2001, Jerry Petroff, Ph.D., an educational consultant experienced in the delivery of services to students with Down Syndrome, reviewed Hassan's educational program by examining his educational records and interviewing his mother to identify trends in the planning and implementation of his special education program within the PSD. Exh.62: Petroff Feb. 2001 Report on Sabree; Exh. 63: Petroff Curriculum Vitae.

77. In the Summary of Findings and Impressions to his Report, Dr. Petroff noted that "Hassan has had extremely limited access and direct instruction in the general education curriculum specifically in the areas of reading, math and general information" and, sadly, "[t]here is no evidence that Hassan has had opportunities to participate in extracurricular school activities with peers with / or without disabilities." "This is despite the frequent comments regarding Hassan's friendly manner and interest in forming social relationships." Exh.62: Petroff Report at 6-7; Exh.98: Sabree Sixth Set of Interrogatories at 1 (where none of the students in the special education class are informed about the school's social activities).

78. Hassan graduated on June 14, 2001 at the age of 21 and received a diploma

verifying that, although he cannot read, write or do basic arithmetic, he has "completed the approved Senior High School curriculum." Nonetheless, he is still struggling to catch up with peers who were given an appropriate education. Exh.98: Sabree Responses to First Set of Interrogatories; Exh.99: Sabree Supplemental Responses to Interrogatories at 2.

79. Following graduation, Hassan attended classes at the Pan African Studies Institute at Temple University, a fee-based program through which the University offers basic education courses to the community. Hassan is eligible for programs at Liberty Resources and Community College of Philadelphia, among other places, which offer programs that teaches students with cognitive disabilities, among other things, reading and computer skills. However, given the family's resources, the cost of such programs makes them prohibitive. Id.

80. The transition services that the school district provided Hassan were not individualized to his unique situation. He was prepared for a career in the food service industry. However, Hassan has psoriasis so severe that from time to time, his skin peels and flakes. Unsurprisingly, he has not been able to secure long-term employment in any industry that serves food. Hassan needed and continues to need transition services that would facilitate his movement from school to post-school integrated employment in an outcome-oriented process. Had PDE fulfilled its obligation to ensure that the PSD provided Hassan a comprehensive transition plan, he would have been prepared for life in the community and – receiving the necessary skills – employment. Id. at 4.

81. Plaintiff MERRIN RAINEY was fourteen years old at the time that the complaint was file and lived with her parents, and received education from the Fairview School District ("FSD") as a student eligible for special education and related services in a self-contained learning

support class for her academic subjects with integration into regular class for science, social studies and specials. Cplt. at ¶ 55: Exh. 100: 1994-95 IEP.

82.     Although Merrin has mild mental retardation and severe motor and language disabilities, she was misdiagnosed as moderately retarded because of her significant language disability. Her difficulty performing motor tasks and language skills has led to the development of behavior problems. However, when Merrin's needs were met, and when she received appropriate instruction including multisensory techniques, manipulatives and behavioral support, her frustration and, resultantly, her difficult behavior decreased. Cplt. at ¶¶ 55, 59; Exh. 100: Rainey 1998 IEP.

83.     Merrin's parents have taken a variety of actions to counteract the FSD's refusal to provide their daughter with a FAPE in the LRE, including:

1.     seeking redress through the due process avenue (1989, 1991 and

b.     seeking redress through PDE – Complaint Closure Reports (4/28/87, 11/30/87, 2/8/88, 9/16/88, 4/26/89, 1/29/90);

c.     seeking redress through the Office of Civil Rights for the U.S. Department of Education; and,

d.     participating in this class action litigation.

84.     In 1989, the parents requested due process over the proposed IEP and the district's and I.U. 5's failure to implement an existing IEP. The Hearing Officer's Order required that her IEP include, among other things, a structured peer tutoring program using both regular and special education students and self-help skills. Further, the Order required that Merrin receive her educational program in her district of residence. Exh.100: 1991 Hearing Officer decision.

27

85.     The family asked the school district and I.U. 5 to include Merrin as much as possible in regular class with supplementary aids and services.  The school district and I.U. 5 continually resisted including Merrin in regular classes and providing her with supplementary aids and services.  It was not until September, 1993, that the district and intermediate unit agreed to include Merrin in regular education for science and social studies and this inclusion was not in fact implemented until January, 1994.  Cplt. at ¶ 58; Exh. 101: Plaintiff's Responses to Defendants' First Set of Interrogatories at 2-6, 10-11.

86.     Merrin was denied a meaningful opportunity to participate in nonacademic and extracurricular activities at her school as well.  1n 1993, Merrin had a peer support program to enable her to eat lunch twice a week with regular education students; the program was supposed to continue the following year, but was dropped.  Merrin's mother asked that Merrin be included in extracurricular activities and she was allowed to join the soccer team.  However, Merrin received no support at all on the team and dropped out in frustration.  Exh. 100: Comprehensive MDT Report 5/12/93 at 9.

87.     Merrin had many negative experiences with non-disabled peers that resulted in behavioral difficulties. Those experiences include teasing, baiting and making fun of Merrin and refusing to sit next to her.  Exh. 100: Rainey's letters 5/8/92 at 1, 9/21/92 at 2.  The Raineys repeatedly asked the district and PDE to help Merrin develop better peer relationships through a widely used and highly successful technique for developing friendships between disabled and non-disabled students called "Circle of Friends."  But neither PDE nor the I.U. 5 was able to provide the training and technical assistance, so Mrs. Rainey provided the training herself.  The school district only permitted her to offer a class for volunteer attendees after school, refused to pay the

teachers for attendance or to give them release time to attend the training.  As a result, only one

staff member, a special education teacher, attended for only half the session.  Exh. 100: Rainey's

letters 9/21/92 at 2, 9/24/92 at 2.

88.     Merrin was assigned a special education teacher to assist with her inclusion in

regular classes, but instead of facilitating Merrin's inclusion the teacher did everything for her,

inducing dependency on Merrin's part, hindering her integration into the class, and preventing the

development of peer relationships and social skills; Exh. 100: Action Minutes-Planning Meeting

1/6/93 at 2.

89.     Lack of teacher training was an enormous obstacle to Merrin's successful

inclusion. Merrin's regular teachers were never trained in the behavior management techniques

listed on Merrin's IEP, despite her mother's repeated requests.  Instead of implementing an

appropriate behavior management plan, the school district repeated suggested that her mother

pick her up when she was having an "episode" and that Merrin undergo a psychiatric evaluation.

Merrin's behavior became increasingly challenging, leading to an incident of aggression in physical

education in 1993 that resulted in Merrin's removal from school.  The incident could have been

avoided if Merrin's behavior management program had been properly enacted.  Exh. 100:

Comprehensive MDT Report 5/12/93 at 3-4, 9-10; Cplt. at ¶ 60; Exh. 100: Rainey's 9/21/92 letter

at 1-3.

90.     Merrin received homebound instruction from 1995 until 2002 when she left school

at the age of 22 to be supported in the service system for adults with developmental disabilities.

She made little progress.  The inadequacy of her IEP contributed to her emotional and behavioral

deterioration.  During the 2000-2001 school year, Merrin spent at least two days a week sitting in

a tub for six hours a day, hiding from the staff because she was afraid she would hit them. Exh. 102: Response to Supplementary Interrogatories at 2-4.

91. In July 2000, plaintiffs' expert, Will Burrow, observed Merrin, interviewed her mother and review her educational records. Dr. Burrow found that there was little change in Merrin's IEP from the 1997-98 to the 1998-99 school years and determined that her services were not being driven by "objective considerations." He also determined that the CER's wording was prejudicial and hostile and that Merrim was blamed for all the negative outcomes that resulted from her educational programming, or lack thereof. Exh. 46: Burrow Jul. 2000 Report on Rainey at 7-8.

92. Dr. Burrow found that Merrin had not receive a individual education program that was reasonably calculated to enable her to obtain educational benefit and progress through the curriculum. He found, further, that the lack of coordination and oversight involved in Merrin's education and overall program of supprts was a "systemic element of the unacceptable outcomes" in her achievement. Id. at 24.

93. Defendant PDE was aware of the problems that the Raineys had in ensuring that Merrin's IEP was implemented because Ms. Rainey filed multiple complaints with the Division of Compliance and the Office of Civil Rights in the U.S. Department of Education. Exh. 101: Plaintiff's Response to Defendants' First Set of Interrogatories at 15-17.

94. Because of PDE's failure to ensure that Merrin receive an appropriate education, she was ill-prepared for responsible adulthood, failed to learn academic, functional, social and communication skills, and suffered irreparable damage to her self esteem. When she left school, she should have been able to use a calculator, read and write with the help of a computer, but

could not. Merrin should have had the social and communication skills necessary to develop friendships, but she had no friends of her own. Exh. 101: Response to First Set of Interrogatories at 26-31; Exh. 102: Response to Supplementary Interrogatories at 4-5; Exh. 100: Positive Behavior Support Plan 8/12/97 at 2. In May, 2003, Merrin Rainey passed away.

95.     Plaintiff SAMUEL LUCKENBILL, at the filing of this complaint, was a student identified with severe learning disabilities and attention deficit disorder (ADD); he was eligible for and received special education and related services from the Conrad Weiser Area School District (CWASD). Cplt. at ¶ 69; Exh. 103: Luckenbill's 10/31/97 CER at 1, 3, 5.

96.     Sam also was identified as a gifted student with exceptional reasoning aptitude and ability to think creatively and abstractly. Sam's learning disabilities significantly affect his educational performance, graphomotor skills and written expression. Cplt. at ¶ 70; Exh. 24: Luckenbill Depos. at 212.; Exh. 103: Luckenbill's 2/16/96 Psychological Re-Evaluation at 2; Exh. 103: Piazza 11/14/02 Psychological Evaluation at 7.

97.     Additionally, Sam has experienced emotional difficulties that affect his learning: anxiety, avoidance, confusion and anger arising from poor performance that compound his academic problems. Cplt. at ¶ 70; Exh. 103: Luckenbill's 2/27/97 Speech/Language Evaluation at 2; Exh. 103: Luckenbill's 2/16/96 Psychological Re-Evaluation at 2, 3, 5.

98.     Sam's parents have taken a variety of actions to counteract the CWASD's refusal to provide their son with a FAPE in the LRE, including:

a.     seeking redress through the due process avenue (Nov. 1990; July, 1994; June, 1996);

b.     seeking redress through the courts of the Commonwealth (Feb. 10, 1992).

31

c.      seeking redress through Special Education Mediation  (Fall, l992, Mar. 1997); and

d.      participating in this class action litigation.

99.      Sam first enrolled in CWASD in 1989, and, following an MDE, he was identified as mentally gifted.  The MDE determined that Sam was gifted but nonexceptional, and the district only offered him gifted services.  Exh. 103: Appeals Panel Decision No. 628 at 1. Sam's parents withdrew him from the public school because of the district's  insistence that Sam was a nonexceptional student and its refusal to provide special education and related services for his learning disabilities and ADD.   They instructed Sam at home for six months. Cplt. at ¶ 71; Exh. 103: Luckenbill's 10/31/97 CER at 1.

100.      After the six months of home instruction, the family re-enrolled Sam in CWASD. The district conducted an MDE, recommended that he be placed in a gifted program and refused Sam the supplementary aids and services that he needed to accommodate his learning disabilities and ADD.  The parents requested a due process hearing. Cplt. at ¶ 72; Exh. 103: Luckenbill's 10/31/97 CER at 1.

101.      The Special Education Appeals Panel, as affirmed by Commonwealth Court, determined that Sam had a specific learning disability in written expression. Cplt. at ¶ 73; Exh. 103: Appeals Panel No. 628 at 2.  The district was ordered to develop an appropriate IEP that addressed both Sam's giftedness and his specific learning disabilities. Cplt. at ¶ 73; Exh. 103: Luckenbill's 10/31/97 CER at 1.

102.      Even after the ruling, Sam's teachers failed to provide him with specialized instruction and other supplementary aids and services in the regular class.   The regular teachers humiliated him in class, punished him for not completing regular assignments and refused to

individualize instruction for him. Cplt. at ¶ 75; Exh. 24: Luckenbill Depos. at 77 - 78; 138 - 139; 187 - 188; 228-229. Exh. 103: Psychological Re-evaluation 2/16/96 at 5; Exh. 103: Luckenbill letter to Berks Co. OVR at 2. Further, Sam's parents were told that he had no learning disability and should be able to do the regular classroom work without modification. Exh.24: Wendy Luckenbill Depos. at 72; 90 - 91; 138; 174 -175.

103.    The CWASD staff were not adequately trained to provide supplementary aids and to modify services to Sam, whose disability is complicated by his mental acuity, and refused or were incapable of modifying the instruction and materials. His teachers simply lowered the classroom expectations as they applied to him. Cplt. at ¶ 76; Exh.24: Luckenbill Depos. at 222, 229-230; Exh. 103: Luckenbill letter to Berks Co. OVR at 2.

104.     There was little collaboration and coordination between Sam's regular education and special education teachers. Sam's teachers did not know what Sam was capable of and what to expect from him. Cplt. at ¶ 77;  Exh.24: Wendy Luckenbill Depos. at 186-188.

105.    After this case was filed, the Luckenbills withdrew Sam from the public school, instructed him at home, and then enrolled him in the Upattinas Educational Resource Center which he attended from school years 1994-1995 through1996-1997. Sam left secondary school without graduating.  Cplt. at ¶ 80; Exh. 103: Appeals Panel No. 628 at 3; Exh. 103: Luckenbill's 10/31/97 CER at 3.  Exh.105: Luckenbill's Supplementary Interrogatories at 2; Exh. 103: Rice letter 11/8/02 at 1.

106.    Because PDE has failed to ensure that Sam received a FAPE, Sam has suffered serious harm and his future has been compromised. Cplt. at ¶ 81.  His experience with CWASD was traumatic.  Many of Sam's evaluations refer to the detrimental effects of his mistrust for

CWASD.  Exh. 103: Psychological Re-Evaluation 2/16/96 at 4.  He experienced behavior problems and frequent absenteeism that resulted from his frustration and inability to meet school requirements.  Exh. 103: Luckenbill's 2/27/97 Speech/Language Evaluation at 2. Sam has been diagnosed with Post-Traumatic Stress Disorder.  Exh. 103: Psychological Re-evaluation 2/16/96 at 5; Exh. 103: Piazza's 11/14/02 Psychological Evaluation at 1-2.

107.    The devastating social, psychological and economic effects of Sam's mis-education continue.  He attended Reading Area Community College and Burlington College in Vermont, but experienced the same difficulties that he had in high school.  Sam was not successful in college because he lacked the endurance and skill to complete much of the course work.  Exh.105: Plaintiff's Responses to Defendants' Supplementary Interrogatories at 2; Exh. 103: Rice letter 11/8/02 at 2; Exh. 103: Luckenbill letter to Berks Co. OVR at 1.

108.    Sam is not in school and has not been able to secure employment.  Exh. 103: Piazza's 11/14/02 Psychological Evaluation at 1.  Sam's has experienced a loss in self-esteem and depression.  Exh. 103: Instructor Evaluation Gary Steller 5/16/01 at 1; Exh. 103: Piazza's 11/14/02 Psychological Evaluation at 6; Exh. 24: Wendy Luckenbill Depos. at 38-40; 219-220; Exh. 103: Luckenbill letter to Berks County OVR at 2.

109.    Plaintiff BRETT MICHAEL KONESKI, at the time the complaint was filed, was a seven year old student in the Wilkes-Barre Area School District ("WBAST").  Brett has Down Syndrome.  Brett's parents chose to live in Wilkes-Barre because of the high quality of the district schools, and their dream was that Brett would attend his home school with his neighborhood peers.  Cplt. at ¶ 116.

110.    Brett received early intervention services and therapies, attended preschool and

made great progress. In May, 1993 Brett's parents asked the school district to educate him in regular kindergarten with support at his home school, Kistler Elementary, and the district agreed. By the fall of 1993, when he was six, he demonstrated virtually the same academic achievement as a typical beginning kindergarten student. Cplt. at ¶ 117 and 118.

111.    In September, 1993, the district assigned Brett to a new teacher who had never taught kindergarten before; unknown to the Koneskis, the other kindergarten teachers had refused to have Brett in their class. Cplt. at ¶ 118; Exh. 116: Koneski Answers to First Set of Interrogatories at 10 and 12.

112.    The school district promised to provide Brett with the supplementary aids and services he needed to succeed in regular class, including specially designed instruction and materials, integrated therapies (physical and occupational therapy and speech and language) in the regular classroom, peer tutoring and regular team meetings. Cplt. at ¶ 119; Exh. 116: Koneski Answers to First Set of Interrogatories at 4.

113.    Brett began school at Kistler Elementary School in September 1993. None of the promised supplementary aids and services were in place. On Brett's first day of school, the vice-principal called his mother to come get him because of his "uncontrolled behavior." The following week, the Koneskis learned that the related services on Brett's IEP (occupational therapy and speech therapy) were not available. They became aware that school personnel were regularly using four-point physical restraint with Brett, restraining all four limbs at once. Cplt. at ¶ 120; Exh. 115:Teacher's Week of 09/20/93 Notes.

114.    On September 28, 1993 a meeting was held at the Koneskis' request to revise Brett's IEP. The revision stated that a written behavior management plan utilizing positive

approaches would be developed for Brett; that all staff, including teachers, aide and related service personnel would be trained in the implementation of the plan; that the curriculum would be adapted for Brett; that the classroom aide would be trained to assure meaningful participation for Brett in all classroom activities; and that all school personnel working with Brett would receive training in inclusion, curriculum adaptation, disability awareness, positive approaches and integrated therapies. The school district agreed to request the necessary training from PDE. Cplt. at ¶ 121; Exh. 115: IEP 09/28/93 Revision.

115.    On October 12, 1993 the Koneskis filed a complaint against the school district with PDE's Division of Compliance on challenging the district's physical mistreatment of Brett and use of restraints. Cplt. at ¶ 120. They also requested technical assistance for Kistler elementary staff on Gateways inclusive practices and best practices for inclusion, adaptations to the curriculum, disability awareness, positive approaches and integrated therapies. Exh. 115: Koneski 10/12/93 letter to Roger Hayden.

116.    On October 20, 1993 the district was contacted by PDE and referred to the Statewide Support Initiative-Early Childhood specialist in Intermediate Unit 18. Exh. 115: Keenan 10/20/93 letter to Michael Koury.

117.    The Koneskis elected to withdraw their complaint after the district requested technical assistance from PDE and PDE referred the school district to the Statewide Support Initiative-Early Childhood specialist in Intermediate Unit 18. Cplt. at ¶ 122. Exh. 115: CER of Brett Koneski (10/19/93). The Koneski's decision to withdraw the complaint was confirmed by PDE's Division of Compliance on November 15, 2003. Exh. 115: Aliberto letter (11/15/93) to Koneskis.

118.     Despite the agreement between the district and the parents and the Koneskis' own persistent advocacy, the school district failed to implement Brett's IEP. The teacher and aide were unable to adapt assignments for Brett and implement his IEP in the regular classroom. In February, 1994, Brett's teacher reported that although Brett's behavior no longer was a problem, he was failing academically, he was not communicating with his peers, he was being humiliated in the classroom and the parents' insistence on his inclusion in regular class amounted to "child abuse." The teacher admitted that he was not in sympathy with inclusion of children with Brett's disabilities in regular classes and that he still did not know how to teach Brett. Also in February, the Koneskis learned that the aide assigned to Brett did not have a copy of his IEP. Cplt. at ¶ 123; Exh. 115: Koneski letter (02/22/94) to Jeff Namey.

119.     District personnel were unable to deliver integrated therapies successfully and the Koneskis agreed reluctantly to allow the therapies to be delivered in a separate therapy room. On at least one occasion, Brett was left in a physical support classroom where he sat with nothing to do. Brett's teacher and aide continued to regard him as an outsider in the class, demonstrated little respect for his personhood or dignity, and failed to treat him as an equal of the other children. On one occasion, Brett's clothes were removed in the library area of his kindergarten classroom and he was walked through the room and down the hall to the nurse's office by his classroom teacher and aide, unclothed (although there was a private bathroom in his class). Cplt. at ¶ 124.

120.     In March 1994, the district sent a letter to Luzerne County Intermediate unit staff requesting that Brett not be allowed in their physical support classroom. Exh. 115:Koury letter (03/01/94) to Fahmy.

121.     Brett's May 27, 1993 IEP provided for Physical and Occupational Therapy as part

of his related services. Exh. 115:IEP (05/27/93) of Brett Koneski.

122.    Brett became fearful, easily upset and resisted going to school or entering his kindergarten class. In March, 1994, defeated by the district's failure to provide their son an appropriate education, the Koneskis decided not to return Brett to Kistler. On March 30 and at the request of the parents Brett was transferred to another school, Dan Flood Elementary and placed in a kindergarten class taught by a teacher who had prior experience (not in the district but in a Head Start program) working with children with special needs. There was no special "program" at Dan Flood for teaching children with Brett's educational needs, but only more acceptance of his presence in regular class. Cplt. at ¶125; Exh. 116: Plaintiff Brett Michael Koneski Answers to First Set of Interrogatories at 5.

123.    Due to PDE's failure to provide adequately trained personnel and technical assistance to Kistler Elementary staff, Brett was kept at home without a program from March 3, 1994 to April 5, 1994. Exh. 115: Plaintiff Brett Michael Koneski Answers to First Set of Interrogatories at 14.

124.    Due to the problems Brett experienced at Kistler, he developed a reputation as a 'problem child.' Prior to his placement at Dan Flood, and contrary to the district's normal practice of assigning students, a meeting with the district superintendent was called by staff at Dan Flood to discuss concerns about Brett. Id., at 17.

125.    Brett began classes at Dan Flood on April 6, 1994. Id. Due to PDE's failure to provide technical assistance to staff at Kistler and the resultant problems, Brett was very apprehensive and fearful about interacting socially at Dan Flood. Id., at 17-18.

126.    On March 30, 1994, while Brett was at home awaiting placement at Dan Flood,

the Koneskis filed a second complaint with PDE charging that the provisions in Brett's IEP requiring teacher and staff training in positive behavioral approaches, integrated therapies and curriculum adaptations had not been implemented. They further alleged that rather than a planned program of positive behavioral strategies as called for in the IEP, the school district used a time out chair. The Koneskis asked PDE to assure that PDE assure that personnel at Kistler Elementary School were trained in inclusion, disability awareness, adaptations to the curriculum, best practices and implementation of Brett's IEP.  Cplt. at ¶ 126.  Exh. 115: Koneski letter (03/30/94) to Roger Hayden.

127.    On April 8, 1994, PDE confirmed receipt of the Koneski's complaint. Exh. 115: Hayden letter (04/08/94) to Koneskis.

128.     The Koneskis received no further response and called PDE on June 7, 1994. Roger Hayden, the PDE staff member assigned to the complaint and the author of the April 8, 1994 letter, said that he was unaware that a second complaint had been filed.  Cplt. at ¶ 127. Exh. 115: Koneski letter (08/22/94) to Roger Hayden.

129.    After the commencement of this action,  PDE closed the Koneski's complaint. PDE found that despite the evidence, the school district was in compliance with inclusionary practice standards because training had been offered.  Exh. 115: Bureau of Special Education Complaint Investigation Form (01/12/95).

130.    On April 30, 1994, the Koneski's filed a complaint with PDE about Brett's kindergarten teacher at Kistler, Mr. Rau.  Mr. Rau was reassigned to Dan Flood for the 1995-96 school year. Exh. 115: Telefax to Judy Gran.

131.    On November 1, 1995, PDE dismissed the Koneski's complaint against Mr. Rau,

citing a 'lack of probable cause.' Exh. 115:Myers letter (11/01/95) to Koneskis.

132.    Brett continued to experience problems within the district. WBAST ordered the LEA not to provide an aide for Brett at his June 1994 IEP meeting; Occupational therapy was delayed by 11 sessions; speech therapy was delayed as well; and, technical assistance in the Canon Communicator system was not provided to district staff. Exh. 116:Plaintiff Brett Michael Koneski Answers to First Set of Interrogatories at 4.

133.    On May 5, 2000, when Brett was in sixth grade, Dr. Christopher Kliewer observed his school program. Dr. Kliewer found that there was a lack of collaboration between regular education and special education teachers. He also found that Brett, who continued to be a student at Dan Flood elementary, was capable of initiating conversation and was quick witted, engaging and articulate. Dr. Kliewer also found, however, that the district failed to provide adequate inclusionary supports to the classroom teachers. Exh.54: Kliewer 09/28/00 Report on Koneski.

134.    Dr. Kliewer recommended redevelopment of Brett's IEP to emphasize how school structures would support Brett's active participation; development of collaboration between special and regular education faculty; and support for teachers with different teaching modalities. Id.

135.    Plaintiff MICHAEL WINTERING, at the filing of the complaint, was a 13-year-old student living in the Philadelphia School District ("PSD"), but attending a parochial school. Michael was identified as gifted and as having pervasive developmental disorder-not otherwise specified (PDD-NOS), a disability that is part of the autism spectrum. Although Michael's diagnosis of PDD-NOS was made when he was two years old, the PSD refused to provide

services appropriate to accommodate this disability. Cplt. at ¶¶ 129 and 131; Wintering Responses to First Set of Interrogatories at 4.

136. As early as the 1987-1988 school year, the parents tried to obtain the supports and services that Michael required to address his unique needs. Initially, the PSD acknowledged only that Michael was gifted and resisted any other medical or clinical analysis that identified him as a student with a disability in the autism spectrum. Cplt. at 131; Exh.119: Wintering Responses to First Set of Interrogatories at 5 including the Notes from Mr. Wintering.

137. Michael's difficulties in the emotional support class became so serious that his parents withdrew him from school, taught him at home for eight months, and, in January, 1994, placed him at a private school, St. Helena, without any supports and services from the Philadelphia School District. He finished the school year at St. Helena's in a regular class with no support other than acceptance and understanding by his teachers. The only supports and services that Michael received were those provided by the parents through the family's own resources. Cplt. at 135.

138. Because the district ignored the family's requests for an appropriate evaluation and services, the family removed Michael from the public school setting. During the time that Michael attended parochial schools, he did not receive any special services from the PSD. The counseling, behavioral counseling, occupational therapy and transition services that he received were provided through the parents' medical insurance and other personal resources. Exh.119: Wintering Responses to First Set of Interrogatories at 4 and 5.

139. Because the district failed to provide Michael a FAPE, he finished 11th grade in the public school failing most of his subjects, and the parents were forced to send him to a private

school – Mill Creek – in the Summer of 1998. Because the experience was successful and because the PSD had still not prepared an IEP, the family decided that Michael should remain at Mill Creek for his 12th grade – the 1998-1999 school year. Exh. 119: Wintering Responses to Sixth Set of Interrogatories at 14; Exh. 118: Hearing Officer Decision at 3.

140. Michael completed his 12th grade at Mill Creek and graduated in June 1999. Mill Creek developed an IEP for Michael that provided him with group counseling 3 times per week for 20 minutes; and 3 times a week after lunch for 25 minutes. He had group therapy once a week and substance abuse counseling 1-2 times a week. Family counseling and crises management were provided on an as needed basis. At Mill Creek each of Michael's problems were addressed individually. The process helped him learn socially and academically. Exh.119: Wintering Responses to Sixth Set of Interrogatories at 14.

141. In 1999, the family filed for due process seeking compensatory education for the summer 1998 and 1998-99 school year. A hearing was held from March 16 to May 7, 1999, resulting in a May 27 ruling that PSD had denied Michael FAPE. The hearing officer awarded compensatory education and tuition reimbursement. Exh. 118: Special Education Appeal No. 929, at 5. The appeals panel affirmed on July 19, 1999.

142. Michael spent the school year after graduation – 1999-2000 – in the City Year Program serving the Philadelphia community. He then went to Johnson & Wales University: Norfolk, Virginia campus where he received his Associate degree. The college's program in Virginia is very laboratory based, covering the basics of food preparation and kitchen management. Michael has been on the dean's list since he began his studies. He is now at the Providence campus of Johnson & Wales where he is learning more of the theoretical concepts.

Michael is on target to receive his B.S. degree in culinary nutrition in May 2004. Exh. 119: Wintering Responses to Sixth Set of Interrogatories at 4.

143.    LISA McCANN, a the time the complaint was filed, was a 9-year-old student in the Cocalico School District ("CSD") with a classification of severe mental retardation who sometimes displays challenging behaviors. She was placed in a multiply handicapped support class operated by Intermediate Unit 13, in another school district that was approximately a 45 minute bus ride each way. Lisa's disability manifests itself in self-abusive and aggressive behavior whenever she feels stress. Cplt. at ¶ 51 and 83; Exh. 106: Behavior Management Plan 1/16/96 at 1.

144.    Lisa began her education outside of her home district at Carter and McRae, an educational program operated by the Lancaster-Lebanon I.U. 13. CSD made no attempt to include Lisa in her neighborhood school denying her the opportunity to interact with the children in her community. In spite of the fact that Lisa is very active, loves to run and play, and likes to play with other children, she lost the opportunity to develop friendships with the children in her immediate community because she did not attend school with them. Friendships with neighborhood peers would afford Lisa the chance for additional social growth after school hours, during weekends, and during holiday and summer vacations. Lisa's neighborhood friendships would be strengthened by the additional contact she might have had with her classmates and the socialization benefits to Lisa would have increased correspondingly. The physical distance between Lisa's home and the homes of the students in Carter and McRae provided fewer opportunities for these benefits. Cplt. at 51; Exh.25: McCann Depos. at 9-10, 114-115, 123.

145.    Rather than include Lisa, the district always maintained that it did not have an

appropriate class for her and refused to educate her. Exh. 106: Hearing Officer Decision 5/28/93 at 6; Exh.25: McCann Depos. at 125. While Reamstown Elementary was only a short walk from her home, Lisa was placed at Carter and McRae outside of her home district. Lisa spent approximately 45 minutes each way to and from the school. The long bus ride was so stressful for Lisa, who has difficulty sitting still, that she had to be strapped to her seat. The combination exacerbated her challenging behaviors and tendency toward self-abuse. At times, Lisa was not properly strapped to her seat, and despite her parents' requests for a bus aide, none was provided. Cplt ¶¶ 51, 52, 53; Exh. 106: Hearing Officer Decision 5/28/93 at 2-3; Exh. 106: Hinkle's Evaluation 3/94 at 2; Exh:25: McCann Depos. at 9-10, 41-42, 106-107, 158-160.

146.    Additionally, the distance Lisa had to travel to get to school caused her to miss approximately 15 minutes of her inclusion time each day in homeroom, one of her few opportunities for inclusion that she had, due to the time it took for the bus to drop her off at school. Exh. 25: McCann Depos. at 29, 190-191.

147.    In 1990, Lisa acquired a bone infection from an episode of biting and spent a month in the hospital. Lisa's teachers did not have sufficient training on behavior modification nor would they follow the mother's suggestion to provide Lisa with a chew toy as an alternative. It is ironic that PDE found that there were no non-compliance issues following the investigation of Mc Cann's complaint in 1990 when she complained that the therapy ball and barrel were not being used and asked for her teacher to be trained on the proper use of the barrel. Exh. 106: PDE's 04/05/90 Interim Complaint Closure Report at 1-2. Ms. McCann made a surprise visit to Carter and McRae, the segregated placement which Lisa's mother had vigorously opposed, she found Lisa stuffed inside the same huge plastic therapy barrel. It took Ms. McCann five hours to

calm her traumatized daughter who "was pinching and biting herself and crying." Exh. 106: Hinkle's Evaluation 6/92 at 1; Exh. 25: McCann Depos. at 72-73 and 79-80.

148.    The district has consistently, and with PDE's compliance and consent, limited Lisa's therapies without consideration of her needs by restricting the input from the therapist at the IEP meetings and terminating contracts to I.U. staff and therapists who spoke on Lisa's behalf.  The problems with the I.U. became so intense that she asked for and obtained the consent of defendant PDE to participate in an IEP meeting.  However, when the I.U. staff refused to conduct the meeting with a PDE Division of Compliance representative, PDE's representative left Ms. McCann alone to meet with 18 to 20 I.U. staff to discuss their refusal and/or failure to follow Lisa's MDEs and IEPs.  Exh. 25: McCann Depos. at 71-78.

149.    Lisa's IEPs were not properly implemented or followed.  Lisa was not redirected when she mouthed objects or herself, and primary reinforcers were not used to decrease her pinching behavior.  The therapy equipment she used required a therapist to train staff on its use, but no therapist was provided and the equipment was not properly used as a result.  The school district's inconsistency in implementing and following Lisa's IEPs contributed to her problematic behavior, such as biting, and prevented her from being further included in regular education classes.  Cplt ¶ 58; Exh. 106:  Hinkle's Evaluations 6/92 at 1-3 and 3/94 at 1-3.

150.    Lisa's parents have taken a variety of actions to counteract the CSD's refusal to educate Lisa in her home school rather than send her to the segregated, our of district placement at Carter and McRae, operated by Lancaster-Lebanon I.U. 13, including:

> a.    seeking redress through the due process avenue (Hearing Officer Decisions dated 3/1/91,  5/19/92, 5/23/93, and Hearing Officer Agreement dated 12/21/94);

b.    seeking redress through PDE (Complaint Closure Reports, Interim Complaint Closure Reports, and Complaint Investigation Reports, 1/18/90 4/17/90, 5/2/90, 11/7/90, and 4/10/92); and

c.    participating in this class action litigation.

151.    In 1993, Lisa's mother requested a due process hearing was held to determine whether Lisa could be educated at her home school and whether she was integrated with non-disabled students to the maximum extent appropriate.  The hearing officer found that Lisa's challenging behavior was generally manageable in her mainstreaming opportunities and that she handled her integration periods well.  Exh. 106: Hearing Officer Decision 5/28/93 at 2 and 3. Without considering supplementary aids and services, the hearing officer ordered the school to include Lisa in regular education classes for three periods of 30 minutes each per day.  Cplt ¶¶ 55, 56 and 57; Exh. 106:   Hearing Officer 5/28/93 Decision at 11.

152.    The school district resisted the order.  Although she had been in a special kindergarten class before the Hearing Officer's order was issued, the district insisted on abruptly "promoting" Lisa to third grade, an action that seemed designed to ensure her failure and attribute that failure to Lisa and her inability to be included. Exh. 25: McCann Depos. at 100-101.

153.    Defendant PDE was aware of all of the problems that the family had in ensuring that Lisa had filed multiple complaints with the Division of Compliance and because the U. S. Office of Civil Rights found the Lancaster-Lebanon I.U. 13 to have violated Lisa's civil rights. Exh. 106: Bureau of Special Education. 1/18/90, 4/17/90, 5/2/90, 11/7/90 and 4/10/92 Reports; and U.S. Office of Civil Rights 06/06/1991 Finding; Exh.  25: McCann Depos at 71-74, and 88.

154.    PDE closed one of Ms. McCann's complaints claiming that the use of passive restraints had been corrected by the I.U. and directing the family to contact the U. S. Department

of Education for a review of the decision. In response to Ms. McCann's complaints to the Office of Civil Rights, the U.S. Department of Education conducted an investigation which included an on-site visit to Lisa's school. The Office of Civil Rights found that Lisa, as a qualified person with a disability, was covered under Section 504. The Office found that I.U. 13 did violate Lisa's civil rights by failing to provide reasonable accommodations, failing to notify her parents of their procedural safeguards, and by discriminating against the her in a retaliatory manner. The Office considered that, in making her allegations, Lisa had established the basis for a prima facie case of discrimination on the basis of her disability. Exh. 106: U.S. Office of Civil Rights 06/06/1991 Finding at 1-2.

155. The school district and I.U. point to Lisa's distractibility and challenging behavior as reasons why she cannot spend more time in a regular class. However, they failed to provide Lisa with an appropriate program of positive behavior management, thereby preventing further opportunities for inclusion. Cplt ¶ 58; Exh. 106: Hinkle's Evaluation 6/92 at 3.

156. Lisa's education has been good or bad solely at the whim of the staff who has worked with her. In middle school, Lisa did not have adequate opportunities to learn in her classrooms. She was segregated and could not move around school as freely. Presently, she is in high school, and her mother considers that she is receiving a better education than previously because the principal of her high school is accommodating and open to suggestions. Exh. 108: McCann Supplemental Responses to Interrogatories at 14 and 18; Exh. 25: McCann Depos. at 63-69.

157. Kristen Guare, plaintiffs' expert, observed Lisa in her educational program on different occasions over a period of seven years: first at Carter and McRae where Lisa attended

kindergarten, then at her neighborhood school, Reamstown Elementary, and finally in April 2000 at the Cocalico Middle School, where Lisa attended an intermediate class for seven students, all of whom were multi-impaired. Ms. Guare noted that in the middle school, there "was a day full of activities that filled time and wasted [Lisa's] day. [The staff] lacked imagination as well as function for the most part.... Inclusion does not exist and integration is at a bare minimum." Exh. 52: Guare 6/20/2000 Report on McCann.

158. The family has expended considerable resources in its attempt to assure Lisa a FAPE in the LRE, expending family savings and having the district defy hearing officer decisions and making little if any headway in its attempts. Exh. 25: McCann Depos. at 108-110 and 94-95.

159. Plaintiff, ELIZABETH MOSER ROYER at the time of the complaint was seven years old and was a student in the Lebanon School District. Cplt. at ¶ 93.

160. Beth has Down syndrome. She began her schooling in the Lebanon United Cerebral Palsy Preschool Program in infancy and subsequently was placed in the Preschool Special Education Program operated by Intermediate Unit 13 in September, 1991. At her mother's request, when Beth reached kindergarten age she was enrolled in a regular kindergarten class. Cplt. at ¶ 93-94.

161. Although Beth was a resident of Lebanon, the I.U. rather than the Lebanon School District assumed responsibility for her kindergarten education and her educational plan was an I.U.-generated IEP. She was enrolled in a kindergarten-level special education "diagnostic" classroom but was to be there only between her arrival at school and when kindergarten class began, or when the kindergarten class was not in session. Beth received no supplementary aids and services in the regular kindergarten class, although she received the related services of speech

and language. Cplt. at ¶ 94.

162.    In April, 1993, the I.U. multidisciplinary team evaluation found that "the relatively higher developmental level of instructional activities [and] the lower staff-to-pupil ratio in kindergarten has seemed to cause an inordinate amount of academically non-engaged time for Beth." Nevertheless, the team agreed with Beth's mother that she had made progress in the regular kindergarten and was able to follow the classroom routine.  Cplt. at ¶ 95.

163.    Although Beth had made significant progress as an included student in the regular kindergarten even without supplementary aids and services, the I.U. multidisciplinary and IEP teams recommended that she be placed for first grade in a full-time self-contained special education classroom. The team offered no rationale for Beth's removal from regular class other than a need for a "low teacher-student ratio to focus on communication, academic, socialization and fine motor skills."  Beth's mother rejected the proposed placement and requested a due process hearing.  Cplt. at ¶ 96; Exh. 109: Lancaster-Lebanon I.U. 13 Multidisciplinary Evaluation/Reevaluation Report (05/14/93).

164.    On May 10, 1993, an independent behavioral assessment found that Beth was able to interact with other students in a regular education setting, compete school assignments without excess prompting, and follow classroom routines without any additional direction.  She did exhibit some disruptive behavior.  The report indicated that behavior would decrease if "there is an increase in adaptation to the standard curriculum and its related materials."  The report recommended an inclusive setting, and immediate addressing of Beth's oppositional behaviors. Provision of an instructional assistant to facilitate those goals was recommended.  Exh. 109: Behavior Assessment Addendum (05/10/93).

165.     On September 21, 1993 the district recommended that Beth be included in a regular first grade class with parallel curriculum modifications and specially designed instruction. Exh. 109: Elizabeth Moser NORA and IEP Team Report (09/21/93).

166.     When Beth started school in the fall of 1993 at Southeast Elementary School, the district had not yet hired an aide. The regular education teacher made clear to Beth's mother that she did not want her in her class. The teacher had no training in inclusion and asked Ms. Moser why she wanted Beth in the regular class when "she isn't grasping anything." The teacher was untrained in behavior management and did not know how to cope with Beth's occasional challenging behavior. The district finally hired a full-time aide for Beth but the aide left almost immediately.  Cplt. at ¶ 97; Exh. 109: Tulli letter (09/17/93) to Moser.

167.     On September 16, 1993, the school district developed an IEP for Beth defining her program as "supplemental intervention in the regular classroom." The IEP also committed the school district to "Implement Gateway inclusion practices with consultation of support staff to Beth's program and assignment." Despite the placement stated on the IEP, Beth's placement was in reality not "supplemental intervention in the regular class" but approximately half time in a special education class. On September 27, 1993 the parents requested Beth's full inclusion into a regular class with appropriate supports by January, 1994; training and technical assistance in inclusionary practices; a trained aide; curricular modifications; behavioral, speech/language, and occupational therapy supports.  Exh. 109: Gran letter (09/27/93) to Harry Garman. The district agreed to do so, and based on that agreed, the due process hearing was dismissed on October 11, 1993.  Cplt. at ¶ 99; Exh. 109: Prouser letter (10/11/93) to Andrew Klein; Exh. 109: Elizabeth Moser IEP (09/21/93).

168.    The district failed to fully include Beth by the January 1994 target date.   As the school year went on, the district was unable to include Beth for additional subjects and she remained in the separate special education class for approximately half of her school day. In February, 1994, the district gave Ms. Moser a Notice of Recommended Assignment (NORA) assigning Beth half-time to a regular class and half-time to a learning support class. An I.U. special education teacher, not a district teacher, had responsibility with the principal for seeing that Beth's IEP is implemented. In the second half of the year, Beth ceased to have recess with her first grade classmates but went to recess with the other I.U. students. Cplt. at ¶ 100.

169.    Because of the district and I.U.'s failure to provide Elizabeth with full inclusion with appropriate supports as specified by her IEP, her academic skills did not develop as they should.  Cplt. at ¶ 101.   A November 1993 curriculum assessment found that Beth could not state her last name, age, birthday, parents names or address; could not recite the days of the week; was unable to recite the alphabet or rote count past six; and did not exhibit age appropriate fine, gross, or oral language skills.  The assessment did find that she had strong work habits, exhibited appropriate behaviors and conversed well with teachers and her peers.  Exh. 109:Lancaster-Lebanon I.U. 13 Curriculum Assessment (11/19/93).

170.    In violation of the IEP, the school district failed to provide behavioral support. As a result, Ms. Moser pay for behavioral support privately. The principal of Beth's school acknowledged to Ms. Moser that the district did not have enough resources for training. Cplt. at ¶ 101; Exh. 109:IEP.

171.    In June 1994, the school district recommended continued placement half time in regular education and half time in a separate special education class. The district's justification was

that many of the staff who were working with Beth had left and the new staff would need to be trained to work with her. Ms. Moser asked that Beth receive integrated speech and language therapy. The Intermediate Unit speech therapists refused to agree to the integrated therapy model, and Ms. Moser privately paid a speech therapist to work with Beth and her classroom teacher. Cplt. at ¶ 102.

172. Evaluations done in 1994 and 1995 found that Beth had pre-reading skills; could rote count only to six; recited the alphabet to J and could sight name numerals 1,2,3. The report found that Beth showed continued improvement in cooperation, classroom behaviors and social interaction. Exh. 109:Lancaster-Lebanon I.U. 13 Progress Report (11/08/94; 02/95).

173. For courses in which she participated in special education, Beth's 1995-96 student progress report indicated deteriorating attitude toward cooperation, preparation and attentiveness in an academic setting. In courses where she was included, Beth's record showed consistent demonstration of appropriate levels of competence. Exh. 109:Cornwell-Lebanon Student Progress Report 1995-96.

174. On April 17, 1996, the I.U. prepared a behavioral support plan for Beth. The report found that Beth needed behavioral support in complying immediately to requests/directives. The report recommended training and technical assistance be provided to instructional staff. Exh. 109:Lancaster-Lebanon I.U. 13 SSI Consultation & Technical Assistance Report (04/17/96).

175. On May 30, 1996 the school district prepared an IEP for Beth. The district's evaluation recommended that Beth be included in regular education 54% of the day, in speech/language therapy 2% of the day, and in learning support for reading, math and language arts for 44% of the school day. Exh. 109:Elizabeth Moser 1996-97 IEP (05/30/96).

176.     PDE has failed to ensure that Beth receives adaptive testing, speech/language services; and that instructional and support staff receive adequate training.  Exh. 111:Plaintiff Beth Moser Royer's Supplemental Responses to Defendant's Interrogatories at 3-4.

177.     In October, 2000, plaintiffs expert, Christopher Kliewer, Ph.D., conducted a school observation and document analysis of Beth's educational program.  He found that Beth was academically segregated and, moreover, that while her 1999-2000 IEP indicated that she spends some 71% of her day in regular classes, she is "primarily place in self-contained, traditional special education classes and resource rooms for the brunt of her academics"and isolated from her peers.  Exh. 55: Kliewer Oct. 2000 Report on Elizabeth Moser.

178.     Dr. Kliewer noted in his observations that "Elizabeth has learned to appear to be helpless" because of a lack of real modifications in her educational program in the regular education classroom.  The differences in Beth's performance when she received an accommodation for an assignment in her tutorial resource room that she had been given in her regular education class without an accommodation was remarkable.  Dr. Kliewer's description of the activities was a clear affirmation of Beth's potential for learning.  Exh. 55: Kliewer Oct. 2000 Report on Elizabeth Moser.

179.     At the beginning of the 10th grade school year, Beth's parents requested a due process hearing to provide her with FAPE in the LRE.  Previously, they had made informal agreements with the school district, but technical assistance and training was not provided.  Exh. 111: Plaintiff Beth Moser Royer's Supplemental Responses to Defendant's Interrogatories at 4-5.

180.     Beth has just completed 10th grade at Cedar Crest High School in the Lebanon School District.  During her tenth grade year, she spent the majority of her day in special

education or community based instruction. Exh. 111: Plaintiff Elizabeth Moser Royer's

Supplemental Responses to Defendant's Interrogatories at 3.

181.     Plaintiff ANNE CORR, at the filing of this complaint, was a 10-year-old identified

as a student with autism, and therefore eligible for and receiving special education and related

services from her home district, North Hill School District (NHSD). Anne does not speak, but

communicates with facilitated communication, yes and no gestures and signs. At times, Anne also

exhibits challenging behavior when she becomes frustrated. Cplt. ¶ 105; Exh. 112: EPSDT Re-

Evaluation Report 11/03/95 at 7.

182.     Anne's parents have taken a variety of actions to counteract the FSD's refusal to

provide their daughter with a FAPE in the LRE, including:

a.      seeking redress through PDE (Complaint Investigation Reports dated
        5/8/95, 1/2/96, and 5/7/97);

b.      participating in the due process system; and

c.      participating in this class action litigation.

183.     In the fall of 1992, and at the Corrs' request, Anne entered the NHSD, where she

was placed in a Life Skills classroom with six other children with significant disabilities. The

school district is also a GATEWAYS site. In June, 1993, and at her parents' request, an IEP was

developed for Anne providing that she would be included 82% of the time in regular classes with

supplementary aids and services. Anne was also to be provided with assistive technology devices

to enable her to communicate. A Statewide Support Initiative (SSI) consultant was to provide

technical assistance to Anne's team. However, the school district failed to train its staff on how to

provide the supplementary aids and services in Anne's IEP. The school district also failed to

implement the recommendations of the SSI consultant. In response, the Corrs contacted defendant Michelle DeSera with the request that she investigate the problems and take corrective action. Cplt. at ¶¶ 106, 107, 109; Exh. 112: Corr's 6/10/93 IEP at 1,4, 8, 9; Exh. 112: GATEWAYS 11/30/93 Memorandum at 2.

184.    On October 4, 1993, Ms. DeSera and the director of the GATEWAYS project made a site visit to the NHSD, and on November 30, 1993, the GATEWAYS director transmitted a report with recommendations to the superintendent of the school district. The report found that not all staff who worked with students with disabilities were aware of ways to approach and communicate with these students; that there was a need for training in assistive technology, positive approaches to challenging behavior and accomplishing inclusion, including curriculum modification and adaptations. However the recommendations made in the report were not implemented and Defendant PDE did not take action to ensure that the commitments made by the NHSD in exchange for its GATEWAYS grant were honored. Cplt at ¶¶ 109, 110; Exh. 112: GATEWAYS 11/30/93 Memorandum at 1-3.

185.    The principal of Anne's elementary school failed to ensure that Anne's teachers were trained in positive approaches to behavior management, and that regular education teachers were held accountable to deliver the supplementary aids and services in Anne's IEP. Anne's positive behavior management plan was not implemented as it was written either. Because Anne exhibited challenging behavior, the regular fourth grade teacher required her to keep one empty desk between herself and the other students in the classroom. Cplt. at ¶ 111; Exh. 113: Plaintiff's Response to Defendants' First Set of Interrogatories at 3, 6, 8, 10, 12.

186.    The school district continued to resist including Anne in regular education classes.

A Comprehensive Evaluation Report (CER) held for Anne on March 30, 1994 recommended increased inclusion in the regular class for academics. But the GATEWAYS consult wrote to Anne's school principal on May 23, 1994, that Anne's program was not being implemented consistently. So an IEP conference was held for Anne on June 10, 1994, but broke up when the principal refused to include Anne in regular classes for reading and language arts, although her CER found that she read at grade level. While the team members recommended co-teaching, the principal refused to agree to team teaching in his building. Cplt. at ¶113; Exh. 112: Corr's 3/30/94 CER at 1-2; Exh. 112: GATEWAYS 5/23/94 Memorandum at 1-2; Exh. 113: Plaintiff's Responses to Defendants' First Set of Interrogatories at 12-13.

187.    Due to the school district's attempts to suspend and expel Anne, the Corr's made multiple complaints to the Bureau of Special Education (BSE). The BSE's investigations from March and September 1995, and January 1996 all found that the school district had violated its duties with respect to Anne's education and ordered corrective action, including her reinstatement in her then current placement. Exh. 112: Complaint Investigation Reports from 5/8/95 at 1-2, and 1/2/96 at 4-5; Exh. 112 EPSDT Re-Evaluation Report 11/03/95 at 1-2.

188.    Because of PDE's failure to ensure that Anne receive an appropriate education, she was isolated and lost self-esteem due to her exclusion from regular classes. A communication device was not made available to her in a timely fashion. She was given no opportunities for socialization in her placement in the Life Skills classroom. Even in the "inclusive" fourth grade setting, Anne was given only minimal opportunities to socialize with nondisabled peers. The Corr's attempts to ensure a FAPE in LRE for Anne were met with continual resistance by the school district. Exh. 113: Plaintiff's Response to Defendants' First Set of Interrogatories at 18-

19; EPSDT Re-Evaluation Report 11/03/95 at 1.

189.    On March 7, 1997, the NHSD terminated the instruction in Anne's home program following a decision of the Appeals Panel in its favor.  Because the parents were in the process of filing a civil action to appeal of the Panel's decision, they filed a complaint with PDE.  The attorney representing Department argued that the action filed by the parents did not constitute an appeal of the Order, and PDE dismissed the complaint.  Exh. 112: May 7, 1997, Complaint Investigation Report.

190.    When the NHSD prevailed in the Third Circuit in the proceeding it initiated to change Anne's placement from her home district to a segregated placement for students with disabilities, Anne's parents home schooled her until she became 18 years old.  The Corrs continue to provide the same educational experiences and activities to Anne that they did before she reached the age of 18; however, they no longer furnish reports to the NHSD.  Exh. 114: Corr Supplemental Responses to Interrogatories.

191.    Plaintiff SARAH NOE, at the filing of this complaint, was a student identified with Down Syndrome, mental retardation, visual and hearing impairments, and, therefore, eligible for and receiving special education and related services from the Neshaminy School District (NSD).  When Sarah was five years old, the district classified her as educable mentally retarded (EMR).  From school years 1987-1988 through 1991-1992, Sarah was educated in a full-time self-contained EMR/Learning Support classroom within the school district, but not in her neighborhood school. Cplt. at ¶¶ 105 and 106; Exh. 121: Noe's 4/23/92 CER at 1; Exh. 28: Noe Depos. at 18.

192.    In school year 1991-1992, in response to her parents' requests for inclusion, the

district included Sarah in regular education classes for a mere 3% of her school day – in music class.  Cplt. at ¶ 106; Exh 121: Noe's 11/21/91 IEP at 1.

193.    In December 1991, Sarah's parents requested that Sarah's placement for the school year 1992-1993 be changed to Oliver Heckman Elementary School, the school Sarah would attend if she did not have a disability.  After numerous telephone calls and a follow-up IEP meeting, Sarah was moved to Oliver Heckman Elementary School beginning the first day of school 1992-1993 school year. Cplt. at ¶ 107 & 108; Exh.122: Noe's  Response to Interrogatories at 10; Exh. 28: Noe Depos. at 39-40.

194.    Although her parents had requested that preparations, like teacher training, be made during the remainder of the prior school, no such training occurred and the teachers and staff were given no training nor were any of the necessary modifications to classroom and curriculum made to accommodate her disability.  Further, teachers who were able to acquire the skills needed to work with Sarah were able to, and did, eventually provided her with an appropriate education.  Her social studies teacher even felt that more inclusion would be appropriate.  Cplt. at ¶ 108; Exh. 122: Noe's Response to Defendants' First Set of Interrogatories at 10; Exh. 28: Noe Depos. at 46-54.

195.    Because of the district's failure to adequately prepare for Sarah's transition into the middle school setting – no child with Sarah's level of need had ever attended the Neshaminy middle school – where she received special education instruction in functional reading and math, science, and social studies in a learning support class.  The less-structured environment and the lack of adequate preparation resulted in Sarah spending much of her time in the classroom coloring.  Cplt. at ¶ 109; Exh. 121: Noe's 5/19/93 IEP at 1-4; Exh. 121: Behavior Modification

Plans 12/96 at1 and 4, and 3/25/98 at 8; Exh. 121: Brown's 10/16/97 letter at 1-3; Exh. 28: Noe Depos. at 56 and 72-75.

196.    The special education teacher that was assigned to work with Sarah at Neshaminy previously had worked with students with learning disabilities, and, because of the inadequate training and preparation provided by the district, she and the other teachers were ill-equipped to meet Sarah's special education needs or to ensure the success of her educational program. Further, the teachers were unable to identify strategies to help Sarah modify her behavior or to develop appropriate behavior modification plans to help her manage her behavior.  Exh.28:  Noe Depos. at 76-80 and 106-109.

197.    Frequently, the district failed to implement the agreed-upon IEP.  Although Sarah's IEP identified that she would receive speech and language therapy, the parents frequently needed to remind them that this was a service that she was to receive.  Exh. 28: Noe Depos. at 26-27.

198.    Neither her regular nor her special education teachers had a clear understanding of why Sarah was in their classes or how to make adaptations to fit her needs.  Additionally, even in an inclusive setting like physical education, Sarah was always grouped with the other classified students and, regardless, of her skills, they were all treated alike.  For example, although Sarah is an excellent swimmer, the teacher insisted that she use inflatable swim aids.  Exh. 121: Guidance Department's 11/8/93 Memorandum at 1-2; Exh. 121: Strokovsky's teacher notes 11/93 at 2-3; Exh. 122: Plaintiff's Responses to Defendant's First Set of Interrogatories at 10; Exh 28: Noe Depos. at 109-111.

199.    In an effort to address these issues, Sarah's parents requested an IEP meeting in

October 1993. Finally, in February 1994, a meeting was convened, but the special education teacher, who had been appointed as the "lead" teacher of the team, was not in attendance. As a result, several key issues remained unresolved, including the development of a consistent behavior plan, and Sarah's marked regression in her math skills. Exh. 122: Plaintiff's Responses to Defendants' First Set of Interrogatories at 11; Exh. 121: ESY form 6/22/94 at 1. Sarah had difficulty progressing in math and needed ESY programs for both the summers of 1994 and 1995. Exh. 121: ESY form 6/22/94 at 1.

200.    In spite of repeated requests from the parents, the NSD failed schedule another IEP meeting. Nonetheless, Sarah's parents met with her teachers, instructional aides and NSD staff on an ongoing basis to make suggestions as to curriculum adaptations and modifications and behavioral interventions. They even provided NSD with information regarding the names of individuals who could deliver training to the NSD staff on educating exceptional students. Cplt. at ¶ 110-112; Exh. 121: Noe's 9/7/97 letter at 1-2; Exh. 121: Noe's 10/28/97 letter at 1.

201.    Throughout her school years at NSD, Sarah exhibited increasingly challenging behavior. Cplt. at ¶ 111. She continually had difficulty with defiant behavior and adapting to transitions at school. Sarah would frequently test her teachers' patience, and often cried in response to authority. Sarah would run away from authority figures, curse, tell people she hated them, and engage in other inappropriate behaviors at school. In one incident, she spent her entire lunch period on the cafeteria floor without NDS staff intervening. Sarah also used the "Time Out Room" with regularity. Her parents were concerned that she used the room to get out of class. Exh. 121: Noe's 5/19/93 IEP at 1; Exh. 121: Strokovsky's 11/93 letter at 1-3; Exh. 121: Behavior Modification Plans 5/19/93 at 1, 12/96 at 1 and 4, and 3/25/98 at 8; Exh. 121: Noe;'s

9/7/97 letter at 1-2; Exh. 121: Brown's 10/16/97 letter at 1-3; Exh 121: Noe's 10/28/97 letter at 1. Sarah continually told her parents that she hated school and it became increasingly difficult to get her to attend school each day.

202.    Sarah's parents believe that her behavior difficulties were a result of the school's inability to provide appropriate supplementary services, including behavior management and the staff's failure to learn from the success that her previous instructors had with Sarah. Because there was no follow through and her teachers did not use the resources in their own building, each year, the process started over again. Therefore, Sarah's gains were neither long lasting nor complete. Cplt. at ¶ 111; Exh.28: Noe Depos. at 115-119.

203.    The family made a deliberate decision not to go through due process because of the cost it would entail and because Sarah's mother works professional with monitoring programs for other students with mental retardation whom the district serves. Exh. 28: Noe Depos. at 86-88.

204.    TIFFANY ZIMENOFF, a the time the complaint was filed, was an 11-year-old student in the Neshaminy School District ("NSD"). Tiffany has Down Syndrome and the NSD classified her as "educable mentally retarded" and placed in a full-time self-contained "EMR" classroom at Albert Schweitzer Elementary. No other placement options were discussed with her parents. Cplt. at ¶ 147 and 148.

205.    Because her parents wanted Tiffany to have the same maturation experiences of any 11-year-old girl, they requested that her placement be changed to a regular kindergarten class in her home school, with part-time special education services for reading, math, and language in a self-contained setting. The district's refusal led to a request for due process. Cplt. at ¶ 148.

206.     Only after the due process hearing actually began did the district agree to provide any services in the regular education program – an afternoon session of the regular kindergarten program at Albert Schweitzer Elementary School with an instructional support aide and a half-day session of the "learning skills support program" – which the parents accepted as a compromise. Cplt. at ¶ 148; Exh. 124: 03/28/91 Settlement stipulation.

207.     In planning for the next school year, the NSD prepared a Notice of Recommended Assignment with a placement back into the full-time learning support classroom with mainstreaming only for music, art, gym, library.  The parents again requested a due process hearing, the result of which was for Tiffany to be educated in a regular first grade classroom, accompanied by an instructional support aide, with a pull-out program for reading and math. Cplt. at ¶ 149;  Exh. 124: Hearing Officer 09/18/91 Decision at 13-14.

208.     Because the order did not require Tiffany to attend her neighborhood school, the district opted to keep her at Schweitzer.  The parents filed a complaint with PDE's Bureau of Compliance which determined that Tiffany's program could be implemented in her neighborhood school.  However, because the learning support class at Tiffany's home school was full, Tiffany remained at Schweitzer.  Cplt. at ¶ 150.

209.     The parents filed a complaint with PDE at the same time they filed for administrative due process.  PDE concluded that the district was doing their best to provide her with a free appropriate education in the least restrictive environment, and that her mother was just never happy or satisfied with the district's efforts.  Exh. 125: Zimenoff's Response to Sixth Set of Interrogatories at 6; Exh. 124:  Bureau of Special Education Complaint Investigation Report, 10/16/91.

210.    Tiffany was the first child with a significant disability educated in the Neshaminy

school district. Tiffany began first grade with a teacher who did not know what to do for her, had

not seen her IEP, and did not know how to modify the curriculum to meet her needs. Tiffany's

desk was in a corner of the room surrounded by several adult-size chairs that were for the three or

four aides had been assigned to accompany Tiffany throughout the day. Cplt. at ¶ 151; Exh. 125:

Zimenoff's Response to Sixth Set of Interrogatories at 5.

211.    Prior to the filing of the <u>Gaskin</u> litigation, Tiffany was totally segregated classroom

at the insistence of the NSD and Intermediate Unit 22. After the commencement of the suit, she

was placed in her neighborhood school and her educational program was implemented by the

district. Exh. 125: Zimenoff's Response to Sixth Set of Interrogatories at 4.

212.    Tiffany and her mother moved to Colorado in December 1995. Tiffany now

receives an education at her local neighborhood school in Boulder. The majority of her classes

are regular classes where she is fully integrated with an instructional support aide and with

curriculum modifications, adaptions, instructional strategies and adaptive testing. Exh. 125:

Zimenoff's Response to Sixth Set of Interrogatories at 2.

213.    Since the family has moved to a more progressive state – OSEP ranks Colorado

third in ranking the States on the inclusion of children with disabilities as compared to

Pennsylvania which ranks 40[st] (Exh. 197: OSEP data - States' Rankings, 1998-99) – Tiffany

receives occupational therapy, physical therapy and speech-language within the regular classroom.

Special and regular education teachers all have access to the SUN team (a group of inclusion

specialists). She is given resource time to work on functional reading and math skills. Several

periods a week are spent on community based instruction such as travel training and work

experiences. Since the family moved to Colorado, they have not had to access the due process system nor the courts to obtain the benefits of the IDEA for Tiffany – a FAPE in the LRE. Exh. 125: Zimenoff's Response to Sixth Set of Interrogatories at 2.

214.   Tiffany was able to adjust to a fully included environment in her Colorado school. She was described as "a very social girl who gets along with kids and adults.  She is socially motivated and is able to bond and be empathic.  She has had a wide variety of experiences and is able to interact appropriately with all types of people." Exh. 124: Boulder Valley Public Schools Social 01/01/96 Work Adaptive Behavior Report at 3.

215.   Within two weeks of moving to Colorado, Tiffany was evaluated and found to have adjusted well to her new school.  She had made a close friend, exhibited appropriate behavior in class and was able to work independently in an inclusive environment.  Exh. 124: Boulder Valley School District Psychological Report (01/18/96) at 5.

## C.   STUDENTS WITH DISABILITIES, INCLUDING THOSE WHOSE DISABILITIES ARE MOST SEVERE, CAN BE EDUCATED SATISFACTORILY IN REGULAR CLASSES WITH SUPPLEMENTARY AIDS AND SERVICES.

216.   Students with disabilities – particularly students with significant disabilities including mental retardation, autism, significant orthopedic disabilities and multiple disabilities – must have opportunities to attend the schools they would attend if they did not have disabilities. Students with significant disabilities need opportunities to attend the schools that serve the preponderance of their peers without disabilities who live in their neighborhoods because, unlike students without significant disabilities who typically have "the social, physical, athletic and other attributes that allow them to attend schools that do not serve many students from their

neighborhoods and still develop the critically needed interpersonal networks in their communities," students with significant disabilities often do not have these skills.

> If they do not attend schools the preponderance of peers who are not disabled in their neighborhoods, it is virtually impossible for them to build relationships at school and then express them during nonschool days and times in their communities. Far too often the tragic result is social isolation, harsh pressures on family members, low self-esteem and underachievement.

Exh. 44, Report of Lou Brown, Ph.D. at 3.

217.    When students with disabilities are not given opportunities to attend schools with their neighborhood peers, they are harmed because this makes it extremely difficult, if not impossible, to provide instruction in the actual environments in which the students will or should function during nonschool days and times; it makes involvement in extracurricular activities much more difficult; it makes parent involvement more difficult; and it requires substantial time spent in transit which is usually not instructional time and therefor should be minimized.  Exh. 44,  Report of Lou Brown at 4-5; Exh. 2: Brown Depos. at 30-41.

218.    A substantial body of research and experience supports the conclusion that students with significant disabilities can receive meaningful educational benefit from being educated in regular education classes in home schools with individually appropriate supplementary aids and services. Exh. 44, Report of Lou Brown at 6-7.

219.    Students with disabilities should spend much time in regular education settings with nondisabled peers. Inclusion is important to students with disabilities for many reasons:

•    It is important for postschool success.

•    Natural proportions have positive effects.

- Better language-behavior-social models are available.

- Social relationships can be facilitated.

- Self-esteem can be enhanced.

- Natural supports are available.

- Cooperative learning and heterogeneous groupings are feasible.

- Increased opportunities for repeated practice of many skills are present.

Exh. 44, Report of Lou Brown at 9.

223.    A student is considered integrated, included or mainstreamed with children who do not have disabilities when:

- her intellectual, emotional, physical, social, behavioral and other uniqueness are recognized and addressed constructively;

- he is perceived as an insider who at times may leave rather than an outsider who visits, a Special Education student, a guest, a favor, a deal or a due process loss;

- she has opportunities to develop the same range of social relationships with peers who are not disabled she would if not disabled;

- Regular Educators are collaborating members of his IEP team, suggest goals and objectives and help design, implement and evaluate activities, teaching strategies, materials or groupings;

- she attempts to "look like", "be like", wear the same clothing and hair styles, etc. as classmates who are not disabled;

- he experiences many of the same after school and weekend environments, activities and relationships with schoolmates who are not disabled he would if not disabled;

- it is expected or assumed that she will be included in formal and informal activities with peers who are not disabled;

- schoolmates are shocked, hurt, angry, disappointed or cannot

understand if he is excluded from places or activities;

> • her peers know her well enough to sense when she is hurt, happy, down, what she is thinking and feeling.

Exh. 44, Report of Lou Brown at 9.

224.     The Pennsylvania Inclusion BEC  echoes these principles; see  ¶¶ 21-27 supra. PDE has made clear that the term "inclusion" means "more than ensuring the mere physical proximity between students with and without disabilities":

> It means that a student is truly a member of, not merely a visitor to, the class or group. Inclusion does not necessarily mean that a student never leaves the class or the group of students of which he or she is a part. As the Department uses the term, "inclusion" also means "supported inclusion," because the term implies that the student and teacher will receive the supports they need.

Exh. 182 at ¶ A.

225.     In almost all instances, if appropriate supplementary aids and services are arranged, students with disabilities can realize individually meaningful success in regular education settings without interfering with the achievement of non-disabled peers at reasonable costs. Exh. 44: Report of Lou Brown  at 6.

226.     Placing a student with significant disabilities in a regular education classroom in a home school "will not be educationally effective, unless it is combined with individually meaningful training and other extra supports." Exh. 44: Report of Lou Brown, Ph.D. at 18. Supplementary aids and services that can enable students with disabilities to be educated in regular class include the following strategies:

• Modifying curricula within general education classrooms.

• Developing social relationships between students with and without disabilities.

- Using family centered planning strategies.

- Using Multiple Intelligence theories.

- Implementing cooperative group teaching.

- Incorporating functional skills into curricula.

- Individualizing data collection techniques.

- Using positive behavior management strategies in general education classes.

- Developing collaborative partnerships between special and general educators to support students with disabilities in general education classrooms.

Exh. 44: Report of Lou Brown at 20; Exh. 58: Report of Gail McGregor, Ed.D. at 6.

Compare Exh. 34: Schrag Depos. at 112 (to instruct students with significant cognitive disabilities, regular education teachers need training in strategies "to deal with the ... challenges associated with a child's disability," including the need for self-help skills, specific social interactions and other functional skills).

227. The ability to make modifications to the general curriculum is a critical skill for teachers of students with significant cognitive or intellectual disabilities. For students with less severe disabilities, it is often possible to include the student with accommodations, which typically involve "modifying the environment [to] make it possible for the child to succeed." Modifications differ from accommodations or adaptations because they involve changing the content of the curriculum, for example by radically simplifying it. Students with significant cognitive disabilities need such modifications, and they can be included successfully in regular classes if their teachers have the knowledge and skill to modify the regular curriculum and instruction. Exh. 4: Carricato Depos. at 125.

228.    It is the responsibility of educational professionals to learn about, create and utilize the best available supplementary aids and services. "Ignorance of that which is constructive professional practice elsewhere is not acceptable." Exh. 44, Report of Lou Brown, Ph.D. at 6. The Pennsylvania Department of Education's Inclusion BEC affirms the same principle:

> The ability of students with disabilities to succeed has increased dramatically in recent years. Acquiring the skills and attitudes necessary to succeed with students with disabilities through inclusive practices is ever changing. Schools must become prepared to do what the profession, as a whole is capable of doing in the area of inclusion. In short, there is no respect for an argument that "Even if the school district over there can do it, my school district cannot." Nor are teachers permitted to refuse to implement an agreed-upon individualized education program.
>
> In the area of inclusion, there is a demanding relationship between law and practice. That is: We in the teaching profession determine, through our actions, the outer limits of what we can practice successfully; but once success in inclusion is achieved somewhere in the profession, increased capability should be replicated throughout the field.

Inclusion BEC, Exh. 182 ¶ D.

229.    A general professional guideline is that at least 80% of a special education student's time should be spent in regular education classes in elementary and middle schools, with the amount of time in regular class decreasing in high schools for students with significant intellectual disabilities, not so that they can spend time in special education classes but so that they can learn vocational and community living skills in real-life environments – the actual environments and activities in which they are being prepared to function when their school career ends. Exh. 44, Report of Lou Brown, Ph.D. at 10-16.

**D.    ACCORDING TO THE PENNSYLVANIA DEPARTMENT OF EDUCATION'S OWN EDUCATIONAL PLACEMENT**

**DATA, STUDENTS WITH SIGNIFICANT DISABILITIES
ARE DISPORTIONATELY EXCLUDED FROM THE
REGULAR CLASS**

230.     Each year, the Pennsylvania Department of Education must report data on the

educational placement of special education students to the United States Department of

Education, Office of Special Education Programs (OSEP). States are required to report, for each

classification of students with disabilities (including specific learning disabilities, mental

retardation, emotional disturbance, orthopedic impairment, multiple disabilities and autism), how

many students spend less than 21% of the school day outside the regular class; how many spend

20-60% of the school day outside the regular class; how many spend more than 60% of the school

day outside the regular class; how many are placed in separate public and private day and

residential schools for students with disabilities only; and how many are instructed at home or in a

hospital setting. OSEP publishes these data in an annual Report to Congress. The most recent

report, the 23d Annual Report to Congress on the Implementation of the Individuals with

Disabilities Education Act, was published in 2002 and includes the states' reported data for the

1998-99 school year. See Exh. 198, OSEP charts and graphs.

231.     Historically, Pennsylvania has ranked below the great majority of the states in the

percentages of students with significant disabilities who are educated in regular class for 80% of

the day or more. For example, in the 1991-1992 school year, Pennsylvania ranked 39th among the

50 states and the district of Columbia in the percentage of students with mental retardation placed

in regular class. Exh. 198: Excerpts from OSEP, Fourteenth Annual Report to Congress on the

Implementation of the Individuals with Disabilities Education Act at A-62. In 1998-99,

Pennsylvania ranked 40th. Exh. 198: Excerpts from OSEP, Twenty-Third Annual Report to

Congress on the Implementation of the Individuals with Disabilities Education Act.

231. In the 1991-1992 school year, Pennsylvania ranked 35th among the 50 states and the district of Columbia in the percentage of students with emotional disturbance placed in regular class. (Exh. 198, OSEP, Fourteenth Annual Report to Congress on the Implementation of the Individuals with Disabilities Education Act at A-63. In 1998-99, Pennsylvania ranked 44th. Exh. 198, OSEP, Twenty-Third Annual Report to Congress on the Implementation of the Individuals with Disabilities Education Act.

232. In the 1991-1992 school year, Pennsylvania ranked 46th among the 50 states and the district of Columbia in the percentage of students with orthopedic disabilities placed in regular class. (Exh. 198, OSEP, Fourteenth Annual Report to Congress on the Implementation of the Individuals with Disabilities Education Act at A-69. In 1998-99, Pennsylvania ranked 50th. Exh. 198, OSEP, Twenty-Third Annual Report to Congress on the Implementation of the Individuals with Disabilities Education Act. (Pennsylvania did not report data for students with autism or students with multiple disabilities in 1991-1992.)

233. Between 1992 and 1999, most of the states significantly increased the percentages of students with significant disabilities who are included for 80% or more of the school day in regular class. Pennsylvania also progressed, but not at the same rate as many of its sister states, and fell further behind. In assessing Pennsylvania's performance, it is important to note that even states with much higher proportions of students with disabilities who spend 80% or more of the day in regular class have been found out of compliance with IDEA's integration mandate by OSEP. Exh. 34: Schrag Depos. at 61.

234. PDE has acknowledged flaws in its system of collecting and reporting data on the

71

educational placement of students with disabilities. Prior to 2000, PDE considers that much of the reported data overestimated the amount of time that students with disabilities were placed outside the regular class. This was so because many local educational agencies (LEAs) did not understand that they were to report the amount of time that students with disabilities were educated with non-disabled peers, and not the amount of time that students with disabilities were, and were not, receiving special education support and specially designed instruction. As a result, some local education agencies reported that a student with disabilities was placed outside the regular class for more than 60% of the school day if that student was receiving specially designed instruction or other special education support, such as an instructional assistant in a regular classroom, for more than 60% of the day. Exh. 4: Carricato Dep. at 100-104; Exh. 6: Cordisco Depos. at 56-57; Exh. 34: Schrag Depos. at 131.

235.    School district administrators have been reluctant to report that students were pulled out of regular class for less than 21% of the school day because they equated that with receiving special education for less than 21% of the school day. "There was a time when funding was based on severities," and a reporting method that suggests that a student's disabilities are not significant enough to require removal from regular class for more than 20% of the day could pose a problem for school districts if Pennsylvania were to return to that funding method. Exh. 33, Schleyer Depos. at 23-27.

236.    PDE asserts that its data system is much improved since the year 1999-2000. It now collects data at the individual student level from school districts, rather than from the Intermediate Units, and it has done a significant amount of training of local school district administrators so that they have a better understanding of how they are to report placement data.

School districts are paying closer attention to data on educational placement and correcting the misunderstanding that placement means "how much service the kid got, not where the service was provided." Exh. 4 , Carricato Depos. at. 102-104.

237.    Individual school districts' data is not always reported accurately. In the past, the School District of Philadelphia over-reported students in full-time classes and under-reported students in Approved Private Schools. Exh. 4, Carricato Depos. at 107.

238.    Because PDE's previous data collection system overestimated the amount of time that students with disabilities spent outside the regular class, and neither the extent of the over reporting in the past nor the extent that the errors have been corrected is known, it is impossible to know how much of the progress PDE asserts that it has made since 1999-2000 is due to correction of the previous flawed reporting practices.

239.    PDE's data for the last three years shows that consistent progress has not occurred in the integration of students with significant disabilities in regular class. Using PDE's placement data for the school years 1999-2000, 2000-2001 and 2001-2002, plaintiffs compared the percentage of students with all disabilities and with specific learning disabilities, retardation, emotional disabilities, autism, physical disabilities and multiple disabilities who were educated for 80% of the day or more in regular class. As one would predict, when PDE changed its data reporting system to correct the over-reporting of the amount of time students with disabilities spent in separate special education settings, the percentages of students who were included went up across the board from the 1999-2000 to the 2000-2001 school year. In the following year, the percentages increased for students with specific learning disabilities, autism and physical disabilities but declined for students with retardation, emotional disabilities and multiple

disabilities. Exh. 198: Charts and Graphs from Placement Data, Placement Trends, 2000-2002, by

Disability (Source: Pennsylvania Special Education Statistical Summary Reports, 1999-2000,

2000-2001, 2001-2002 school years, http://ed.hbg.psu.edu/ssr2000.htm).

240.    To account for the possibility that PDE's placement data for students with

significant disabilities might reflect increasing time spent outside the regular classroom with age,

since as Dr. Brown testified, it is appropriate for many high school students with significant

disabilities to spend more time in vocational training and community-based instruction than in a

regular academic classroom, plaintiffs also examined the placement data for students aged 6 - 11

during the last three years. The placement pattern for younger students was virtually identical to

the placement pattern for students of all ages, except that the percentage of students with

retardation aged 6 - 11 in regular class remained the same from 2000-2001 to 2001-2002 instead

of declining.[3]

241.    Using PDE's placement data for the school years 1999-2000, 2000-2001 and

2001-2002,  plaintiffs also compared the percentage of students with retardation, autism,

emotional disabilities, physical/orthopedic disabilities and multiple disabilities who were educated

in regular class for 80% of the day or more in nine of Pennsylvania's twenty-nine intermediate

---

[3]The data show that to a large extent, the increasing inclusion of children with autism in
Pennsylvania is a product of the increasing inclusion of <u>younger</u> children with autism. In 2001-
2002, 584 of the 751 students with autism in the Commonwealth were between the ages of 6 and
11. This high percentage probably reflects the increasing frequency with which this condition has
been diagnosed in recent years in younger children and the identification of children with
Asperger's Syndrome and other forms of "high-functioning" autism who in earlier years might not
have been given a diagnosis in the autism spectrum.
    In any case, the placement patterns for younger and older children with autism in
Pennsylvania are quite different. While 21.5% of children aged 6-11 with autism are educated in
regular class for 80% of the day or more, for children aged 12-17 the figure is 14.9%, and for
students aged 18-21 it is only 4.5%.

units. These intermediate units selected were chosen because they house a random sample of school districts that plaintiffs' statistician James W. Conroy, Ph.D., selected for a study of students with learning disabilities, retardation, emotional disturbance, autism and multiple disabilities, using a procedure in which probability of selection was directly proportional to size. Geographically, the intermediate units represent all regions of the Commonwealth and range from Erie in the northwest to Philadelphia in the southeast. Exh. 198, Charts and Graphs Drawn from PennDATA statistics; see Exh. 47 at 69.

242. For students with retardation, the percentage of students educated in regular class actually declined in three of the nine intermediate units over the course of the entire three-year period from 1999-2000 to 2001-2002. In the Carbon-Lehigh Intermediate Unit, the proportion stayed approximately the same, and in the Appalachia Intermediate Unit and Philadelphia, the figures show a slight increase. Only Pittsburgh and the Lancaster-Lebanon Intermediate Unit showed a significant increase, and the large spike in the data for Lancaster Lebanon in 2000-2001, followed by an almost equally precipitous drop in 2001-2002, raises questions about the reliability of these data. Exh. 198, Charts and Graphs Drawn from PennDATA statistics.

243. For students with autism, the percentage of students educated in regular class declined in two of the nine intermediate units and rose only slightly in four others. Only Pittsburgh and Lancaster-Lebanon showed significant gains. Exh. 198, Charts and Graphs Drawn from PennDATA statistics.

244. For students receiving emotional support, four intermediate units showed a decline in the percentage of students educated in regular class, and in three, the figures show a slight increase. Again, only Pittsburgh and Lancaster-Lebanon show a significant increase. Exh. 198,

Charts and Graphs Drawn from PennDATA statistics.

245.    For students with physical disabilities, all intermediate units show an increase in the percentage of students educated in regular class, but in Appalachia and Carbon-Lehigh, the gains are so slight as to be almost imperceptible, and there is wide variation among the intermediate units. While in six intermediate units, more than fifty percent of all students with physical disabilities are educated in regular class for 80% of the day or more, in Lancaster-Lebanon, Carbon-Lehigh and Philadelphia, less than twenty-five percent are so included. Exh. 198, Charts and Graphs Drawn from PennDATA statistics.

246.    For students with multiple disabilities, the percentage of students included for 80% of the day or more declined in three of the nine intermediate units, and in Philadelphia and Carbon-Lehigh increased only slightly. Only Pittsburgh showed a substantial increase. Exh. 198, Charts and Graphs Drawn from PennDATA statistics.

247.    That the percentages of students with significant disabilities who are educated in regular class for 80% of the day or more has declined in several intermediate units despite PDE's correction of the previous over reporting of time outside the regular class shows that system-wide progress in the inclusion of students with significant disabilities is not occurring.

248.    OSEP's data from all the states shows that in many states, a majority of students with significant disabilities are included in regular class for 80% of the day or more. In Vermont and New Hampshire, more than 50% of students with multiple disabilities, more than 55% percent of students with retardation, more than 60% of students receiving emotional support, more than 65% of students with autism, and more than 80% of students with orthopedic impairments were included in regular class for 80% of the day or more. In North Dakota, Iowa, Colorado, Oregon,

Idaho, Ohio, Massachusetts and Kansas substantial percentages of students with these disabilities are educated for 80% of the day or more in regular class. Exh. 198, OSEP, Excerpts from the Twenty-Third Annual Report to Congress on the Implementation of the Individuals with Disabilities Education Act.

249.    The variation among the states is mirrored by an equally striking variation among local school districts in Pennsylvania. To illustrate this variation, plaintiffs charted the percentage of students with retardation, autism and multiple disabilities who are educated in regular class for 80% of the day or more in twenty-eight of the twenty-nine Pennsylvania intermediate units in 2001-2002, the most recent year for which PennDATA figures are available (defendants did not include Intermediate Unit 29 in their production of the 2001-2002 PennDATA). For students with retardation, the variation among the intermediate units is as extreme as the variation among the states, from 45-70% in Pittsburgh and Chester County to less than 5% in the Bucks County and Lincoln Intermediate Units (the latter covers York, Franklin and Adams Counties).

250.    In Pittsburgh, Chester County and the Appalachia Intermediate Unit (Blair, Bedford, Cambria and Somerset Counties), about half of all students with autism are included in regular class for 80% of the day or more, while fewer than 10% are included in Bucks, Delaware, Philadelphia, and the Lincoln and Northeast Intermediate Units (Lackawanna, Pike, Susquehanna, Wayne and Wyoming Counties). More than 15% of students with multiple disabilities are included in regular class in Pittsburgh, Montgomery County, and the Central Susquehanna, Tuscarora and Capitol Area Intermediate Units, while not a single student with multiple disabilities is included in the Riverview and Midwestern Intermediate Units. Exh. 198, Charts and Graphs Drawn from PennDATA statistics.

251.     This geographic disparity confirms the experience described by plaintiff Pennsylvania TASH in the Complaint that "in Pennsylvania, the opportunity to choose inclusion varies widely across the Commonwealth and depends on where the family lives." Complaint, ¶ 180.

252.     In conjunction with OSEP's most recent monitoring of special education services in Pennsylvania, PDE conducted a Self-Assessment to identify strengths, weaknesses and challenges in its special education system. The Self-Assessment, which was conducted with the assistance of a group of stakeholders in the special education system found that "There is a wide variation in the prevalence of use of a range of placement options across the state." Exh. 212, Pennsylvania Department of Education, Bureau of Special Education, Executive Summary for Cluster Areas F, FAPE in the LRE – Part B.

253.     The Self-Assessment also found that "There seems to be disproportionate numbers of students from certain disability categories in certain types of placements" and that "The percentage of students from the following disability categories exceed national data for specific, more restrictive educational placements: mental retardation; emotional disturbance; multiple disabilities; physical disabilities; visual impairment; learning disability; autism; deaf-blind; hearing impaired; traumatic brain injury." Exh. 212, Pennsylvania Department of Education, Bureau of Special Education, Executive Summary for Cluster Areas F, FAPE in the LRE – Part B.

254.     Dr. Lou Brown testified that the low percentages of students with significant disabilities who spend 80% of the day or more in regular class in Pennsylvania would not occur without an implicit policy. "[I]t's an unnatural event ... naturally you wouldn't get those percentages." Exh. 2: Brown Depos. at 94-95. Students with disabilities in Pennsylvania cannot

be so different from students in Vermont, Colorado, Iowa, Oregon, Massachusetts and Minnesota that they cannot be included in regular class to the same extent. Id. at 97-98.

255.    Defendants' expert Judy Schrag considers that the Pennsylvania Department of Education "absolutely" can and must increase the numbers of students with disabilities who are educated for 80% of the day or more in regular class: "I would hope that's everyone's goal, yes. That's the country's goal, too." Exh. 34: Schrag Depos. at 137-38.

256.    In June, 2002, OSEP convened a two-day meeting of a national stakeholders' group to complete the development of a focused monitoring model for OSEP's use and that of the states. Defendant Fran James Warkomski and other state special education directors participated in the meeting. The monitoring proposal completed by the group contained a benchmark or performance standard for compliance with the statutory integration mandate. That benchmark was that 90% of all students with disabilities should be educated in regular class for 80% of the day or more.  Defendant Warkomski agreed that 90% should be set as the performance benchmark.  Exh. 127: Declaration of Leslie Seid Margolis.

E.    **THE PLACEMENT PRACTICES OF SCHOOL DISTRICTS THROUGHOUT THE COMMONWEALTH PLACE STUDENTS WITH SIGNIFICANT DISABILITIES AT DISPROPORTIONATE RISK OF BEING EXCLUDED FROM REGULAR CLASSES IN NEIGHBORHOOD SCHOOLS**

257.    In the course of discovery in this case, plaintiffs selected ten school for a closer look at special education in Pennsylvania. The districts were selected at random sampling method in which the probability that a district would be selected was directly proportional to its size. Exh. 47, Report of Beverley Evans and Linda Lengyel at 69 ff. The schools districts selected were

Pittsburgh, Wilmington Area, Erie, Western Beaver County, Northern Cambria, Danville Area, Lancaster City, Hempfield, Northern Lehigh and Philadelphia,. In geography, the districts range across the state and vary in size from large urban districts to small rural ones. The plaintiffs also examined the training and technical assistance provided to students with disabilities in each of the nine intermediate units in which the ten districts were located.

258.     Although the ten districts vary in their progress toward inclusion and their strategies for achieving it, in nearly all the ten districts, students with significant disabilities encounter different and separate treatment from that accorded their less severely disabled peers. A partial exception is Pittsburgh, which, using a home-grown, building-based approach to inclusion that the district has cultivated on its own quite independently of PDE, has made significant progress in including students with significant disabilities, though it still serves several hundred students in separate special education centers. Other districts have launched local  initiatives, again not inspired by PDE, to enable students with disabilities to participate and progress in the general curriculum and to adapt instruction in the regular class. However, most of these initiatives are designed primarily for students with mild disabilities, and students with more significant disabilities do not have access to them. In most of the districts, students with significant disabilities are almost automatically consigned to Intermediate Unit placement, special education centers and out of district placements. Opportunities for significant inclusion in regular class are available, for the most part, only to those students with disabilities who are intellectually capable of performing on grade level. The districts report that PDE has done nothing to encourage the districts to bring their students back to district classes or to offer more opportunities for inclusion.

259.     The Lancaster City School District has been designated an "empowerment district"

because of low student test scores. Exh. 33: Schleyer Depos. at 9. As an empowerment district, Lancaster is expected to raise standards and teach to those standards. The Lancaster City School District has initiated a major emphasis on staff development and has been tracking student progress since 1999. Exh. 33: Schleyer Depos. at 9-15.

260.     Lancaster organizes special education for students with mild disabilities through teams of educators based in small learning communities in its school buildings. The district uses individualized instructional methods such as differentiated instruction and tiered learning to teach students with mild disabilities as well as students without disabilities.[4] The teams serve about 100-150 students apiece and represent the core subject areas or, at the high school level, learning communities based on interest. A special education teacher is attached to the team to support the students served by that team who are in special education as well as all students who can benefit from differentiated instruction. The role of the special education teacher is to demonstrate instructional techniques that work for all students; this may include co-teaching special education students in general education classrooms. Exh. 33: Schleyer Depos. at 15-19. The goal of Lancaster's staff development is "to get all staff to understand that there are different learning styles" and that teachers must consider diverse learners in their classrooms. This is not just a special education focus, but a part of general education training. Exh. 33, Schleyer Depos. at 27-28.

261.     Students with significant disabilities in Lancaster are not explicitly included in this

---

[4]Differentiated instruction is a method of "presenting material in a variety of methods to address the learner's needs and the learner's style of learning." Exh. 13, Fedorcha Depos. at 40-41. It primarily benefits students in learning support, those who are intellectually on the same level as typical students but have different learning needs. Exh. 13, Fedorcha Depos. at 50-51.

initiate because Lancaster still consigns most of its students with significant disabilities to separate classrooms and intermediate unit programs. However, the school district attempts to keep elementary school students from being placed in life skills classes and to keep them in an academic learning environment for as long as possible, because "if you put a kid in life skills many times you've written off the whole academic portion of their education." Exh. 33: Schleyer Depos. at 83-84.

262.    In 2001, the Commonwealth of Pennsylvania declared that the School District of Philadelphia was a distressed school district and as a result, governance of the school district was transferred to a School Reform Commission, whose membership consists of four members appointed by the Governor of Pennsylvania and one member appointed by the mayor of Philadelphia. The Commonwealth's action was precipitated by financial distress and student performance issues. As part of the School Reform Commission's educational improvement initiative, Philadelphia is developing a new curriculum and is also, at the same time, developing adaptations to the curriculum for students with disabilities. Exh. 30: Oakes Depos. at 14-23. The district has contracted with "community partners" to take over failing schools, on the premise that the community partners could do a better job of educating the students in those schools. However, the students with "low incidence" disabilities are not able to participate in the programs operated by the community partners because the terms of the Educational Services Agreements between Philadelphia and the community partners requires students with significant disabilities to remain in programs operated by the School District of Philadelphia.

263.    Students with mild disabilities in the Western Beaver School District benefit from team-teaching between regular and special education teachers, although this occurs mostly at the

elementary school level. Exh. 36: Smochko Depos. at 16. The Western Beaver School District participated in the Tri-State ConsortI.U.m on Positive Behavioral Support because teachers saw a need among both general and special education students to learn more socially appropriate behavior. Exh. 36, Smochko Depos. at 52-54. The Tri-State ConsortI.U.m initiative provided technical assistance and training to school districts and, in exchange, the school district signed an agreement to participate by providing a focused team for training and to assist a focus student or student. Western Beaver identified twenty focus students, of whom only seven or eight were in special education. Exh. 36, Smochko Depos. at 58-59. Western Beaver has also invested much time and effort in the Instructional Support Team program, a pre-referral intervention designed to keep students out of special education. Exh. 36: Smochko Depos. at 52-66, 93-109. However, students with significant disabilities do not benefit from these initiatives since they are placed out of district.

264. Secondary school special education students in the Northern Lehigh School District receive "very minimal" self-contained class support. However, this does not apply to the high school students who receive Life Skills Support; those students attend the Intermediate Unit program for life skills students. Exh. 13: Fedorcha Depos. at 115.

265. In 1993, Pittsburgh began an initiative called the Home School Project in which students all the 97 buildings in the district "can go to their neighborhood school with their brothers and sisters and friends … rather than being bused or transported." Each principal is required to develop a Comprehensive Evaluation Improvement Plan (CEIP) for his building that addresses how the school with support students with disabilities in the most integrated environment in that building. As a result, "well over 93 percent of our kids with disabilities are in

the school they would go to [if] they weren't disabled." Exh. 7: Cupples Depos. at 23-24, 28.

266.    The impetus for the Home School Project came from parents whose children had been included in Early Intervention programs under a federally funded project for mainstreaming students with significant disabilities and who desired the same inclusive opportunities for their children once they reached school age. Exh. 7: Cupples Depos. at 34-36.

267.    The Home School Project is sustained by the personal philosophy of the Special Education Director, and by the resources committed at the building level. As Dr. Cupples testified, "without resources in the schools to help schools do that and keep it … on the plate of principals, because there's so much on the plate of principals … the likelihood of it happening [is] just like in any kind of business world … it's not going to happen unless someone's out there pushing the agenda." Exh. 7: Cupples Depos. at 139.

268.    Pittsburgh has not found that inclusion of students with disabilities is more difficult in an urban setting. Exh. 7: Cupples Depos. at 78-79.

269.    Under the Home School Project, a team of four inclusion specialists provides "targeted, tailored staff development and focused technical assistance" to regular education and special education teachers to enhance inclusion. The district also offers an annual Summer Institute on Inclusion for hundreds of participants, most of them regular education teachers. Exh. 7: Cupples Depos. at 24-25.

270.    Pittsburgh has found that "[what] works most effectively is not large group stuff on a yearly basis, but getting these people into the schools, and helping individual principals and buildings develop their own agendas for inclusion." Exh. 7: Cupples Depos. at 25-26.

271.    The Pittsburgh Public Schools does not rely on PaTTAN for technical assistance

and training because the quality of its own technical assistance staff "match and exceed many times the technical assistance we can buy privately or get through PaTTAN." Exh. 7: Cupples at 107.

272.     The units within the Pittsburgh Public Schools' Division of Instructional Support work collaboratively to design content curriculum that incorporates adaptations for students with disabilities. Exh. 7: Cupples Depos. at 89-91.

273.     Students with significant disabilities in the Lancaster, Hempfield, Wilmington Area, Western Beaver, Northen Cambria and Northern Lehigh School Districts typically are placed in Intermediate Unit programs.

274.     In Northern Lehigh, the students placed out of district in I.U. programs are primarily the students in life skills support and multiple disabilities support. The Northern Lehigh School District sends these students out of district, because "[w]e don't have a program that will meet their needs." Exh. 13: Fedorcha Depos. at 54,116.

275.     In Lancaster, Northern Cambria and Wilmington Area, students with emotional disabilities are also placed in I.U. programs.

276.     In the Lancaster School District, about half the students who receive emotional support are in classes operated by the Intermediate Unit. The district does not run its own emotional support program at the high school level: "Once they enter high school, the I.U. supplies services." In elementary and middle school, the district has its own emotional support classes, but "once we reach capacity, we then have to rely on the I.U. for supports." Exh. 33: Schleyer Depos. at 89-90.

277.     However, Lancaster is working to bring back some students into district classes

who presently are being educated in classes operated by the Intermediate Unit. The district is starting with older students and working down, rather than starting at the elementary school level and working up, because the elementary level life skills classes operated by the Intermediate Unit are housed in Lancaster buildings, while because of crowding, once the students leave elementary school they tend to be placed in buildings outside the school district. Exh. 33: Schleyer Depos. at 79-80.

278.    The Northern Cambria School District contracts with the Appalachia Intermediate Unit to serve its students in life skills support, multiple disabilities support, and full-time emotional support. Exh. 22: Lizik Depos. at 32.

279.    The Wilmington Area School District sends its students needing emotional support and life skills support to several Intermediate Unit-operated programs outside the district; the district also houses five Intermediate Unit classrooms.  Exh. 27: Nicksick Depos. at 31-34. Of its 298 special education students, the district has placed 45 in Intermediate Unit-operated programs. Id. at 139.

280.    Most students with disabilities who are educated in the schools of the Western Beaver School District have specific learning disabilities or have physical disabilities and are cognitively normal or very bright. One or two have mild retardation. Western Beaver students with more significant disabilities are educated outside the district schools, at Approved Private Schools such as D.T. Watson and Glade Run, or at the New Horizons School, a public special education center, attended by eleven students from the district in 2001. In all, 16 students or 14.4% of all district special education students were educated outside the district.  Exh. 36: Smochko Depos. at 16-24.

281.    In most of the sample school districts, even the students with significant disabilities who are educated in the district rather than in I.U. classes do not typically spend much of the day in regular class. Few students with significant cognitive impairments are included in regular class. Usually, a student with intellectual disabilities  is considered a candidate for inclusion only if he is performing "close to" the typical range. For example, he Northern Cambria School District has modified the high school learning support program to accommodate two students with retardation who are "close to … a learning support range" in intellectual ability," although students with more significant retardation are placed in Intermediate Unit life skills classes. Exh. 22: Lizik Depos. at 32.

282.    In the Hempfield School District's most recent compliance monitoring, the district's Facilitated Self-Assessment showed that 63.5 of the district's students were placed outside the regular class less than 21% of the school day, a figure comfortably above the state average at that time of 35.5 percent. However, virtually all the 63.5% was accounted for by students with speech and language impairment or specific learning disabilities. The district reported to PDE that "our data reflects that a higher number of children whose primary disability is autism, PDD, mental retardation, multiple disabilities and emotional disturbance are in more restrictive settings. This is due to the unique needs of each student that can only be met by receiving a higher level of intervention." PDE accepted this explanation. Exh. 32: Scanlan/McNelis Depos. at 113-115 (Scanlan).

283.    In the Hempfield School District, students with learning disabilities spend a significant amount of time in regular class. However, students with more significant disabilities are placed in full-time and part-time special education classes operated by the Intermediate Unit. The

majority of part-time and full-time classes serving Hempfield students are operated by the Lancaster-Lebanon Intermediate Unit. More than 40% of all programs housed in the district are operated by the Intermediate Unit. Exh. 143, Special Education Plan 2002-2005.

284.    In 2001, Lancaster took back 33 students with mild to moderate retardation from an intermediate unit program far from their homes. However, the amount of time that the students were educated with students who do not have disabilities did not change significantly. Exh. 33: Schleyer Depos. at 36-43.

285.    John Lizik, the Special Education Director of the Northern Cambria School District, who believes strongly in inclusion, decided during the 1998-99 school year, his second in the school district, to "look more at a total inclusionary program for kindergarten, first and second grade" for students with learning disabilities. He know that he would need to do "a lot of inservicing up front" before the program could begin. An intermediate unit provided a survey on inclusion that Mr. Lizik distributed to the regular kindergarten, first and second grade teachers. The results showed "what [he] was up against": an "inherent fear" about inclusion and a belief that students learn more in a special education class. Mr. Lizik hired a new special education teacher who had the skills to "take some beatings" and "pick herself right back up" after meeting resistance, and, in the fall of 1999, he brought in Dr. Thomas Kippeny, the coordinator of Intermediate Unit 8's Comprehensive System of Personnel Development, to provide three inservice sessions with the regular education staff. Exh. 22: Lizik Depos. at 97-103; Exh. 19: Kippeny Depos. at 9.[5]

---

[5]Mr. Lizik's request was the only specific request for assistance from a school district within I.U. 8 to increase opportunities for inclusion that Dr. Kippeny recalled when asked if the Intermediate Unit had received such requests. Exh. 19: Kippeny Depos. at 40, 49.

286. Dr. Kippeny met with 20 regular education teachers from Northern Cambria for a total of about three hours and did an assessment of their attitudes and beliefs "to get them to start talking about their perceptions." He recommended that they visit a school district named Spring Cove that supports students with learning disabilities in the mainstream. He left it up to Mr.Lizik to call him if he needed and further assistance, but he was not contacted again and did not know what happened after that. Exh. 19: Kippeny Depos. at 40-45.

287. After the inservices delivered by Dr. Kippeny, which focused on attitudes rather than skill development, Mr. Lizik proceeded with the inclusion initiative for students with learning disabilities. The special education teacher went into the regular classrooms with an additional aide. She still had a special education classroom but rarely used it. At the beginning, six students were suggested for the program. The parents of two children did not agree that their children should be fully included. Two more were pulled back into the resource room for increasing amounts of the school day during the course of the year, and two remained fully included for the rest of that school year; but at the students' IEP meetings at the end of that school year, the students' programs "seemed to go back to more traditional continuum of services again." Unfortunately, the building principal was not knowledgeable about inclusion or had fears about it. "People [were] telling teachers' aides it wasn't going to work," and "I think if a teacher is given a little bit of an out, sometimes if they're not knowledgeable enough or don't totally understand or [are] fearful, they'll take that little out." Exh. 22: Lizik Depos. at 103-110.

288. In the School District of Philadelphia, which is both a school district and an intermediate unit, students with significant cognitive disabilities are effectively excluded from the opportunity to participate and progress in the general curriculum, as the Individuals with

Disabilities Education Act requires, and consigned to a separate curriculum. In effect, two separate special education programs exist in Philadelphia, one for students with high-incidence disabilities and the other for students with low-incidence disabilities. Programs for students with low-incidence disabilities – students who are hearing or vision impaired, or are in life skills support, multiple disabilities support and autistic support programs -- are the responsibility of the Philadelphia Intermediate Unit. The district operates one special education center, the Widener Memorial School, where students with physical disabilities and health care needs are congregated.[6]

289.     However, as of May, 2003, Philadelphia had placed approximately one thousand students in Approved Private Schools. Exh. 12: Erskine Depos. at 92.

290.     Educational reform in Philadelphia under the leadership of the Commission has included transferring responsibility for providing educational services in many school buildings to "community partners" including Victory Schools, Edison Schools, foundations and other entities. Exh. 12: Erskine Depos. at 10-15.

291.     The Educational Services Agreements or contracts between the School District of Philadelphia and the community partners who now provide services in many Philadelphia school buildings require the School District to continue to operate and be solely responsible for services to children with low incidence disabilities. Exh. 12: Erskine Depos. at 98-99.

292.     The Rule 30(b)(6) designee of the Philadelphia School District considers that every

_____

[6]Other special education centers were closed as a result of a consent decree in the enforcement phase of <u>PARC v. Commonwealth</u> (E.D. Pa.), which also required an intensive training program for teachers of students with significant disabilities. Exh. 12: Erskine Depos. at 17-21.

student whose IEP team has recommended a placement that would place her in a special education class for more than twenty percent of the school day is appropriately placed. The district does not consider that it is appropriate to set any targets or benchmarks for increasing the number of students with low-incidence disabilities who are included in regular class for more than 80% of the school day. Erskine Depos. at 46-51.

293.     The Rule 30b)(6) designee for the Philadelphia School District responsible for programs for students with low-incidence disabilities could think of only one student with multiple disabilities in the Philadelphia School District who had been included in regular class for 80% of the day or more. That student was placed in regular class in her home middle school after she prevailed in a due process hearing challenging the school district's decision to place her in a multiple disabilities class in a school that was not her home school. Exh. 12: Erskine Depos. at 64-67.

294.      Pittsburgh still has about 400 students, out of 6,000 students in special education, in segregated special education centers like the Conroy Center, a school for students with significant retardation and multiple disabilities. Exh. 7: Cupples Depos. at 86.

295.     The sample districts report that PDE has not been communicated to them that they should be offering more opportunities for inclusion to students with significant disabilities or indeed, that they should make any changes in their programs at all.

296.     According to the Northern Cambria School District, the message that students with disabilities should be included in regular class has been there for the past ten years, but "it's dropped off somewhat lately," and the message the district receives from the state is that while the continuum is mandated, inclusion is not. Id. at 115-16.  District administrators who believe in

inclusion must struggle against an entrenched system: "[Y]ou're changing opinions of people who've experienced a system one way for their career, their whole career ... you're battling attitudes. .. Research showed that kids will learn better. They're probably better adjusted if they were maintained in a regular classroom. But you're just working against a system that has worked for years and years and years." Exh. 22: Lizik Depos. at 112-114.

297.    PDE has never placed any pressure on the Western Beaver School to bring its out of district students back from New Horizons and other segregated settings; it has not communicated to the district that there will be any consequences if these students continue to be educated out of district. Exh. 36: Smochko Depos. at 80-84.

298.    Administrators of the Hempfield School District are not aware of any aspirational goal of the Pennsylvania Department of Education to increase the number of students who are included in regular class: "Everything that I get from PDE tells me that you need to look at the individual child and that individual child's needs. And that [drives] the placement, not percentages of children." Exh. 32: Scanlan/McNelis Depos. at 118-19 (Scanlan).

299.    PDE has provided no directive to the Hempfield School District suggesting that the district should train district teachers and develop the capacity to serve the 40% of its students who presently are educated in intermediate unit-operated programs in district classes. Nor has PDE suggested to Hempfield that it does not need to consider bringing these students back to district. It simply has not expressed a view about them one way or the other. Exh. 32: Scanlan/McNelis Depos. at 129-132.

300.    To bring their students back to district from intermediate unit programs and to enhance inclusion in regular class, the sample districts testified that they will need appropriately

trained teachers and support from administrators.

301.    To satisfy the needs in district of a student with cerebral palsy who is placed in a separate special education school out of district, the Western Beaver School District representative testified that the district would need a teacher trained to teach a student with cerebral palsy, as well as specialized speech therapy and equipment to meet that child's needs. Exh. 36: Smochko Depos. at 123-125.

302.    To bring the students from New Horizon back to the district, the special education director of Western Beaver testified that the district will need to be able to provide more life skills support. In his opinion, "I think schools can do it. I think that the state has to recognize and I think the state has to support these programs." Exh. 36: Smochko Depos. at 144-45.

303.    The superintendent of the Wilmington Area School District would like to bring emotional support students back to the district "because they're our students, and they're going to live in our community." Id. at 42. However, this will require more training in behavior management, handling conflict and similar skills. Id. at 43. The director also hopes to take back the life skills support classroom currently operated by the Intermediate Unit and move it to the elementary school building, which she expects will encourage greater parental involvement. Id. at 44-45. Meanwhile, the district paid more than $54,000 for transportation of special education students to out of district placements in the 2002-2003 school year. Exh. 27: Nicksick Depos. at 20.

304.    The coordinator of special education for the Lancaster City School District testified that if he had his way, he would not bring the emotional support students in Intermediate Unit programs back to the school district, at least until the district has the staff and the training to

support these students: "I don't want to take the responsibility of running those programs because it will mean a lot more support staff that we don't have … It will mean a lot of different training." Currently, the Intermediate Unit staff deal with discipline issues, and if the classes were district-run, the principals would have to handle those problems. Exh. 33: Schleyer Depos. at 90-91.

F. **PDE'S FAILURE TO ENSURE THAT STUDENTS WITH SIGNIFICANT DISABILITIES ARE EDUCATED IN THEIR HOME SCHOOLS WITH THEIR PEERS HAS HARMED MANY MEMBERS OF THE CLASS.**

305. The declarations of parents of special education students contained in Exhibit 127 show how much benefit students with disabilities can receive when they have opportunities to be educated with their peers in regular class. At the same time, they show how difficult it is for parents of children with significant disabilities to obtain inclusion in regular class and the support their children need to succeed there.

306. Parents in Pennsylvania who seek opportunities for their children with significant disabilities in regular class encounter resistance from local school district personnel who seem to take as axiomatic that students with retardation, autism and other severe disabilities belong in separate classes. Decl. of Patricia B. (student with Down Syndrome offered only special education placement: no co-teaching or other support made available in regular class); Exh.127: Decl. of William W. (student with autism who had been included in regular classes in New Jersey denied a similar experience in his home school in Pennsylvania after family move); Exh.127: Decl. of Susan G. (student with significant speech and fine motor deficiencies not included in regular education classes, instead placed in life skills class operated by the Intermediate Unit that has moved nearly every year from one district to another); Exh.127: Decl. of Anna S. (student with Down

Syndrome denied inclusion in neighborhood school and placed in private program by district, parent not informed of rights, parent went through due process system to seek inclusion).

307.    The segregated programs that school districts offer to students with significant disabilities (life skills, multiple disabilities, or full-time learning support classes), offer an inferior learning environment and cannot compare with the rich learning opportunities available in regular class. Exh.127:  Decl. of Keith B., whose son "barreled through" his IEP goals in regular class with resource room support after prevailing in a due process hearing brought by the district to place the child in a full-time life skills support class with much lower academic expectations; Decl of Kathleen D., whose son with autism was placed in intermediate unit-operated classes where he was forcibly restrained by staff, placed in a closet for therapy, denied personal autonomy and dignity while toileting, verbally and physically abused by staff)l Decl. of Donna C., whose son with autism was placed in full time learning support without a functional behavioral assessment or any discussion of supplementary aids and services.

308.    Many parents who seek inclusion find that their districts simply do not have experience or training in including students with significant disabilities and do not know how to provide the support the student needs. Exh.127: Decl. of Sandi B. (student with Down Syndrome);  Exh. 127: Decl. of Sarah H. (student with multiple disabilities who is the first in her district with such disabilities to be included); Exh.127: Decl. of Christine J. (student with autism and multiple disabilities placed outside his neighborhood school because of the district's failure to provide adequately trained staff);  Exh.127: Decl.of Marci L. (kindergarten student with behavioral difficulties not given functional behavior assessment and IEP, instead sent to wait in hall when behaviors surfaced); Exh.127: Decl. of Jackie L. (student with Down's Syndrome

denied inclusion after district refused to request technical assistance from Intermediate Unit staff); Exh.127: Decl. of Kim R. (parents of student with Fragile X syndrome forced to provide supplementary aids and services to enable their son to be included in regular class after district's failure to do so).

309.     In Pennsylvania, parents of children with disabilities must often go to extraordinary lengths to gain inclusion for their children.  Parents have even moved from one school district to another in search of a school that is receptive to inclusion. Exh.127: Decl. of Keith B. (after attempt to have district include student with Down Syndrome, family moved 20 miles to alternate community in hope of finding greater inclusion in the neighborhood school); Exh.127: Decl. of Gail L. (parents of child with autism moved from Luzerne to Allegheny County in search of greater inclusion in neighborhood school); Exh.127: Decl. of Carol L. (parent of student with high-functioning autism moved from one school district to another after unsuccessfully trying to persuade the first school district to include her son); Exh. 127: Decl. of Diana M. (parents of student with Asperger's Syndrome moved from one Southeastern Pennsylvania school district to another after the first district required placement in an approved private school and recommended placement in a residential school, student was successfully included in the second neighborhood school).

310.     The difficulty parents face persuading school district personnel to support their children in regular classes is exacerbated by PDE's failure to provide relevant technical assistance in inclusive practice and school districts' failure to send the relevant staff to trainings.  Exh.127: Decl.of Ed C. (Autism Select Team Training offered by PDE through PaTTAN failed to address or develop the skills needed for successful inclusion and did not include sustained on-site guided

practice; student's aide never attended training). See also Decl. of Carol S., whose son with autism was successfully included in regular class with the support of the GATEWAYS program, a PDE initiative to provide customized technical assistance to school districts to include students with significant disabilities. After PDE stopped supporting the program and the technical assistance came to an end  the family "lost the battle" to include their son.

311.    Fortunately, some school districts are willing to include children with disabilities, even if they are relatively inexperienced in doing so, and parents are delighted with the results. Exh.127: Decl. of Jeanne D. (students with Down Syndrome successfully included in her neighborhood school in the Erie School District); Decl. of Diana M. (student with autism did so well in regular district classes that he is now college-bound). See also Exh.127: Decl. of Virginia H. (student received final two years of high school education in neighborhood school after attending schools up to one hour away for fourteen years).

312.    Some school districts have denied students with disabilities the opportunity to participate in elective courses or extracurricular activities. Exh.127: Decl. of Laurene K. (autistic student with strong interest in chorus denied opportunity to be included).

313.    Some parents have had to educate their school districts about the supplementary aids and services that could be made available in regular class and have, in effect, provided technical assistance and materials to instructional staff because of the latter's lack of expertise. Exh.127: Decl. of Wendy Luckenbill, who after years of asking her son Haven's school district to obtain training and technical assistance for its staff, developed much of the specially designed instruction in Haven's IEP and donated software and materials to district); Decl. of Kim R. (parents of student with Fragile X syndrome provided accommodations such as modified

calculator and augmentative communication device after district refused or failed to get equipment and provide supplemental services and supports); Decl. of Anna S. (parent of student with ADD provided information, references and materials to district staff after pleading for technical assistance and training); Decl. of Denise Z. (parent of autistic student provided at family expense an aide to shadow student in school after district's refusal to provide needed service).

314.    Many parents have been forced to go through due process or mediation in order to gain inclusion for their children. Exh.127: Decl. of Elizabeth M. (parent of student with emotional disabilities currently in due process after district recommended placement in a segregated public school). Exh.127: Decl. of Pam S. (parent of student with Central Auditory Processing Disorder requested mediation and filed several complaints against district after district's failure to include student in regular education); Exh.127: Decl. of Audrey S. (parent of student with Down Syndrome sought mediation and due process after district abruptly denied inclusion in fourth grade after four years of successful inclusion); Exh.127: Decl. of Colleen T. (parent of student with multiple disabilities forced to file complaints with U.S. Dept. of Education Office of Civil Rights after district's failure to consider inclusion and documented abuse of student by district staff); Exh.127: Decl. of Maria V. (parent of student with ADD and auditory processing disorder denied specialized reading program obtained the program only after initiating a due process hearing); Exh.127: Decl. of William W. (parent of autistic student who was denied inclusion in Pennsylvania after receiving inclusion in New Jersey had to request a due process hearing when the school district insisted on changing his son's placement).

315.    Being forced to battle one's school district in a due process hearing is emotionally and financially stressful, see Exh. 127: Decl. of Keith B., and even where the parent is successful,

the strain that the dispute places on the relationship between family and school has led some parents to the decision to homeschool their child rather than continue a broken relationship. Exh.127: Decl. of Kathleen D.

316. The declarations of graduates of the Widener Memorial School in Philadelphia in Exh. 127 show that this segregated special education center for students with orthopedic offered an inferior education, failed to provide its students with an education commensurate with their academic ability and failed to prepare them for productive adulthood.

**G.** **THE UNITED STATES DEPARTMENT OF EDUCATION, IN EVERY RECENT MONITORING OF SPECIAL EDUCATION SERVICES IN PENNSYLVANIA, HAS FOUND SERIOUS VIOLATIONS OF THE REQUIREMENT THAT STUDENTS BE EDUCATED WITH STUDENTS WHO DO NOT HAVE DISABILITIES TO THE MAXIMUM EXTENT APPROPRIATE.**

313.    Throughout the 1990s and again in the year 2000, OSEP monitored special education services in Pennsylvania and each time found significant violations of the integration mandate. OSEP issued a report to Pennsylvania on March 31, 1994, finding that the Pennsylvania Department of Education had failed to assure that students with disabilities were educated with their non-disabled peers and, among other violations, had failed to exercise general supervision of special education services throughout the state. Exh. 212: Letter from Judith E. Heumann to Eugene W. Hickok, Jr., February 16, 1999 and attached report.

314.    OSEP monitored Pennsylvania again determine whether it had corrected the deficiencies and issued a follow-up report on October 3, 1996, finding that it had not. Again, OSEP monitored Pennsylvania in 1998 and found once again that the violations had not been corrected. The federal agency wrote to the Pennsylvania Secretary of Education on February 16, 1999:  "Principally, OSEP finds that PDE has not exercised its general supervisory authority in such a way so as to ensure that local school districts correct identified deficiencies in a timely manner. As a result, serious deficiencies have been allowed to exist for a number of years impacting services for children with disabilities." Because of the long-standing pattern of noncompliance, OSEP issued Pennsylvania's Part B grant to the state subject to special conditions. Exh. 212: Letter from Judith E. Heumann to Eugene W. Hickok, Jr., February 16, 1999 and attached report.

315.    PDE's Part B grant for fiscal year 2000 also was released subject to special conditions because OSEP determined that PDE had not ensured that its process for verifying the completion of local school district corrective actions resulted in the effective correction of identified noncompliance. In March and late October, 2000, the agency again conducted a review in Pennsylvania and once again found students with disabilities in Pennsylvania "are excluded from the regular educational environment for reasons other than the nature or severity of the disability." Exh. 212, Letter from Patricia J. Guard to Charles B. Zogby, February 1, 2002 at 2.

316.    Specifically, OSEP found that "Personnel in seven of eight districts reported that children with disabilities would be placed in less restrictive environments if staff were available for co-teaching, consultation, teacher support [and] student support. [] IEP teams are unable to consider some options because they know they are not available." Exh. 212, OSEP, Pennsylvania Monitoring Report 2000 at 33.

317.    The findings recorded in detail during the 2000 monitoring, both by OSEP observers and the PDE officials who accompanied them, and the records of their interviews with teachers, administrators, related service providers and parents, provide vivid evidence of the extent to which students with disabilities are unnecessarily and arbitrarily excluded from regular class and prevented from satisfactorily being educated there because of the absence of supplementary aids and services.

318.    Educators in the local districts that OSEP monitored still hold the erroneous belief that inclusion is appropriate only for students without significant cognitive disabilities, or for those who are performing at, or near, grade level. In the Erie School District, for example, a PDE observer reported that according to four regular education teachers, "[i]nclusion is mostly LS

[learning support] kids – very few other exceptionalities." Exh. 189 at 614-15; Exh. 186 at 536.

319.    At Cook-Wissahickon School in the Philadelphia School District, Roxborough Cluster, OSEP interviewed a learning support teacher who reported that the factors that determine whether a student will be included in general education include: ability to be in a large group and "levels of functioning." When asked whether it is not assumed that all students will participate in general education, the teacher replied that "low functioning children won't benefit from it so LRE is the [Autistic Support] room." Exh. 192 at 352.

320.    Similarly, at Strawberry Mansion High School in Philadelphia, the Special Education Director reported that in one elementary school in the cluster, you are "either in a general education classroom and working successfully without supports or you are in a special education pull-out for whatever subject is problematic." A general education teacher reported that he had 54 students in his class that over half of them were special education students without support.  Exh. 207 at 4.[7]

321.    At Audubon Elementary School in Scranton, the principal stated that placements are determined by the school psychologist, and that students must be "pretty much on level" to be placed in a regular education classroom. The principal was unaware of guidance from the state on

---

[7]Observations of students from the sample school districts in the survey designed by plaintiffs' experts Beverley Evans and Linda Lengyel showed that only rarely did these students receive specially designed instruction during intervals when they were in regular education classes. Less than half the students who were observed in regular class received, during any portion of the day in which they were observed, "special education" in the form of objectives addressed and specially designed instruction provided in the regular classroom. Further, much of the "specially designed instruction" that was being provided during observation of the sample students was not in fact specially designed instruction, but "practices that are routine in the course of normal teaching," such as "small group instruction"; "individual work"; "instructional techniques"; "redirection"; "reinforcement of phonics skills"; "feedback"; "flashcards"; "math tools"; "large group instruction"; "will attend school." Exh. 50: Evans Report at 1-5.

this issue. Exh. 186 at 522-23.

322.    At West Scranton High School, the PDE observer reported that according to a special education teacher, the factors that determine the extent to which the student is involved in the general curriculum include the nature of the disability, the child's desire, and the amount of services required. Exh. 194 at 424;  Exh. 186 at 524-25.

323.    Six regular education teachers in the Scranton School District reported that students did not spend more time in regular class because the special education teacher "doesn't feel they have [the] aptitude." Exh. 186 at 526.

324.    A special education teacher at the G.A.R. High School in Wilkes-Barre reported that the Emotional Support program was isolated from other special education classes in the high school. The special education teacher was not included in department meetings and her students could not access Learning Support classes: they either had to be in the Emotional Support class or mainstreamed into general education classes. Exh. 209a at 5.

325.    At Ashland Elementary in the North Schuylkill School District, a special education teacher reported that "Ability to function without adaptations is what determines access to the general curriculum" (the PDE observer noted that the teacher confused access to the curriculum with inclusion). Another special education teacher reported that "Parents are fighting to have [their] kids in regular education; both this special education teacher and a guidance counselor reported that no co-teaching is done."  Exh. 196 at 527.

326.    In the Erie School District, a teacher reported that modifications such as peer tutors and note-takers were not listed on students' IEP because "it might embarrass the student." Barriers to placing students in the least restrictive environment, for this teacher, were students'

"sub-average functioning, especially in reading or math; [t]hey wouldn't have skills." Asked whether accommodations are made for students with disabilities in extracurricular activities, the teacher replied, "If they can do it, they do it." Exh. 189 at 620.

327.    In one of the Philadelphia Charter Schools monitored by OSEP, the curriculum is based on reading level, and students are placed accordingly. Students with specific learning disabilities are placed in low-level reading groups and can progress to higher levels only when they achieve that level. No attempted modification or accommodation occurs that would allow students to participate at a more age appropriate level.  Exh.199 at 2.

328.    In some districts, placements are not individualized but categorical. Students with disabilities are placed in centralized programs, often away from their home schools, based on their classification rather than their individual needs. Although the Special Education Director for the Erie School District stated that the IEP team makes the placement decisions, OSEP found that all Physical Support, Autistic Support, Life Skills Support, Deaf and Emotional Support programs are centralized in certain buildings in the district. Exh. 189 at 3-4. Staff in the district reported that all Physically Handicapped students go to the Glenwood Elementary School, which hosts the only class for students with orthopedic disabilities.  Exh. 186 at 538. A building administrator stated that even if a student receives emotional support for only one percent of the school day, he would still go to the building where emotional support services are centralized. OSEP found that "they are doing categorical placements into central locations for most kids ES, autistic, physical, life skills, hearing," as confirmed by district staff and by building administrators who stated that the

central office (not the team) decided what schools students would attend. Exh. 202 at 3-4.[8]

329.    At the G.A.R. High School in Wilkes-Barre, teachers reported that the progression from special education for all special education students is movement into the Vo-Tech school, unless strongly protested by the student or parent.  Exh. 209a at 5.

330.    At Dan Flood Elementary School in Wilkes-Barre, a special education teacher reported that this was not the home school for any students in her Emotional Support class, and that behavior prevents the participation of students in regular education. Exh. 186 at 518.

331.    In the Roxborough, West Philadelphia and Washington clusters in the Philadelphia School District, OSEP found that Notices of Recommended Assignment (NORAs) "did not often document consideration of alternative placements" and that "[t]eachers reinforced this in interviews. Teachers reported that "students were placed in available programs – not necessarily what the student needed." Memorandum to Jane Sullivan from Bill Riggar, December 1, 2000, Exh. 192 at 346-47.

332.    At Strawberry Mansion High, it was reported that all autistic students were placed in the same classroom.  Exh. 207 at 7.

333.    The OSEP review found instances of segregation that seemed to be reflexive responses to students' disabilities, and not based on any analysis of the student's needs. Staff at Roxborough High in Philadelphia "clearly do not consider LRE by beginning with the LRE. They

---

[8]Examples of categorical placements in the school districts within Intermediate Unit 8 are referenced in the deposition of assistive technology expert Kristen Choma-Tachoir, Exh. 5 at 69, 75 (students who are placed in a Life Skills Support class because they have intellectual disabilities but no physical disabilities; students with intellectual and physical disabilities are in Multiple Disabilities Support classrooms). Ms. Choma-Tachoir also described a student who was placed in a life skills class because "[s]he was not able to make it in the regular ed." Id. at 67.

begin with the child's current placement and ask if it remains appropriate." Exh. 206 at 5.

334.    Placement at the Widener School, a center exclusively for students with disabilities is "not generally reconsidered as it is assumed to be the only available appropriate placement for these students." Exh. 206 at 4.

335.    In the West Philadelphia Cluster, a high school teacher reports that Autistic Support students are completely segregated, even for lunch, and that the only activity they attend with non-disabled peers are assemblies. Exh.209 at 4.

336.    In the special education preschool program operated by Intermediate Unit 19 for children residing in the Scranton School District, according to MAWA personnel, children with disabilities have only informal, non-individual opportunities to participate in activities with children who do not have disabilities, and those opportunities are not documented on the IEP. Because of limited staff, the MAWA is not able to send children with disabilities on an individual basis to typical preschool classes but must go as a class. Exh. 206a at 2.

337.    Students with disabilities who are sent to alternate schools for disciplinary reasons are sent to schools that are special education centers, where they have no opportunity to interact with general education students. Exh. 206a at 2.

338.    In the Washington Cluster in Philadelphia, a special education teacher reported that Lilfe Skills students with disabilities are grouped together for Extended School Year services and do not have integration with non-disabled peers. Exh. 208 at 4.

339.    Districts reported that students are sent to Intermediate Unit classes out of district because their local school district does not have room for them, or rather, will not make room for them, although it would be virtually unthinkable to exclude a non-special education student from

his home district due to lack of space. In the North Schuylkill School District, students with disabilities are placed in classes operated by the Intermediate Unit outside the school they would attend if not disabled. This includes students in Life Skills Support, Multiple Disabilities Support, full-time Learning Support and part-time Learning Support. Although the school district operates learning support classes of its own, staff report that the district schools "max out" their slots and send the students to classes in other districts. Exh. 204 at 3.

340. In the Washington Cluster in Philadelphia, a special education teacher reported that integrating children with disabilities into general education classrooms is a problem because the classrooms are already full. Exh. 208 at 4.

341. The PDE observer assigned to Northern Schuylkill reported that, according to the junior-senior high school principal, special education students who are enrolled in the middle of the year may be sent to a neighboring school district rather than create a new class. Exh. 191 at 793.

342. A nearly universal theme in the school districts monitored was the lack of special education teachers who were available for co-teaching, team-teaching and collaboration with regular education teachers. In the Deer Lake School District, all general education teachers stated that they would benefit from another special education teacher and that students were not receiving all the services they needed because special education services were lacking. This was echoed by a special education teacher who stated that she could be co-teaching more with general education teachers in the regular class, but "there are so many kids in my room I cannot service them with everything they need." A special education teacher who teaches a self-contained emotional support class reported that his students could be placed in more integrated settings if

staff were available for collaboration in regular class. This teacher stated that he wished he could spend more time in the regular class, instead of his students' being sent back to his room when they exhibited behavior problems, and expressed that if he had support from a paraprofessional, he would be able to do this. Exh. 200 at 2.

343.    In the Elizabeth Forward School District, two special education teachers, one of them a Life Skills Support teacher, reported that their students could be placed in less restrictive environments if more support could be provided in the regular classroom. Exh. 201 at 2.

344.    Also In the Elizabeth Forward School District, an emotional support teacher asked what support her students received in general education, replied "None – gen[eral] curriculum." Exh. 188 at 398.

345.    In the Erie School District, special education teachers "have to be asked" to provide support, and then their ability to help is limited because of their caseloads. Regular education teacher complained that they do not receive enough support. One teacher had ten special education students and 15 regular education students in one class, with no assistance. An Autistic Support teacher added that grades are a problem for special education students: "[K]ids can't get grades on regular ed report card, so teacher has few kids out." The PDE observer reported as a "red flag" that both the regular and the Autistic Support teachers want more inclusion, but are "not sure how to make it happen." Exh. 189 at 614-615; Exh. 186 at 536.

346.    At Central High School in Erie, general education teachers report that they receive almost no support from special education teachers for special education students who spend part of the day in their classes. They receive a monthly report about how the student is doing in their classes, but they are responsible for all accommodations and modifications the student needs while

in their classrooms.  Exh. at 2, 3-4.

347.     At Perry Elementary School in Erie, regular education teachers stated that they were not comfortable with the inclusion of Emotional Support students "because [a] support system [is] not in place." When the principal, who had indicated that he was pleased with the efforts to include Learning Support students, was asked about inclusion of Emotional Support students, he replied, "I don't know," and, when pushed to explain his lack of desire to support Emotional Support students in regular education, said he felt the program was fine. Exh. 186 at 537.

348.     Regular and special education teachers at Perry Elementary School reported that students whose IEPs provided for "consultative" emotional support services for 1% of the school day would receive no support unless the student acted out in the regular education environment, and then the student would be "punished" by placement in an emotional support class.  Exh. 186 at 537.

349.     In the North Schuylkill School District, a special education teacher reported that the school district hires part-time aides to avoid paying benefits, that they are not trained or reliable and that they need more substitute aides. Exh. 204 at 2.

350.     In the North Schuylkill School District, the PDE observer reported that according to regular education teachers, it was difficult to get substitutes for regular education teachers to attend IEP meetings, and that "change in [the] support system" would allow more special education students to spend more time in regular classes." Exh. 191 at 791; Exh.186 at 526.

351.     In the Olney Cluster in Philadelphia, a building administrator reported to OSEP that when children with disabilities are educated in general education classes, support such as

training to general educators is not provided. Exh. 205 at 2.

352. At Roxborough High School and Strawberry Mansion High School in Philadelphia, a special education teacher and building administrator report that students with disabilities would be placed in more integrated settings if staff were available for co-teaching, consultation, teacher support and student support. Exh.206 at 2, 207 at 4.

353. All staff interviewed by OSEP in the Scranton School District reported that more children with disabilities would be placed in less restrictive environments if more staff were available for co-teaching, consultation, teacher support and student support. Staff stated that more students could be included in regular class if general education teachers had more special education training and if more aides were available to assist in general education classes. Exh. 206a at 2.

354. At Audubon Elementary School in Scranton, a special education teacher reported that lack of training was a barrier to placement in the least restrictive environment and that regular education teachers were not always involved in IEP meetings. The principal reported that there was no co-teaching that she knew of, and that "[i]nclusion numbers are small -- staffing and training are issues." The principal reported that the state had done little about the "real problem" of teacher shortages. Exh. 186 at 522-23.

355. At West Scranton High School, the PDE observer reported that according to a special education teacher, students could be in less restrictive settings if more regular education teachers were trained, more aides and special education teachers were available, and the barrier presented by regular education teachers' lack of knowledge about special education could be overcome. Exh. 194 at 424; Exh. 186 at 524-25.

356.    In the Pottsville School District, the PDE observer reported that according to the staff, there were no instances of co-teaching between regular and special education teachers, and no time set aside for mutual planning.. The staff agreed that co-teaching would facilitate the placement of special education students in regular classes. Exh. 205a at 769, 770; Exh.186 at 539.

357.    The five special education teachers at Pottsville High School have one aide to share among them, which adversely affects placement in the most integrated setting; as evidence of the positive impact an aide could have on inclusion, they cited the fact that three students have gone from Cs and Ds or below in health sciences to As and Bs with the support of this aide. Exh. 205a at 3, 6.

358.    For children over thirteen in the Pottsville School District, lack of modifications and accommodations in vocational and pre-vocational courses limit access to that curriculum. High school teachers reported that some students have been unable to "make it" in vo-tech courses because the support was not available, and that vocational courses on a separate campus from the high school do not allow for collaboration between Vo-Tech and special education teachers. Exh. 205a at 3.

359.    Six regular education teachers in the Scranton School District stated that for inclusion to work well, they would need more special education teachers.  Exh. 186 at 526.

360.    The Scranton School District Special Education Director considered that barriers to placement in the least restrictive environment included training, funding, class size and some parents' preferences.  Exh. 186 at 525. The transition coordinator in the district reported a reluctance on the part of the Vocational-Technical (Vo-Tech) School to accept special education students and reluctance on the part of the regular education teachers at the Vo-Tech to make

accommodations.  Exh. 186 at 526.

361.    All staff interviewed by OSEP in the Wilkes-Barre School District School District reported that more children with disabilities would be placed in less restrictive environments if more staff were available for co-teaching, consultation, teacher support and student support. High school teachers reports there were too many students in the class to provide quality services to students with disabilities. By contract, special education students are not included in teachers' student count for maximum caseloads. Exh. 209a at 4.

362.    In the Wilkes-Barre and Scranton school districts, PDE observers reported that "potential problematic areas" in the area of LRE included barriers such as the size of classes, the district's failure to provide time for staff to get together, attitude, the need to train more teachers and staffing issues. Although PDE had instructed the observers to keep a record of the OSEP reviwers' use of improper or leading questions, the PDE observer in these districts reported that "OSEP was consistent in sticking to the scripted questions," and that there was no difference in how OSEP observers asked the questions in the two school districts. Exh. 186 at 518-19.

363.    In the Wilkes-Barre School District, the director and supervisor of special education reported that no team teaching is done in the district. Exh. 186 at 521..

364.    In Wilkes-Barre, four regular education teachers reported that regular education teachers do not attend students' IEP meetings; rather, the forms are routed to teachers for signature. Teachers select accommodations and modifications from a list. The barriers to inclusion cited by these teachers were lack of special education teachers for teach teaching, lack of training, and lack of aides.  Exh. 186 at 521.

365.    At the G.A.R. High School in Wilkes-Barre, a learning support teacher reported

that no consultation time was available to meet with other teachers. Exh. 195 at 404.

366.    At Dan Flood Elementary School in Wilkes-Barre, four regular education teachers reported that they needed more training in special education, that the training they received was "hit or miss," that they had no formal training in behavior management, and that they had no choice in selecting inservice training. Exh. 195 at 559-560.

367.    Four high school general education teachers in Wilkes-Barre reported that support for general education teachers to provide access to the general curriculum for students with disabilities are not available or provided. There are no aides, other than Therapeutic Support Staff, team teaching possibilities or in-service programs to support the regular teachers. Exh. 209a at 4.

368.    OSEP's review found that students in all settings, including both regular and special education classes, were denied appropriate services based on their needs. In particular, it found widespread failure to provide psychological services and behavioral support to students with emotional and behavioral disabilities, and almost equally widespread acceptance of the rule that those services should be the responsibility of public or private insurance or their parents.

369.    In the Allegheny Intermediate Unit 3 MAWA (pre-school) program, PDE observers reported that students who need psychological counseling services were referred to outside agencies, but because of staff shortages in those agencies, service provision could take up to two months. "Wrap-around" emotional support services provided through Medical Assistance might not appear on the student's IEP. Exh. 188 at 386-87.

370.    In the Deer Lakes School District, the PDE observer reported that according to the Special Education Director, psychological counseling is generally not available as a related

service on students' IEP.  Exh. 187 at 545.

371.    At Pottsville High School, a transition coordinator stated that  the "very limited" character of behavior management plans limits students' academic achievement and placement in the least restrictive environment.  Exh. 186 at 539.

372.    In the Erie School District, a PDE observer reported that according to a district special education teacher, "Counseling as a related services is never used," and that according to the principal and assistant principal of Central High School, the teams "don't write behavior supports on the IEP 'until we're sure we're getting it.'" An elementary school special education teacher reported that he was not sure how to get psychological services as part of an Extended School year program when the student needs it. Exh. 186 at 535-36, 537.

373.    PDE observers reported that students in the Hazleton MAWA had difficulty obtaining Functional Behavioral Assessments (FBAs). The staff reported that they did not have training in dealing with behavior or if they did, "it was a long time ago and everything we learned then is against the law now." The Hazleton pre-school program obtained FBAs from outside agencies for the most part, but found it difficult to get them done due to those agencies' caseloads. The agency also did not provide psychological counseling services.  Report by Esther Beck, Exh. 190 at 382.

374.    In the Northern Schuylkill School District, elementary school teachers, high school teachers and the high school administrator reported that psychological counseling services are not included in students' IEPs. Students who need therapeutic counseling are referred to an outside agency, and it is paid for through the parents' insurance. Exh. 191 at 795.

375.    At Ashland Elementary School in the North Schuylkill School District, a PDE

observer reported that according to a special education teacher, the district does "nothing" to meet the behavioral needs of students and that staffing is not always adequate. Exh. 186 at 527.

376.     Staff at Roxborough High School in Philadelphia report that psychological counseling services, including crisis intervention and behavior management, are not included in the IEP. Students who need counseling are referred to a mental health agency where it is the parents' responsibility to ensure that the student receives the service and the parent may have to pay for the service, as well.  Exh. 206 at 7.

377.     In the Wilkes-Barre and Scranton School Districts, PDE observers reported that IEPs did not include psychological counseling as a related service. Exh. 186 at 519, 525.

378.     In the Wilkes-Barre School District, a PDE observer reported that according to district administrators, students with behavioral problems who have a Medical Assistance card can receive Therapeutic Support Services, but otherwise they "go without services."  Exh. 195 at 413.

379.     At  the Dan Flood Elementary School  in Wilkes-Barre, a PDE observer reported that counseling is not incorporated into students' IEPs as a related service; the observer reiterated that counseling is not available at the high school for non-Medicaid eligible students. Exh. 186 at 519.

380.     In Wilkes Barre, students with disabilities placed in alternative schools may not receive the special education and related services that are identified on their IEPs, in violation of 20 U.S.C. §1415(k)(2)(3)(B). Students with retardation placed in an alternative school would have to go to a private day treatment program or a partial hospitalization program rather than an alternative school attended by students who do not have disabilities. Learning support and emotional support students must be signed out of special education by their parents on a Notice of

Recommended Assignment form before placement in an alternative school.   Exh. 209a at 4.

381.    In the Pottsville School District, a PDE observer reported that according to three regular education teachers, the amount of related services is determined by availability, scheduling and related service providers' schedules. The teachers reported that a volatile student has no behavior plan and that the response to his behavior is to send him to the Dean of Students.  Exh. 186 at 539.

382.    OSEP found that students were denied other IEP services, including related services such as speech and occupational therapy. In Erie, related services providers reported that they must find their own substitutes or else the students receive no services while the therapist is out; that staff availability affected the frequency of therapy services; that therapists put fewer sessions than they intended to deliver on the IEP so that they are "covered" if they have to miss a therapy session; if they have to miss session, they do not have time to make them up. Exh. 186 at 538.

383.    In Philadelphia, PDE observers notes that "[s]ervices, goals, objectives, evaluation standard etc." on students' IEPs "were not specific in many instances," and that amounts of therapy were left open. Assistive technology was listed on IEPs as a service without specifying the device and in what situations it would be used. Students at the Widener School, a center for students with disabilities only, were denied therapies because of provider vacancy or because decisions to offer and terminate those services were made by the individual related service provider and not the IEP team. Related services were arbitrarily halted at certain times of the year so that personnel could do evaluations. Teachers reported difficulty obtaining devices such as FM units for hearing impaired students. Exh. 190: Memorandum to Jane Sullivan from Bill Riggar,

December 1, 2000 at 346-350; <u>see</u> Exh. 208 at 2. This evidence is all the more disturbing since students with physical disabilities are placed at Widener based on the assumption that their need for specialized therapies and assistive technology can be met there.

384.    In the Strawberry Mansion Cluster in Philadelphia, the Special Education Director reported that IEP services are identified based on staff availability rather than student need. Building administrators reported that they identify what the student needs but often can't provide it due to staff shortages and as a result, they provide as much as a year of compensatory education services to make up for the deficiency. Exh. 207 at 4.

385.    The Strawberry Mansion Special Education Director reported that the state has provided no help at all in addressing their shortages in speech and special education. Exh. 207 at 9. Similarly, the Special Education Directors of the West Philadelphia Cluster reported that the cluster has problems obtaining certified speech and special education teachers and that the state has not provided them any assistance.  Exh.209 at 2.

386.    A therapist in West Philadelphia reported to OSEP that it is "next to impossible" to meet student needs. The Special Education Directors agreed that services are stretched very thin because of providers' caseloads.  Exh. 209 at 2.

387.    OSEP found that obtaining assistive technology services was problematic in many school districts and preschool programs. In the Hazleton MAWA (Mutually Agreed-upon Written Arrangement or pre-school program), the PDE observer reported that "when the question of [assistive technology] came up, it was absolutely damning. All who dared speak complained that it can take up to a year to get an AT device and added many times the child has outgrown the device [by the time ir arrived]."  Report by Esther Beck, Exh. 190 at 381.

388.    A therapist at the Widener School in the Philadelphia School District reported that assistive technology that is not readily available is funded either through insurance or Medical Assistance, or it is requested from the state; however, if the state denies or delays payment, it has to wait until the next budget cycle, and the student will not received the device. OSEP Exh. 206 at 4.

389.    In Strawberry Mansion, according to the Special Education Director, training for staff, parents and students in the use of assistive technology devices is not always provided as needed. Many young, uncertified speech teachers work in the cluster, and they do not know very much about assistive technology and don't accept responsibility to ensure that students get the devices and are appropriately trained. One related services provider has been working for a year for one student to obtain a needed device. OSEP Exh.207 at 6.

390.    Philadelphia Charter Schools saw Assistive Technology as limited to "making computer available" and failed to have behavior management plans in place for students with behavioral issues. Exh.187 at 548.

391.    In some school districts, OSEP found that students with significant disabilities do not participate in the general curriculum but have their own separate curriculum. In the North Schuylkill School District, a high school teacher stated that students in Multiple Disabilities Support and Life Skills Support classes have a completely different curriculum from that of other disabled and non-disabled students. Learning Support teachers teach academic subjects with curricular content to full-time and part-time learning disabled students, although the teachers are not certified in the areas in which they teach, such as History, World Cultures and Economics. One social studies content class is offered each year, so that over four years, all special education

students take all four subjects – but out of sequence with their grade level. Sometimes the course offered to the typical students has been changed (a course dropped and a new one substituted), while the special education students are still taking the "old" course. Exh. 204 at 2.

392.    Building administrators and the Special Education Director in the Roxborough Cluster in Philadelphia reported that students participate in two separate curricula – the Philadelphia Frameworks, which is heavily academic and based on high standards, and the Life Skills Curriculum. Exh.206 at 2. Staff in the Washington Cluster and the Special Education Directors in the West Philadelphia Cluster confirmed that students with disabilities have a separate life skills curriculum for low-functioning students that is different from the curriculum offered to other students. Exh. 208 at 2; Exh. 209 at 2.

393.    High school teachers and a building administrator in the Olney Cluster reported that while special educators teaching academic subject area classes utilize the Philadelphia Frameworks, the extent of adaptation and modification required means that students do not receive the full curriculum to the same extent as nondisabled peers. According to a high school special education teacher, special education students generally do not participate in any fashion in the high school math curriculum, but in an alternate general math curriculum. Exh. 205 at 2.

394.    In Wilkes-Barre, the PDE observer reported that according to administrators, multi-handicapped and "[p]hysical support kids are missing services because don't [] know what to do with them." Exh. 195 at 413; Exh. 186 at 519.

395.    During the 2000 monitoring of Pennsylvania, OSEP reviewed and analyzed student records in the districts to which it made on-site visits. At the request of PDE, the Pennsylvania Training and Technical Assistance Network (PaTTAN) performed a similar review of students'

records "in response to OSEP's review of same." Exh. 196, Memorandum from Jane Sullivan to Fran Warkomski, December 1, 2000. The number of records reviewed was not comparable -- the sample PaTTAN reviewed was at least twice as large -- and the number of records that PaTTAN classified as "not applicable" was quite large for a number of items. Nevertheless, both reviews found that significant numbers of students' records contained violations of the IDEA regulations implementing the requirement that students with disabilities are educated with students who do not have disabilities to the maximum extent possible with supplementary aids and services.

396.     OSEP found that for nearly half the students evaluated -- 48.7% -- the team failed to consider multiple placement options. Exh. 211: Pennsylvania Case Record Review Form – Summary at 2. PaTTAN's analysis showed that this failure had occurred in 40.7% of the cases. PaTTAN, Pennsylvania Case Record Review Form – Summary, Grand Total -- All Records, Exh. 196 at 1212.

397.     OSEP found that for a vast majority of students whose records were reviewed – 86.7% –  the IEP failed to delineate participation in non-academic and extra-curricular activities. Exh. 211: Pennsylvania Case Record Review Form – Summary at 3. PaTTAN found this failure in 34.4% of the records.  PaTTAN, Pennsylvania Case Record Review Form – Summary, Grand Total - All Records, Exh 196 at 1212.

398.     Of the students whose records were reviewed, 26.4% were not attending the school that student would attend if not disabled. Exh. 211: Pennsylvania Case Record Review Form – Summary at 3. PaTTAN's figure was 19.8%.  PaTTAN, Pennsylvania Case Record Review Form – Summary, Grand Total - All Records, Exh. 196 at 1212. This percentage is for all students with disabilities, but the proportion for students with significant disabilities is

undoubtedly far higher because, as OSEP investigation showed, these are the students who are most likely to be assigned to categorical placements.

399.     OSEP found that 21 out of 123, or 17.1 percent, of students with disabilities placed in regular education did not have special education and related services included in their IEPs. OSEP found that necessary supports for students with disabilities were not included in students' IEPs for 30 out of 120, or 25%, of students with disabilities who were placed in regular education. A significant number of students with disabilities placed in regular class are denied the supplementary aides and services they need to receive a free, appropriate public education. Exh. 211 at 1. PaTTAN's comparable figures were 11.5% and 15.3%, respectively.   Exh. 196 at 1212.

400.     OSEP found that about half the students who needed behavioral support were not receiving an appropriate form of this essential service. OSEP found that over half the students who needed a Functional Behavioral Assessment (FBA) -- 54.55%  -- did not have one that accorded with federal regulations. More than half the students who needed a behavioral support plan – 51.5% -- did not have an appropriate plan included in their IEPs. Exh. 211 at 1-2. PaTTAN's figures for the same items were 40.8% and 29.8% respectively. Exh. 196 at 1212.

401.     According to OSEP, one-third of the students who had an evaluated need for assistive technology were not provided it.  Exh. 211 at 2. PaTTAN's analysis found a comparable violation for 16.7% of the students reviewed.  Exh. 196 at 1212.

402.     According to OSEP, in 27.3% of the records reviewed, the student's IEP did not delineate access to the general curriculum. OSEP Exh.211 at 3. PaTTAN insisted this was so for only 8.3%.  Exh. 196 at 1212.

403.     According to OSEP, in 31.1% of the records reviewed, the student's IEP did not

identify specific special education and related services. Exh.211 at 3. PaTTAN found this to be the case for only 7.9%. Exh. 196 at 1212.

404. According to OSEP, in 21.1% of the records reviewed, the student's IEP did not include modifications and accommodations. Exh. 211 at 3. PaTTAN claimed this was so for only 7.9%. PaTTAN, Pennsylvania Case Record Review Form – Summary, Grand Total - All Records, Exh. 196 at 1212.

405. OSEP found that in a majority of the records reviewed – 57.2% – the student's IEP failed to include the frequency of the services to be provided. Exh. 211 at 3. PaTTAN claimed this was the case for 18.2%. Exh. 196 at1212.

406. The OSEP review vividly illustrates Dr. Brown's description of the reflexive placement process for special education students with significant disabilities in Pennsylvania:

> First, a team of professionals evaluates a student and determines that she-he is eligible for Special Education services.
>
> Second, it assigns that student a special education label.
>
> Third, if there is not an opening in a Special Education classroom in a school close to the home of the student, or if the home school does not operate a Special Education classroom for such persons, the student is then transported to a school that does.

Exh. 44, Brown Report at 4.

**H.   PDE HAS ABDICATED ITS RESPONSIBILITY TO ASSURE
THAT STUDENTS WITH DISABILITIES ARE EDUCATED IN
REGULAR CLASS WITH SUPPLEMENTARY AIDS AND
SERVICES TO THE MAXIMUM EXTENT APPROPRIATE.**

407.   The Pennsylvania Department of Education affirms as a goal that students with

disabilities should spend increasing amounts of time in regular classes. This includes students with

retardation, autism, emotional support needs, physical disabilities and multiple disabilities.

However, Pennsylvania, unlike some other states, has no targets for increasing the number of

students who spent 80% of the day or more in regular class.  Exh. 4, Carricato Depos. at 84-88,

95-97.

408.   PDE asserts that it communicates the goal of increasing participation in regular

class through the Inclusion BEC and by placing emphasis on improvement in reading instruction

and behavior management. However, PDE's message is oblique at best: "What we communicate

to school districts is that instruction is the goal .... Where it happens is a decision of the IEP

team." Exh. 4, Carricato Depos. at 88-90.

409.   PDE does not communicate to school districts that it expects them to offer

"effective strategies, evidence-based practices" in conjunction with regular classroom placement;

rather, it assumes that "[a] result of improved instruction in reading and behavior management

strategy will be increased time in regular class." Exh. 4, Carricato Depos. at 90-91.

410.   Rather than require school districts to offer effective supplementary aids and

services, such as reading programs and behavioral support, in conjunction with regular classroom

placement and to train teachers to adapt and modify curriculum and instruction to accommodate

students who are working at different reading levels, PDE's strategy is to "wait and hope" that

students with disabilities will make enough progress in reading and behavior to earn their way into regular class.

411.     PDE's asserted reliance on reading instruction and behavior management to produce sufficient improvement in the accomplishment of students with those disabilities to enable them to gain greater access to regular class offers little hope to students whose disabilities lie in areas other than reading and behavior, for example students with dyscalcula, non-verbal learning disabilities, attention deficit disorder, communication disorders including those typical of autism, physical disabilities, significant cognitive disabilities, emotional support needs that do not involve challenging behavior and multiple disabilities.

412.     PDE's position is that it cannot determine whether individual students are educated in regular class with supplementary aids and services to the maximum extent appropriate because it is "obligated to respect the IEP's decision in that area." Exh. 4, Carricato Depos. at 75, 80-81. That is directly contrary to the legal requirement that the State Educational Agency monitor local education agencies compliance with the legal standards that govern placement decisions under the Act. In assuming this position, PDE has effectively abdicated its responsibility for general supervision of special education in Pennsylvania and its responsibility to assure that students with disabilities receive educational benefit.

413.     As the OSEP review makes plain, students with disabilities in most school districts in Pennsylvania are denied the right to be educated in regular class with individualized supplementary aids and services. Too often, the only alternative to a separate special education placement offered to students with disabilities and their parents is the regular class without support.

414.     The state's responsibility for general supervision of special education programs encompasses all the requirements of 20 U.S.C. §1412(a), as well as the comprehensive personnel development requirements of 20 U.S.C. §1453(c)(d)(3)(D). Exh. 34: Schrag Depos. at 6.

415.     PDE uses three basic methods, all required by federal law, for assuring compliance with the mandates of the Individuals with Disabilities Education Act: compliance monitoring, special education plan approval and complaint resolution, pursuant to 20 U.S.C. § 1221e-3 and 34 C.F.R. § 300.660-662.  PDE also maintains a dispute resolution process, including mediation and due process hearings.

416.     The complaint resolution process (CRP) is the responsibility of the Division of Compliance of the Bureau of Special Education. PDE's complaint resolution process does not address complaints that a school district's proposed placement does not represent the least restrictive environment; PDE considers that it is not within the jurisdiction of the Division of Compliance to make that determination. Exh. 4: Carricato Dep. at 66-67.

417.     As designed by PDE, Pennsylvania's compliance monitoring system cannot even identify, let alone correct, educational placements that do not comply with 20 U.S.C. § 1412(a)(5) and 34 C.F.R. § 300.550.

418.     A state's monitoring system "absolutely" must look at educational benefits. Exh. 34: Schrag Depos.at 12.  While "[i]n the past states across the country have been more focused on procedural guarantees, ... the trend and guidance from the federal government has been to balance procedural guarantees with the review of educational benefit." Id.at 10. However, PDE's compliance monitoring system is "procedurally oriented now." Exh. 4: Carricato Depos. at 136. It does not inquire whether students are receiving educational benefit, including the benefit of being

educated in regular class to the maximum extent appropriate. Exh. 65: Tucker Report II and Exh. 40: Tucker Depos. at 70.

419.     PDE's monitoring system does not contain a mechanism for ascertaining whether the statutory and regulatory standards of 20 U.S.C. §1412(a)(5) and 34 C.F.R. §300.550 are met. Exh. 40: Tucker Depos. at 70.

420.     PDE does not monitor implementation of school districts' Comprehensive System of Personnel Development Plans. PDE's Rule 30(b)(6) designee acknowledged that "we can improve that area." Exh. 4: Carricato Depos. at 153. See Ex. 36: Smochko Depos. at 47, 51-52.

421.     The Disabilities Education Act requires PDE to monitor local education agencies to assure that students with disabilities are educated with students who do not have disabilities to the maximum extent appropriate and that they are removed from regular class only when they cannot satisfactorily be educated in regular class with supplementary aids and services. The Act's regulation implementing 20 U.S.C. § 1412(a)(5), C.F.R. § 300.556, "Monitoring Activities," requires that:

> (a) The SEA shall carry out activities to ensure that §300.550 is implemented by each public agency.
>
> (b) If there is evidence that a public agency makes placements that are inconsistent with §300.550, the SEA shall—
>
> > (1) Review the public agency's justification for its actions; and
> >
> > (2) Assist in planning and implementing any necessary corrective action.

See Exh. 34: Schrag Depos. at 7.

422.     In addition, the state is expected to monitor and evaluate students' Individualized Education Programs (IEPs). 34 C.F.R. § 300.128(b)(2).

423.     In the late 1990s, defendants designed a new process for compliance monitoring of local school districts. After a pilot test in 2000, the new process was revised and implemented beginning in the 2001-2002 school years. Exh. 34: Schrag Depos. at 20; Exh. 174:

424.     The impetus for PDE's new monitoring system came from changes in monitoring of special education programs at the federal level, specifically, the development by the United States Department of Education, Office of Special Education Programs (OSEP) of a method of monitoring called the Continuous Improvement Monitoring Process. PDE intended its new monitoring monitoring system to be more closely aligned with OSEP's process.  Exh. 174: Pennsylvania Department of Education, Bureau of Special Education, Compliance Monitoring System (July 2002).

425.     The OSEP monitoring process on which PDE modeled its current monitoring system is based on the model of continuous improvement from a baseline of data that focus on educational results for students with disabilities. It consists of the following key components:

    a)     Self-Assessment: an analysis of the State's success in achieving compliance with the Disabilities Education Act that establishes a baseline for measurement of the state's progress. OSEP strongly recommends that states use OSEP's Continuous Improvement Monitoring Process Cluster Areas as the basis for their self-assessments. OSEP's Part B Cluster Area F is designed to measure progress in the provision of a free, appropriate public education in the least restrictive environment.

    b)     Validation Planning:  reviewing the results of the self-assessment phase, and developing a data collection plan.

    c)     Validation Data Collection: collecting data.

d)      Reporting to the Public: addresses strengths, areas that need improvement, areas of noncompliance and specific corrective action.

e)      Improvement Planning: development of an improvement plan that addresses both compliance and improvement and includes timelines, benchmarks and methods to verify improvement. Typically, the plan would include technical assistance tailored to improved performance.

f)      Implementation of Improvement Strategies.

g)      Verification and Consequences.

United States Department of Education, Office of Special Education Programs, Continuous Improvement Monitoring Process, 2000-2001 Monitoring Manual at 6, 7-9, http://www.dssc.org/frc/monitor.htm, visited July 6, 2003.

426.     PDE's expert witness Judy Schrag testified that to be "reasonably calculated to determine the extent to which local and intermediate entities are in compliance," a monitoring system should be consistent with the directions of the National Monitoring Center funded by the Office of Special Education and Rehabilitative Services (OSERS, the agency within the United States Department of Education that houses OSEP). That means the monitoring system should be data driven from state performance goals; contain a mechanism for local education agencies to carry out self-assessments with the guidance of the state office and address the findings in a special education plan or other planning mechanism; and provide for the state to go on site to verify and validate the district's findings. Exh. 34: Schrag Depos. at 8, 9-10.

427.     According to Dr. Schrag, a school district that is not in compliance with the requirement that students with disabilities be educated in regular class to the maximum extent

appropriate would exhibit the following characteristics:

> [T]he Penn data would probably show more students than the
> average in the state of students outside of the general classroom 60
> percent of the time or whatever [and] the district would not be able
> to satisfactorily describe the decision making process [that] IEP
> teams make to assure to the state that they are making good
> decisions reasonably calculated to provide educational benefits.
> That school system would not be able to adequately describe the
> support and services they are providing in the general classroom
> and for that matter in special education.
>      They may have out of district placements for which they are
> not involved on an ongoing basis in the planning and transition
> back. They might have students that are placed in schools not in
> their neighborhood. ... [A]nd they may not be providing their
> teachers with training.
>      These would be all probes, and the are part of the questions,
> in fact, that are asked on site. And there could likely then be
> corrective action required by the school system.

Exh. 34: Schrag Depos. at 42-43.

428. Dr. Schrag's description fits many of the sample school districts and other school districts whose Facilitated Self-Assessments and special education plans are contained in Exh. 129-173. Yet PDE has not required corrective action of any of these school districts to increase opportunities for placement in regular classes and district schools. In its monitoring process, PDE does not require school districts to "satisfactorily describe the decision making process the IEP teams make," nor to "describe the support and services they are providing in the general classroom" nor the training they make available. PDE does not require or expect school districts to plan for the transition back to the district or the home school of students who attend school far from home. See Schrag Depos. at 77. Since PDE does not even ask these questions, it is unsurprising that PDE requires no corrective action where these conditions exist.

429. PDE asserts that its current monitoring system is intended to focus on consistent

systemic improvement, that monitoring will result in corrective action plans developed by PDE and Improvement Plans developed by LEAs, and that improvement strategies in response to monitoring will incorporate technical assistance provided by PaTTAN and the Intermediate Unit Comprehensive Systems of Personnel Development. Exh.174: Pennsylvania Department of Education Bureau of Special Education Compliance Monitoring System, Introduction; see Exh. 214: Pennsylvania State Improvement Plan at 23, 65.

430.    In PDE's compliance monitoring process, the school district prepares a Facilitated Self-Assessment (FSA) prior to the on-site portion of the monitoring. In the FSA, the school district analyzes its own compliance in areas that include "policies, procedures, student outcomes, file reviews and program operations." The purpose of the FSA is to "facilitate discussion between the LEA and monitoring team and to identify areas that need improvement." Exh. 174, "Description of the CMCI Process."

431.    Following preparation of the FSA, the monitoring team reviews a sample of student records on-site in the district to determine compliance with requirements for evaluation, IEP development, placement, secondary transition and procedural safeguards. Id.

432.    The monitoring team interviews parents and teachers of the sample students to determine whether the school district involves parents and professionals in the student's special education services as required, whether programs and services are being provided, and "whether the LEA provides training to enhance knowledge." Id.

433.    After the monitoring has been completed, the Bureau of Special Education issues a report to the school district with findings in ten topical areas (Policies and Procedures; Performance Outcomes; Training for Parents and Professionals; Evaluation of Students; IEPs;

IEP Implementation; Secondary Transition; Educational Placement (including LRE); Discipline; and Procedural Safeguards. The report is to list findings and state whether corrective action is required. PDE expects that "the majority of corrective action activities will be individually designed by the LEA based on their own unique circumstances and goals" and that the LEA typically will recommend a corrective action strategy and timeline, in which PaTTAN educational consultants will be required to participate and I.U. CSPD staff will be available to assist. Id. The school district and the Bureau of Special Education are to agree upon the Compliance Plan.

434.    The school district is expected to take corrective action, which will then be verified by the BSE employee assigned to that district and a PaTTAN educational consultant. Id.

435.    The FSA contains a section entitled "Least Restrictive Environment," in which the school district is asked to provide data on the educational placement of all its students with disabilities. Specifically, the school district is asked to compare with state averages the percentage of its students who receive special education outside the regular school class less than 21% of the school day; the percentage who receive special education outside the regular school class from 21-60% of the school day; the percentage who receive special education outside the regular school class for more than 60% of the school day; and the percentage of students placed in public separate facilities, private day schools and residential facilities. Id., Facilitated Self-Assessment at 38.

436.    In addition to those aggregate percentages, the school district is also required to list the number of students by primary disability who are educated in each of the above six categories of placement as well as those who receive instruction in the home. The categories of disability are Autistic/PDD; Blind/Visually Impaired; Deaf/Hearing Impaired; Mentally Retarded;

Multiply Disabled; Neurologically Impaired (Traumatic Brain Injury); Other Health Impaired; Physically Disabled; Seriously Emotionally Disturbed; Specific Learning Disabled; and Speech and Language Impaired. The form does not ask the school district to compare its figures with state averages for any of these disability classifications.  Id. at 39.

437.    The PDE Chairperson of the monitoring team is to review the data and answer "yes" or "no" to the question whether "[t]he LEA is complying with requirements for use of non-restrictive settings comparable to the state average." Id. at 40.

438.    The FSA asks the school district team to "begin and sustain discussion" on "indicators of effective programs," including "What measures are taken to ensure that services are provided to children with disabilities first in the general education environment?" "Are there specific disability groups that have a high number of children in more restrictive settings?" and "Do you see an increase in the number of children with disabilities served in general classrooms?" Id. at 43.

439.    Finally, BSE personnel are to complete the LRE section of the FSA by noting the "Conclusion for LRE" by checking "Yes, In Compliance" or "No, Not in Compliance."

440.    The FSA also contains a section on Student Record Review in which the school district is asked to assess whether the school districts "has developed IEPs as required under federal and state regulations." Id. at 66. For this part of the FSA, the Bureau of Special Education selected the names of students whose files will be analyzed, and Bureau staff review the selected files and tabulate the results in the monitoring review. The FSA contains a number of discussion points for the school district to use concerning file review; the only discussion points relevant to 20 U.S.C. § 1412(a)(5) are "Does the file review document that related services and

132

supplementary aids are included if needed to provide a free appropriate public education?"and "Does the educational placement documented on the IEP reflect the student's current educational placement?" Id. at 67-69.

441.	The Parent Interview portion of the monitoring process contains twenty-two questions, four of them open-ended. The other questions on the instrument ask the parent to indicate various levels of agreement with several affirmative statements indicating compliance with the Disabilities Education Act. The affirmative statements relevant to placement are "My child does classroom work with students without disabilities" and "My child participates or has the opportunity to participate in school activities other than classroom work with children without disabilities." As framed, the questions are leading. Exh.4: Exh. 174: Special Education Parent Interview.

442.	The Regular Education Teacher Interview portion of the monitoring process contains seven questions, none of them open-ended. The questions ask the teacher to respond "yes" or "no" to affirmative statements indicating compliance with the law, including "Do you adapt and modify the general education curriculum based on the student's IEP?" and "Are necessary supplemental aids and services as required in the student's IEP provided to support this student in regular education?" As framed, the questions are altogether leading. Exh. 174: Regular Education Teacher Interview.

443.	The Special Education Teacher Interview portion of the monitoring process contains fourteen questions, none of them open-ended. The questions ask the teacher to respond to affirmative statements indicating compliance with the law, including "Is this student participating in the regular class and the general education curriculum with children without

disabilities to the maximum extent possible?" and "Are you and the related service personnel and regular education staff working together toward meeting measurable goals and objectives ?" As framed, the questions are throughly leading.  Exh. 174: Special Education Teacher Interview.

444.    The File Review portion of the monitoring process is almost entirely procedural. The district is found in compliance if documents are present and prepared within timelines and if forms, evaluation reports and Individualized Education Programs contain required information and signatures. Students' IEPs are not reviewed for substantive educational benefit. Exh. 174: File Review (of Student Files).

445.    In the File Review portion of the monitoring, it is a "variable practice" whether PDE chooses its random sample from the files of every student who is the district's responsibility, including those students who are placed out of district. Although it is the goal "to include more fully out of district students," sometimes those students are monitored as part of the district's monitoring, and sometime they are not. Exh. 34: Schrag Depos. at 69-70.

446.    Similarly, it is a "variable practice" whether PDE monitors students in classes operated by the intermediate unit within school district buildings when it monitors a school district. According to Dr. Schrag, "their intent is to monitor them but they have not always done it." Exh. 34: Schrag Depos. at 74-75.

447.    Because of these "variable practices," it is likely that the programs of an unknown but potentially significant number of special education students have not been monitored by PDE at all in the course of PDE's monitoring of the school districts in which they reside.

448.    During the Verification portion of the monitoring process, PDE verifies whether certain information contained in the Facilitated Self-Assessment is accurate.

449.    PDE's monitoring process does not determine compliance or non-compliance with the integration mandate of the Individuals with Disabilities Education Act, and indeed it cannot. The reason is that it simply is not designed to measure compliance with that requirement of the Act. The measures of school district performance that the monitoring process examines under the rubric of Educational Placement and the Least Restrictive Environment in fact are irrelevant to the question whether students are educated with students who do not have disabilities to the maximum extent appropriate.

450.    Although OSEP regulation specifically requires the State Education Agency to monitor compliance with the substantive requirements of 34 C.F.R. § 300.550, PDE does not measure students' programs against this standard. Rather, in the File Review portion of the monitoring process,  PDE monitors compliance with 34 C.F.R. § 300.347(a)(4), which specifies information that must be included in students' Individualized Education Programs. That section of the regulation requires that each student's IEP contain "[a]n explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in paragraph (a)(3) of this section (referring to nonacademic and extracurricular activities)." PDE monitors are instructed to report whether or not the student is in the placement stated in his IEP and whether his IEP contains an explanation of the extent, if any, the student will not participate in regular class. This condition is satisfied if the section of PDE's standard IEP format labelled "Explanation of the extent, if any, the student **will not participate** with non-disabled children in the regular class and in the general education curriculum" is filled in. Compliance Monitoring Report, File Review, Part VI, Least Restrictive Environment, Nos. 119 and 120; Exh. 4, Carricato Dep. at 185-90; Exh. 174, File Review (of Student Files) and

Individualized Education Program (IEP) Format at 6 (emphasis in original).

451.    PDE's monitoring of a random sample of students' files cannot determine whether those students are being educated in regular class to the maximum extent appropriate since it does not measure compliance with the integration mandate of IDEA in 20 U.S.C. § 1412(a)(5) and 34 C.F.R. § 300.550. In PDE's interpretation, the requirement of § 300.347(a)(3)(2) is satisfied if the IEP contains any explanation, including a simple description, of the student's placement. Exh. 4: Carricato Depos. at 189-90.

452.    PDE's inquiry whether the student's IEP satisfies 34 C.F.R. §300.347(a)(3)(2) does not measure whether the student can satisfactorily be educated in the regular class with the use of supplementary aids and services because "it only asks for an explanation, if any, why the student doesn't." The monitoring instrument does not indicate whether or not the benefit of placement in regular class has been achieved or could be achieved with the provision of supplementary aids and services. Exh. 40: Tucker Depos. at 71.

453.    Exhibit 213 is a summary of the "Explanation of the extent, if any, the student will not participate with non-disabled children in the regular class and the general education curriculum" in the IEPs of a sample of special education students drawn by plaintiffs in their study of special education in ten randomly-selected school districts. Within each school district, students with specific learning disabilities, retardation, autism, emotional support needs and multiple disabilities were chosen at random.

454.    Exhibit 213 shows how inadequate is the "explanation" contained in IEPs in Pennsylvania pursuant to 34 C.F.R. § 300.347 as a measure of whether the student is educated with students who do not have disabilities to the maximum extent appropriate. Many

"explanations" simply describe the student's placement:

> "All academics are in the Resource Room, all other course work is in reg. educational setting (p. 1);

> "He eats lunch in the cafeteria, and participates in the Key Club on Fridays" (p. 4);

> "Learning Support Keystone Charter School full-time 100% of Time" (p. 10).

Other "explanations" attempt to justify the student's placement, not as an application of the statutory standard but more often on the basis of the student's developmental or intellectual functioning:

> "Danny's condition and specific needs prevent him from involvement in general curriculum" (p.2);

> "Delays in the development of academic skills prohibit Isaiah from learning at a rate commensurate with same age peers in a regular class setting. Student will attend a life skills support class 90% of the time for development of academic and social skills" (p. 3);

> "Jeromy requires an environment where his self-care, communication, cognitive, social/emotional needs can occur 100% of the time. These needs are best met in a full time special education setting" (p. 5);

> "Steve's cognitive skills prevent him from being placed in all mainstreamed subjects and needs to continue in learning support classes" (p. 6).

Some "explanations" imply that the student can be included in regular class only when he needs no adaptation of the regular curriculum or when he overcomes the characteristics of his disability:

> "Brandon will be eligible if he can get his emotional problems under control. Regular classes are too restrictive [sic] at this time" (p. 1);

137

"Michael will be included in regular education at all times except when adaptations as outlined in the specially designed instruction portion of his IEP are being implemented" (p. 4).

455.    PDE's determination whether a school district is in compliance in the area of Educational Placement, one of the ten topical areas in which findings of compliance are made, is based on the results of portions of the Facilitated Self-Assessment. Results of parent interviews are listed under the topical area of Educational Placement, but do not result in findings of compliance or non-compliance. See, e.g., Exh. 129: Report of Findings for Abington School District (January 30, 2002) at 15-16.

456.    The parts of the FSA on which PDE bases its findings of compliance in the area of Educational Placement topic area are referenced to three regulatory standards. The first standard (FSA 11) is compliance with 34 C.F.R. § 130(a), "The State must have ... procedures that ensure that the requirements of §§300.550-300.556 are met, including the provision in §§300.551 requiring a continuum of alternative placements to meet the unique needs of each child with a disability." PDE does not monitor the school district's compliance with any requirement of §§ 300.550-300.556 except that of § 300.551(a) which requires that "each public agency shall ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." Exh. 174: FSA at 36.

457.    Section 300.551 also requires, in Section (b), that "The continuum required in paragraph (a) of this section must

> (1) Include the alternative placements listed in the definition of special education under §§300.26 (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions); and

(2) Make provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement.

458.     PDE measures compliance with FSA 11 by comparing the educational placement data for all students with disabilities, in the aggregate, in that district, to the overall state averages for all students with disabilities. Exh. 174: Facilitated Self-Assessment at 38-40.

459.     The second standard (FSA 12) that PDE uses to determine the school district's compliance is the teacher caseload requirement of a Pennsylvania state regulation, 22 Pa. Code § 14.142(a), "Caseload for special education." The regulation establishes the maximum caseload allowed on a single teacher's roll in the following chart:

| Type of Service | Itinerant | Resource | Part-time | Full-time: |
|---|---|---|---|---|
| Learning Support | 50 | 20 | 15 | 12 |
| Life Skills Support | 20 | 20 | 15 | 12 Elementary |
| | | | | 15 Secondary |
| Emotional Support | 50 | 20 | 15 | 12 |
| Deaf and Hearing Impaired Support | 50 | 15 | 10 | 8 |
| Blind or Visually Impaired Support | 50 | 15 | 15 | 12 |
| Speech and Language Support | 65 | | | 8 |
| Physical Support | 50 | 15 | 12 | 12 |
| Autistic Support | 12 | 8 | 8 | 8 |
| Multiple Disabilities Support | 12 | 8 | 8 | 8 |

The third standard (FSA 13) that PDE uses to determine the school district's compliance is the age range requirement of the same Pennsylvania state regulation, 22 Pa. Code § 14.142(f). This regulation establishes the maximum age range in a special education class: three years in elementary school (grades K-6) and 4 years in secondary school (grades 7-12) and states that "A student with a disability may not be placed in a class in which the chronological age from the youngest to the oldest student exceeds these limits unless an exception is determined to be

appropriate by the IEP team and is justified in the IEP." Id.

460. Of the three standards, FSA 11-13, only the first, FSA 11, in any way measures the district's performance of its obligation to educate students with disabilities with students who do not have disabilities. However, FSA 11 does not measure whether any student is, in fact, educated with students who do not have disabilities to the maximum extent appropriate, but only whether students are placed in a variety of different settings in proportions that are more or less consistent with the state average.

461. Neither the Facilitated Self-Assessment nor any other component of the monitoring process inquires whether the school district makes resource room or itinerant instruction to be provided in conjunction with regular class placement.

462. In the Facilitated Self-Assessments, PDE compares the percentages of LEA students with disabilities in the continuum of educational placements to state averages.[9] The

_____

[9] The placement categories are:

(a)    Percent of LEA students who receive special education outside the regular school class less than 21% of the school day to the state average, for which PDE reported the state average in the 2001-2002 monitorings as 35.7% and in the 2002-2003 monitorings as 50%.

(b)    Percent of LEA students who receive special education outside the regular school class 21-60% of the school day, for which PDE reported the state average as 33% in 2001-2002 and 28.7% in 2002-2003.

(c)    Percent of LEA students who receive special education outside the regular school class more than 60% of the school day, for which PDE reported the state average as 27.8 in 2001-2002 and 17.5% in 2002-2003.

(d)    Percent of LEA students who receive special education in public separate facilities (centers), for which PDE reported the state average as 2% in 2001-2002 and 1.6% in 2002-2003.

Facilitated Self-Assessment requires the PDE Chairperson of the monitoring team to review the data provided by the LEA and answer the following question: "In any of the above 6 questions, when compared with the state percentages, does the LEA demonstrate disproportionate placement that would adversely affect the availability of LRE?" If the answer is yes, the FSA asks for an explanation.

463. None of the FSAs plaintiffs have received from defendants in discovery have this part of the FSA filled in; that is, "yes" and "no" are not checked, and no explanation is provided. The FSA then lists the number of students by each disability classification who receive special education outside the regular class for less than 21% of the school day, from 21 to 60% of the school day, more than 60%, in special education public schools, approved private schools, private residential schools and instruction in the home. The PDE Chairperson is required to analyze the data and answer "yes" or "no" to the following question: "The LEA is complying with requirements for use of non-restrictive settings comparable to the state average." The Chairman is then to indicate any "special considerations." Exh. 174.

464. None of the FSAs that plaintiffs obtained from defendants in discovery had the response to this question nor any "special considerations" filled in. See Exh. 129 - 173. PDE's

---

    (e)    Percent of LEA students who receive special education in private separate facilities (private day schools), for which PDE reported the state average as 1% in 2001-2002 and 1.4% in 2002-2003.

    (f)    Percent of LEA students who receive special education in public or private separate residential facilities, for which PDE reported the state average as 0.6 in 2001-2002 and 0.4% in 2002-2003.

Id. at 38. See, e.g., Exh. 129: Facilitated Self-Assessment for the Abington School District, January 13, 2002 at 42; Exh. 130: Facilitated Self-Assessment for the Aliquippa School District, March 3, 2003 at 40.

Rule 30(b)(6) designee could not explain why they do not, but testified that "the protocol is that no or yes is to be checked." Exh. 4, Carricato Depos. at 180.

465.    Neither the FSA itself nor PDE's manual for its Compliance Monitoring System contains any instructions, definitions or direction for responding to these questions. It is not stated what the requirements are for "use of non-restrictive settings," nor are the state averages pertinent to the second question provided, nor is a "non-restrictive setting" defined. How much variation is permitted  from state averages before the school district will be found non-compliant is not specified. Compliance is not defined as a statistical derivative, but is left to the judgment of the PDE Special Education Advisor. Exh. 4, Carricato Depos. at 180.

466.    PDE conducts a cyclical monitoring, and, if noncompliance is found in the area of FSA 11, requires corrective action and evidence of change. See, e.g., Abington School District, Corrective Action Verification/School District Compliance Plan, Exh.129.

467.    In PDE's monitoring design, monitoring of a school district precedes the development of that school district's special education plan by one year. Exh. 4, Carricato Depos. at 191.

468.    In the plan that follows monitoring, PDE requires the school district to address any compliance issues that were found in monitoring, including disproportionate numbers of students placed in separate settings. Exh. 4, Carricato Depos. at 192.

469.    School district's special education plans are submitted on a three-year cycle. Plans are submitted the year before the three year period of the plan begins. For example, special education plans for 2000 - 2003 were submitted to PDE for approval in 1999.  Exh. 4, Carricato Depos. at  190-91.

470.     PDE's Rule 30(b)(6) designee could not explain why, given PDE's

monitoring/planning design, some school districts were monitored the year after their plans were

submitted, rather than the year before. In fact, in most of districts whose recent special education

plans have been obtained by plaintiffs, monitoring occurred after plan development, not before,

and in any case, most plans do not address LRE (that is, FSA 11) violations found during the

monitoring at all.

471.     Plaintiffs' Exh. 128 is a chart comparing the placement data reported in the FSA,

the results of the district's compliance monitoring of FSA, the corrective action or improvement

plan, if any, to address educational placement that was either required by PDE or proposed

voluntarily by the school district in its special education plan. It also includes provisions in the

Comprehensive Personnel Development section of the school district's plan for training related to

inclusion.

472.     The FSAs and Compliance Monitoring reports and corrective action verification

were obtained from PDE in discovery in two groups of documents. One set was produced in May,

2002 and consisted of FSAs and monitoring reports from all the districts PDE had monitored

since its current monitoring system was initiated in October, 2001. The second group was

produced in May, 2003, by which time PDE had monitored a much larger number of school

districts. Plaintiffs selected every fifth school district and a handful of other districts of interest

(for example, because the district in the home school district for one of the named plaintiffs). See

Exh. 1, Declaration of Judith Gran.

473.     Plaintiffs obtained the most recent special education plan for districts monitored by

PDE from 2001 to 2003 from local school districts by submitting requests for copies of those

documents under the Pennsylvania Right to Know Act, 65 P.S. § 66.1. By this method, plaintiffs obtained monitoring reports and special education plans for 45 school districts. For 26 of those school districts, PDE also produced a Facilitated Self-Assessment.

474.    For districts with a Facilitated Self-Assessment that was produced, the chart in Exhibit 128 reports the percentage of students with disabilities placed outside regular class for less than 21% of the school day, as well as the percentages of students with significant disabilities (autism, retardation, multiple disabilities, physical disabilities and emotional disturbance). The chart also notes the percentage of the district's special education students who are placed outside the district and the percentage of programs housed in the district that are operated by the Intermediate Unit. Where the district's professional development plans were concrete enough to track in the Act 48 database and were to occur before March 2003, when the last entries in plaintiffs' copy of the Act 48 database were made, plaintiffs checked the district's plan for personnel development in the area of inclusive practice against the record of professional development activities in defendants' Act 48 database.

475.    The chart shows that PDE found violations of FSA 11 in ten of the 45 districts. Despite PDE's design in which "monitoring precede[s] plan," Exh. 4, Carricato Depos. at 191, monitoring occurred in the year preceding initiation of the school district's special education plan in only four of the 45 districts. In only one of the districts in which PDE found a violation of FSA 11, the Chambersburg Area School District, did monitoring precede plan. The corrective action required by PDE for the violation of FSA 11 was "LEA will implement a PDE approved LEA improvement plan." However, the district's special education plan contained no improvement plan for increasing opportunities for students with disabilities to be educated with students who do not

have disabilities and no plans for personnel development in inclusive practice. Exh. 136: Special Education Plan at 2.

476.     The failure of the Chambersburg plan to address inclusion is all the more remarkable since, at the time of the 2003-2006 planning cycle, PDE's plan format required school districts explicitly to address improvement in the area of the "least restrictive environment." The plan format asked the district, "Using the data from the school district's data summary sheet, address baseline information, analyze that information with the programs and services already in place or that the school district's contracts for, then address any improvement steps that the school district is planning to implement." The plan format asks the school district to present "Baseline LRE Data," an "Analysis of Data" and specify "Performance Targets, Improvement Steps and Percentage Improved." Exh. 136: Chambersburg Area School District, Special Education Plan, 2003-2006 School Years at 15.

477.     Chambersburg's analysis of LRE data stated that "The District needs to review its tracking system of the level of intervention. Everyone needs to understand and use the same definitions." The district's performance target is that "Percentages will better reflect the State averages when the tracking data is accurately reported."

478.     The same 2003-2006 plan shows that 140 of Chambersburg's 1,248 special education students, or 11.2 %, are placed <u>outside</u> <u>regular</u> <u>school</u> <u>buildings</u> – a figure that is several times the state average of 3.4% -- and that many of these students are placed in institutions. Exh. 136: Chambersburg Area School District, Special Education Plan, 2003-2006 School Years at 13-14, 4. Since all the schools and institutions attended by these students are listed by name in the Chambersburg Special Education Plan, it would be a remarkable data

collection error if this disproportionate placement pattern were the product of a problem with "tracking data."

479.    It cannot be discerned from the chart what standards PDE monitors apply for determining noncompliance with FSA 11. In a number of school districts whose FSAs and compliance monitoring reports are included in Exh. 129-173, the percentages of students with significant disabilities who were included for 80% of the day or more in regular class was well below state averages, yet the district were found in compliance with FSA 11, and there is no evidence of any further action on PDE's part.

480.    In 2002, when the state average percentage of students educated outside regular class for less than 21% of the school day was 35.7, the Abington School District, with an average of 23%, was found in noncompliance with FSA 11. PDE required as corrective action that "LEA will implement a PDE approved LEA improvement plan." Exh. 129, Compliance Monitoring Report at 1.  However, in the same year, the Keystone Central School District was found in compliance with FSA 11, although only 20% of special education students were educated outside regular class for less than 21% of the day, and no student with autism, retardation or multiple disabilities and only 6.5% of students in emotional support were educated outside regular class for less than 21% of the day in that district. Exh. 146: Keystone Central School District.

481.    PDE found the Lower Moreland Township School District in compliance /with FSA 11, although no student with retardation, multiple disabilities or emotional disturbance was educated in regular class for 80% of the day or more, which is significantly lower than the state averages for these disabilities. Exh. 147 (Lower Moreland documents); Exh. 198 (placement data).

482.    Other special education plans from the 2003-2006 planning cycle purport to address educating students in the least restrictive environment but in fact do not. The Fairview School District, where more than 11% of all special education students are placed outside the district, did not include any improvement steps for increasing participation in regular classes and schools in the "LRE" section of its special education plan. Its performance target is to reduce the number of students identified as needing special education: "We project a slow decline in the number of identified M.R. students over the next three years." Exh. 141: Fairview School District.

483.    The Middletown Area School District's only entry in the "LRE" section of its 2003-2006 special education plan that in fact is relevant to the least restrictive environment is the following:

> Some information related to % of time outside the regular class in Data Report of December 1, 2001 is not accurate due to incorrect Penn Data information. The District has fewer students who are outside the regular class for less than 21% than the state average, more students who are outside the regular class between 21-60% of the time and fewer students than the state average who are outside the regular class for more than 60% or who are in other settings. After an analysis of this data our conclusion is that this discrepancy reflects the fact that the District provides more explicit instruction in reading and math rather than providing only accommodations and adaptations in the regular class. It is our conclusion, therefore, that no corrective actions need to be taken. No performance targets.

Exh. 149: Middletown Area School District Special Education Plan. The district also recognized that it provides "less itinerant and resource service and more part-time service" than the state average, that is, has fewer students in regular class for 80% of the day or more, recognized "the need to provide additional itinerant support in the long term" and proposed to reduce the number of students requiring part-time support by 2% by 2004-2005. Id.

484.     The Penncrest School District stated, in the "LRE" section of its 2003-2006 special education plan that "PSD endeavors to place all students in the regular education placement as much as possible. We feel that we are doing a good job and are very close to the state averages. All placements are determined by the IEP team." The district addressed a disparity of 11% between the state's average and its own higher numbers in the 21-60% placement category with the suggestion, "Perhaps the higher number in PENNCREST is indicative of a different way of calculati[ng] percentages or is indicative of a higher % of students with severe needs." Exh. 154:  Penncrest School District, Special Education Plan, 2003-2006 School Years at 19-20

485.     Penncrest's stated performance target is "PSD will continue to make placement decisions through the IEP team. An effort will continue to be made to educate students in the regular class as much as possible." Id.

486.     PDE has approved these plans even though the districts have set no real performance goals and have not committed to do anything different from what they have been doing all along.

487.     PDE's plan approval process results in the routine approval of special education plans no matter what placement configuration the school district provides for special education students.

488.     Despite the requirement of 34 C.F.R. §300.551(a) that "each public agency shall ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services," the special education plans contained in Exh. 129-173 reveal that most of these 28 public agencies did not make a continuum of

alternative placements available, especially for students with significant disabilities. The table below summarizes the information in the "Program Profile" section of the school districts' special education plans for students who need learning support, life skills support, emotional support, physical support, autistic support and multiple disabilities support. Although PDE regulation 22 Pa. Code § 14.142(a) provides caseload students in each disability classification will be provided with the four types of service in the "continuum" – itinerant, resource room, part-time class and full-time class (for example, itinerant autistic support and multiple disabilities support teachers are allowed a caseload of no more than 12 students), in practice, the continuum was not in place in most of the 28 Pennsylvania school districts whose program profiles are contained in Exh. 129-173. The vast majority of programs for students who need life skills support and multiple disabilities support are full-time special education classes. Only one school district offered itinerant services for students needing life skills support and none offered resource room support.

**Total Number of Programs for Students with Disabilities**
**By Type of Service and Classification, Special Education Plans in Exh. 129-173**

| Type of Service | Itinerant | Resource | Part-time | Full-time: |
|---|---|---|---|---|
| Learning Support | 139 | 316 | 188 | 34 |
| Life Skills Support | 1 | 0 | 19 | 57 |
| Emotional Support | 15 | 11 | 51 | 27 |
| Physical Support | 0 | 0 | 2 | 2 |
| Autistic Support | 4 | 0 | 1 | 20 |
| Multiple Disabilities Support | 0 | 0 | 0 | 13 |

489. The 28 school districts varied widely in the extent to which they offered itinerant services. Eight school districts (Abington, Aliquippa, Armstrong, Keystone Central, Lower Moreland, Milton Area, West Mifflin and York Suburban) listed <u>no</u> itinerant services at all in the

program profile section of their special education plans, and the large district of Upper Darby had only one itinerant program (an itinerant learning support teacher). Of the districts that did not offer itinerant programs, only Abington, Milton Area (and Upper Darby, with its single itinerant program) were found in noncompliance with FSA 11, and the others were found in compliance. Exh. 128.

490.    Four of the twenty-eight school districts (Chambersburg, Penncrest, State College Area and West Perry) account for more than half the total number of itinerant programs, 85 out of 159. Chambersburg has 35 programs identified as "Itinerant/Resource"; plaintiffs classified all these programs as "itinerant" for purposes of this analysis.

491.    Only five of the 28 school districts – Middletown Area, Richland, State College Area, West Perry and Windber Area – offered itinerant emotional support services, although emotional disturbance is a high-incident disability. Exh. 129-173.

492.    In the special education plan format for the 2003-2006 planning cycle, unlike the formats for the 2002-2005 and early planning cycles, PDE did not ask school districts to identify, in the Comprehensive System of Personnel Development Section of its plan, any proposed training activities in the area of inclusion or FAPE in the LRE. Compare Exh.154: Penncrest School District with Exh.152: North Pocono School District, Special Education Plan, 2002-2005 School Years at 6. Instead, the personnel development goals are referenced to Pennsylvania's goals for compliance with the No Child Left Behind Act of 2001, P.L. 107-110, rather than to the requirements of the Individuals with Disabilities Education Act or Pennsylvania's performance goals under the Disabilities Education Act.

493.    The PDE Rule 30(b)(6) designee testified that when an FSA reveals that a

disproportionate numbers of students with particular disabilities such as mental retardation, autism, emotional disturbance or multiple disabilities are being educated outside the regular class, such data would trigger at least "a search for an explanation." However, no evidence appears in the Facilitated Self-Assessments, the Compliance Monitoring Reports or the Special Education Plans that disproportions do, in fact, trigger any action on PDE's part. If an explanation is sought, it is plain from the special education plans approved recently by PDE that any "search for an explanation" is satisfied by a conclusory statement that all placements are consistent with IEP team decisions.

494.     Defendants' expert Judy Schrag reviewed the defendants' "model" of compliance monitoring, but did not review any monitoring data, and she reviewed only one special education plan. She did not know whether the plans the school districts developed after PDE's monitoring, assuming that they did develop a plan after the monitoring visit, reflected corrective action required of the district by PDE. She did not review any of the data collected by PDE observers on the OSEP interviews with personnel in school districts. She did not review actual records in defendants' database of training and technical assistance offered through the Pennsylvania Training and Technical Assistance Network. Exh. 34: Schrag Depos. at 21, 69, 81, 82-83.

495.     Dr. Schrag met with the defendants' agents about a month after she submitted her supplementary expert report on May 31, 2003, to fill in some "holes" in her report. Exh. 34: Schrag Depos. at 18-19. She understood from her discussions with that "by their own admission," PDE staff say that the process of analyzing the data gathered in the FSA has been only "minimally" implemented to date and will be "implemented more rigorously in the future." Exh. 34: Schrag Depos. at 136-37. As Dr. Schrag understands the PDE monitoring process, it is

supposed to provide data for all school systems and that "school systems are expected to analyze the data and incorporate improvement strategies, to look at unnecessary placements ... outside of the general ed ... classroom or any other patterns such as high out of district placements, private facilities, whatever." Exh. 34: Schrag Depos. at 134-35. Any "anomalies and outliers" are to be a part of the district's self-assessment and planning.

496.    It is plain from the FSAs, Compliance Monitoring Reports and Special Education Plans that PDE does not currently require such an analysis of school districts.

497.    Representatives of the sample districts, where many students are placed outside the regular class, in Intermediate Unit Classes and out of district placements, reported that any corrective action that PDE has requested they undertake as a result of recent compliance monitoring concerned procedural matters only..

498.    The Rule 30(b0(6) designee of the Philadelphia School District testified that most of the PDE's monitoring findings since October 2001 concerned time line, procedural requirements and paperwork. Special education administrators of the District meet monthly with the PDE staff who are responsible for monitoring Philadelphia. The Rule 30(b)(6) designee could not recall ever hearing from PDE staff who attend these meetings that PDE considers there are students in Philadelphia who could be spending more time in regular class if they had appropriate supplementary aids and services. Nor could she recall that PDE had ever suggested that the district should include more students with significant disabilities in regular class. Exh. 12: Erskine Depos. at 113-14.

499.    As a result of PDE's most recent compliance monitoring under the current monitoring system, the Hempfield School District was required to correct the signature sheet on

its Evaluation Reports and other minor procedural corrective action that did not require training to accomplish. At the end of the compliance monitoring, PDE provided a packet of training information and opportunities that Hempfield staff could access, but did not recommend any training. Exh. 32: Scanlan/McNelis Depos. at 125-26 (Scanlan).

500. The Hempfield Special Education director testified that her contacts with PDE in the last year concerned the new state regulations and questions about procedure: "what does this mean on this new form." Exh. 32: Scanlan/McNelis Depos. at 45 (Scanlan).

501. The designee of the Northern Lehigh School District testified that the most recent communications between the district and PDE concerned student complaints and procedural issues. Exh. 13, Fedorcha Depos. at 102-106.

502. In its most recent cyclical monitoring, the Lancaster City School District was cited for using paperwork that was out of compliance for a few months due to changing paperwork requirements. Exh. 33: Schleyer Depos. at 122-23.

503. The Rule 30(b)(6) designee of the Western Beaver School District was not aware of anything that PDE is doing to make sure that district staff are informed of their duty to provide supplementary aids and services in the regular class, or to assure that students are removed from regular class only when they cannot satisfactorily be educated there with supplementary aids and services. Exh. 36: Smochko Depos. at 113-14.

504. In 1998, in its application for a State Improvement Grant, PDE promised to use the funds awarded under the grant to develop an integrated system of monitoring and technical assistance that is focused on educational benefit. PDE wrote to OSEP that heretofore, "Pennsylvania's compliance system has focused heavily on procedural issues rather than results

based issues. This change to a more results-based system is necessary to assist LEAs and the Commonwealth in meeting the spirit and intent of IDEA." Exh. 214: State Improvement Plan at 23.

505. Five years later, the grant period is almost over, and Pennsylvania's compliance system still focuses heavily on procedural issues and not at all on educational benefit.

**I. THE PENNSYLVANIA DEPARTMENT OF EDUCATION HAS NOT USED THE FEDERAL FUNDS DEDICATED TO ITS COMPREHENSIVE SYSTEM OF PERSONNEL DEVELOPMENT TO ASSURE THAT TEACHERS DEVELOP THE SKILLS TO EDUCATE STUDENTS WITH SIGNIFICANT DISABILITIES IN REGULAR CLASS TO THE MAXIMUM EXTENT APPROPRIATE.**

506. The mission of the Pennsylvania Training and Technical Assistance Network ("PaTTAN"), formerly the Instruction Support System of Pennsylvania,

> is to support the efforts of the Bureau of Special Education and its initiatives and to build the capacity of local educational agencies to provide appropriate services to students who receive special education services.

http://www.pattan.k12.pa.us/pattan-body.htm (visited Jul. 5, 2003); Exh. 35: Sloand Armstrong Depos. at 17.

507. In spite of this published statement and the description by the Harrisburg Regional manager, Janet Sloand Armstrong, that PaTTAN is the training arm for the Bureau of Special Education, id. at 6, the current executive director of PaTTAN, Jackie Vocke, testified that the agency provides services under the auspices of the Bureau of Curriculum and Development which are designed specifically to address the needs of children who are not served by the Bureau of Special Education. Exh. 41: Vocke Depos at 141-143. See Exh. 34: Schrag Depos. at 118 (the BSE's reading initiative is targeted to children in general education as well as children in special

education).

508.     PaTTAN has an annual budget of $17,000,000, all of which is obtained from federal funds, and all of which is controlled by the Bureau of Special Education, directly and indirectly under the operation of the managing directors for each of the three regional offices, each of whom report directly to Fran Warkomski. A portion of PaTTAN's budget comes from the State Improvement Plan (SIP) funded through OSEP for which Janet Sloand Armstrong, the managing director for PaTTAN's Harrisburg office, was a drafter and currently serves as the project coordinator.  Exh. 41: Vocke Depos. at 21, 46-47 and 221; Exh. 35: Sloand Armstrong Depos.38-40 and 41-42.

509.     As the executive director, Ms. Vocke coordinates the services of the three PaTTAN offices: Pittsburgh, Harrisburg and King of Prussia, and the early intervention technical assistance staff that work for PaTTAN and the higher education programs that are operated and provided by PaTTAN.  Exh. 41: Vocke Depos. at 13.

510.     PaTTAN is controlled, not by its executive director nor by the I.U.'s that staff the agency, but by Fran Warkomski, director of defendant PDE's Bureau of Special Education.  Id. at 20, 22 and 37.

511.     PaTTAN employs approximately 150 educational consultants and support staff. The consultants are expected to work collaboratively with intermediate units to provide services in the areas of professional development, technical assistance and information dissemination to support school districts within the Commonwealth. Id. at 195.

http://www.pattan.k12.pa.us/AboutUs/PaTTAN_Up_Close.htm (visited Jul. 5, 2003).

512.     The professional development activities offered by PaTTAN and by the other

components of Pennsylvania's Comprehensive System of Personnel Development (primarily, the educational consultants based in the Intermediate Units), consist primarily of workshops and presentations, rather than hands on technical assistance. Training sessions are basically "stand and deliver" forms of inservice training; most are delivered in units ranging from an hour to a day. As plaintiffs' expert Gail McGregor stated, "It is difficult to conceive of school-level change occurred as a result of this amount of training. This format and intensity of training lends itself to, at best, awareness level knowledge of the topic addressed." Exh. 58: McGregor/Kronberg Report at 4. Compare Exh. 47: Evans/Lengyel Report at 8: "Without follow-up technical assistance, the trainee stands only a 5-10% chance of remembering and practicing the information presented."

513.    According to defendants' expert Judith Schrag, technical assistance is "follow up to training ... responding to telephone inquiries, going on-site, helping school systems with planning, with implementation, with helping them develop." While training is "the delivery of information," technical assistance is "helping to develop the skills through ... guided practice." States are "required to help develop and implement, provide support for implementation of corrective actions, information sharing, dissemination of research based strategies." Exh. 34: Schrag Depos. at 36-37.

514.    Dr. McGregor's review of the PaTTAN database for the 2000-2001 school year found that of 165 records coded "FAPE/LRE" (the topic code that would be employed for professional development in inclusive practice), 13 represented technical assistance to a student team, 6 represented building-specific technical assistance, and 35 represented technical assistance planning meetings. Only 20 records state that the activity was tied to an ongoing technical assistance plan. Exh. 61: McGregor Report II at 2.

515.     Dr. McGregor analyzed the continuity of training and technical assistance to school districts in the subset of records that indicated that technical assistance addressed the issue of FAPE/LRE. The 165 records encompassed professional development activities provided to approximately 42 different school districts or intermediate units. Many districts or I.U.s had only one or two contacts during the year, typically planning meetings or a workshop. The only exceptions were the Tuscarora Intermediate Unit, which had 8 contacts during the year, and the Philadelphia School District, which had 57.  Exh. 61: McGregor Report II at 2.

516.     The 8 records in the Tuscarora I.U. all concerned meetings to plan large scale training events, rather than on the application of these skills in school settings.  Exh. 61: McGregor Report II at 2.

517.     Of the 57 records in Philadelphia, most concerned training activities related to procedural compliance, and only a few records focused on "what to do in the classroom to support students with disabilities." Exh. 61: McGregor Report II at 2-3.

518.     Dr. McGregor's review of the entire database revealed a predominance of inservice training/workshops that are single-event trainings, largely unconnected to ongoing plans of technical assistance to school districts. Records indicate that "much time is devoted to planning training events, often involving multiple partners and receiving entities." Dr McGregor did not see "a clear progression of technical assistance within a single entity that moved from initial stages of sharing information, to various other forms of support, including on-site activities, that facilitate the application of information learned in training settings." Exh. 61: McGregor Report II at 5.

519.     Similarly, Drs. Beverley Evans and Linda Lengyel reported in a survey of special

education students' teachers in the ten sample school districts that district staff reported receiving follow-up technical assistance for only 15% of the trainings they attended. <u>Compare</u> Exh. 47: Evans/Lengyel Report at 8.

520.    Exhibits 175-180 are reports from the 2001-2002 PaTTAN database. The first report examines the building-level technical assistance provided in the topic area FAPE/LRE. (No student-team technical assistance records on this topic were contained in the database.)  A total of 43 records were retrieved (from an entire database of 3,019 records), representing a total of 60 clock hours (some clock hours were not recorded). There were 27 records of technical assistance provided to Intermediate Units and MAWAs and fifteen records of technical assistance provided to school districts: all fifteen of the latter were to assist the South Academic Area Office (AAO) in Philadelphia to include a student with Down Syndrome in regular class. Exh. 175.

521.    The next reports examine all records of any type of training or technical assistance that contain, in the title field, any variant of the terms "inclusive," "modify," "adapt," "differentiate" or "diverse" ("inclu", "modif", "adapt," "differ," "divers"). Entering the root "inclu" retrieved a total of 57 records, including 26 records of building-specific technical assistance and 6 planning meetings. Only four school districts received more than one technical assistance activity in this category. Eight of the records concerned technical assistance in modifying curriculum and instruction for a student with Down Syndrome in the South Academic Area Office of the Philadelphia School District and overlapped with or duplicated the South AAO discussed in the previous paragraph. Exh. 176.

522.    Entering the root "modif" retrieved only 9 records. Eight were the same as the eight records retrieved earlier for the student with Down Syndrome in the South AAO in

Philadelphia. Exh. 177.

523.    Entering "adapt" retrieved 10 ten records, but they included only one building-specific technical assistance activity. Exh. 178.

524.    Entering the root "differ" retrieved 45 records, including a number of presentations of what appears to be an introductory workshop on differentiated instruction. No record of building-specific technical assistance was retrieved, and only two technical assistance planning meetings were retrieved. Ten of the 45 workshops and inservice presentations were provided to the Middletown Area School District, 6 to the Elizabethtown School District, 3 to the Cheltenham School District, and 3 to Pittsburgh. Another 5 school district received one or two inservice training presentations. Exh. 179.

525.    Entering "divers" retrieved 10 records, including workshops on meeting the needs of diverse learners in the classroom. No building-specific technical assistance was retrieved, and three planning meetings were retrieved. Exh. 180.

526.    It is clear from Dr. McGregor's report and the reports from the 2001-2002 PaTTAN database that only a handful of school districts have benefitted from training and technical assistance from PaTTAN that is related to strategies and techniques for including students with disabilities in regular classes.

527.    The depositions of the school districts and of the training and technical assistance consultants based in the Intermediate Units show that for the most part, they operate quite independently of PaTTAN and do not rely on PaTTAN for guidance and leadership.

528.    Pittsburgh has invited PaTTAN to participate in its Summer Institute on Inclusion, but PaTTAN did not offer any of its own training during the institute. Exh. 6, Cupples Depos. at

118.

529.    Dr. Cupples testified that it is extremely difficult to get release time and substitutes so that teachers can leave their classrooms to attend a PaTTAN training. Exh. 6, Cupples Depos. at 123.

530.    PaTTAN is "not an easy trip" for teachers in the Wilmington Area School District. District teachers feel more comfortable going to the Intermediate Unit. Exh. 27, Nicksick Depos. at 83.

531.    The Rule 30(b)(6) designee of the Northern Lehigh School District characterized the trainings offered by PaTTAN as "awareness trainings." Exh. 13, Fedorcha Depos. at 75, 76.

532.    The only trainings offered by PaTTAN that the Northern Lehigh School District sent its staff to during the 2000-2001 school year and the summer of 2001 were a training in reporting for PennDATA and a training in the Chapter 14 special education regulations, although in the past, the district staff attended PaTTAN courses on differentiating instruction, transition outcome training, and Interagency Cordero. The PaTTAN course on differentiated instruction was similar to the three and a half hour Intermediate Unit course given on the same topic, but with a different presenter. Exh. 13, Fedorcha Depos. at 87-90.

533.    The Wilmington Area School District received a mini-grant for Transition Age Students from a program coordinated by PaTTAN, but the Special Education Director was not aware that the grant was coordinated by PaTTAN. Exh. 27, Nicksick Depos. at 110-111. The district was not able to renew the grant because the transition teacher was not able to travel to Harrisburg, which was a condition of receiving funding under the grant. Id. at 112-113.

534.    The principal programmatic communications between the Hempfield School

District and PaTTAN during the last school year concerned a program for gifted students. Exh. 32, Scanlan/McNelis Depos. (Scanlan) at 44-45.

535.     Pennsylvania state law ("Act 48") requires each school district to submit a three year plan to PDE for the ongoing professional development of the instructional staff.  To maintain permanent certification, teachers must obtain either six higher education credits, six continuing education credits or 180 hours of staff development every five years. Act 48 is a vehicle to provide those staff development opportunities to the staff. It is up to each school district to decide what staff development programs to offer. Exh. 32, Scanlan/McNelis Depos. (McNelis) at

536.     Dr. Cupples, the special education director of the Pittsburgh Public Schools, testified that PDE does not require integration of a school district's Act 48 plans and special education plans. "[Act] 178 and 48 [plans] are the responsibility of regular ed to submit. … I have never had to submit as an attachment or to comment on a 178 or 48 plan as part of [the] special ed plan." Exh. 6, Cupples Depos. at 93.

537.     The Northern Cambria School District has not tried to integrate the implementation of its Act 48/178 plan and the district's special education plan. Exh. 22, Lizik Depos. at 39-40.

538.     The Rule 30(b)(6) designee and special education director of the Western Beaver School District was not aware that PDE had ever monitored implementation of its comprehensive system of personnel development. Exh. 36, Smochko Depos. at 47, 51-52.

539.     The designee of the Northern Lehigh School District testified that PDE has never initiated any discussion with the district about its special education plan prior to approval, including the section on the Comprehensive System of Personnel Development. The district's

Rule 30(b)(6) designee does not recall any inquiry from PDE whether the district had

implemented the training projected in its special education plan. Exh. 13 Fedorcha Depos. at 100-

102.

540.    Each local school district is responsible under the Individuals with Disabilities

Education Act, 20 U.C.C. § 1413, for maintaining its own Comprehensive System of Personnel

Development of participating in the state's CSPD. Personnel development systems in

Pennsylvania vary tremendously from one district to another. School districts in Pennsylvania

typically offer about four or five inservice training days to their staff each year.  Exh. 13,

Fedorcha Depos. at 110, 111 (Northern Lehigh); Exh. 36, Smochko Depos. at 153. The

Wilmington Area School District provides a total of eight in-service days, including two Act 80

days. Exh. 27, Nicksick Depos. at 80. Act 80 days are "extra" time in the school day beyond the

time the state requires a school district to spend teaching students. The school district may use

this time as inservice training for staff. Exh. 22, Lizik Depos. at 49-50.

541.    Teachers in the Northern Cambria School District may attend the Intermediate

Unit's three-day summer inservice training, but are not required to attend. Attendance is at the

choice of the individual teacher. No general education teachers from the district were signed up

for the inservice in the summer of 2001, nor did any regular education teachers attend during the

previous year, and the Special Education Director did not know who had attended the previous

summer's event from the special education staff. Exh. 22, Lizik Depos. at 57-59.

542.    The inservice training events staff in the Northern Cambria School District

attended that had relevance to special education in the several years prior to summer, 2001

consisted of the following: (a) a workshop offered by the Appalachia Intermediate Unit to all the

school districts in the Intermediate Unit on Generating the IEP from the General Education Curriculum, for special education teachers; (b) a one-hour inservice on confidentiality of records; (c) an inservice for parents on parents' rights, special education law and resources for parents; (d) a training for the school board on discipline and behavior; a training on IDEA in 1998; (e) a PaTTAN teleconference attended by a district speech therapist; (f) a workshop in corrective reading attended by three learning support teachers and a speech therapist; (g) a meeting led by the Special Education Director of the Intermediate Unit to prepare for PDE's compliance monitoring; and three meetings with Dr. Thomas Kippeny of the Intermediate Unit to discuss inclusionary practices. Exh. 22, Lizik Depos. at 51-87.

543.    Every building in the Lancaster City School District has an instructional facilitator, who is not a special educator, but a teacher whose job is to work with any teacher who needs training so that teachers do not have to go away to receive training, but can get on the job training while they are instructing at the same time. This is a district initiative. Exh. 33, Schleyer Depos. at 58-59.

544.    The three and a half hour training that Lancaster has provided to many of its general and special education teachers in differentiated instruction would not, by itself, equip the teachers to go back to their classrooms and set up learning centers. For this they would need follow up technical assistance. The training "starts the dialogue going." Exh. 33, Schleyer Depos. at 49-50.

545.    Lancaster has also offered awareness training in a method for teaching diverse learners in a general education classroom called "tiered activities," in which students with diverse abilities participate in the same activity, but achieve different learning outcomes, and "problem-

based learning," in which students analyze problems in a lesson at different levels. Exh. 33, Schleyer Depos. at 51-53. If a teacher is not already using this methods, the didactic training Lancaster provides is expected to create interest and a desire to explore the method farther. Id. at 54.

546.    According to the superintendent of the Wilmington Area School District, neither the local intermediate unit nor PaTTAN has offered any courses or support services for students with learning disabilities in mathematics. Exh.27, Nicksick Depos. at 56-57, 62.

547.    The Wilmington Area School District has not offered any training in inclusive practices at the high school or middle school level since Dr. Nicksick became superintendent; the training in inclusive practices that has occurred has been for elementary school students. Exh. 27, Nicksick Depos. at 147-48.

548.    PDE does not monitor implementation of school districts' Act 48 plans. Exh. 32, Scanlan/McNelis Depos. at 175-76 (McNelis).

549.    PDE obtained a five year State Improvement Grant providing a total of more than one million dollars in federal funds, to run from 1999 through 2004 as provided under Part D of the IDEA, National Activities to Improve Education of Children with Disabilities, the purpose of which is to reform and improve the systems for "providing educational, early intervention, and transitional services ... and dissemination of knowledge about best practices, to improve results for students with disabilities." 20 U.S.C. § 1451(b); Exh. 214: Pennsylvania State Improvement Plan ("SIP").

550.    Activities for which PDE obtains federal funds under the SIP grant include training, technical assistance and minigrants to LEAs for monitoring/technical assistance student

outcome pilots. PDE described the rationale for these activities as follows:

> The Pennsylvania Department of Education is responsible for general supervision of LEAs to insure that each student with a disability receives a free appropriate public education and that each family has the benefit of a system of procedural safeguards. One mechanism that is used to achieve this general supervision is compliance monitoring. Currently, monitoring and technical assistance are conceptually distinct systems. ... Pennsylvania's compliance system has **focused heavily on procedural issues rather than results based issues. This change to a more results-based system is necessary** to assist LEAs and the Commonwealth in meeting the spirit and intent of IDEA. Additionally, **a more blended system of technical assistance and monitoring** is needed within the Commonwealth.

Exh 214: SIP at 23 (emphasis added).

     551. Accordingly, PDE committed in its grant application to "develop a customized technical assistance base[d] specifically on the needs, climate and organizational structure of the targeted district. ... All technical assistance activities (e.g., follow-up training activities, Corrective Action Plan technical assistance to poorly performing districts, etc.) will be customized." Exh. 214: SIP at 65. Within the framework of customized technical assistance, PaTTAN (known at the time of the SIP application as the Instructional Support System of Pennsylvania) was to provide "assistance as needed to support teachers implementing new skills." Exh. 214: SIP at 66. In conjunction with technical assistance, PDE proposed to provide minigrants of $7,500 per year to 60 LEAs to support the Monitoring/Technical Assistance Student Outcome Pilots. Funds would be used to pay for substitutes while "educators and administrators participate in professional development sessions focused on the corrective action plan implementation." Exh. 214: SIP at 135.

     552. The SIP also provides minigrants and technical assistance to LEAs to achieve

"[a]lignment of curriculum, instruction and assessment to the standards and the alignment of the general and special education leadership and instruction to the standards." Exh. 214: SIP at 75, 135.

553.   The budget of the SIP includes Monitoring and Technical Assistance for Minigrants to LEAs, as described above, as well as for inservice training and professional development activities in the area of autism and behavior support. Funds were requested for all five years for these areas.  Exh. 214: SIP at 131 and 135.

554.   Of the 2,184 readable records in the PaTTAN database for 2000-2001, the third year of the SIP, only 36 (2%)  indicated PaTTAN's support of minigrant projects to the LEAs. The total recorded training time expended by PaTTAN staff was approximately 117.5 clock hours (six entries had no hours recorded).

555.   The data shows that 269 of the 2,184 (12%) records indicate that PaTTAN had some involvement with training and/or information dissemination on the topic of autism, with 662 clock hours of involvement (again, there were entries with no recorded hours).  The titles of the sessions included some that indicate little, if any direct service, e.g., "Autism Resource Materials for Physicians Outreach," "POC/Supervisory Meeting at I.U. 16" for 13 administrators, Meeting of PaTTAN staff to review autism training materials."

556.   Defendants' expert Judy Schrag understood from her discussions with PDE staff that PaTTAN provides technical assistance to school districts that PDE considers, as a result of its monitoring activities, could be supporting their students in more integrated settings. Exh. 34: Schrag Depos. at 91-92.  From Dr. Schrag's review of reports from the PaTTAN database provided to her by defendants, she understood that the training and technical assistance topic

PaTTAN terms FAPE in the LRE would be the area that one would look to to determine what training and technical assistance PaTTAN offered in the area of inclusion. <u>See</u> Pennsylvania Training and Technical Assistance Network, "What is FAPE in the LRE?" www.pattan.k12.pa.us. However, the 2001-2002 PaTTAN database does not contain a single entry for training and technical assistance for the purpose of corrective action in the area of FAPE in the LRE. Dr. Schrag did not see any customized technical assistance plans developed under Pennsylvania's State Improvement Grant. Exh. 34: Schrag Depos. at 115-116.

557.    Despite the weaknesses in its Comprehensive System of Personnel Development, PDE could, if it focused its resources, develop an effective training and technical assistance initiative in inclusive practices. PDE has sponsored effective personnel development initiatives in the past. Among the areas of training and technical assistance supported by IDEA funds that flow through the Intermediate Units, the most well-articulated and coordinated are the areas of assistive technology (AT) and instructional support teams (IST). Exh. 58: McGregor/Kronberg Report at 3.

558.    Instructional Support Teams are a pre-referral intervention designed to prevent referral of students who may be struggling in the regular classroom. Formerly, the IST initiative was required by state regulation. When the regulation was changed to eliminate the requirement, most school districts opted to keep the program, though generally in a greatly reduced form. The IST initiative as originally designed included intensive training for Instructional Support Team members, technical assistance provided by the Statewide Support Initiative (later known as the Instructional Support System of Pennsylvania and now known as the Pennsylvania Training and Technical Assistance Network or PaTTAN), and validation by PDE that the Instructional Support

Team was performing its functions as designed. Exh. 5, Choma-Tachoir Depos., generally (assistive technology); Exh. 39: Torlino Depos., generally (assistive technology); Exh. 29, Paterson Depos. at 11-15 (IST); Exh. 19, Kippeny Depos. at 26-36, 51-58;  (IST).

559.    When the Instructional Support Team initiative began, PDE gave districts seed money to support it, as much as $30,000 a year for a school district the size of tiny Western Beaver. This was enough to hire and train an instructional support teacher. The program included an intensive training requirement, school districts were required to send their staff to the training. Weeks of training were provided to instructional support teachers, with refresher trainings spread throughout the year. The training was provided through PaTTAN's predecessor, the Instructional Support Centers. Exh. 36, Smochko Depos. at 99-102.

560.    The administrator of the Northern Lehigh School District testified that while the original focus of IST was to make it possible for students with disabilities to stay in general education and not have to be referred to special education, the current direction is "more of a pre-diagnosis of the learner's needs and then determining the degree of need and determining whether that degree of need can be met in the regular classroom." In the old days, the IST intervention for a student who is struggling in regular education would have been more intensive. Currently, the instructional support teacher is no longer viewed as a remedial teacher. Exh. 13, Fedorcha Depos. at 41-42, 45-46.  IST has been very successful in the Western Beaver School District at bringing younger students to grade level and averting referrals to special education. Exh. 36, Smochko Depos. at 94-96.

561.    IST support for a student ends when that student is identified as needing special education. Exh. 36, Smochko Depos. at 109.

562.    In the early to mid 1990s, Pennsylvania had a model program for inclusion of students with significant disabilities called GATEWAYS. PDE provided grants and ongoing, on-site technical assistance. The program was an extremely effective model, but it ended, possibly for political reasons. Exh. 9, DeVett. Depos. at 26-29.

563.    The format and intensity of most training experiences supported by PDE's Comprehensive System of Personnel Development could produce, at most, an awareness level of training; it is difficult to bring about systemic change in a one hour, half-day or full-day didactic training. Id. Yet that is the level of professional development that PaTTAN and the Intermediate Units typically make available. Exh. 58: McGregor/Kronberg Report at 4.

564.    Linda Cordisco, an expert in autism who has established an inclusive model program for students with autism and severe disabilities in regular school buildings in the Pittsburgh Public Schools, contracted with another agency rather that with PaTTAN to provide the on-site technical assistance to make the project a success because her program needed a guarantee of sixteen hours of technical assistance a week and she did not believe PaTTAN's staff would be able to provide that. PaTTAN's trainings focus more on "the philosophy, the overview." Exh. 6, Cordisco Depos. at 125-130.

565.    Some Intermediate Unit Accommodations for Lifelong Learning consultants provide hands on technical assistance only "occasionally." Exh. 10, Eardley Depos. at 32-34; Exh. 8, Dendas Depos. at 9. Much of the didactic training they offer is at an awareness level. Exh. 10, Eardley Depos. at 22-31; Exh. 19 Kippeny Depos., generally. Ms. Dendas testified that she received a request for technical assistance from the Jim Thorpe School District that would have required more time than she could provide. Exh. 8, Dendas Depos. at 53.

566.	Many specialized interventions for students with autism, such as the Picture Exchange Communication System (PECS), TEACCH, Applied Behavior Analysis and Floor Time require more training time to master than Intermediate Unit technical assistance consultants are able to give in the relatively brief trainings they provide to school district staff, and in some cases the training materials are copyrighted, so that only a licensee can deliver the program.  Exh. 10, Eardley Depos. at 40-65, Exh. 5, Choma-Tachoir Depos. at 64-65, testifying that she provides only an awareness level overview of PECS because the Intermediate Unit has no one certified to teach the program.

567.	Among the school districts and Intermediate Units that plaintiffs examined, Pittsburgh offers an almost unique example of effective, building-based technical assistance, supporting students with disabilities in inclusive settings.  Exh. 39, Torlino Depos. at 12-27. In Pittsburgh, it has been administratively and logistically much easier to provide on-site technical assistance in school buildings that to arrange large group trainings.

568.	There is an absence of accountability mechanisms at all levels within the CSPD system in Pennsylvania. Exh. 58: McGregor/Kronberg report at 4. The basic accountability owed to PDE by recipients of IDEA Part B funds for comprehensive personnel development is to report the trainings provided on a form to the Department. Exh. 42: Williams Depos. at 53-57.

569.	The needs of general educators who have students with disabilities in their classrooms receive substantially less attention than those of other target audiences. Exh. 58: McGregor/Kronberg report at 5. Many consultants in the Intermediate Unit are providing technical assistance primarily to students in full-time or part-time special education settings: Life Skills Support, Autistic Support, Emotional Support and Multiple Disabilities Support classes.

Exh. 3, Buchanan Depos. at 14-33, Exh. 5, Choma-Tachoir Depos. at 32-60, 66-72; 74-78; 81-90; Exh. 11, Eccles Depos. at 38-69; Exh. 20, Krebs Depos. at 20-27, 32-38.

570.     Most training and technical assistance is provided at the request of the school district. The needs assessments that are conducted typically give teachers a list of professional development topics and ask which ones they are interested in receiving more training in. There is no indication in the depositions of Intermediate Unit consultants that system or student indicators are used to identify professional development needs. Exh. 19, Kippeny Depos. at 69-75 (75% of training provided is at the request of a school district; the remaining 25% is based upon the needs assessment); Exh. 3, Buchanan Depos. at 49-50; Exh. 15, Homish Depos. at 95-99 (nearly all technical assistance is provided at the request of the district rather than on the basis of a needs assessment).

571.     A relatively small number of trainings require or encourage school-based teams to attend together; this is a manifestation of the "disconnect" between professional development needs and professional development offerings. Exh. 58: McGregor/Kronberg Report at 6. The Autism Select Team training, PaTTAN's centerpiece "school-based team training" initiative, illustrates the "disconnect" quite vividly. For the Autism Select Team Training sessions, the teams generally had to leave the school building and travel to one of PaTTAN's regional offices. There was very little on-site guided practice or other on-site follow-up. The focus student was videotaped and discussed in absentia. Exh. 27: Declaration of Ed C.

572.     Rose Homish, a behavioral support consultant who works for Intermediate Unit 27, described her participation in the Autism Select Team Training given by PaTTAN as a member of a team for two students with autism, one placed at New Horizons, a special education

center, and the other in an I.U.-operated autistic support class within a school district that was not his home district. The latter student could not return to his own school district because that district was not willing to have him return. Twenty teams met in a central location for the training for a total of four days over the course of a year; PaTTAN did not go into schools to work with the student. Exh. 15, Homish Depos. at 41-49.

573.   A goal for Ms. Homish's team was to include in a regular math class for a period a day the student who was placed in a self-contained intermediate unit class. However, the regular math teacher did not attend the team training. The only team member who actually worked with the student and attended the team training was his intermediate unit special education teacher. The school psychologist from the school district in which the student's self-contained class was located was "recruited" to attend the training, although he did not actually work with the student. The fact that the student was from outside the district and the regular education teacher did not attend the select team training did not encourage the teacher to take ownership of the student's successful inclusion. The student had difficulty adjusting to the changes in his program and the team eventually chose another student, the child who attended New Horizon. Exh. 15, Homish Depos. at 49-72.

574.   The members of the Autism Select Team elected to work with students in segregated and self-contained settings "to get our feet wet in working with the student [and] in the technical way of teaming with the student." No goals were developed for the student who attended New Horizons to enable her to spend more time in regular class and at the time of Ms. Homish's deposition, her inclusion in regular class "had not really been discussed." Exh. 15, Homish Depos. at 72-91.

575. Training and technical assistance in inclusive practices is highly undersupported. Exh. 26, McGregor Depos. at 55-56. In the Intermediate Unit plans Dr. McGregor reviewed, the description of the role and function of the full-time equivalent (FTE) assigned to the person responsible for training and technical assistance in inclusive practice is almost always tied to the Instructional Support Team initiative.

576. PDE's reading initiative, currently its most focused and well-resourced personnel development effort, primarily serve students in general education, not special education, although they are supported with Part B funding. Exh. 17, Horton Depos. at 34-38; 58-59.

577. Although the activities in PDE's State Improvement Plan, "Professional Development Partnerships for Improving Student Outcomes," include providing "customized technical assistance" to local school districts to remediate noncompliance, most Intermediate Unit technical assistance and training consultants had not participated in or were aware of such activities. Exh. 29, Paterson Depos. at 38; Exh. 19, Kippeny Depos. at 107; Exh. 11, Eccles Depos. at 76-77; Exh. 20, Krebs Depos. at 48-50; Exh. 17, Horton Depos. at 93-106.

## III.     LEGAL ARGUMENT

### A.     PLAINTIFFS HAVE SUSTAINED THE BURDEN FOR OBTAINING SUMMARY JUDGMENT.

Rule 56 of the Federal Rules of Civil Procedure sets forth the standard for granting summary judgment.  It provides in relevant part that:

> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine
> issue as to any material fact and that the moving party is entitled to
> a judgment as a matter of law.

Fed. R. Civ. Pro. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (a genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  A "material fact" is one whose determination would affect the outcome of the case.  Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994).  Summary judgment must, therefore, be granted "against any party who fails to make a showing sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. Pro. 56(e).

Once the moving party demonstrates that no genuine issue exists and that, as a matter of law, it is entitled to judgment, the burden then shifts to the non-moving party.  The non-movant's burden is to "do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient").

In meeting its burden, the non-moving party cannot rest on the mere allegations or denials in its pleadings or by presenting bare assertions, conclusory allegations or suspicions.  Celotex,

174

477 U.S. at 324; <u>Firemen's Ins. Co. v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir. 1982); <u>Chu v. Samuel Geltman & Co.</u>, 1993 U.S. dist. LEXIS 17473 at * 6 (E.D. Pa. Nov. 17, 1993) (quoting <u>Lujan v. Nat'l Wildlife Fed'n.</u>, 497 U.S. 871, 888 (1990)).  Nor can the non-movant make vague and amorphous assertions that the record somewhere contains facts sufficient to support the claims.  <u>Childers v. Joseph</u>, 842 F.2d 689, 694-95 (3dCir. 1988); <u>Roa v. City of Bethlehem</u>, 782 F. Supp. 1008, 1014 (E.D. Pa. 1991).  To the contrary, the non-moving party must come forward with specific facts -- supported by admissible evidence -- that contradict the facts averred by the movant and indicate that there is a genuine issue for trial.  <u>Lujan</u> 497 U.S. 888; <u>In re: Paoli Railroad Yard PCB Litigation</u>, 916 F.2d 829, 860 (3d Cir. 1990) <u>cert. denied sub nom. General Electric v. Knight</u>, 419 U.S. 961 (1991).

Unless the party opposing the motion produces evidence from which a reasonable factfinder could return a verdict in its favor, the Court must grant summary judgment.  <u>Lawrence v. Nat'l Westminster Bank New Jersey</u>, 98 F.3d 61, 65 (3d Cir. 1996) (citing <u>Liberty Lobby, Inc.</u>, 477 U.S. 250); <u>Arc of New Jersey, Inc. v. State of New Jersey</u>, 950 F. Supp. 637, 641 (D.N.J. 1996).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Liberty Lobby, Inc.</u>, 477 U.S. 248.  Here the undisputed facts establish that no fair minded fact finder could possibly find that PDE is in compliance with the IDEA's mandate that requires that children eligible under the IDEA receive a free appropriate public education in the least restrictive environment.

**B. DEFENDANTS HAVE FAILED IN THEIR OBLIGATION TO ENSURE THAT ALL THE COMMONWEALTH'S CHILDREN WITH DISABILITIES ARE EDUCATED WITH STUDENTS WHO DO NOT HAVE DISABILITIES TO THE MAXIMUM EXTENT APPROPRIATE.**

**1. The Pennsylvania Department of Education Has Primary Responsibility to Assure That Students with Disabilities in Pennsylvania Are Educated in Regular Class with Supplementary Aids and Services to the Maximum Extent Appropriate.**

The IDEA, like other programs providing federal financial assistance to states, squarely places responsibility for the education of special needs children with the State. As Congress stated:

> [T]he establishment of a single agency responsibility for assuring the right to education of all handicapped children of paramount importance. Without this requirement, there is an abdication of responsibility of handicapped children. Presently, in many States, responsibility is divided...While the Committee understands that different agencies may, in fact, deliver services, the responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver service or the violation of the rights of handicapped children is squarely the responsibility of one agency.

S. Rep. No. 94-168, at 24 (1975), reprinted at 1975 U.S.C.C.A.N. 1425, 1448.

The State's central responsibility for full compliance with the Act has remained constant throughout the over twenty-five years of the Act's existence. Congress reaffirmed this statutory scheme when it undertook significant revisions to the IDEA in 1997 (Pub. L. 105-17). See generally H. Rep. No. 105-95, at 90-95 (1997), reprinted at 1997 U.S.C.C.A.N. 78, 87-93.

The responsibilities of the State through its state educational agency (SEA) are set forth in

20 U.S.C. § 1412(a).[10]  These responsibilities include having policies and procedures that the State ensures meet the conditions set forth in 20 U.S.C. § 1412(a). See supra, ¶9.

•        All children within the State between the ages of 3 and 21 have available a free appropriate public education, including children with disabilities who have been suspended or expelled from school, *id.* §1412(a)(1)(A);

•        The State has a goal of "providing full educational opportunity to all children with disabilities and a detained timetable for accomplishing that goal," id. §1412(a)(2);

•        The State identifies, locates and evaluates every child in need of educational services, known as "child find," id. §1412(a)(3);

•        Each child has an individualized education program that meets his or her unique needs. id. §1412(a)(4);

•        Children with disabilities receive education in the least restrictive environment to the maximum extent appropriate with children who are not disabled.  id. §1412(a)(5);

•        Children with disabilities and their parents are afforded the IDEA's procedural safeguards, id. §1412(a)(6);

•        Evaluations are appropriately conducted, id. §§ 1412(a)(7), 1414(a)-(c);

•        Confidentiality of records is maintained, id. §1412(a)(8);

•        Children with disabilities in private schools and facilities that provide special education are provided educational services in accordance with their IEPs at no cost to the parents, and the private schools meet State standards, and the children so served have all the

---

[10]In earlier versions of the statute, these provisions were found in different sections.  The 1997 amendments collected them here.

rights they would have if served by the local educational agency (LEA), id. §1412(a)(10);

• There is in effect a "comprehensive system of personnel development that is designed to ensure an adequate supply of qualified special education, regular education, and related services personnel," and that State standards ensure that personnel are "appropriately and adequately prepared and trained." id. §1412(a)(14)&(15);

• Goals are established for the performance of children and performance indicators will be used to assess children's progress, id. §1412(a)(16);

• Children with disabilities are included in general State and district-wide assessment programs, with appropriate accommodations, where necessary, id. §1412(a)(17);

• The SEA examines data on suspension and expulsion rates, and if there are excessive rates then it reviews and if necessary revises it and/or the local educational agencies' (LEA) policies, procedures, and practices "related to the development and implementation of IEPs, the use of behavioral interventions, and procedural safeguards, to ensure that such policies, procedures, and practices comply" with the IDEA, id. §1412(a)(22);

• The SEA is required to be the provider of education of "last resort' if an LEA cannot provide such an education,[11] id. §1412(b)

---

[11]Federal regulations reinforce these obligations. See generally 34 C.F.R. §§ 300.121-197, .550-556. See especially § 300.556 ("Monitoring Activities") and § 300.600 ("Responsibility for all Educational Programs") requiring SEAs to ensure that the IDEA is implemented. The comments of the United States Department of Education when it issued the regulations for the 1997 amendments are instructive:

A strong SEA monitoring process to ensure effective implementation of the Act is crucial to improving educational results for children with disabilities... We know from long experience... that if SEA monitoring is lax, noncompliant practices emerge at the local level and indicators of performance for children with disabilities decline.

Underscoring the State's responsibilities, the IDEA specifically provides that the SEA is responsible for supervision of the IDEA's requirements throughout the State so that all the requirements are met. id. §1412(a)(11). See also Thomas A Mayers & Perry A. Zirkel, State Educational Agencies and Special Education: Obligations and Liabilities, 10 Pub. Int. L.J. 62 (2000).

Given the breadth and detailed responsibilities required of the States, through their SEAs, it is not surprising that all the circuits which have examined this issue have emphasized the crucial role played by SEAs under the Act.[12] David D. v. Dartmouth Sch. Comm., 775 F.2d 411 (1st Cir. 1985) (discussing State responsibilities for the Act; holding State substantive standards incorporated into federal standards for determination of free appropriate public education); Jose P. v. Ambach, 669 F.2d 865, 870-71 (2d Cir. 1982) (affirming judgment for failure to have met the States' responsibilities for assuring compliance with Act's policies); Beth V. v. Carroll, 87 F.3d 80 (3rd Cir. 1996) (recognizing States have primary responsibility under the Act and reversing District court's dismissal under theory that no private right of action exists under the Act); Gadsby v. Grasmick, 109 F.3d 940, 952-953 (4th Cir. 1997) (requiring SEA to reimburse LEA for cost of portion of residential placement as SEA must provide services when LEA unable to do so because, "...ultimately, it is the SEA's responsibility to ensure that each child within its jurisdiction is provided a free appropriate public education. Therefore, it is clear that an SEA may

---

64 Fed. Reg. 12,537, at 12,644 (Mar. 12, 1999).

[12]For the purposes of the IDEA, the District of Columbia is defined as a "state" at 20 U.S.C. § 1419 (i) & 20 U.S.C. § 1455(a). The District of Columbia, beginning in fiscal year 1999 and beyond, has also been treated as an individual local educational agency under the IDEA. 20 U.S.C. § 6333.

be held responsible if it fails to comply with its duty to assure that IDEA's substantive requirements are implemented" Id. at 952); St. Tammany Parish Sch. Bd. v. State of Louisiana, 142 F.3d 776, 784-85 (5th Cir. 1998) (following Gadsby although in a different procedural posture); Ullmo v. Guilmour Acad., 273 F.3d 671, 678-79 (6th Cir. 2001) (recognizing importance of the SEA in the statutory scheme although denying plaintiffs' claims.) Marie O. v. Edgar, 131 F.3d 610 (7th Cir. 1997) (affirming classwide relief to bring State defendants into compliance with Part H [early intervention services] of the IDEA and finding no violation of the 11th Amendment); John T. v. Iowa Dept. of Educ., 258 F.3rd 860, 864-66 (8th Cir. 2001) (recognizing State as single line of authority under the Act and awarding attorneys fees against it); see also Meiner v. Missouri, 800 F.2d 749, 754 (8th Cir. 1986) (ordering relief against both State and local defendants without discussion of State responsibilities); Doe v. Arizona Dep't of Educ., 111 F.3rd 678, 682 (9th Cir. 1997) (declining in circumstances before it to hold State defendants responsible because of failure to exhaust administrative remedies where such exhaustion not futile, but recognizing State as appropriate defendant); Beard v. Teska, 31 F.3d 942, 954 (10th Cir. 1994) (recognizing the State as the single point of responsibility, although denying attorneys' frees under respondent superior theory); Georgia Ass'n of Retarded Citizens v. McDaniel, 716 F.2d 1565, 1575-78 (11th Cir. 1983) (affirming injunction striking down state's policy of limiting special education to 180 days per school year).

**2.    The Individuals with Disabilities Education Act Requires that All Students With Disabilities, Including Those Whose Disabilities Are Most Severe, Be Educated With Students Who Do Not Have Disabilities to the Maximum Extent Appropriate.**

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401, et seq., asserts a statutory preference for the placement of children with disabilities in regular classes with the aid

of supplementary aids and services. States must establish procedures:

> to assure that, to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who do not have disabilities, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5)(b). See 34 C.F.R. § 300.550. The mandate that students with disabilities be educated in the most integrated setting appropriate requires a hearing officer faced with a choice between two competing programs, both of which qualify as appropriate, to order the more integrated program, regardless of which is superior.

The regulations implementing IDEA place affirmative obligations on the school districts to provide a wide variety of options for the education of children with disabilities:

> (a) Each public agency shall insure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services.
> (b) The continuum required under paragraph (a) of this section must:
> > (1) Include the alternative placements listed in the definitions of special education under § 300.13 of Subpart A (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions), and
> > (2) Make provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement.

34 C.F.R. § 300.551 (emphasis added).

Interpreting the statutory and regulatory mandates that establish regular class with supplementary aids and services as the preferred placement, the Court of Appeals for the Third Circuit held in Oberti v. Board of Education of the Borough of Clementon, 995 F. 2d 1204, 1216

(3d Cir. 1993), that a school district, when determining whether a child with disabilities can be included in a regular classroom, "'must consider the whole range of supplemental aids and services'" that will make inclusion possible, including "speech and language therapy, special education training for the regular teacher, behavior modification programs, or any other available aids and services appropriate to the child's particular disabilities." Id., quoting Greer v. Rome City School District, 950 F.2d 688, 696 (11th Cir. 1991). The school "must also make efforts to modify the regular education program to accommodate a disabled child." Id., citing 34 C.F.R. Part 300, App. C. Question 48.

The Third Circuit's three-factor Oberti test requires courts to: evaluate whether the school made reasonable efforts to educate the student in a regular education class through the use of supplementary aids and services; evaluate the benefits of including the student in a regular classroom with these aids and services against the benefits the child would receive in a special education classroom; and, consider the detriment that including the child in a regular classroom might have on the education of the other students. Oberti, 995 F. 2d at 1216-17. In considering whether there is any detriment to other students, the Circuit, recognizing that an appropriate program with aids and services may prevent any disruption, requires that courts first examine the district's use of such supports in the child's program. Id. at 1217.

The range of supplementary aids and services that are required when needed to make inclusion possible is broad. The law is plain that districts must enrich their own available services and staff competence when needed to include a student with disabilities. As Chief Judge Gerry stated in his opinion for the district court in Oberti, "the IDEA requires school districts to supplement their resources in order to meet the special needs of children with disabilities," 789

F.Supp. at 1328.  Where the experience and resources needed for inclusion are lacking, school districts must "supplement and realign their resources to move beyond those systems, structures, and practices which tend to result in unnecessary segregation of children with disabilities."  Id. at 1333.  To allow districts to escape liability because they have maintained such "structures and practices" would simply reward them for conduct that the law does not allow.  Compare Greer by Greer, 950 F.2d 688, 696 (11th Cir. 1991), quoting Daniel R.R. v. State Board of Education, 874 F.2d 1036, 1045, 1048 (5th Cir. 1989).  See also Board of Education, Sacramento City Unified School District v. Holland, 786 F.Supp. 874, 877-78 (E.D. Cal. 1992), aff'd sub nom. Sacramento City Unified School District, Board of Education v. Holland, 14 F.3d 1398 (9th Cir.), cert. denied, 114 S.Ct. 2679 (1994); A.W. v. Northwest R-1 School District, 813 F.2d 158 (8th Cir. 1987), cert.denied, 484 U.S. 487 (1987); Roncker v. Walter, 700 F.2d 1058 (6th Cir. 1983), cert. denied, 464 U.S. 864 (1983)[13]; Oberti v. Board of Education of the Borough of Clementon School District, 801 F.Supp. 1392 (holding that the school district had violated the IDEA) and 789 F.Supp. 1322 (D.N.J. 1992) (denying cross-motions for summary judgment).

The school district must consider the "full range" of supplementary aids and services and must consider them during the development of the child's IEP:

---

[13]In Roncker, the Circuit Court posed the same inquiry in a different manner:

> The proper inquiry is whether a proposed placement is appropriate under the Act. . . .In a case where the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting.  If they can, the placement in the segregated school would be inappropriate under the Act.

700 F.2d at 1063.

> Thus, before the school district may conclude that a handicapped
> child should be educated outside the regular classroom, it must
> consider whether supplemental aids and services would permit
> satisfactory education in the regular classroom. The school district
> must consider the whole range of supplemental aids and services,
> including resource rooms and itinerant instruction, for which it is
> obligated under the Act and the regulations promulgated thereunder
> to make provision. Only when the handicapped child's education
> may not be achieved satisfactorily, even with one or more of these
> supplemental aids and services, may the school board consider
> placing the child outside of the regular classroom.

Greer by Greer, 950 F.2d at 696. Examples of supplementary resources that may be required

include full-time or part-time supplementary teacher's aides, id., citing Department of Education,

State of Hawaii, v. Katherine D., 727 F.2d 809. 823 (9th Cir. 1983); support and training for

teachers and other school district personnel; and "a substantial degree of consultation and

communication between the special services forces of a school district, supplemented by

consultation and assistance from outside sources if necessary, and teachers and other front line

personnel." Oberti, 789 F.Supp. 1328-29, aff'd., 995 F.2d 1204.

The Western District of Pennsylvania further clarified the Oberti standard in Girty v. Sch.

Dist. of Grove Valley, 163 F.Supp.2d 527, 532-537 (W.D. Pa. 2001) aff'd, 60 Fed. Apx. 889,

2002 U.S. App. LEXIS 23388 (2002). The district court held, and the Third Circuit affirmed,

that students with disabilities are not required to receive the same educational experience or

benefit as their typically developing peers. Id. at 536. The school district had recommended

placement in a part-time life skills class for Spike because his sixth grade teachers considered that

they could not adapt the regular sixth grade curriculum to his level, and the special education

coordinator considered that the disparity between the sixth grade curriculum and Spike's "pre-

readiness" level of functioning was so great that no amount of adaptation would enable him to

benefit from inclusion. Id. at 529. (Spike's assigned IQ was 36. Id. at 528.) The district court rejected these arguments and held that as long as the disabled student is progressing commensurate with his or her abilities in the regular classroom, then the placement is appropriate. Id. The focus is whether the student is progressing on his individualized goals, not whether the he is progressing at a level comparable to his classmates. Id. at 536.

The district court in Girty reaffirmed the holding of Oberti that school districts have an affirmative obligation to train their personnel in inclusive practice. While Valley Grove personnel had some training, it was insufficient to facilitate Spike Girty's access to the general curriculum. The Valley Grove special education coordinator and school psychologist testified at the due process hearing that teachers were permitted (but not required) to attend in-service training on their own. Spike's instructional aide, who had primary responsibility for implementing the goals on his IEP, had as her only training, "a crash course in special ed," in the first year of the three years she supported Spike. Id. at 535. Because Spike's regular sixth grade teachers were not provided with adequate special education training, they were not able to modify the curriculum to mainstream Spike into the classroom. Id. Although the local Intermediate Unit was expected to provide technical assistance to the district to facilitate Spike's inclusion, this had not occurred except for hallway conversations. Id. at 530. In short, no meaningful attempt was made to support the regular education teachers or to train them in techniques for modifying the curriculum or including Spike in the classroom. The district court that the district had not "meaningfully attempt[ed] to instruct him inclusively as required under the IDEA." Id. at 535.

In enacting the 1997 amendments to the Individuals with Disabilities Education Act (IDEA), Congress reaffirmed the importance of IDEA's integration and comprehensive personnel

development mandates in the following findings :[14]

> Over 20 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by --

>> (A) having high expectations for such children and ensuring their access in the general curriculum to the maximum extent possible;
>> ..........
>> (D) providing appropriate special education and related services and aids and supports in the regular classroom to such children, whenever appropriate;

>> (E) supporting high-quality, intensive professional development for all personnel who work with such children in order to ensure that they have the skills and knowledge necessary to enable them--

>>> (i) to meet developmental goals and, to the maximum extent possible, those challenging expectations that have been established for all children; and

>>> (ii) to be prepared to lead productive, independent, adult lives, to the maximum extent possible.

20 U.S.C. § 1401(c) (5). Thus, Congress found explicitly that the effective education of students with disabilities is best promoted by high expectations, proven methods of teaching and learning, access to the general curriculum and the provision of services and support in general education classes.

The IDEA amendments of 1997 added requirements to the Act designed to encourage placement in general education classes. Each student's IEP must include goals and objectives designed to "enable the child to be involved in and progress in the general curriculum." 20 U.S.C. § 1414(d)(1)(A)(ii). The student's IEP team must include at least one regular education teacher of the child and a representative of the local educational agency who is knowledgeable about the

---

[14]In T.R. v. Kingswood, 205 F.3d 572, 578 n. 3 (3d Cir. 2000), the Court of Appeals noted the recodification and strengthening of the LRE requirement in the 1997 amendments.

general curriculum. 20 U.S.C. § 1414(d)(1)(B). These requirements, and others in the IEP review and revision section and in the section on procedural safeguards, are designed to ensure that each student with disabilities participates and progresses in the general curriculum to the greatest extent possible and is a driving force toward inclusion in regular class.

The requirement that students receive the support they need in regular class was strengthened in the 1997 amendments. IDEA now explicitly requires that each student's IEP contains

> [A] statement of the special education and related services and supplementary aids and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child --
>
> > (I) to advance appropriately toward attaining [his] annual goals;
> >
> > (II) to be involved and progress in the general curriculum in accordance with clause (i) and to participate in extracurricular and other nonacademic activities; and
> >
> > (III) to be educated and participate with ... nondisabled children in [academic and nonacademic activities].

20 U.S.C. § 1414 (d)(1)(A)(iii).[15]

Supplementary aids and services include modification of curriculum and instruction in the general education class. This "program modification" was explicitly recognized by this Court in Oberti, as a supplementary service that may be required to enable students with disabilities to be included in the mainstream. Id. at 1211 (recounting testimony by education professor consultant about "commonly applied strategies" for integrating student) & 1216 ("mere token gestures.to

---

[15] See also 22 Pa. Code §14.42(c) with a similar presumption in favor of placement in a regular educational environment.

accommodate" not permitted under IDEA (quoting Daniel R.R. v. State Bd. of Educ., 874 F.2d

1036, 1048 (5th Cir. 1989)). The regulation promulgated by the United States Department of

Education under IDEA 1997 makes plain that when a students needs a modification curriculum to

be included successfully, that support must be provided:

> In determining the educational placement of a child with a
> disability, including a preschool child with a disability, each public
> agency shall ensure that--
> .............
> (e) A child with a disability is not removed from education in age-
> appropriate regular classrooms solely because of needed
> modifications in the general curriculum. (Authority: 20 U.S.C.
> 1412(a)(5)).

34 C.F.R. § 300.552. Assistance in modifying the general curriculum (for example, through

assistance provided to the general education teacher by a special education teacher) is a "support

for school personnel" that also may be required to enable a student to be included.

3. **The Pennsylvania Department of Education Has Endorsed the
Legal Requirement that Educational Agencies Must Adopt
Promising Practices that Can Enable Students with Disabilities
to be Included in Regular Class to the Maximum Extent
Appropriate**

Both IDEA and the case law require school districts to acquire the expertise in inclusive

practices they need to make inclusion successful. See Oberti, 995 F.2d 1204, 1216; Greer v.

Rome City School District, 950 F.2d 688, 696 (11th Cir. 1991) ( the duty to provide

supplementary aids and services in the regular class may include the duty to provide "special

education training for the regular teacher"). In provisions that have long been part of IDEA but

that were strengthened in the 1997 amendments, both state and local education agencies must

develop "comprehensive systems of personnel development" (CSPD) to assure that all personnel,

in general education as well as special education, have the skills to teach students with disabilities.

Under IDEA, each local school district has the obligation to have a comprehensive state-wide system of comprehensive personnel development in effect that is designed to ensure

> [A]n adequate supply of qualified special education, regular education, and related services personnel that meets the requirements for a State improvement plan relating to personnel development in subsections (b)(2)(B) and (c)(3)(D) of section 653.

20 U.S.C. § 1412(a)(14). In addition, each local educational agency has the obligation to ensure "that all personnel necessary to carry out this part are appropriately and adequately prepared."

Both state and local educational agencies' comprehensive systems of personnel development must address the elements set out in the statute. The agency's plan for personnel development must show how:

> (i) the State will prepare **general and special education personnel** with the **content knowledge and collaborative skills** needed to meet the needs of children with disabilities, including how the State will work with other States on common certification criteria;
> .............
> (vi) the State will **enhance the ability of teachers and others** to use strategies, such as **behavioral interventions**, to address the conduct of children with disabilities that impedes the learning of children with disabilities and others;
>
> (vii) the State will **acquire and disseminate**, to teachers, administrators, school board members, and related services personnel, **significant knowledge derived from educational research and other sources**, and how the State will, when appropriate, **adopt promising practices, materials, and technology;**
> ...............
> (ix) **the plan is integrated**, to the maximum extent possible, **with other professional development plans and activities,** including plans and activities developed and carried out under other Federal and State laws that address personnel recruitment and training; and
>
> (x) the State will provide for the joint training of **parents and special education, related services, and general education personnel**.

20 U.S.C. § 1453(c)(3)(D) (emphasis added).

As these criteria show, the comprehensive system of personnel development mandate of IDEA requires both state and local educational agencies actually to develop competence in inclusive practices. Especially pertinent are the requirements that general education teachers develop the "content knowledge and collaborative skills" to meet the needs of students with disabilities; that agencies enhance the capacity of their staff to use behavioral interventions; that educational agencies actually adopt promising practices.

In the 1997 amendments, Congress clarified the central role that regular education teachers play a central role in the education of children with disabilities and the Act and regulations were amended accordingly. H. Rep. 105-17 at 103 (1997); S. Rep No. 105-17 at 23 (1997) (*cited* in 64 Fed. Reg. 12406, 12472 (Mar. 12, 1999), App. A). Moreover, with the emphasis on participation and progress in the general curriculum added by the 1997 IDEA amendments, regular education teachers play a critical role in implementing the individualized program for most children with disabilities. *Id*. at 12472. See also, 34 CFR §300.344(a)(2)(at least one regular education teacher to be part of IEP team). The Pennsylvania Department of Education (PDE) has endorsed this principle in its Inclusion Policy, Basic Education Circular No. 2-95 (January, 1995) (BEC 2-95). Noting that "[t]he ability of the profession to succeed with students with disabilities has increased dramatically in recent years," the Department recognized that some school districts in Pennsylvania are ahead of others in their ability successfully to implement a program of inclusion. The Department stated, however, that in its understanding of the law, inability to do the job is not an excuse:

> The most demanding part of the legal standard ... is that each
> school district must become prepared to do what the profession as

a whole is capable of doing in the area of inclusion. For example, the Department understands the law as not respecting an argument that "Even if that school district over there can do it, my school district cannot." ....

In the area of inclusion, there is a demanding relationship between law and practice. That is: We in the teaching profession determine, through our actions, the outer limits of what we can practice successfully, but once success in inclusion is achieved somewhere in the profession, the law virtually requires that this increased capacity be replicated throughout the field.

BEC 2-95 at A-265.

The BEC articulates and applies to the domain of inclusion the requirement of 20 U.S.C. §1453(c)(3)(D)(vii) that all education agencies in Pennsylvania must actually <u>adopt</u> promising practices that can enable students with disabilities to be included in regular classes and to experience educational success there. Where IDEA's mandate that students with disabilities be educated in regular class to the maximum extent possible is at issue, and where promising practices have been developed that make inclusion possible, the law plainly requires "that this increased capacity be replicated throughout the field," and certainly throughout school districts in Pennsylvania.

> **4.      Applying the <u>Oberti</u> Standards, the Pennsylvania Special Education Appeals Panel Holds That Students with Significant Disabilities Can Benefit from Education in Regular Class with Supplementary Aids and Services.**

Following the option available to it under the IDEA, Pennsylvania has established a two-tier due process system which provides that a due process hearing may be appealed for an impartial review of the decision to the State educational agency for an impartial review.  20 U.S.C. § 1415(g).  In recent years, the Pennsylvania Special Education Appeals Panel has applied the <u>Oberti</u> standards in decisions holding that students with a wide range of disabilities, including

retardation, autism, emotional disabilities and multiple disabilities, can be educated in regular class with supplementary aids and services.

In the matter of Greggory D., a student in the Southern Tioga School District, Special Education Opinion No. 598 (Appeals Panel 1993) (Exh. 71), the parents of a ten-year old child with severe disabilities sought placement in full-time regular class in the home school. Greggory's disabilities included cerebral palsy with spastic quadriplegia. He was labelled profoundly retarded. He used a wheelchair, did not speak, was tube fed and received breathing treatments and suctioning for congestive drainage problems. Greggory's parents asked that he be included in a regular third grade class at his home school with supportive services, including curriculum modifications, the support of a classroom aide, certain peer supports, consultative and direct therapies (physical therapy, occupational therapy and speech), regular educational planning by the team, and training and technical assistance provided by an integration specialist.

The first issue the parents raised was whether Greggory's then-current educational placement in a multihandicapped support class, with no more than 8% of his time spent in academic and nonacademic activities with peers who did not have disabilities, afforded him an opportunity to be educated with children who do not have disabilities to the maximum extent appropriate). The second issue was whether Greggory should be educated at his home school.

The Hearing Officer held that Greggory's placement in the multihandicapped support class offered integration to the maximum extent appropriate because of the severity of his disabilities and because he required "intensive programming." She implicitly assumed that the legal standards set forth in Oberti, Holland and Greer applied only to students with mild disabilities.

The Appeals Panel rejected the Hearing Officer's reasoning and held that the school

district had failed to show that Greggory could not satisfactorily be educated in the regular classroom with supplementary aids and services and ordered placement in regular third grade in his home school. The evidence showed that Greggory could benefit both academically and socially from inclusion in regular class and that his presence would not detract from the education of general education students.

In the matter of Billy Joe T., a student in the Millersburg Area School District (Special Education Opinion No. 749-A (Appeals Panel, 1997), aff'd sub nom. Millersburg Area School District v. Lynda T., 707 A.2d 572 (Pa. Cmwlth.), allocatur denied (Pa. 1998) (Exh. 88), the parents of an eighth-grader with serious emotional disturbance (SED) sought inclusion in the student's home school. The district had placed the student in progressively more restrictive settings over the years, culminating in his placement at the Northumberland Center, a specialized emotional support secondary school operated by the Intermediate Unit. Billy's behavior problems included the use of vulgar language, striking other students, pushing and fighting, not being prepared for class and stealing a locker key.

The Hearing Officer upheld the school district's program with the addition of an aide. The Appeals Panel reversed, holding that the district had failed to consider the full range of supplemental aids and services that could be provided to Billy Joe in the regular class, including training for the regular education teachers and a behavior modification program for the child. The district's cumulative failure to provide supplementary aids and services to Billy Joe over a period of several years amount to a denial of free appropriate public education (FAPE). The Panel ordered Billy Joe's placement in regular class for at least half the school day and compensatory education in the form of intensive services. The Panel's order was upheld by Commonwealth

Court.

In the matter of Gareth R., a student in the Hempfield School District (Pennsylvania Special Education Hearing Officer, January 22, 1998) (Exh. 83) the parents of a third-grader with Down Syndrome opposed the district's proposed placement in a part-time life skills support class and sought a more inclusive placement for Gareth in regular third grade with resource room support. The district contended that Gareth's behavior precluded a less restrictive placement. The district had developed a behavior support plan for Gareth with the help of a consultant from the Intermediate Unit, and argued that Gareth had failed to benefit from education in regular class even with the help of an I.U. inclusion specialist.

The Hearing Officer held that the district had not made the reasonable accommodations that could have enabled Gareth to be educated satisfactorily in a regular class before proposing a more restrictive placement. The principal accommodation it had failed to consider was a Behavioral Support Plan (BSP) that emphasized the teaching of alternative skills. The BSP provided by the district emphasized negative consequences for Gareth's target behaviors and was likely to fail since it did not teach him alternative ways to cope with his frustrations at school. Gareth's behavioral problems were caused by lack of communication and social skills, and could reasonably could be addressed through a BSP based on positive measures in a less restrictive environment than the life skills class. The district's BSP did not comply with 22 Pa. Code § 14.36(c), which requires that BSPs be based on positive, rather than negative interventions. The Appeals Panel affirmed the Hearing Officer.

In the matter of Adam M., a student in Lower Merion School District (Special Education Opinion 1248, 2002) (Exh. 80), the school district sought to remove Adam, an eight-year old

student with Verbal Auditory Agnosia and Vocal Decoding Disorder, from a placement in which he spent the beginning and end of his day in regular education, as well as special subjects, lunch, recess, assemblies and similar activities, to a full-time autistic support classroom in a different school building with limited opportunity for inclusion. The parents disagreed with the plan and requested a due process hearing.

The Appeals Panel determined that the placement was inappropriate for numerous reasons. The most obvious problem was that Adam had not been identified as autistic or having a pervasive developmental disorder. However, the Appeals Panel further held that the district inappropriately based its decision by comparing Adam's abilities to those of his peers, rather than on Adam's strengths and needs. Furthermore, the district failed to demonstrate that a continuum of services was available to its students. It had presented its placement to Adam's parents as the only one possible. The Appeals Panel ordered the district to develop a new IEP for Adam.

In the matter of Bridget L., a student in the Souderton Area School District (Special Education Opinion No. 1112 (Appeals Panel, 2001) (Exh. 78), Bridget, a ten-year old student with congenital brain damage and severe and profound mental retardation in the Souderton Area School District, was evaluated by a psychologist as functioning at the nine to twelve month level, thereby making testing her intelligence quotient impractical. Bridget was placed in the district's multi-disability classroom at E.M. Crouthamel Elementary School with inclusion for certain non-academic activities including assemblies, holiday events, home room and lunch. She received a variety of services, including self-help, daily living, behavioral and therapy services. Bridget progressed in her academic and social goals under this program. The parents were pleased with her progress, but disagreed with the district over Bridget's placement and IEP content proposed

for the next school year. The disagreement led to a due process hearing.

The district argued that Bridget's placement in a multi-disability class was proper because certain supplementary aids and services could not be offered in a less restrictive setting. It further contended that inclusion should not be favored for students with significant disabilities. The Appeals Panel found that Bridget's IEP was appropriate and deliverable in at her home school, Oak Ridge Elementary. Even if the program in the multiple disabilities class were more appropriate, Bridget would still be entitled to attend her home school. The degree of a program's appropriateness was irrelevant as long as it was in fact appropriate. The critical question was which program, of the multiple appropriate ones, was least restrictive. Because the district failed to demonstrate that Bridget's IEP could not be implemented at her home school, the district ordered her placement there.

School districts in the Commonwealth mistakenly place students in unnecessarily restrictive programs because they compare the academic abilities of a student with a disability to typically developing classmates without consideration of the individualized program plan. Sometimes they consider, erroneously, that the curriculum cannot be adapted to fit the disabled student's needs. In the matter of Kristi H., a student in the Tri-Valley School District (Pennsylvania Hearing Officer, August 9, 1999) (Exh. 76), a 17-year old student with the classification of mental retardation was placed in a self-contained life skills program operated by Intermediate Unit 29 in a school outside her home school district. The district claimed that it did not have the ability to adapt the general education curriculum to fit Kristi's needs. The district recommended a life skills program in a neighboring district and vocational training in her home district.

The parents filed for due process. The Hearing Officer held that the placement was not consistent with Kristi's right to be educated with students who do not have disabilities because the district failed to show that the program could not be implemented within Kristi's home school. The Hearing Officer ordered a multidisciplinary reevaluation and an IEP team meeting to develop an appropriate plan for Kristi to be implemented in the least restrictive environment. For evidence of Kristi's progress since she was placed in her home school, see Exh. 127: Decl. of Virginia H.

In the matter of Brannon I, a student in the Butler Area School District, Special Education Opinion N. 1012 (Appeals Panel 2000) (Exh. 78), a student classified with mental retardation had been placed in an inclusive program from kindergarten through fourth grade. In fifth grade, the district placed him in a part-time emotional support class, which the district changed to full-time emotional support placement later that year. Brannon had a TSS worker and one and a half full time aides in his class, but his disruptive behavior continued to escalate. The school district sought to place him at Pace School, an approved private school. His mother disagreed with the proposed placement.

The Appeals Panel found that the district had not demonstrated that it used supplementary aids and services sufficiently to enable Brannon to be educated with non-disabled peers to the maximum extent appropriate. There was no evidence of curriculum modification, a behavior modification plan, counseling or an aide, nor was there any evidence that the district had trained its teachers. The Appeals Panel held that it could not evaluate the appropriateness of the district's placement without first being able to observe whether Brannon could be educated in a more integrated setting with the help of supplementary aids and services.

In the matter of Mark S., a student in the Conemaugh Valley School District, Special

Education Opinion No. 1203 (Appeals Panel, 2001) (Exh. 85), the school district sought to place a student with autism in a special education class for reading and English. The Appeals Panel held that the district failed to demonstrate that Mark needed to be removed from the regular class for those subjects, that Mark's IEP could not be implemented there, or that he was disruptive to the other students. The Appeals Panel held that as long as a student's IEP can be implemented in a regular classroom, it was irrelevant whether or not the class's curriculum could be "brought down" to the student's ability. The Order required the district to educate Mark in a regular class for English and Reading with appropriate curricular adaptations and modify Mark's IEP and include specially designed instruction in various areas, including the use of Alpha Smart (an assistive device for writing) pursuant to the independent educational evaluation that was conducted prior to the hearing.

In the matter of Brendan B., a student in the Central Bucks School District, Special Education Opinion No. 1278 (Appeals Panel, 2002) (Exh.70), the district sought to move an 11-year old fourth grader with Down Syndrome and Hirschsprung's disorder to a life skills class outside his home school.

Verbal apraxia distorted Brendan's speech. He had been included in regular class and a learning support resource room at Groveland Elementary, his neighborhood school, since first grade and made social and educational progress in second and third grades. In the fall of Brendan's fourth grade year, the district developed a new IEP which provided for full-time learning support with virtually no participation in regular education curriculum, and recommended placement at Linden Elementary School, where the district had sought to place Brendan in the past. Brendan's parents would not accept the IEP, and the district requested a due process

hearing.   The district contended that Brendan should be placed in the life skills class because he had begun to isolate himself and demonstrated escape/avoidance behavior. The evidence produced at the hearing showed, however, that his behavior plan "rewarded" him with considerable down time when he attempted to avoid work, and that this only increased his problematic behavior.

The Appeals Panel held that placement at the Linden school was not appropriate or consistent with IDEA's integration mandate.  Brendan's communication problems and avoidance behavior would have to be addressed regardless of which school he attended.  The district inappropriately based its placement decision on Brendan's behavior rather than his educational need, and the evidence showed that Brendan was making progress at his placement in Groveland. The district had made appropriate curriculum modifications, but failed to address Brendan's behavioral needs.  The Appeals Panel held that an appropriate behavior management plan was a supplemental service that the district must offer Brendan and that could help him meet his goals in a regular classroom.

Brendan made tremendous progress at his home school in fifth grade with more appropriate behavioral support. Exh 127: Decl. of Keith B.

5.    **The Pennsylvania Department of Education Has Violated Its Duty Under The Individuals With Disabilities Education Act to Assure That Students With Disabilities Are Educated With Children Who Do Not Have Disabilities to The Maximum Extent Appropriate.**

On the undisputed facts, based primarily on defendants' own statements, records, reports and the testimony of representatives of school districts and Intermediate Units across the Commonwealth, the Pennsylvania Department of Education (PDE) has abdicated its duty to assure that students with disabilities, especially those whose disabilities are severe, enjoy the right to be educated in regular classes alongside their peers, friends and neighbors.

PDE states that it uses three methods to discharge its duty to assure compliance with the integration mandate of the Individuals with Disabilities Education Act: the complaint resolution process, the compliance monitoring process, and dissemination of a Basic Education Circular (BEC) on inclusion.  None of these methods has assured that students with disabilities are educated in regular class to the maximum extent appropriate or fulfilled PDE's statutory duty under 20 U.S.C. § 1412(a)(5). Nor is there any reasonable prospect that the methods presently employed by PDE can assure compliance with the Act. PDE's compliance monitoring system is essentially a Potemkin village in which, behind a facade of data driven analysis, on site verification, and corrective action, school districts may continue to do as they have always done, and may continue to place students with disabilities in unnecessarily segregated settings as long as the district can state that an IEP team has approved those placements.

- PDE's compliance monitoring system, as presently designed, does not and cannot measure whether students with disabilities are in fact being educated with students who do not have disabilities to the maximum extent appropriate.

- PDE's compliance monitoring system does not and cannot measure whether students with disabilities have been removed from regular class, or denied the opportunity to be educated in regular class, only because of the nature or severity of their disabilities. .

- PDE's compliance monitoring system does not and cannot measure whether students with disabilities could be educated satisfactorily in regular class with supplementary aids and services.

The Individuals with Disabilities Education Act requires explicitly that states assure that the integration mandate is implemented by every local school district and intermediate unit. 34 C.F.R. § 300.556, "Monitoring Activities," requires that:

> (a) The SEA shall carry out activities to ensure that § 300.550 is implemented by each public agency.
>
> (b) If there is evidence that a public agency makes placements that are inconsistent with § 300.550, the SEA shall—
>
> > (1) Review the public agency's justification for its actions; and
> >
> > (2) Assist in planning and implementing any necessary corrective action.

The Pennsylvania Department of Education has abdicated its responsibility under this statutory and regulatory mandate, which requires it to determine, when it monitors a local school district, whether the districts makes placements that are inconsistent with the Act, to examine the district's asserted justification for the decision and to assist in implementing corrective action. Instead, PDE accords unquestioning deference to placements made by local school districts: Its examination ends when the school district states that all placement decisions were made by an

Individualized Education Program team. As long as the Department maintains the stance that "Whatever is, is right,"[16] and refuses to fulfill its duty to assure that placement decisions are made in compliance with the integration mandate, it may as well not monitor school districts at all.

C.    **PDE HAS AIDED AND PERPETUATED DISCRIMINATION AGAINST MEMBERS OF THE PLAINTIFF CLASS SOLELY ON THE BASIS OF THEIR DISABILITIES AND THE SEVERITY OF THEIR DISABILITIES, IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT AND THE AMERICANS WITH DISABILITIES ACT.**

It is well-established that Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides "an independent source of rights for children with disabilities in addition to the IDEA." Oberti v. Board of Education of the Borough of Clementon, 801 F.Supp. 1392, 1404-1405 (D.N.J. 1992), aff'd, 995 F.2d 1203 (3d Cir. 1993); see also 20 U.S.C. § 1415(f). Section 504 states, in relevant part:

> No otherwise qualified individual with disabilities in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794a. The regulation promulgated by the United States Department of Education under Section 504 forbids educational agencies receiving federal financial assistance to:

(i) Deny a qualified[17] handicapped person the opportunity to participate in or

---

[16]Alexander Pope, Essay on Man, epistle i, line 289.

[17]The regulation defines a "qualified" student with disabilities as a person
(i) of an age during which nonhandicapped persons are provided such services,
(ii) of any age during which it is mandatory under state law to provide such services to handicapped persons, or
(iii) to whom a state is required to provide a free appropriate public education under

benefit from [its] aid, benefit, or service;

(ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;

(iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others;

(v) Aid or perpetuate discrimination against a qualified handicapped person by providing significant assistance to an agency, organization, or person that discriminates on the basis of handicap in providing any aid, benefit, or service to beneficiaries of the recipients program or activity;

(vi) Deny a qualified handicapped person the opportunity to participate as a member of planning or advisory boards; or

(vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.

34 C.F.R. § 104.4. Thus, not only does Section 504 forbid PDE from discriminating against students with disabilities directly, it forbids it from "aiding and perpetuating" discrimination

---

section 612 of the Education of the Handicapped Act.
34 C.F.R. § 104.3(l)(2).

against students with disabilities by other entities such as local school districts to which it provides "significant assistance." In providing funding to local school districts, approving their special education plans and finding them in compliance with legal requirements even when they unnecessarily and unlawfully exclude students with disabilities from regular class, PDE has aided and perpetuated discrimination against students with disabilities.

To make out a prima facie case under section 504, the plaintiff must prove: (1) that he is a person with disabilities under the Act (2) that he is "otherwise qualified" for the position sought, (3) that he was excluded from the position solely by reason of his disability, and (4) that the program or activity in question receives federal financial assistance. Oberti, 801 F.Supp. at 1405, citing Strathie v. Department of Transportation, 716 F.2d 227, 230 (3d Cir. 1983).

Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-34, incorporates the "non-discrimination principles" of section 504 of the Rehabilitation Act and extends them to state and local governments. Helen L. v. DiDario, 46 F.3d 325, 331 (3d Cir. 1995). Section 12132 of the Act provides:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

Defendant PDE, as a recipient of Federal financial assistance, is a covered entity within the meaning of Section 504. For purposes of the Act, "program or activity" includes the operations of the 501 districts and 29 I.U.s in the Commonwealth as local educational agencies. 29 U.S.C. § 794(b)(2)(B).

Section 504 and the ADA protect children with disabilities from discrimination on the

basis of the severity of their disabilities or their membership in a particular category of persons

with disabilities such as retardation, emotional disabilities or multiple disabilities. The United

States Department of Education's 504 regulation states that it is unlawful and discriminatory to

"[p]rovide **different** or **separate** aid, benefits, or services to handicapped persons or to **any class**

**of handicapped persons** unless such action is **necessary** to provide qualified handicapped

persons with aid, benefits, or services that are as effective as those provided to others." 34 C.F.R.

§104.4(b)(1)(iv) (emphasis added).

The ADA regulation of the U.S. Department of Justice, which prohibits discrimination in

programs operated by state and local government entities, contains an almost identical

requirement. Under the regulation, it is unlawful for a public entity to "p]rovide **different** or

**separate** aids, benefits, or services to individuals with disabilities or to any **class of individuals**

**with disabilities** than is provided to others unless such action is necessary to provide qualified

individuals with disabilities with aids, benefits, or services that are as effective as those provided

to others." 28 C.F.R. § 35.130(b)(1)(iv).

The courts have recognized that Section 504 and the ADA prohibit discrimination

between persons with different types or degrees of disability. The district court in Martin v.

Voinovich, 840 F.Supp. 1175, 1192 (S.D. Ohio 1993), held that applying Section 504 to prohibit

discrimination among persons "with different or varying degrees of disability" is a proper

interpretation of the statute and one that "furthers the goal of eliminating disability based

discrimination." Similarly, the district court in McGuire v. Switzer, 734 F.Supp. 99, 114

(S.D.N.Y. 1990) held that it was discriminatory to apply a ceiling or "cap" on benefits for

rehabilitation services for persons with paraplegia that was less generous than the benefit ceiling

for blind persons. The court held that the disparity in benefits violated Section 504's proscription of "different or separate aid, benefits or services ... to any class of handicapped persons" because "the only reason the state provides [the plaintiff] with less funding for his tuition and maintenance expenses is because his disability does not involve the impairment of sight." 734 F.Supp. at 114.

In another case arising under Section 504, the district court in Jackson v. Fort Stanton Hospital and Training School, 757 F.Supp. 1243, 1298 (D.N.M. 1990), rev'd in part on other grounds, 964 F.2d 980 (10th Cir. 1992), held that the state's denial of access to community programs "on the basis of physical as well as mental handicaps" constituted unlawful discrimination in opportunities for community placement against institutional residents who had physical disabilities, challenging behavior or medical needs. The court found that reasonable alterations in the defendants' community-based programs, which at the time of trial were rarely available except to persons with mild and moderate retardation who had no other significant disabilities, would enable them to serve residents with other types of disability. Id. at 1299. Other cases holding that discrimination in the provision of federally funded, public services on the basis among persons with different categories or degrees of disability include Wagner by Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1016 (3d Cir. 1995); Plummer v. Branstad, 731 F.2d 574, 578 (8th Cir. 1984); Messier v. Southbury Training School, 916 F.Supp. 133, 141 (D. Conn. 1996); Garrity v. Gallen, 522 F.Supp. 171 (D.N.H. 1981); see also Winkler v. Interim Services, Inc., 36 F.Supp. 2d 1026, 1029 (M.D. Tenn. 1999). But see People First of Tennessee v. Arlington Developmental Center, 878 F.Supp. 97, 101 (W.D. Tenn. 1992).[18]

---

[18]The line of employee benefits cases holding that an employer may lawfully provide a disability benefit plan that affords more generous coverage for physical disabilities than for mental or emotional disabilities is not to the contrary. See, e.g., Equal Employment Opportunity

Providing plaintiffs and class members different and separate educational benefits from those provided to their typically developing and less disabled peers is allowable only when "such action is <u>necessary</u> to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others." 28 C.F.R. § 35.130(b)(1)(iv), 34 C.F.R. § 104.4(b)(1)(iv) (emphasis added). Research, experience, expert opinion and the case law show how mistaken it would be to conclude that removal from regular class is <u>necessary</u> to afford students with significant disabilities an educational benefit, when just the opposite is true, that those students can, in most cases, achieve a greater benefit from placement in regular class than can be achieved in a separate class.

In many school districts, e.g. Hempfield, Lancaster, Northern Cambria, Western Beaver County and Wilmington Area, students with significant disabilities and students with particular categories of disability (autism, multiple disabilities, students with significant cognitive disabilities) are automatically placed in I.U.-operated programs rather than in the regular programs of the

---

Commission v. Staten Island Savings Bank, 207 F.2d 144, 149-50 (2d Cir. 2000) and cases cited therein. These cases arose under Title I of the Americans with Disabilities Act and raised the question whether offering an employee benefit plan that provides different coverage for different disabilities constitutes employment discrimination. Most courts that have considered the question have answered it in the negative, based on the legislative history of Title I of the ADA indicating that "it is permissible for an employer to offer insurance policies that limit coverage for certain procedures or treatments," so long as employees with disabilities "have equal access to the ... insurance coverage that is provided by the employer to all employees." 207 F.3d at 150, citing H.R. Rep. No. 101-485(III) at 38 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 460-61; S.Rep. No. 101-116 at 29 (1989). Thus, the relevant question under Title I is not whether the insurer (who is not a covered entity under Title I) provides a different benefit structure for different disabilities, but whether the employer (who is covered under Title I) has offered every employee the same plan regardless of her disability. "[S]o long as every employee is offered the same plan regardless of that employee's contemporary or future disability status, then no discrimination has occurred." 207 F.3d at 150, quoting Ford v. Schering-Plough Corp., 145 F.3d 601, 608 (3d Cir. 1998).

district. Placement in I.U. programs denies students with disabilities the benefit of participating in public education at one's home school in a regular education class with one's peers because:

- I.U. programs frequently are far from home and the student must travel long distances, which, for students with significant disabilities may have especially adverse consequences.

- It is very difficult for the student who attends school far from home to participate in extracurricular activities and neighborhood activities because of long travel time and because the neighborhood school sees him as the "I.U.'s kid," not "our kid."

- I.U. programs are taught by teachers who work for an educational agency other than the student's local school district and report to a different chain of command. They are not subject to the professional development requirements of the school district and do not necessarily participate in district initiatives.

- The locus of an I.U. class subject to negotiation between the school I.U. and the host district. If the district decides it does not want to host the I.U. class any longer, the I.U. class will have to move to another school district. See Exh 127: Declaration of Susan G., whose daughter moved from year to year, from one school district to another.

- Even if the I.U. class is in the student's home school, the other students in the class may be from other school districts; geographical distant will make it harder to sustain friendships.

In other districts, students with significant disabilities may be placed out of district, with the same problems created by distance, not sharing common school experiences with one's peers and not being able to participate in extra curricular activities and other non-academic activities at either the home school or the host school.

In some school districts, such as Pittsburgh (Conroy and other special education centers), Philadelphia (Widener and the thousand students in Approved Private Schools) and Western Beaver County (New Horizons and various Approved Private Schools), many students with significant disabilities and particular categories of disability are placed in separate schools. In other school districts, students with significant disabilities and particular categories of disability are more likely to be placed in full-time and part time classes. These students are denied the

benefits of regular class placement and of services such as itinerant support and co-teaching that students with milder disabilities enjoy, even though they benefit just as much or even more from regular class placement.

Students placed in separate classes for low-functioning children are denied the benefits of public education and often are denied access to the general curriculum. In some of the smaller school districts, the rule of thumb is that students with low incidence disabilities will be served by the I.U.s or in classes shared among the districts. See Exh. 27: Nicksick Depos.  In Philadelphia, students in Life Skills Support have a separate curriculum. There are in effect two separate programs for students with disabilities in Philadelphia – the programs for high incidence and low incidence disabilities, respectively. The students in the low incidence program are in very segregated settings and generally lack access to the general curriculum. Exh. 30: Oakes Depos. at 23. There is no consideration of individual strengths and weaknesses for students who, like Hassan Sabree, have retardation. Exh. 31: Sabree Depos.  As a result, students leave school with no skills and no prospects for becoming integrated into the social and economic fabric of the community.  As they were in school, they continue to be segregated and isolated to the detriment of us all.

As part of a school reform initiative, Philadelphia is developing a new curriculum and is also, at the same time, developing adaptations to the curriculum for students with disabilities. The district has contracted with "community partners" to take over failing schools, on the premise that the community partners could do a better job of educating the students in those schools. However, the students with "low incidence" disabilities are not able to participate in the programs operated by the community partners because the terms of the Educational Services Agreements

between Philadelphia and the community partners excludes them from the programs operated by the community partners.

PDE also has violated Section 504 and the ADA by allowing school districts effectively to exclude students with disabilities from extracurricular activities by failing to provide support for their participation in the IEP. OSEP's analysis of students' records found that for the great majority of special education students, extracurricular activities were not addressed in the IEP. Students who need accommodations to participate in extracurricular activities but cannot receive them will inevitably be excluded from a significant aspect of the school experience and tracked into patterns of life-long segregation, as is illustrated by plaintiff Lydia Gaskin's experience when her parents inquired about her participation in the schools' athletic program and were told, "there is always 'Special Olympics.'"

As the district court found in New York State Association for Retarded Children (NYSARC) v. Carey, 466 F.Supp. 487, 496-97 (E.D.N.Y. 1979),

> A child's chance in this society is through the educational process. A major goal of the educational process is the socialization process that takes place in the regular classroom, with the resulting capability to interact in a social way with one's peers. It is therefore imperative that every child receive an education with his or her peers insofar as it is at all possible.
>
> It is an educational fact that the maximum benefits to a child are received by placement in an normal an environment as possible. ... A child has to learn to interact in a social way with its peers and the denial of this opportunity during his minor years imposes added lifetime burdens upon a handicapped individual.

The court in NYSARC v. Carey found that the exclusion of children with disabilities from classes in regular schools solely because of an additional disability, Hepatitis-B carrier status, violated their right to an appropriate public education under Section 504. Although their disabilities vary,

the members of the plaintiff class with significant disabilities are just as effectively barred from the regular preschool classroom by DCIU's policy and practice of refusing to for a regular preschool classroom for children with his category of disability.

## IV.     CONCLUSION

For all of the foregoing reasons, plaintiffs request that this Court find that the defendant Pennsylvania Department of Education has denied them a free, appropriate public education in the most integrated setting appropriate and that defendants' refusal to assure that they have opportunities to participate in regular classrooms with their typically-developing peers discriminates against them on the basis of their disabilities. Plaintiffs further request that the Court enter an order requiring defendants to submit a remedial plan to the plaintiffs and the Court to correct these violations. At a minimum, such a plan must make provision for:

(a)     Policies and clear directives to local educational agencies stating how placement decisions and decisions about the provision of supplementary aids and services must be made;

(b)     A redesigned compliance monitoring system that is capable of determining whether students with disabilities have been unnecessary removed from regular class when their education in regular class could be achieved satisfactorily with supplementary aids and services;

(c)     A set of benchmarks or performance expectations to guide local school districts in assuring that students with disabilities, including those whose disabilities are most severe, are included in regular class to the maximum extent appropriate;

(d)     A redesigned special education plan approval process requiring local school

districts to set performance goals for

(1)    Enhancing inclusion in regular class of students with disabilities, including those whose disabilities are most severe;

(2)    Providing opportunities for students with significant disabilities to be educated in district-operated classes in students' home schools;

(e)    A training and technical assistance plan emphasizing on-site guided practice by PDE and its professional development partners to develop the capacity within local school districts to meet reasonable performance goals for the inclusion of students with disabilities in regular class, by developing the skills of school district personnel in the following areas:

(1)    Modifying curricula within general education classrooms

(2)    Using differentiated instruction and multiple intelligences strategies to facilitate inclusion of all students with all disabilities;

(3)    Using cooperative groups to teach all students with disabilities;

(4)    Incorporating functional skills into curricula.

(5)    Individualizing data collection techniques.

(6)    Using positive behavior management strategies in general education classes.

(7)    Developing collaborative partnerships between special and general educators to support students with disabilities in general education classrooms.

(8)    Developing social relationships between students with and without

disabilities.

(9)     Using family centered planning strategies.

Respectfully Submitted,

PUBLIC INTEREST LAW CENTER OF
PHILADELPHIA

_____

Judith A. Gran
Barbara E. Ransom
125 South Ninth Street, Suite 700
Philadelphia, PA 19107
Tel:     (215) 627-7100
Fax:     (215) 627-3183

Dated:  July 23, 2003                    Attorneys for Plaintiffs