**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


LYDIA GASKIN, <u>et al.</u>,              :
                                      :
        Plaintiffs,              :
                                        :
          v.                  :      NO. 94-CV-4048 (E.D.Pa.)
                                        :      JUDGE ROBRENO
COMMONWEALTH OF PENNSYLVANIA,    :
DEPARTMENT OF EDUCATION,       :
                                        :
        Defendants.         :


**PLAINTIFFS' RESPONSE  IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**


Plaintiffs, Lydia Rebecca Gaskin, <u>et al.</u>, respond to Defendants' Motion for Partial

Summary Judgment by requesting that the Court deny the Motion in its entirety. The grounds for

denial are set forth in the accompanying Memorandum of Law.


                                    BY:    _____

                                         Judith A. Gran
                                         Barbara E. Ransom
                                         Public Interest Law Center of
                                                  Philadelphia
                                         125 S. 9th Street, Suite 700
                                         Philadelphia, PA 19107
                                         (215) 627-7100

                                         Attorney for Plaintiffs


August 18, 2003

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LYDIA GASKIN, <u>et al.</u>, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 94-CV-4048 (E.D.Pa.) |
| | : | JUDGE ROBRENO |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| DEPARTMENT OF EDUCATION, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.    INTRODUCTION**

In their Motion for Partial Summary Judgment, defendants contend that plaintiffs' claims

under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, are barred by

the Eleventh Amendment and that plaintiffs' claims for class-wide relief should be dismissed

because plaintiffs can offer no admissible evidence of class-wide injury.  Defendants'

Memorandum  at 2-4.  In this Response to defendants' motion, plaintiffs will show that the ADA

contains a clear statutory abrogation of the states' Eleventh Amendment immunity and – based

on Pennsylvania's history of discrimination against persons with disabilities – the Congressional

abrogation satisfies the congruent and proportionality tests.  Further, because plaintiffs seek

injunctive relief against officials of the Department of Education, their claims for relief are not

barred by the Eleventh Amendment since, under the doctrine of <u>Ex parte Young</u> state officials

enjoy no immunity from actions for injunctive and declaratory relief for violations of  the laws of

the United States.

Defendants' contention that plaintiffs can present no admissible evidence of class-wide injury also fails. Defendants challenge the admission of the data obtained as a result of the study overseen by two of plaintiffs' experts – Beverley Evans, Ph.D. and Linda Lengyel, Ph.D. – – without challenging the admissibility of their expert opinions. In representing that this is the only class-wide evidence in support of plaintiffs' claims, defendants ignore the vast majority of evidence produced in discovery. The findings in the Evans-Lengyel report are consistent with – and bolstered by – abundant evidence in support of plaintiffs' claims for class-wide injunctive relief. That evidence includes evidence from federal monitors and the defendants' own monitoring reports; the depositions of a random sample of school districts; the depositions of Intermediate Unit personnel changed providing technical assistance and training; defendants' Act 48 and PaTTAN database of technical assistance and training; defendants own data on placement of students with disabilities in difference educational environments; testimony of dozens of parents and students other than the named plaintiffs from school districts across the Commonwealth; the deposition testimony of the defendants; and other expert witnesses and their reports. See e.g., Complaint at ¶¶ 195, 196, 233, 235 and 236 and Plaintiffs' Motion for Summary Judgment at ¶¶ 230-255 and 313-406. The Evans-Lengyel report and findings are but one other source of information plaintiffs will present to the finder of fact to support their claims for relief on behalf of the members of the class.

Additionally, and over the opposition of defendants, this Court issued its June 12, 1995 Order certifying this matter as a class action.[1] As a result, the harm plaintiffs, as representatives

---

[1]       What matters is that the Department of Education's alleged failure to monitor local school districts to ensure compliance with the provisions of the IDEA directly and adversely affects each

of the class, sustained is deemed to be typical of the harm that the class members experience.

Tellingly, defendants have not sought to have the class decertified, nor have they asked for

summary judgment dismissing any of the individual plaintiffs' claims. The injury suffered by the

individual plaintiffs is another valid, unrefuted source of proof upon which plaintiffs can and do

rely to support the findings obtained from the work of Evans and Lengyel.

While defendants clearly argue that this Court lacks jurisdiction to address plaintiffs'

Title II claims, their arguments based on Section 504 of the Rehabilitation Act of 1973, 29

U.S.C. § 794, ("Section 504") and the Individuals with Disabilities Education Act, 20 U.S.C. §§

1400 - 1485, ("IDEA") are less clear. Defendants' Section 504 and IDEA arguments relate only

to the claims for relief for the unnamed members of the class. Defendants' Memo at 3-4. Other

than the jurisdictional challenge to Title II, defendants do not oppose the claims of the individual

plaintiffs. Consequently, there are no arguments against this Court's jurisdiction under Section

504 and IDEA for plaintiffs to address.

For all of the reasons stated in defendants Motion and for all of the reasons herein,

defendants' Motion for Partial Summary Judgment must be denied.

## II.     DEFENDANTS HAVE FAILED TO MEET THE LEGAL AND EVIDENTIARY STANDARDS REQUIRED FOR SUMMARY JUDGMENT.

Summary judgment may be granted only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact" and "that the moving party is entitled to judgment as a

---

handicapped, school-age child in Pennsylvania. This issue is
common to all members of the class.
June 12, 1995, Order-Memorandum at 7.

4

matter of law." Rule 56(c), Fed. R. Civ. P.  See also,  Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 2554-55, 91 L.Ed. 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Bushman v. Haln, 798 F.2d 651, 655, 657 (3d Cir. l986);  Falcone v. Columbia Pictures Industries, 805 F.2d 115, 117-18 (3d Cir. l986).  The facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-90 (1986);  Celotex, 477 U.S. at 323.

Defendants have failed to demonstrate that there are undisputed material facts or that they are entitled to judgment as a matter of law.  See Bowers v.  Nat'l Collegiate Athletic Ass'n, 9 F. Supp.  460, 471 (D.N.J. 1998) ("the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case.") (citing Celotex, 477 U.S. at 255-56).

The material facts in this matter involve the individual plaintiffs' claims – which defendants do not seek to dismiss in their motion – and the claims of absent class members. Because plaintiffs have produced evidence upon which a reasonable factfinder could rule  in favor of the class members, the Court must deny defendants' Motion for Partial Summary Judgment.  Lawrence v. Nat'l Westminster Bank New Jersey, 98 F.3d 61, 65 (3d Cir. 1996) (citing Anderson., 477 U.S. at 250).

## III.    PLAINTIFFS' CLAIMS UNDER THE ADA ARE NOT BARRED BY THE ELEVENTH AMENDMENT.

Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, prohibits a public

entity from discriminating against persons with disabilities in the provision of public services. Defendants do not argue, nor can they, that they are not a public entity within the meaning of the Act nor that plaintiffs are persons with disabilities and, therefore, entitled to the protections afforded under the Act. Defendants do argue that PDE's status as a Commonwealth agency assures that it is entitled to Eleventh Amendment immunity and, further, serves to bar PDE from claims brought pursuant to Title II of the ADA.[2] For this proposition, PDE relies on the Supreme Court's holding in Bd. Of Trustees of the Univ. Of Alabama v. Garrett, 531 U.S. 356 (2001) and on the Third Circuit's ruling in Lavia v. Pennsylvania, 244 F.3d 190 (3d Cir. 2000). Defendants' Memo at 3 and 7. Nonetheless, defendants acknowledge that neither case addressed the issue of abrogation in the Title II context. Defendants' Memo at 9.

A.    NO CONTROLLING LEGAL AUTHORITY BARS PLAINTIFFS' CLAIMS UNDER THE ADA

In addition to Garrett and Lavia (which plaintiffs address fully infra at III.B.), defendants string cite seven cases which they claim support their position that the Eleventh Amendment bars claims against state defendants brought pursuant to Title II of the ADA. Defendants' Memo at 9-10. Defendants do not analysis any of the cases in the string – and for good reason. Defendants' recitation of cases does not support their position.

Defendants' rely on decisions from the Sixth and the Eighth Circuits which have held that

_____

[2]The only claims under Title II that potentially could be subject to an Eleventh Amendment bars are plaintiffs' claims against the Pennsylvania Department of Education as an entity and any potential claims for damages included in the residual ---- of plaintiffs' prayer for relief. Plaintiffs' claims against the defendant state officials for injunctive relief do not implicate the Eleventh Amendment at all, as will be discussed below. Thus, even if the Court were to grant defendants' motion and find that PDE is immune from suit, such holding would have letter if any practical effect since virtually all the relief plaintiffs such is available against the defendant PDE officials.

Congress did not properly abrogate the states' Eleventh Amendment immunity. However, in these cases the courts analyzed Title II only as an exercise of Congress' to enforce the Equal Protection Clause. See Alsbrook v. City of Maumelle, 184 F.3d 999, 1006-07 (8th Cir. 1999) (applying an analysis under the Equal Protection Clause, court dismissed officer's claims of employment discrimination against the state brought under Title II of the ADA);[3] Angel v. Kentucky, 314 F.3d 262, 265 (6th Cir. 2002) (the court expressly left the door open for actions brought under Title II actions to enforce the guarantee of due process of law).

Defendants also rely on Popovich v. Cuyahoga County Court of Common Pleas, 227 F.3d 627 (6th Cir. 2000) reversed by 276 F.3d 808 (6th Cir. 2002). Defendants only cite the panel decision, totally and inappropriately, ignoring the fact that it was overturned by the Court of Appeals sitting en banc. In Popovich, the Sixth Circuit – remanding the case to the trial court – determined that it is "appropriate to reach the due process basis for upholding Title II" where the plaintiff's inability to participate in a custody proceeding because of his disability "may constitute an unreasonable exclusion from participation in the proceeding under the principles of due process of law." Popovich, 276 F.3d 817 and n. 8. Defendants' recitation to Walker v. Snyder, 213 F.3d 344, 347 (7th Cir. 2000) (only the state, and not state officials, may be sued for violating Title II) as a basis to uphold its position on Title II is similarly flawed. In a post-Garrett decision, the Seventh Circuit specifically rejected its own ruling in Walker. See Bruggeman v. Blagojevich, 324 F.3d 906, 911-912 (7th Cir. 2003) (suits for prospective injunctive relief against

_____

[3]Although, Garrett reached the Supreme Court on claims under both Title I and Title II, the Court made clear that employment discrimination claims were proper only under Title I of the ADA, whether or not the alleged offender is the state. 531 U.S. at 374. As a result, any attempt to harmonize Alsbrook with the instant case, presents the same Title I versus Title II controversy that plaintiffs address in this Memorandum.

state officials sued in their official capacity are authorized under Title II) (citing <u>Ex Parte Young</u>, 209 U.S. 123 (1908)).[4]

The decisions in both <u>Reickenbacker v. Foster</u>, 274 F.3d 974, 982-83 (5th Cir. 2001) (finding that there was no history and pattern of unconstitutional discrimination by the states against the disabled) and <u>Pace v. Bogalusa</u>, 325 F.3d 609, 613 (5th Cir. 2003) (relying on claims <u>Reickenbacker</u> to dismiss ADA ) rely on the failure to identify a clear pattern of "unconstitutional discrimination" by the states as a basis for barring claims raised under Title II. As the Supreme Court recently held, evidence of a long and extensive history of discrimination warrants the Congressional use of Section V powers.  <u>See</u> <u>Nevada Dep't of Human Resources v. Hibbs</u>, – U.S. –, 123 S.Ct. 1972, 1976, 155 L. Ed. 2d 953, 960 (January 15, 2003) (in enacting the FMLA, Congress had evidence of a long and extensive history of sex discrimination which justified the exercise of its section 5 powers).  In the area of education, the history of segregation and discrimination is particularly pronounced and egregious.  The Fifth Circuit's decision  in <u>Reickenbacker</u>, and in <u>Pace</u> even more so, because the decision addresses education, is just flat out wrong.  The Fifth Circuit identifies examples of "facially neutral policies" without reference to the abundant existing history of many state laws that purposefully excluded persons with disabilities from life in the community and  gave rise to the ADA, and therefore fails to do the analysis that <u>Hibbs</u> requires.  <u>See</u> <u>Hibbs</u> 123 S.Ct. at 1978, 155 L. Ed. 2d at 964.  Congress specifically noted that "discrimination against individuals with disabilities persists in such critical areas as... education... institutionalization... voting... and access to public services."  42

---

[4]The Seventh Circuit noted that <u>Walker</u> predated <u>Garrett</u> and cited five other circuit court opinions that have upheld the <u>Ex Parte Young</u> doctrine. <u>Bruggeman</u>, 324 F.3d at 912.  <u>See</u> <u>also</u> <u>infra</u> III.G.

U.S.C. 12101(a)(3).  The findings also appear in the legislative history of Title II.  H.R. Rep. No.

101-485, pt. 2, at 28-29 (1990); S. Rep. No. 101-116, at 6 (1989).

Finally, a district court case cited by defendants erroneously applied the <u>Garrett</u> decision

to Title II claims.  <u>Mincewicz v. Parker</u>, 2001 U.S. Dist. LEXIS 3373 (D. Conn 2001) at 7-8.

(Prisoner filed suit against judge in criminal case alleging unequal treatment and seeking

monetary damages, as opposed to injunctive relief).[5]

B.    THE COURTS IN <u>GARRETT</u> AND <u>LAVIA</u> EXPLICITLY LIMITED  THE HOLDINGS,
      IN THOSE CASES  TO EMPLOYMENT CASES.

Plaintiffs' claims against the PDE defendants arise under Title II, the public

accommodation provision of the ADA, and not Title I, the employment provision.  When the

issue is not employment, but rather some other statutorily-enforceable right such as, education,

public accommodations or family medical leave, courts cannot rely on <u>Garrett</u>, but must analyze

the legislative history respective to the statute in question.  See <u>Hibbs</u>, 123 S.Ct. at 1981, 155 L.

Ed. 2d at 967 (the States' record of unconstitutional participation in, and fostering of,

discrimination justifies Congress' enactment of prophylactic legislation under its Section V

powers).

In <u>Garrett</u>, the Supreme Court explicitly limited its holding to employment cases brought

under Title I of the Act, and exempted Title II from its holding explaining that Title II "has

somewhat different remedial provisions from Title I."  531 U.S. at 360.   The Court dismissed

---

[5]Admittedly in a decision that pre-dated <u>Garrett</u>, the Third Circuit applied Title II in an
action against a state prison. <u>Yeskey v. Pennsylvania Dept of Corrections</u>, 118 F.3d 168 (3d. Cir.
1997) <u>aff'd by</u> <u>Pennsylvania Dept. of Corrections v.Yeskey</u>, 524 U.S. 206 (1998).

<u>certiorari</u> on the question of Title II's abrogation as improvidently granted.  <u>Id</u>. at 360 n.1.[6]  The

Third Circuit similarly limited its decision in <u>Lavia</u>, 224 F.3d 195 n. 2 ("We limit our review to

whether Congress validly abrogated the States' Eleventh Amendment immunity under Title I of

the ADA.  We do not consider whether Congress validly abrogated the States' sovereign

immunity under either Title II of the ADA or under the Rehabilitation Act ...").

Defendants' argument that <u>Garrett</u> and <u>Lavia</u> are powerfully instructive if not directly

controlling under Title II contorts the holdings in these cases.  Defendants' Memo at 9.[7]  Because

<u>Garrett</u> and <u>Lavia</u> address the constitutionality of Title I of the ADA and not Title II, defendants'

reliance on these decisions is misplaced.  <u>See</u> <u>e.g.</u>, <u>Popovich</u>, 276 F.3d at 818 (<u>Garrett</u> does not

address the history of states' discrimination against people with disabilities in the provision of

public services, therefore, that decision is "not determinative in the context of Title II) (J. Moore,

concurring).

Plaintiffs' ADA claims arise under the provisions of Title II that applies to discrimination

in the receipt of public services.  Therefore, the holdings in <u>Garrett</u> and <u>Lavia</u> that Congress did

not effect a valid abrogation of the States' Eleventh Amendment immunity from suit for

discrimination in public employment simply does not apply.  As Chief Justice Rehnquist, writing

_____

[6]The ADA's severability clause also compels a separate reading of each Title of the Act: (the unconstitutionality of one provision "shall not affect the enforceability of the remaining provisions of the Act.").  42 U.S.C. § 12213.

[7]Plaintiffs also assert claims under Section 504 of the Rehabilitation Act on their own behalf and on behalf of the members of the class.  Defendants do not contend  that plaintiffs' claims under Section 504 and IDEA are barred by the Eleventh Amendment.  Defendants' Memo at 10.  It must be noted that the law of the Third Circuit, following the 1986 amendments, is that Section 504 is an "unambiguous waiver of the State's Eleventh Amendment immunity."  <u>Koslow v. Pennsylvania</u>, 302 F.3d 161, 169 (3d Cir. 2002) (quoting <u>Lane v. Pena</u>, 518 U.S. 187, 170 (1996)).

for the <u>Garrett</u> majority, acknowledged, the "overwhelming majority" of the accounts of state-sponsored discrimination upon which the Congress relied as a valid basis for abrogating the States' immunity were not in the area of employment, but rather, as in these plaintiffs' claims, "in the provision of public services and public accommodations, which areas are addressed in Titles II and III of the ADA."  <u>Id</u>. at 372 n. 7 (noting the appendix to Justice Breyer's dissent lists Congressional documentation of unconstitutional state conduct prohibited by Titles II and III, not Title I).  The leap from employment discrimination to discrimination in the provision of public services is a wider chasm than defendants would have us believe.

C.    TITLE II OF THE ADA CONTAINS A CLEAR AND UNEQUIVOCAL EXPRESSION OF CONGRESS' INTENT TO ABROGATE THE STATES' ELEVENTH AMENDMENT IMMUNITY.

Title II was the least dramatic of the ADA's additions to existing law; its primary purpose was to extend to all State entities the non-discrimination  requirements already applicable to most governmental agencies under § 504 of the Rehabilitation Act.[8]  As defendants agree, Congress may abrogate a state's Eleventh Amendment immunity with a clear expression of its intent to do so.  Defendants' Memo at 8.  Congress' unequivocal abrogation of Eleventh Amendment immunity is found in Title II of the ADA.[9]  Finding that the ADA contains a clear and

---

[8]*See* M.C. Weber, *Disability Discrimination By State And Local Government: The Relationship Between Section 504 Of The Rehabilitation Act and Title II of the Americans With Disabilities Act*, 36 WM. & MARY L. REV. 1089, 1117 (1995) (suggesting that Title II's legislative history is, in reality, a form of subsequent legislative history for section 504).  Further, the ADA itself provides that "[n]othing in the ADA shall be construed to provide a lesser standard than the standard applied under Title V of the Rehabilitation Act." 42 U.S.C.§ 12201(a).  The legislative history of Title II also displays strong support for § 504 and its regulations.  *See* H.R. Rep. No. 101-485, pt. 1, at 26.

[9]    A State shall not be immune under the Eleventh Amendment to the Constitution of the United States from an action in [a] Federal or

unambiguous expression, defendants argue that Congress exceeded its authority under the

Fourteenth Amendment when it did in fact abrogate the States' immunity under Title II.

**D.     THE ADA IS A VALID EXERCISE OF CONGRESS' SECTION V POWER TO CURE A HISTORY OF DISCRIMINATION, SEGREGATION AND EXCLUSION.**

Although a "lack of support in the legislative record is not determinative" of whether

Congress' exercise of its Section V power is valid (*Olmstead*, 527 U.S. at 592), the legislative

record obtained in consideration of the ADA provides proof of "widespread and persisting

deprivation of constitutional rights" by the States based on an individual's disability. *City of*

*Boerne v. Flores*, 521 U.S. 507, 526 (1997).  When Congress enacted the ADA, it clearly and

unambiguously sought to reverse the irrational, unconstitutional discrimination established and

enforced by authority of every state.  *See* 42 U.S.C. § 12101(b)(4).  With virtual unanimity,

Congress recognized the legacy of irrational prejudice and fear that has forced Americans with

disabilities to live under discriminatory conditions.

**1.     Congress carefully considered the history of unconstitutional discrimination when it drafted the ADA.**

Before enacting the ADA, Congress carefully explored the problems of discrimination

against people with disabilities. It conducted numerous hearings on the ADA and considered

testimony by hundreds of people about discrimination across the entire spectrum of governmental

functions, including education, voting, public health, transportation, communication, judicial,

and law enforcement such as police, courts, and jails.[10]  In its extensive deliberations on the

---

State court of competent jurisdiction for a violation of this chapter.
42 U.S.C. §12202.

[10]Congress held 13 hearings to investigate discrimination against persons with disabilities.  See <u>Americans with Disabilities Act of 1989: Hearings on</u> H.R. 2273 <u>Before the</u>

ADA,[11] Congress also reviewed authoritative governmental, public health, and census reports

which studied the status of people with disabilities, all of which concluded that comprehensive

civil rights legislation was necessary to combat pervasive discrimination against people with

disabilities.[12]

---

House Comm. On the Judiciary and the Subcomm. On Civil and Const. Rights, 101st Cong., 1st
Sess. (1989); Americans with Disabilities Act: Hearing on H.R. 2273 and S 933 Before the
Subcomm. on Transp. And Haz. Materials of the House Comm. On Energy and Commerce,
101st Cong., 1st Sess., (1990); Americans with Disabilities Act: Hearing on H.R. 2273 Before
the Subcomm on Surface Transp. Of the House Comm.  On Pub. Works and Tranp., 101st Cong.,
1st Sess. (1990): Americans with Disabilities: Telecomm. Relay Servs., Hearing on Title V of
H.R. 2273 Before the Subcomm on Telecomm. And Fin of the House Comm. On Energy and
Commerce, 101st Cong., 1st Sess. (1990): Americans with Disabilities Act of t 1989: Hearing on
H.R. 2273 Before the Subcomm. On Select Educ., of the House Comm. On Educ. and Labor,
101st Cong., 1st Sess. (1989); Hearing on H.R. 2273, The Americans with Disabilities Act of
1989: Joint Hearing Before the Subcomm. On Employment Opps. And Select Educ. of the House
Comm. On Educ. and Labor, 101st Cong., 1st Sess. (July 18 & Sept. 13, 1989); Oversight
Hearing on H.R. 4498, Americans with Disabilities Act  of 1988: Hearing Before the Subcomm.
On Select Educ. of the House Comm. On Educ. and Labor, 100th Cong., 2d Sess. (1989);
Americans with Disabilties Act: Hearing Before the House Comm. on Small Bus., 101st Cong.,
2d Sess. (1990); Americans with Disabilities Act of 1989: Hearings on S. 933 Before the Senate
Comm. On Labor and Human Res. And the Subcomm. on the Handicapped, 101st Sess. (1989)
(May 1989 Hearings): Americans with Disabilities Act 1988: Joint Hearing on S.B. 2345 Before
Subcomm. On the Handicapped of the Senate Comm. on Labor and Human Res. and the
Subcomm on Select Educ. of the House Comm. On Educ. and Labor, 100th Cong., 2nd Sess.
(1989)

[11]The Senate Committee on Labor and Human Resources and the Senate Subcommittee
on the Handicapped held five hearings on the bill.  On September 7, 1989, the bill passed the
Senate with overwhelming support by a vote of 76 to 8. In the House, over twenty hearings were
held before four House committees' subcommittees.  The House and Senate Conference
Committee convened twice.  The conference bill passed by an overwhelming majority in both the
House (by a vote of 377 to 28) and the Senate (by a vote of 91 to 6).  The ADA was signed by
President George H. W. Bush on July 26, 1990.

[12] Both the House and the Senate cited seven substantive studies or reports to support the
conclusion that discrimination against the disabled is a serious and pervasive problem.  S. Rep.
No. 101-116, at 6;  H.R. Rep. No. 101-485, pt. 2, at 28 (both citing National Council on the
Handicapped: On the Threshold of Independence (Jan.1988) (updating the legislative changes
recommended in Toward Independence));  National Council on the Handicapped, Toward

Congress made nine general Findings about the widespread discrimination against persons with disabilities that existed in virtually every aspect of society.[13] These findings provide the rationale for the purpose, scope, and remedial standards of the ADA. They represent the factual and legal predicate for Congress' actions. They more than support Congress' conclusion that it was necessary to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(a).

### 2. States have historically sponsored, supported, and enacted policies which purposely discriminate against persons with disabilities.

Congressional consideration of the ADA took place against an historical backdrop of longstanding State sponsored discrimination against people with disabilities that can only be called "grotesque." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 448 (1985). This discrimination arose not only from deep-seated prejudice against individuals with disabilities, but from archaic laws that reflect inaccurate stereotypes about disabilities. Sch. Bd. of Nassau County, 480 U.S. at 279. For example, during the early part of the 20th century,

---

Independence (Feb.1986) (reviewing different laws and programs that affect disabled persons and offering recommendations for legislative changes). *See also*, U.S. Brf. At 19, n. 7.

[13]These findings include, inter alia, that 43,000,000 Americans with physical or mental disabilities have been isolated, segregated and discriminated against in such critical areas as employment, public accommodations, education, institutionalization, and access to public services; individuals who have been discriminated against on the basis of disability often have no legal recourse to redress discrimination that has tended to relegate them to lesser services, programs, activities, benefits, jobs, or other opportunities; the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and the continuing existence of unfair and unnecessary discrimination and prejudice denies them the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity. 42 U.S.C. § 12101(a).

practically every state adopted a policy of segregating and isolating individuals with disabilities for life in massive custodial institutions. <u>Cleburne</u>, 473 U.S. at 461-462 (Marshall, J., concurring and dissenting in parts).[14]   The States actively inculcated society with an unnatural fear of disability, especially mental retardation, and undertook major outreach efforts to identify and remove people with the disability  from the community.  Courts have found unconstitutional treatment of persons with disabilities in a wide variety of public services, including violations of the Equal Protection Clause, the Due Process Clause, and the Eighth Amendment, as incorporated into Section I of the Fourteenth Amendment.[15]  As the Supreme recognized, states,

---

[14]The virulence and bigotry directed by the States towards people with disabilities "rivaled, and indeed paralleled, the worst excesses of Jim Crow." *Cleburne*, 473 U.S. at 461, (Marshall, J, concurring and dissenting in part).  State legislation also prohibited people with mental retardation,  epilepsy and mental illness from marrying.  Most states categorically disqualified "idiots" and other persons labeled as disabled from voting, without regard to individual capacity and with discretion to exclude left in the hands of low-level election officials. 473 U.S. at 464.  People with disabilities were blamed for all of society's worst evils, from crime to poverty.  The goal was not merely to separate them from the community, but to prevent them from reproducing so as to literally "nearly extinguish their race." *Id.* at 462 (citing A. Moore, *The Feeble-Minded in New York* 3 (1911)).

[15]<u>See</u>, <u>e.g.</u>, <u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982) (unconstitutional conditions of confinement; <u>O'Connor v. Donaldson</u>, 422 U.S. 563, 567-575 (1975) (impermissible confinement); <u>LaFaut v. Smith</u>, 834 F.2d 389 (4th Cir. 1987); (Powell, J.) (failure to provide paraplegic inmate with an accessible toilet is cruel and unusual punishment); <u>Garrity v. Gallen</u>, 522 F. Supp. 171, 214 (D.N.H. 1981) ("blanket discrimination against the handicapped... id unfortunately firmly rooted in the history of the country"); <u>Flakes v. Percy</u>, 511 F. Supp. 1325 (W.D. Wis. 1981): <u>New York State Ass'n for Retarded Children v. Carey</u>, 466 F. Supp. 487 (E.D.N.Y. 1979): <u>Lora v. Board of Educ.</u>, 456 F. Supp. 1211, 1275 (E.D.N.Y. 1978)" <u>Hairston v. Drosick,</u> 423 F. Supp. 180 (Supp. 180 (S.D.W. Va. 1976): <u>Frederick L. v. Thomas</u>, 408 F. Supp. 832, 836 (E.D. Pa 1976): <u>Panitch v. Wisconsin</u>, 444 F. Supp. 320 (E.D. Wis. 1977) <u>Aden v, Younger</u>, 129 Cal Rptr. 535 (Ct. App 1976): <u>In re Downy</u> 340 N.Y.S.2d 687 (Fam. Ct. 1973: <u>Fialkowski v. Shapp</u>, 405 F. Supp. 946, 958-959 (E.D. Pa 1975): In re G.H., 218 N.W, 2d 441, 447 (N.D. 1974); <u>Stoner v. Miller,</u> 377 F. Supp. 1361, 1368 (E.D. Pa 1974), aff'd 558 F.2d 150 (3d Cir. ), cert denied, 434 U.S. 943 (1977); <u>Welsch v. Likins</u>, 372 F. Supp. 487 (D. Minn. 1974) aff'd in part, 550 F.2d 1122 (8th Cir. 1977); <u>Mills v. Board of Educ.</u>, 348 F. Supp. 866 (D.D.C. 1972); <u>Pennsylvania Ass'n for Retarded Children v. Pennsylvania</u>, 343 F.Supp. 1257 (E.D.Pa

even with the incentive of federal monies, were reluctant to expand and improve "programs and projects ... for the education of 'handicapped children .'" Honig v. Doe, 484 U.S. 305, 310 n. 1 (1988) (Congress' earlier efforts to ensure that disabled students received adequate public education had failed in part because the measures it adopted were largely horatory.").

Pennsylvania, like its sister states, took an active role in separating the "feebleminded" or mentally retarded and mentally ill from the rest of society in custodial institutions as early as the 1800s. In 1893, the Pennsylvania General Assembly authorized the construction of a large institution in the western part of the state for the "reception" and "detention" of "idiotic and feeble-minded children" who were "under the age of twenty years." 1893 Pa. Laws 289, 291, No. 256 §§ 10 and 11. By 1903, a similar institution was organized to be built in the eastern part of the state. 1903 Pa. Laws 446, No. 424.

In its report to the legislative body of the Commonwealth, the Commission formed by that body to consider the number and status of feeble-minded and epileptic persons identified persons with mental retardation as "such an unpleasant burden, that parents usually are more than willing to part with them." REPORT OF THE COMMISSION ON THE SEGREGATION, CARE AND TREATMENT OF FEEBLE-MINDED AND EPILEPTIC PERSONS IN THE COMMONWEALTH OF PENNSYLVANIA 42 (1913). The Commission determined who should be put into the state institutions. "[A] type of mind must be established as a normal standard for the age, race and social status of each individual, and he who falls below this to a recognizable degree is *ipso facto* feeble-minded." *Id.* This institutionalization of persons **deemed to be unacceptable and unworthy of** association within the general population was made explicitly clear in the lack of

1971): Wyatt v. Stickney, 325 F. Supp. 781 (M.D. Ala 1971), aff'd in part, 503 F.2d 1305)

education afforded them.

### E. TITLE II IS CONGRUENT AND PROPORTIONAL TO THE HARM THAT CONGRESS SOUGHT TO CORRECT IN ENACTING THE ADA.

Whether a statute is "congruent and proportional" is a contextual question that cannot be divorced from the historical wrong the statute is meant to remedy; what is "proportional" to ensure voting rights for minorities may not be to guard against patent infringement. Compare South Carolina v. Katzenbach, 383 U.S. 301 (1966), with College Savings Bank v. Florida Prepaid Postsecondary Educational Expense Board, 527 U.S. 627 (1999). Therefore, because Title II differs in scope and purpose from Title I, Title II must be viewed separately for Fourteenth Amendment abrogation purposes.

Section 5 endows Congress with the "power to enforce" provisions of this Amendment. Florida Prepaid, 527 U.S. at 647; see also Hibbs, 123 S.Ct. at 1977, 155 L. Ed. 2d at 963 (Congress' enforcement power includes "the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text."). Courts determine the constitutionality of legislation through a congruence and proportionality test. Garrett, 531 U.S. at 365-369. See also City of Boerne, 521 U.S. at 520 (The affected legislation must exhibit "congruence and proportionality between the injury to be prevented and remedied and the means adopted towards that end."). The congruence and proportionality test requires that the Court (1) identify the constitutional right at issue; (2) determine if Congress identified a history and pattern of unconstitutional discrimination by the States against the disabled; and (3) determine if the legislative requirements are proportional to the constitutional injury identified. Garrett, 531 U.S. at 365-369.

Title II imposes a duty upon public entities not to discriminate against people with disabilities in the provision of public services or programs.  42 U.S.C. § 12132.  "Fundamental alteration" modifies the duty: a State need not include persons with disabilities in programs or services if such inclusion would, financially or otherwise, fundamentally alter the program or service.  35 C.F.R. § 35.130(b)(7); H.R. Rep. 101-485 (III), 101st Cong., 2nd Sess. 50 (1990).

The duties of States under Title II are congruent and proportional, if not identical, to those under the Equal Protection Clause as the Supreme Court stated them in <u>Cleburne</u>.  Title II require only that  not require States to make available "special" provisions for people with disabilities, only that it states administer *available* resources for programs and activities in a manner that is not discriminatory.  A State that refuses to administer its public services or programs in a nondiscriminatory manner, even when doing so would not fundamentally alter the program or require the State to distribute available resources inequitably, is engaging in irrational conduct that, in the end, dissolves to prejudice.  Such conduct would withstand neither Title II nor the Fourteenth Amendment.  <u>See</u> <u>Cleburne</u>, 473 U.S. at 450.  At a minimum, Title II's protections and requirements of "reasonable accommodations" are congruent and proportional to the wholesale, state-sponsored exclusion of people with disabilities from schools and society.

F.    **DEFENDANTS CAN ASSERT NO IMMUNITY  FROM PLAINTIFFS' CLAIMS ARISING UNDER THE ADA FOR INJUNCTIVE AND DECLARATORY RELIEF.**

Defendants argue that they are immune from suit from all of plaintiffs' claims under the ADA.  Defendants ignore entirely that plaintiffs have asserted claims for injunctive relief against state officials.  Those claims are governed by the rule of <u>Ex parte Young</u>, 209 U.S. 123 (1908),

which precludes Eleventh Amendment defenses.[16]

The doctrine of Ex parte Young holds that a suit to halt the enforcement of state action in conflict with federal law is "an action against the individual officer charged with that enforcement and ceases to be an action against the state to which sovereign immunity extends; the officer is stripped of his official or representative character and becomes subject to the consequences of his individual conduct." MCI Telecommunications Corp v. Bell-Atlantic Pennsylvania, 271 F.3d 491, 506 (3d Cir. 2001), citing Ex parte Young, 209 U.S. at 159-60 and Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 103. By limiting relief to prospective injunctions of officials, the rule of Ex parte Young "avoids judgments directly against the State while at the same time forbidding states, through their officials, from continuing mote the vindication of federal rights." Pennhurst, 465 U.S. at 104 (1984); see Alden, 527 U.S. at 747, 748 ("Certain suits for declaratory and injunctive relief against state officers must ... be permitted if the Constitution is to remain the supreme law of the land ... [the Ex parte Young doctrine] is an "essential part of our sovereignty"). Under the doctrine of Ex parte Young, state officials enjoy no immunity from actions for injunctive and declaratory relief arising under the laws of the United States. Thus, the Eleventh Amendment simply does not apply to the claims for injunctive and declaratory relief in this case.

The rule of Ex parte Young applies equally to suits seeking prospective relief for

---

[16]In Ex parte Young, the Supreme Court held that the federal courts have jurisdiction to enjoin state officials to conform their conduct to federal law. It was to reconcile the principle of states' Eleventh Amendment immunity from suit and the principle of the Supremacy Clause, that state officials are bound by federal law just as other persons are, that the Supreme Court held in Ex parte Young that when a state official acts in violation of the Constitution or federal law (which the Constitution's Supremacy Clause makes the "supreme Law of the Land"), he is acting ultra vires and is no longer entitled to the State's immunity from suit.

violations of the United States Constitution and suits seeking prospective relief for violations of federal statutory law. See, e.g., Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 300 (1997) (Kennedy opinion);(Souter opinion, citing Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 698-699 (1949). Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. Green v. Mansour, 474 U.S. 64, 68 (1985). "[T]he Young doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States .... Our decisions repeatedly have emphasized that the Young doctrine rests on the need to promote the vindication of federal rights." Pennhurst v. Halderman, 465 U.S. at 89, 104; see Alden v. Maine, 527 U.S. 706, 747, 748 (1999) ("Certain suits for declaratory and injunctive relief against state officers must ... be permitted if the Constitution is to remain the supreme law of the land ... [the Young doctrine] is an 'essential part of our sovereignty'").

In Coeur d'Alene, 529 U.S. 261 (1997), seven of the present justices of the Supreme Court reaffirmed the vitality of the Ex parte Young doctrine and the principle that "[w]hen a plaintiffs seeks prospective relief to end an ongoing violation of federal rights, ordinarily the Eleventh Amendment poses no bar." 529 U.S. at 293. In Coeur d'Alene, two members of the Court, Justice Kennedy and Justice Rehnquist, would have replaced the general rule allowing federal court jurisdiction for prospective relief against state officials for violations of federal law with a case-by-case determination whether "the presumption in favor of federal court jurisdiction" should control. Justice O'Connor, joined by Justices Scalia and Thomas, reaffirmed the rule of the Court's unbroken line of cases that "a Young suit is available where a plaintiff

alleges an ongoing violation of federal law, and where the relief sought is prospective rather than retrospective." 521 U.S. at 288, 294 (emphasis in original). Justice Souter, joined by Justices Stevens, Ginsburg, and Breyer, also affirmed that

> [A] federal court has jurisdiction in an individual's action against state officers so long as two conditions are met. The plaintiff must allege that the officers are acting in violation of federal law [citation omitted], and must seek prospective relief to address an ongoing violation, not compensation or other retrospective relief for violations past [citations omitted].

Id., 521 U.S. at 297, 298-99.

The two-part test for federal jurisdiction agreed upon by these seven justices remains the rule today. The Third Circuit has held explicitly that in light of Coeur d'Alene, "Young continues to permit actions against state officers or prospective relief from ongoing violations of federal law; no case-by-case balancing is necessary or proper." MCI Telecommunications Corp. v. Bell-Atlantic Pennsylvania, 271 F.3d at 507. See also State of Connecticut v. Cahill, 217 F.3d at 101 (citing Coeur d'Alene) ("the Ex parteYoung cases reflect the principle that a State is the only real defendant-party in interest when damages are sought, although that State's officials alone may still be sued for prospective injunctive relief.") and TFWS, Inc. v. Shaefer, 24 F.3d 198, 204 (4th Cir.2000) ("the Ex parte Young exception to Eleventh Amendment immunity remains generally available to a plaintiff who seeks prospective declaratory and injunctive relief against a state official for an ongoing violation of federal law."

The Supreme Court again reaffirmed the vitality of Ex parte Young in Verizon Maryland, Inc. v. Public Service Commission of Maryland, 535 U.S. 635 (2002). The Court held that even absent a waiver of state sovereign immunity, Verizon could maintain an action for injunctive and declaratory relief against the Commissioners in their official capacities, pursuant to the doctrine

of Ex parte Young.  Verizon, 535 U.S. at 645.  The Court further held that "in determining

whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need

only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation

of federal law and seeks relief properly characterized as prospective.'" id., quoting Coeur d'

Alene, 521 U.S. at 296 (opinion of O'Connor, Scalia and Thomas) and citing I d., 521 U.S. at

298-299 (opinion of Souter, Stevens, Ginsburg and Breyer).  The Court held that Verizon's

prayer for injunctive and declaratory relief, requesting that the Commissioners be restrained from

enforcing an order that contravened the Telecommunications Act, clearly satisfied the

"straightforward inquiry" test. Id.

    Verizon governs this case. This is an action for injunctive relief against state officials, in

which plaintiffs seek an order that those officials conform their conduct to federal law.  Plainly,

the complaint satisfies the "straightforward inquiry" test; the plaintiffs have alleged an ongoing

violation of federal law, the Title II of ADA, Section 504 and the IDEA, and they seek

prospective relief.

    Since claims for injunctive relief against state officials are not barred by the Eleventh

Amendment, no abrogation of the state's Eleventh Amendment immunity is required to permit

private plaintiffs to sue state officials under the doctrine of Ex parte Young.  Thus, Ex parte

Young suits may be brought against the PDE administrators who fail to enforce the provisions of

Section 504 and IDEA pursuant to Congress' authority under the Spending Clause, as well as to

enforce the ADA enacted pursuant to a proper abrogation of the state's sovereign immunity under

Section 5 of the Fourteenth Amendment.  See, e.g., Cloverland-Green  Spring Dairies, Inc. v.

Pennsylvania Milk Marketing Board, 2002 U.S. App. LEXIS 14853 *2 n.2 (3d Cir. July 24,

2002) (dormant Commerce Clause);  Missouri Child Care Ass'n v. Cross,  2002 U.S. App.

LEXIS 12822 (8th Cir., June 28, 2002) (Spending Clause);  Farricielli v. Commissioner of the

Connecticut Dep't. of Environmental Protection, 215 F.3d 241, 244 (2d Cir. 2000) (Commerce

Clause).


IV.    **ABSENT FEDERAL COURT DECREES AND FEDERAL LEGISLATION SUCH
       AS THE ADA, STUDENTS WITH DISABILITIES WOULD STILL BE SUBJECT
       TO DISCRIMINATORY STATE LAWS THAT DENY THEM ACCESS TO
       EDUCATION**

Until 1972, the Commonwealth's Department of Public Welfare ("DPW") – and not the

Department of Education – was designated as the state agency responsible for ensuring any

modicum of education that students with the most significant disabilities received.  In 1972, a

consent decree ordered the Commonwealth to effect reform in the area of special education.  For

the first time, defendant PDE became the agency responsible to ensure that school-aged children

with mental retardation would be educated with their non-disabled peers.  Pennsylvania Ass'n for

Retarded Children v. Pennsylvania, 343 F.Supp. 279, 282-283 and 282 at  nn. 2, 3, 4 and 5

(E.D.Pa. 1972) ("PARC") (plaintiffs sought relief from four State statutes which relieved the

State Board of Education "from any obligation to educate a child whom a public school

psychologist certifies as uneducable" – 24 P.S. §§ 13-1304, -1326, -1330, and -1375).[17]

---

[17]The pertinent sections of Title 24 are:
§13-1304 (Admission of Beginners) "The board of school directors may refuse to accept
or retain beginners who have not reached a mental age of five years."
§13-1326 (Definitions) defined the compulsory school age to be "not later than the age of
eight years until the age of seventeen years."
§13-1330 (2) (Exceptions to Compulsory Attendance) specified that compulsory
education shall not be applied to any child who "has been examined by a certified school
psychologist or psychological examiner, and has been found to be unable to profit from further
public school attendance, and who has been reported to the board of school directors and

The consent order specified that implementation of the four statutes identified as being used to

effectively discriminate against children with special needs would cease, and required the

Commonwealth to:

1.    Stop applying 24 Pa. Stat. §13-1304 so as to postpone or in any way deny to any
      mentally retarded child access to a free public program of education and training;

2.    Stop applying 24 Pa. Stat §13-1326 or 24 Pa. Stat. §1330(2) so as to postpone, to
      terminate or in any way deny to any mentally retarded child access to a free
      program of education and training;

3.    Stop applying 24 Pa. Stat. §13-1375 so as to deny to any mentally retarded child
      access to a free public program of education and training.

Id., at 302-303.  The statues were not repealed, and all four have remained valid and

unamended.[18]  An analysis of the history of two of these statutes shows that state officials have

_____

excused, in accordance with regulations promulgated by the State Board of Education."
      §13-1375 (Uneducable Children Provided for by Department of Public Welfare) "The
state Board of Education shall establish standards for temporary or permanent exclusion from the
public school of children who are found to be uneducable and untrainable in the public schools.
Any child who is reported by a person who is certificated as a public school psychologist as
being uneducable and untrainable in the public schools, may be reported by the by the board of
school directors to the Superintendent of Public Instruction and when approved by him, in
accordance with the standards of the State Board of Education, shall be certified to the
Department of Public Welfare as a child who is uneducable and untrainable in the public schools.
When a child is thus certified, the public schools shall be relieved of the obligation of providing
education or training for such child.  The Department of Public Welfare shall thereupon arrange
for the care, training and supervision of such child in a manner not inconsistent with the laws
governing mentally defective individuals."  Plaintiffs alleged that §13-1375 was used to shift
responsibility from the Department of Education to the Department of Public Welfare, which had
no mandate to provide educational services to a child, that §13-1304 was used to deny
educational services to a child who did not have a mental age of five years; and, that §13-1326
was used to postpone admission of retarded children until age eight or eliminate them from
public schools at age 17.  PARC, 343 F.Supp. at 282.

      [18]On at least two occasions, bills were introduced in the Pennsylvania Senate which
attempted to amend §13-1375. S.B. 82, Regular Session (Pa. 1981) and S. B. 470 Regular
Session (Pa. 1983).  Both proposal amendments were – replace "Superintendent of Public
Instruction" with "Secretary of Education." Neither bill was adopted, and no substantive

continued to invoice and apply these laws since the May 5, 1972 order in PARC.

The Commonwealth relied on §13-1375 in an administrative hearing before the United States General Accounting Board to justify the state's claims for reimbursement from the Federal Medicaid program for provision of special education services by the Pennsylvania Department of Public Welfare at the Woodhaven Center. Pennsylvania Dept. of Public Welfare, DAB No. 777, 1986 HHS DAB Lexis 751, *at* §§33-36, (DAB August 20, 1986). Title XIX of the Social Security Act does not allow the use of Medicaid funds for educational programs provided by social service agencies. Id., at § 32. The Commonwealth argued that the general rule should not apply in Pennsylvania, on the ground that 24 P.S. § 13-1375 is a special education statute unique to Pennsylvania. Id., at § 33.

Pennsylvania attempted to use its unique "special education statute" to justify shifting the responsibility of providing educational services to handicapped children from PDE to DPW. In its ruling, the GAB specifically found that Pennsylvania's actions "ignored...the decision and consent agreement in the PARC case, [which] required that 'insofar as DPW is charged to arrange for the care, training and supervision of a child certified to it, DPW must provide a program of education and training appropriate to the capacities of that child subject to the State Department of Education's standards and supervision.'" Id., at § 34, citing PARC, 343 F.Supp. at 313-14. Further, the GAB found that under IDEA, while "a child might be placed in a [facility] managed by DPW, the state education agency has the primary responsibility for ensuring that the child is provided a free appropriate public education in accordance with state educational standards." Id., at § 35, citing 20 U.S.C. 1412(6); 45 C.F.R.121a.600.

_____

amendments have been proposed.

Similarly, the language of 24 Pa. Stat. §13-1304 still contains the provision that beginners who have not attained a mental age of five years can be denied access to public education. While no case directly on point has adjudicated that issue, §13-1304 has been litigated in the Commonwealth Court on other grounds.[19]

Courts in the Eastern District repeatedly have found that PDE has failed to comply with the federal laws protecting children with disabilities subsequent to PARC and the passage of the IDEA and prior to the passage of the ADA. See, e. g., Armstrong v. Kline, 476 F.Supp 583 (E.D. Pa. 1979), aff'd by Battle v. Pennsylvania, 629 F.2d 269 (1980) (because Pennsylvania statute set a per pupil expenditure of funding only 180 days of education services[20] students with disabilities requiring a longer school year were deprived of a free appropriate education). The Third Circuit affirmed that the "inflexible application of a 180 day maximum prevents the proper formulation of appropriate educational goals for individual members of the plaintiff class." Battle, 629 F.2d at 281. Fialkowski v. Shapp, 405 F.Supp 949, 959 (E.D.Pa. 1975) (reasoning that "depriving retarded children of all educational benefits would appear to warrants the scrutiny of the federal

_____

[19]Two cases have been brought in Commonwealth Court citing 24 P.S. § 13-1304: Rosenstein v. North Penn Sch. Dist., 342 A.2d 788 (Pa. Commw. 1975) (child who did not fall within age cutoff for kindergarten denied eligibility for kindergarten); and, O'Leary v. Wisecup, 364 A.2d 770 (Pa. Commw. 1976) (student wishing to transfer from one kindergarten where he met age requirement to one with a different age requirement denied opportunity to do so).

[20]Pennsylvania statutes (24 P.S. §§ 13-1376 and -1377) set a ceiling of 180 days per pupil expenditure "for any child, handicapped or non-handicapped." Armstrong, 476 F.Supp. at 587. PDE, therefore, instructed contractors it hired to conduct due process hearings that they did not have the "authority to, and may not, order a special education program which is in excess of 180 days per year [without regard to the child's level of disability]." Id. The Eastern District court found ample evidence that 'breaks in programming' would lead to substantial regression and unravel gains made during the regular school year. Id., at 587-588. The decision was codified in the IDEA as Extended School Year services. 20 U.S.C. § 1412(a)(1); 34 C.F.R. § 300.309.

courts); <u>Lester H. v. Gilhool</u>, 1989 US DIST LEXIS 13466 (E.D. Pa. 1989), at 17, <u>aff'd.</u> 916
F.2d 865 (1990) (because PDE was on notice, from at least April 1986, that Lester was being
denied an appropriate education, it should have remedied the situation when they were aware of
the harm); <u>Hendricks v. Gilhool</u>, 709 F.Supp 1362, 1369 (E.D. Pa. 1989) (since placing students
with disabilities in trailers and separate wings of school buildings violated the Act, PDE failed to
meet its duty to assure that students with disabilities were educated in a regular education
environment to the maximum extent appropriate to their needs); <u>Tokarcik v. Forest Hills Sch.
Dist.</u>, 665 F.2d 443, 458 (3d Cir. 1981) (A student with spina bifida required catheterization in
order to remain in a regular classroom.  PDE violated the Act because there "are simply no
legitimate educational or fiscal grounds for denying Amber a right to participate in the regular
classroom setting.").

## V. PLAINTIFFS HAVE PRESENTED AMPLE ADMISSIBLE EVIDENCE OF DEFENDANTS' VIOLATIONS OF LAW THAT AFFECT ALL MEMBERS OF THE CLASS.

### A. THE EVIDENCE PLAINTIFFS HAVE PRESENTED IS MORE THAN ADEQUATE TO MAKE OUT A PRIMA FACIE CASE OF CLASS-WIDE VIOLATIONS OF THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT AND OTHER GOVERNING FEDERAL STATUTES.

Defendants contend, Defendants' Memo. at 10-11, that plaintiffs have "no admissible
evidence of class-wide injury" and assert that "[t]he <u>sole</u> evidence of unnamed class members'
injuries" derives from a survey conducted under the direction of Drs. Beverley Evans and Linda
Lengyel, both professors at Duquesne University in Pittsburgh (emphasis added).[21] Defendants'

---

[21]Defendants assert that "[t]o obtain the relief they seek, Plaintiffs have the burden of
proving by a preponderance of the evidence not just that the twelve named student class
representatives have and continue to suffer actual injury." It is well-settled that denial of
students' and parents' rights under IDEA constitute "actual injury." <u>Bitsilly v. BIA</u>, 253 F. Supp.

assertion that plaintiffs have presented only one piece of evidence evidencing class-wide injury is simply wrong. A cursory review of the evidence presented in support of Plaintiffs' Motion for Summary Judgment" shows that plaintiffs have substantial evidence of state-wide and class-wide violations of the IDEA and other governing federal statutes in addition to the Evans-Lengyel survey.

### B. THE EXPERT OPINIONS OF DRS. EVANS AND LENGYEL PLAINLY ARE ADMISSIBLE.

But even if plaintiffs did not have extensive additional evidence of class-wide injury, the opinions of Dr. Evans and Dr. Lengyel, disclosed in their expert reports, of class-wide violations of law clearly are admissible under FED R. EVID. 702.

Unaccountably, defendants do not even mention Rule 702 and the other Federal Rules of Evidence governing expert testimony. Rather, relying upon Pittsburgh Press Club v. United States, 579 F.2d 751 (3d. Cir. 1978), and In re Petition of Sullivan, 904 F.2d 826 (3d. Cir. 1990), cases in which survey evidence developed and sponsored by non-experts was excluded, defendants contend that the data gathered by Drs. Evans and Lengyel in support of their expert opinions are not admissible, id. at 23, and that therefore the report itself cannot be admissible. Defendants' Memo. at 12. This argument stands on its head the rule allowing admission of expert opinion even when it is based on inadmissible hearsay. FED R. EVID. 703. Defendants' argument would make sense only if the plaintiffs were planning to offer into evidence the data made known to the experts but not the opinions themselves.

In fact, much of the underlying data is in fact admissible under recognized exceptions to

2d 1257, 1262 (D.N.M. 2003), citing Honig v. Doe, 484 U.S. 305, 310-11 (1988); cf. Heldman v. Sobol, 962 F.2d 148, 156 (2d Cir. 1992).

the hearsay rule, and we will discuss this below. First, however, we shall briefly describe the survey on which Dr. Evans and Dr. Lengyel based their report, and show that it is unquestionably admissible when measured against the proper standards for determining admissibility of expert testimony.

1.    **Drs. Evans' and Lengyel's Reports and the Survey on which they are based.**

In support of their motion for summary judgment, plaintiffs submitted the expert report of Drs. Beverley Evans and Linda Lengyel, the two experts' curricula vitae, and a supplemental report by Dr. Evans. Plaintiffs' Motion for Summary Judgment, Exh. 47-50.  Dr. Evans' and Dr. Lengyel's opinions, which are set forth in the report, are based on a classroom observations of a sample of special education students in Pennsylvania; analysis of those students' Individualized Education Programs; and interviews with teachers, principals and parents of those students and district special education directors. The survey methodology (the observation techniques, IEP review protocol, and interview protocols) were designed by Drs. Evans and Lengyel; the sampling methodology for identifying the students to be studies was designed by statistician and quantitative evaluation expert James W. Conroy. Plaintiffs' Motion for Summary Judgment, Exh. 47 at 69-78; Deposition of Beverley Evans, Ph.D., Exhibit 1 of Defendants' Documents in Support of Their Motion for Partial Summary Judgment at 28-34 (hereinafter Evans Depos.)  The original sampling design aimed at obtaining a sample of 40 students in each of 10 school districts, with roughly equal representation from the disability categories of specific learning disability, retardation, emotional disturbance, autism and multiple disabilities.

The Court is well-acquainted with the difficulty plaintiffs and their experts encountered

when they tried to conduct the survey without defendants' cooperation.[22] The parties struggled

for many months in court proceedings and negotiations before plaintiffs obtained an electronic

copy of PDE's database of special education students in Pennsylvania. By the time plaintiffs

obtained the database and converted it to readable form, an extremely time-consuming,

expensive and difficult process, the database was already out of date, yet replacing it with an

updated version would have been prohibitively expensive.

    The entire survey had to be conducted as third-party discovery, with observations and

interviews of school district personnel conducted pursuant to subpoena, the latter as depositions

upon written questions. Nearly all the school districts objected to the subpoenas, and PDE

appeared to encourage their opposition in response to plaintiffs' motions to compel. PDE insisted

on having its own observers present during classroom observations and receiving several days'

notice of the observations. Several school districts resisted production of students' Individualized

Education Programs and evaluation reports under the Family Educational Rights and Privacy

Act, and in some school districts (notably Northern Lehigh and Western Beaver County),

parents' opposition to disclosure of their children's educational records further limited the

number of sample students available to plaintiffs. Educators who agreed to work with plaintiffs

(including Dr. Lengyel herself) were informed by PDE that they were no longer welcome to work

_____

[22]Plaintiffs and their experts initially hoped to conduct a joint scientific survey with the
defendants, as the parties did in Corey H. v. Board of Educ. of the City of Chicago and Illinois
State Board of Education, 995 F.Supp. 900, 903 (N.D. Ill. 1998), but the defendants declined the
plaintiffs' proposal. Evans Depos. at 9-10.

    In Corey H., the three parties selected three independent experts to conduct an inquiry
into the plaintiffs' allegations. The experts then conducted "an extensive, scientifically sound
investigation." Id.  Plaintiffs then reached a settlement with the Chicago public schools, but the
case went forward against the State defendants.

on PDE-supported projects.

Plaintiffs do not wish to revisit that history here, except to note that the adversarial context in which the survey was conducted vastly increased the cost and logistical difficulty of the survey and consequently, the likelihood that any observations and interviews that could not take place as scheduled in intricate negotiations among counsel (including counsel for the teachers' union) would not take place at all.

Compounding the legal and logistical difficulties of the survey were difficulties of selecting a sufficient sample of special education students. As Dr. Conroy points out in his Declaration, attached to this response as Exhibit 14, in many of the sample districts, the number of students in low-incidence disability categories was extremely small. Six of the sample districts had 2 or fewer students with autism. It simply was not possible to obtain a sample of ten students with autism in any of those school districts no matter how many "replacements" plaintiffs might try to select for students who could not or would not participate. Exh. 14 ¶ 5.

A further difficulty was the extremely poor quality of the data from which the student samples were drawn. As Dr. Conroy has testified, of the 400 students he initially drew from the Department's own database, only about 260 could be confirmed "to actually be where the database said they were." The same occurred when plaintiffs asked Dr. Conroy to draw a second sample to make up for the missing students: Again, nearly a third of the students could not be found. Dr. Conroy calls this "evidence of stunningly bad data management" on the part of PDE. As time went by, more and more students moved, dropped out, or otherwise could not be accounted for. Since the survey was conducted pursuant to a series of Rule 45 requests for inspection and for production of documents, plaintiffs were completely dependent on the sample

school districts to provide students' IEPs and provide access to the students themselves.

After it was agreed that PDE observers would shadow the plaintiffs' observers, defendants' expert Naomi Zigmond was asked to instruct employees in the Pennsylvania Department of Education in how to collect observation data. Exhibit 16, Zigmond Depos. at 61. Dr. Zigmond developed a protocol that went through various drafts, including a recording form for narrative field notes, and a training program to orient employees of PDE's Division of Compliance in how to collect classroom observation data. Id. at 62-69. Dr. Zigmond's expectation was that the PDE employees would collect observation data and that someone would "gather them together and do an analysis of them." Id. at 69-71. However, this "never did happen." Id. at 70.

Dr. Zigmond conducted a training for PDE employees that lasted three or four hours. It included training designed to achieve inter-rater reliability in describing behavior in narrative field notes; however, she did not attempt to assign a quantitative score to the reliability measures. Id. at 71-75. She did not attempt to assess the reliability of Department employees in recording whether IEP goals and objectives were being addressed. She intended to train the PDE employees to achieve reliability in coding observation data so that PDE observers could record reliable data eventually. Id. at 75-80. Presumably, this would have required a training effort of comparable intensity to the training of classroom observers conducted by Dr. Evans and Dr. Lengyel in which trainees had to achieve 80% reliability observing implementation of goals and objective before they could conduct actual classroom observations. However, Dr. Zigmond and the trainees never got to that stage of assessing reliability. No more trainings were held beyond the single session in January or February of 1999. Id. at 81-83. Apart from attending three of plaintiffs'

trainings, Dr. Zigmond did no more work on the case, and her contract with the defendants'

expired, until the fall of 2001, when she became re-involved at the request of the Attorney

General. Id. at 83-86.

It seems clear that originally, defendants intended to produce their own "shadow survey"

of the students observed by the plaintiffs. Why the defendants abandoned the project is a

mystery.  Perhaps defendants hoped to rebut plaintiffs' survey with substantive evidence of their

own, then recognized after they began to observe students that the data would not favor them or

that their employees could not match plaintiffs' observers in reliability measures.

### 2. The expert opinions of Drs. Evans and Lengyel are admissible under FED R. EVID. 702.

The criteria for admissibility of expert opinion are set forth in FED R. EVID. 702, not the

hearsay evidence rules. Rule 703 was amended in 2000 in response to the Supreme Court's

opinion in Daubert v. Merrell Dow Pharm., 509 U.S. 579 (1993), Kumho Tire Co. v. Carmichael,

526 U.S. 137 (1999) and other cases applying Daubert. Under Rule 702 as amended, the

"scientific, technical, or other specialized knowledge" of an expert witness is admissible

provided that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the

product of reliable principles and methods, and (3) the witness has applied the principles and

methods reliably to the facts of the case."

In Daubert, the Supreme Court held that under Rule 702, trial judges should admit

scientific evidence literally, provided the testimony is relevant, reliable and will assist the trier of

fact in assessment the facts of the case. 509 U.S. at 588-89. The Court declined to adopt the rigid

"general acceptance" test, which required that scientific testimony be generally accepted among

professionals before it could be admitted and held that the all or nothing standard of "general acceptance" was at odds with the liberal thrust of Rule 702. The Advisory Committee notes to the 2000 amendments to Rule 702 point out that "[a] review of the caselaw after <u>Daubert</u> shows that the rejection of expert testimony is the exception rather than the rule. <u>Daubert</u> did not work a 'seachange over federal evidence law,'" <u>quoting</u> <u>United States v. 14.38 Acres of Land Sitauted in Leflore County, Mississippi</u>, 80 F.3d 1074, 1078 (5th Cir. 1966). Expert opinion is not rendered inadmissible simply because it is flawed: "As the Court in <u>Daubert</u> stated: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" <u>Id.</u>, <u>quoting</u> 484 U.S. at 595.

3.  **The expert opinions of Drs. Evans and Lengyel are admissible under FED R. EVID. 703 regardless of the hearsay status of the underlying data on which the opinions are based.**

.

Under Rule 703, an expert may base his or her opinion testimony on evidence otherwise inadmissible as hearsay. Specifically, Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Thus, an expert may testify based otherwise inadmissible hearsay evidence provided the evidence is "of a type reasonably relied upon by experts in the particular field." FED. R. EVID. 403; <u>see</u> <u>Stecyk v. Bell Helicopter Textron, Inc.</u>, 295 F.3d 408, 414 (3d Cir. 2002).

4.  **The proper method for challenging the admissibility of expert**

**testimony is a <u>Daubert</u> Inquiry.**

Because experts may base their opinions on inadmissible hearsay, the proper method for challenging the admissibility of expert opinion is for the objecting party to initiate a <u>Daubert</u> inquiry rather than a hearsay challenge to the data underlying the experts' opinion. In <u>Daubert</u>, the Supreme Court affirmed the "gatekeeping" role of the district court concerning the admission of expert testimony. 509 U.S. at 597. In this role, the court must make a preliminary determination "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can properly be applied to the facts in issue." <u>Id.</u> at 592-93.

Procedurally, a <u>Daubert</u> inquiry may be initiated by a motion to exclude the evidence (or a motion in limine) or in a motion for summary judgment. <u>See</u> <u>Rudd v. General Motors Corp.</u>, 127 F.Supp. 2d 1330, 1332-33 (M. D. Ala. 2001). The court may hold an evidentiary hearing to determine whether to admit the expert testimony, <u>see</u> <u>Falise v. American Tobacco Co.</u>, 258 F.Supp. 2d 63, 65 (E.D.N.Y. 1993), or it may decide the issue of admissibility on the existing record, <u>see</u> <u>Rudd</u>, 127 F. Supp. 2d at 1334. The proponent of the expert opinion must establish scientific reliability by a preponderance of the evidence. <u>Falise</u>, 258 F. Supp. 2d at 66.

Defendants do not invoke <u>Daubert</u> but rather rely on two pre-<u>Daubert</u> cases, <u>Pittsburgh Press Club v. United States of America</u>, 579 F.2d 751 (3d Cir. 1978) and <u>In re Sullivan</u>, 904 F.2d 826 (3d Cir. 1990) that excluded as hearsay evidence gathered by non-experts. In <u>Pittsburgh Press Club</u>, the survey at issue was conducted by a club whose tax exemption the Internal Revenue Service had revoked on the ground that it was not being operated exclusively for nonprofit purposes. The club's survey was designed to prove that the amount of revenue received

36

by the club for use of its facilities for business use was de minimis. 579 F.2d at 753-755. The court held that the survey was nothing but a collection of extra-judicial decisions offered to prove the truth of the matters asserted, i.e. that the banquets challenged by the IRS were not profit-making affairs. Id. at 758. Although an economist assisted in the survey, the club's lawyers and employees also participated, and the Court of Appeals did not analyze the survey as expert opinion under rule 702 or 703. Rather, it treated the survey as a "hearsay poll" that could be admitted as evidence only if it fell into one of the exceptions to the hearsay evidence rule, including the residual hearsay exception (now FED R. EVID. 807). Thus, the survey in Pittsburgh Press Club is easily distinguishable from the survey in the present case, since it was offered as fact, not expert opinion. Further, nothing in the survey evinces that the survey relied on a scientific methodology or that it was "of a type reasonably relied upon by experts in the particular field."

In re Sullivan is even less apposite. That case did not involve a survey in any sense of the word, but only a list of reported Social Security disability cases compiled, apparently, by the lawyers and offered to show that the Secretary of the Department of Health and Human Services engaged in a pattern of ignoring certain judicial rulings concerning the criteria for awarding Social Security benefits. The Court of Appeals held  that it was not possible to determine the rate of error since the cases cited by the lawyers (reported cases that resulted in opinions) did not represent the universe of all such cases; it also held that the cited cases often did not stand for the proposition imputed to them by the lawyers. 904 F.2d at 847, 850-851.

      **5.**       **Defendants have failed to show that the results obtained by Drs. Evans and Lengyel are unreliable.**

Given defendants' assertion that the Evans-Lengyel survey is unreliable, one would expect them to have presented a <u>Daubert</u> challenge to the admissibility of the report on the ground that the reasoning or methodology underlying the testimony is not scientifically valid or that the reasoning or methodology cannot properly be applied to the facts in issue. They have not done so, and for this reason alone their effort to challenge admissibility of the evidence contained in the report must fail. But even if the Court were to construe defendants' motion as a challenge under <u>Daubert,</u> defendants plainly have failed to make a case for excluding the report on methodological or scientific grounds.

Defendants' claim that the survey method is unreliable is based almost entirely on the report of Dr. Naomi Zigmond. In preparing her critique, Dr. Zigmond apparently read only the expert report of Drs. Evans and Lengyel; she did not examine any of the underlying data on which it was based.  In fact, Dr. Zigmond's critique recognizes implicitly that the survey <u>method</u> and <u>design</u> are scientifically sound. She offers no real critique of the method by which the sample was selected, except to assert that it would have been better to have used a ten percent sample of the entire population of special education students in Pennsylvania. Zigmond, Review of the Evans/Lengyel Expert Report, Exhibit 5 to Defendants' Documents in Support of their Motion for Partial Summary Judgment (hereinafter Zigmond Review) at 2. As Dr. Conroy points out in his Declaration,[23] this assertion is based on the failure, all too common even among experienced experts, to understand that the precision of a sample depends primarily on the size of the sample,

---

[3]If the admissibility of the testimony of Dr. Evans and Dr. Lengyel were being challenged in a <u>Daubert</u> hearing, plaintiffs would call Dr. Conroy as a witness in support of admissibility of their opinions. On the assumption that defendants' Motion for Summary Judgment presents the functional equivalent of a motion in limine to exclude expert testimony under <u>Daubert</u>, plaintiffs have offered Dr. Conroy's testimony in the form of a declaration.

not the size of the population, and that the 5% margin of error can be reached with samples of 400 from a population of <u>any</u> size. With sample sizes larger than 400, the margin of error decreases only very slowly. Exh. 14 at ¶ 6. Dr. Zigmond's suggestion that a two-stage sampling strategy is anything less than commonly accepted is also "unfounded and indefensible." <u>Id.</u> at ¶ 3.

The survey suffered not from an unreliable or unscientific sample design, but from difficulties in implementation that prevented the plaintiffs from studying all 400 students in the original design, or even from drawing a sample of that size in the first place. As Dr. Conroy points out, the loss in the number of students observed or studies resulted in a loss of precision, and a rise in the margin of error from the hoped-for 5.03% in the original survey design to about 8.7%. As Dr. Conroy states,

> <u>This is not a fatal error; it is not an invalidation of the work. It is a slight decrement in precision.</u> To claim that this decrement in precision from 4% to 9% makes the survey work utterly and completely useless is egregiously wrong. All statisticians know that the precision of any sample survey is measured in shades of gray. None are perfect, most shed considerable light despite imperfections, and a few are worthless. This study is far from worthless. It is highly credible.

Exh. 14 at ¶ 1. Decrement in precision, or increase in margin of error, is even less important when the effects that are looked for are large. Plaintiffs expected the survey to confirm what they know from abundant other evidence is true, that noncompliance with the guarantees of IDEA exists on a large scale in Pennsylvania, and the survey did confirm that. Exh. 14 at ¶ 7.

Dr. Zigmond's opinion that plaintiffs' sample was not representative of the "universe" of students with disabilities in Pennsylvania is based on lack of understanding of the "universe" on which the study was based: students with the disabilities of retardation, autism, specific learning

disabilities and emotional disturbance. Plaintiffs did not simply draw a random sample of all students with disabilities in Pennsylvania, as Dr. Zigmond apparently assumed they did, because had they done so, the overwhelming majority would have been students with learning disabilities and speech/language impairment, and they would have been able to study at most, only 2 or 3 students with autism and relatively small numbers of students with emotional support needs, retardation or multiple disabilities. Exh. 14 at ¶¶2, 5.

Dr. Zigmond's assertion that "random sampling with replacement is the method of choice" in any sample survey is so oversimplified as to be misleading. There are times when sampling without replacement offers more efficiency than sampling with replacement. This was certainly the case in the context of the sample survey, when plaintiffs had no way of knowing how many of the students in the sample they drew from the PDE database were actually in the district, or known to the district, until they received copies of student IEPs in response to a subpoena. When the number of sample students actually still in school in the district proved inadequate, plaintiffs could, of course, go back again and again to the same inadequate database and draw more student names, then serve subpoenas for their IEPs and inspection of their programs, knowing that at least a third of those students would no longer be in the district, that others' IEPs simply would not be produced by the district. Meanwhile, in all but the very largest school districts, the proportion of students with lower-incidence disabilities in the sample would continue to decline as the number of potential "replacement" students was exhausted. Eventually, the sample would become more and more skewed toward students with high-incidence disabilities, thus greatly reducing the usefulness of the survey as a tool for drawing conclusions about students with a range of disabilities. Exh. 14 at ¶ 4, 5.

The flaws in execution of the original sample design of 400 students in ten school districts arose through no fault of Drs. Evans, Lengyel and Conroy. The sample was designed to be representative, fair and unbiased; it followed established techniques that are well known in the literature and that are commonly used in large scale research and polling. Its implementation "certainly did not fall below the criteria of academic, commercial or legal standards." Exh. 14 at ¶ 9. As Dr. Lengyel noted, she and Dr. Evans did nothing "to change what the picture was," or "to pick the bad situations or the ... good situations. Exhibit 15, Lengyel Depos. at 18.

There is certainly no requirement after Daubert that expert testimony be based on epidemiological or random sample survey data, even for the rigorous purpose of proving causation (which was not the purpose of the Evans-Lengyel survey). See Kennedy v. Collagen Corp., 161 F.3d 1226, 1229 (9th Cir. 1998); Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378, 1384 (4th Cir. 1995). Methodological flaws in a survey do not render it inadmissible, but rather go to the weight of the evidence. A & M Records, Inc. v. Napster, Inc., 2000 U.S. Dist. LEXIS 10668 (N.D. Cal. *10 (allowing admission of survey despite potential flaw in identifying the "universe" from which the sample was drawn).

Even if the randomness of the Evans-Lengyel survey were vitiated by the problems in implementation, it still valid as a set of case studies of special education students across the Commonwealth. As Dr. Lengyel testified in her deposition, a set of 139 case studies is powerful data. "I see nothing to suggest that [these] 139 stories of IEPs and students does not give a picture of ... what's happening in Pennsylvania. Single subject research is "a very valid method of research" and in special education, "we have gained an incredible amount of information from single subject research." Each case study probes the system, measures the response of that

system: "[E]ach person in that systems tells a story about the system." Exh. 15 at 41.

Not even Dr. Zigmond criticized the observation method used by Drs. Evans and Lengyel, the methods they used to train observers (in several trainings that Dr. Zigmond herself attended), or the methods they used to achieve reliability. Dr. Zigmond has not disputed that plaintiffs' observers were able accurately to record whether students' IEPs were being implemented and specially designed instruction was being delivered in both special education and regular education settings.

Further, Dr. Zigmond herself has used the case study approach and considers it a valid way to generalize about the state of special education practice. For example, in one of a series of articles called "An Exploration of the Meaning and Practice of Special Education in the Context of Full Inclusion of Students with Learning Disabilities," published in 29 Journal of Special Education 2 (1995), Dr. Zigmond reported on visits to five sites (school districts) in which she examined the experiences of two students with learning disabilities at each site. Neither the sites nor the students were selected at random; the students were, in fact, chosen by school district personnel. Regardless of the complete absence of randomness in her survey design, Dr. Zigmond drew conclusions about what constituted special education in full inclusion models; she "generalized from the five case studies" to a wider population than the population included in the case study and drew implications from the cases for policy and personnel preparation." Exhibit 16, Zigmond Depos. at 47-49, 109.  Dr. Zigmond believes that because the five case studies each found "about the same thing," it is possible to "make some generalizations" about the phenomena being studied. Id. at 109. Her explanation why the Evans-Lengyel report cannot serve the same function is that "[i]t wasn't characterized as a case study." Id. at 110.

Not only does the Evans-Lengyel survey meet the standards for admssibility under Rule 702 and <u>Daubert</u>; it also meets the standard for assuring "the circumstantial guarantees of trustworthiness" that the Third Circuit held in <u>Pittsburgh Press Club</u> are required to establish admissibility under the residual hearsay exception, Rule 807. The study draws from a proper universe; it uses a representative sampling method; the persons conducting the survey are experts (not even defendants challenge the expertise of Dr. Evans and Dr. Lengyel); the data were properly gathered and accurately reported; the sample design, questionnaire and the manner of interviewing meet the standards of objective surveying and statistical techniques; the survey was conducted independently of the attorneys involved in the litigation (except for their role in obtaining documents and access to students, which had to be accomplished by subpoena); the interviewers and sample designers were trained. <u>See</u> 579 F.2d at 758.

> **6.**     **Much of the data underlying Drs. Evans' and Lengyel's Expert Report is in fact admissible.**

Even without the "circumstantial guarantees of trustworthiness" provided by the Evans-Lengyel survey methodology, much of the data collected in the course of the survey is admissible in its own right. Student IEPs, since they are school records kept in the ordinary course of business, are admissible as business records under Fed. R. Evid. 803(6). <u>See</u> <u>Miller v. Pfizer, Inc.</u>, 196 F.Supp. 2d 1062, 1086 (D. Kan. 2002); <u>J.W. v. Contoocook Valley School District</u>, 2001 U.S. Dist. LEXIS 13286 (D.N.H. 2001). The personnel surveys certainly are admissible as evidence of the present states of mind of survey respondents, for example, respondents' inability to remember the inservice training experiences they have received or to articulate changes in classroom or building that has occurred as a result of inservice training. Examples of a principal

and a personnel (teacher) survey from one of the sample district are attached as Exhibit 13

(contrary to Dr. Zigmond's assumption, the questions in the two surveys are much alike).

Examples of state of mind evidence are the principal's statement that he is not aware what steps

PDE would take if his district did not follow the IDEA regulations, or the special education

teacher's statements that as an Intermediate Unit employee, she is unaware of school district

policies, practices and procedures; that she does not know if the district considers extra-curricular

activities for students with IEPs;  that she believes that students with IEPs "age up" to her

classroom from elementary school; that the students who "age up" may fit in an autistic support,

multiple disabilities support or life skills support class; and that she has had only two students

"eligible" for inclusion. Exh. 13. See Schering Corp. v. Pfizer, Inc., 189 F.3d 218, 227 (2d Cir.

1999) (state of mind exception); id at 225-227 (collecting cases on admissibility of surveys

generally); id. at 235-236 (distinguishing Pittsburgh Press).

    **C.**    **THE OBSERVATIONS OF SAMPLE STUDENTS IN THE TEN SCHOOL DISTRICTS BY DEFENDANTS' MANAGING AGENTS ARE FURTHER ADMISSIBLE EVIDENCE OF CLASS-WIDE HARM.**

        Plaintiffs' observers were "shadowed" by employees of PDE's Division of Compliance.

Exhibit 16, Zigmond Deposition at 62-63, 68.  As statements against interest by defendants'

managing agents, their recorded observations of students in the sample may be considered non-

hearsay under FED R. EVID. 801(d)(2). They observed the same students at the same times as

plaintiffs' observers, and recorded their observations, usually on the observation form developed

by Dr. Zigmond, occasionally on the forms used by plaintiffs' observers or on a blank piece of

paper. Like plaintiffs' observers, they recorded whether IEP goals, objectives and specially

designed instruction were implemented during the observation, although they did so in a much

less structured and systematic manner.

Exhibits 1-12 are twelve examples of defendants' observations of the sample students.[24] Exhibit 1 is the record of an observation of a student in a learning support classroom by a PDE employee who notes that "Folks in the [district] office were very friendly, I am their compliance advisor & have helped them w/a very 'hot' situation." Exh. 1 at 4107. She was surprised by the cool reception the observers received from the teachers and notes that the teacher refused to answer any questions on the advice of her attorney. Id. at 4106. In addition to plaintiffs' observer and the PDE observer, a third observer, apparently a classroom aide for the district, entered the classroom during the observation. Id. at 4112. Using the plaintiffs' observation form, the PDE observer notes that IEP goals and objectives were worked on during only two of the four observation periods; she reports that the sample student and a peer were taught by an aide, "totally separate from the rest of the class," while the teacher ignored them. Id. at 4113.

In Exhibit 2, the same PDE observer reports an observation of another sample student in a learning support classroom. The student "appears to be day dreaming," Exh. 2 at 4068; "lying across book. Appears to be bored. Yawns. ... Students ... just sitting around making noises"; (Id. at 4069); "Kids working independently were drawing/coloring, they told me they have nothing to do," id. at 4071 (these students were old enough to be studying World War II in a social studies class, id. at 4070). The PDE observer reported that the teacher and aide had a discussion "over kids' head" and that "this was essentially a wasted class, when kids get help, they work. Otherwise, they look out the window and socialize." Id. at 4071. The observer checked on the

_____

[4]Since these documents are not filed under seal, the names of the students have been deleted to protect their privacy.

plaintiffs' observation form that the student was where she was supposed to be according to her schedule, but indicates that no IEP goals and objectives were worked on and no specially designed instruction was delivered.

In Exhibit 3, the PDE observer recorded her observations of an eighth-grader who spent most of the observation time in an "academic support class" talking to other students or working independently. No teacher was in the room with the students; it appeared that a paraprofessional was responsible for the class. Exh. 3 at 4367-4368. The PDE observer reported, "This class is very disorganized. [The] TA [teaching assistant] shouts across room and deals with many students at once. 3 or 4 students appear to be very confused and they are not actively engaged. Only the most motivated students could get anything done." Id. at 4369. The district provided the observer with an IEP, but it was for a student other than the one observed.. Id. at 4374.

Exhibit 4 is a PDE employee's observation of a student who spent two consecutive periods in study hall. During these periods, the students sat passively listening to a story, expressing no interest in the points the teacher raised, or worked at computers with little or no interaction with the teacher. The student then went to chemistry class, where he sat with his books closed and his head down, and "the teacher did not make any attempt to contact him or encourage him to open his book." Exh. 4 at 6882-6883. The observer stated that he was not able to observe implementation of any IEP goals and objectives or specially designed instruction for this student.

In Exhibit 5, the PDE employee reports that the student he observed was "performing marginally" in a course and was barely achieving course requirements. He saw no evidence of the co-teaching, small group and individual work that was supposed to be provided as specially

designed instruction for this student, and no evidence that IEP goals and objectives were evaluated in the manner described in the IEP.

Exhibit 6 is a PDE employee's report of an observation in a full-time autistic support class. The observer reported that "There was very little evaluation criteria identified on the IEP. There were also some evaluation mechanisms as part of the program but they were very min[imal]. Students received very little structured feedback." Exh. 6 at 6888. The student being observed made "non-understandable" vocalizations, but the only communication intervention during the entire observation occurred when the student was asked to hand someone a "grooming card and did so. Id. at 6887.

Exhibit 7 is a PDE employee's report of an observation of a student who spent most of her day in regular class but without specially designed instruction. Exh. 7 at 6911. The student was disengaged; even in the study skills class she attended, with two teachers, the teachers did not try to engage the uninvolved students. Id. at 6910.  In communication arts, no one noticed the sample student was not responding or on task for more than half an hour. Id. at 6919-6920. She was not reading as instructed but was  talking and passing drawings back and forth with the student behind her.  Id. at 6920. In math class, the students became progressively louder and louder, and for the last twenty minutes, "Class time was wasted and non-productive ... Students were out of control. The only children benefitting were those using computer math game." Id. at 6922.

Exhibit 8 is a PDE employee's report of a student in two classes, the first a "disorganized" class that became progressively louder and in which, during a spelling test, the student being observed sat not writing, followed by a "behavior class." Exh. 8 at 6897.  Despite

the student's placement in a "behavior class," the observer saw nothing that indicated that behavior support strategies were being implemented or that the student's IEP goals and objectives were being evaluated in the manner described in her IEP. Id. at 6898. The observer reported that the student's IEP was "out of compliance – dates changed." Id.

Exhibit 9 and 10 are PDE employee's reports of observations of two students with learning disabilities whose "specially designed instruction" was identified as "learning support," Exh. 9 at 2584, or "learning support room," Exh. 10 at 2578 (obviously, a room is not a form of instruction). One of the students was observed on a test-taking day. By an interesting coincidence, the "specially designed instruction" on that student's IEP apart from "learning support" consisted almost entirely of modifications during test-taking. Yet the observer saw no evidence that specially designed instruction was provided. Exh. 9 at 2579.

Exhibit 11 is a PDE employee's report of her observation of a middle school student in a small special education class of eight students, a teacher and an aide. This student's schedule indicates that she leaves the self-contained classroom only for physical education, lunch and computer lab. Exh. 11 at 6970. The observer's statement on page 6969 that she observed "1:1 instruction, discussion of problem-solving with conflict resolution and activities to increase self-esteem and expectation of appropriate behavior" – the objectives in the student's IEP – is belied completely by her detailed account of a classroom in almost total chaos, in which students cursed, shouted, sang, drummed on their desks, wandered. One student pretended to drive a tractor; another recited the Dunkin Donuts Coolatta menu and banged on the classroom door; another carried on a loud running monologue with "no one in particular." Id. at 6950-6954. To her great credit, the student being observed tried hard to read and at one point yelled out to other

48

students, "do [you] want to read another story?" but the students were talking at once, yelling and loudly telling one another to shut up, and no one responded. Id.

The class descended even further into bedlam, with vulgar exchanges, threats, pushing, shoving, screaming, cursing and altercations. The student being observed, who had tried so hard to focus on reading, now alternated between wandering, sitting and walking out of the room. Finally, although no bell had rung to signal the end of the period, the students simply trailed out of the room one by one. Id. at 6955-6960.

Exhibit 12 is a PDE employee's report of an observation in a learning support (LS) class. The class watched movies for the entire observation period except for a period in between movies when the students went to gym. The PDE employee reported the movies as implementation of a "b-mod" program, with the movie as an and-of-the-month for good behavior. Exh. 12 at 6973, 6971. No other goals, objectives or specially designed instruction were implemented. During most of the time that the movies were playing, the student being observed put her head down on her desk. Id. at 6971-6972.

These are only a fraction of PDE agents' observations of the non-education of special education students throughout the Commonwealth of Pennsylvania, of their unnecessary segregation and the system's failure to provide them with meaningful specially designed instruction in regular classes or in special education classes.

## V. CONCLUSION

For the foregoing reasons, plaintiffs ask that the Court deny defendants' Motion for

Partial Summary Judgment.


                                    BY: _____
                                         Judith A. Gran
                                         Barbara E. Ransom
                                         Public Interest Law Center of
                                              Philadelphia
                                         125 S. 9th Street, Suite 700
                                         Philadelphia, PA 19107
                                         (215) 627-7100

                                         Attorney for Plaintiffs


August 18, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LYDIA GASKIN, et al.,                          :
                                               :
        Plaintiffs,                            :
                                               :
        v.                                     :        NO. 94-CV-4048 (E.D.Pa.)
                                               :
COMMONWEALTH OF                                :        (JUDGE ROBRENO)
PENNSYLVANIA,                                  :
DEPARTMENT OF EDUCATION,                       :
                                               :
        Defendants.

## ORDER

AND NOW, this _____ day of _____, 2003, upon consideration of the

Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment and Defendants'

Reply, if any, thereto, it is hereby

ORDERED that Defendants' Motion is DENIED..

_____
Honorable Eduardo C. Robreno
United States District Judge