IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GASKIN, ET AL.,                  :    CIVIL ACTION
                                 :    NO. 94-4048
            Plaintiffs,          :
                                 :
        v.                       :
                                 :
COMMONWEALTH OF                  :
PENNSYLVANIA, ET AL.,            :
                                 :
            Defendants.          :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        SEPTEMBER 16, 2005

        After eleven years of alternating between aggressive
litigation and intensive settlement negotiations, the parties in
this action have reached a Settlement Agreement.  Before the
Court is the parties' joint motion for final approval of the
proposed Settlement Agreement (doc. no. 326).  For the following
reasons, the Court will grant the motion, approve the Settlement
Agreement, and dismiss the case with prejudice.

I.    BACKGROUND

        On June 30, 1994, twelve students,[1] all of whom were
enrolled in various local school districts in Pennsylvania and
alleged to have disabilities, and eleven state and regional

---

[1]    All twelve students were minors when the class action
was initiated.  Thus, the students' parents or foster parents
commenced the lawsuit on their behalf.

disability advocacy groups ("Plaintiffs"), initiated the instant

class action against the Commonwealth of Pennsylvania, the

Pennsylvania Department of Education ("PDE"), and multiple

individuals acting in their capacities as officials of various

state organizations ("Defendants").

Plaintiffs claimed that Defendants violated: (1) the

Individuals with Disabilities in Education Act ("IDEA"), 20

U.S.C. §§ 1400-1485, by failing to identify disabled students,

develop individual educational programs or plans ("IEPs"),[2] and

provide a free appropriate public education ("FAPE") in the least

restrictive environment ("LRE") to the maximum extent reasonably

possible; (2) Section 504 of the Rehabilitation Act, as amended

by 29 U.S.C. § 794, by excluding disabled students, solely

because of their disability, from participating in or from

receiving the benefits of any program that received federal

funding; and (3) Title II of the Americans with Disabilities Act

---

[2]    According to the Settlement Agreement:

> "IEP" stands for "individualized
> education program" or
> "individualized education plan."
> IEP is statutorily defined as "a
> written statement for each child
> with a disability that is
> developed, reviewed, and revised in
> accordance with [20 U.S.C. §]
> 1414(d)." See 20 U.S.C. §
> 1401(1)); 32 C.F.R. §§ 300.340-
> 300.350.

(Settlement Agreement, Provision II(I)(3), doc. no. 295.)

("ADA"), 42 U.S.C. §§ 12131-12134, by excluding otherwise
qualified students from access to public programs solely because
of their disability.  Defendants denied these allegations.

In 1995, pursuant to Federal Rule of Civil Procedure
23, the Court certified the class, defined as:

> [A]ll present and future school age
> students with disabilities in the
> Commonwealth of Pennsylvania who
> have been denied the option of
> receiving a free appropriate
> education in regular classrooms
> with individualized supportive
> services, or have been placed in
> regular education classrooms
> without the supportive services,
> individualized instruction, and
> accommodations they need to succeed
> in the regular classrooms.

Gaskin v. Pennsylvania, No. Civ. A. 94-4048, 1995 WL 355346, at
*1 (E.D. Pa. June 12, 1995).  The class is comprised of
approximately 255,264 members, according to the most recent data
from PDE.[3]  (Fairness Hr'g Tr., 06/24/2005, 20-22.)

Following certification, the parties engaged in
extensive discovery, which lead to, inter alia, the production of
thousands of documents, the taking of dozens of depositions, and
the exchange of at least eighteen expert reports involving a

---

[3]      This total reflects the number of school-aged
children--that is, children between the ages of 3 and 21--who
have an IEP. (Fairness Hr'g Tr., 06/24/2005, 20 & Defs.' Ex. 3.)
At the Fairness Hearing, Dr. Linda Rhen, Director of the Bureau
of Special Education for the Commonwealth, testified that this
number represents the best estimate of class members.  (Id. at
21-22.)

panoply of subjects.  During various stages of discovery, the parties also exchanged settlement proposals and participated in settlement discussions with a number of court-designated facilitators.  Each settlement attempt, although not initially successful, brought the parties closer together.

In 2002, following a discovery dispute, the Court appointed The Honorable Louis C. Bechtle, former Chief Judge of the United States District Court for the Eastern District of Pennsylvania, as Discovery Master in the case.  With Judge Bechtle's guidance, the parties completed discovery on May 30, 2003.  Thereafter, the parties filed cross-motions for summary judgment, along with responses and replies.  On March 24, 2004, the Court heard oral argument on the summary judgment motions.  After oral argument, and at the Court's suggestion, the parties agreed to reconvene settlement discussions, with Judge Bechtle serving as a mediator.

From July 2004 to December 2004, the parties negotiated--through mediation sessions with Judge Bechtle, face-to-face meetings with negotiating teams that represented the parties, and the exchange of correspondence--a settlement that addressed all of the issues in the case.  On December 21, 2004, the parties filed a joint motion for provisional approval of the proposed Settlement Agreement (doc. no. 295), which the Court

granted on April 29, 2005 (doc. no. 305).[4]  The Court also (1)

_____

[4]     As the Court indicated in its order granting
provisional approval of the proposed Settlement Agreement, citing
to its decision in <u>Samuel v. Equicredit Corp.</u>, No. Civ. 00-6196,
2002 WL 970396, at *1 n.1 (E.D. Pa. May 6, 2002),

>           [a] decision granting preliminary
>           approval does not bind the court to
>           granting final approval.  As noted
>           by the Third Circuit, "[the]
>           preliminary determination
>           establishes an initial presumption
>           of fairness . . . ." <u>In re General
>           Motors Corp.</u>, 55 F.3d 768, 785 (3d
>           Cir. 1995) (emphasis added).  "If
>           the proposed settlement appears to
>           be the product of serious,
>           informed, non-collusive
>           negotiations, has no obvious
>           deficiencies, does not improperly
>           grant preferential treatment to
>           class representatives or segments
>           of the class, and falls within the
>           range of possible approval, then
>           the court should direct that the
>           notice be given to the class
>           members of a formal fairness
>           hearing . . . ."  Manual for
>           Complex Litigation, Second § 30.44
>           (1985).  In addition, "[t]he court
>           may find that the settlement
>           proposal contains some merit, is
>           within the range of reasonableness
>           required for a settlement offer, or
>           is presumptively valid."  Newberg
>           on Class Actions § 11.25 (1992).
>           In this case, the court finds that
>           the settlement falls within the
>           "range of possible approval" and
>           shall be submitted to the class
>           members for their consideration and
>           for a hearing to determine whether
>           the settlement will be approved by
>           the court.

(doc. no. 305).

altered and approved the parties' proposed form of notice; (2)
prescribed time frames for the distribution of the notice; (3)
established time frames for the submission of objections to the
proposed Settlement Agreement; and (4) set a date for a Fairness
Hearing.

The Court received nineteen objections to the
Settlement Agreement, of which only sixteen where submitted by
class members or their parents.  At the Fairness Hearing, which
was held on June 24, 2005, the Court heard oral argument from the
parties and other interested persons and received testimony from
a special-education expert, Commonwealth officials, parents of
several named Plaintiffs, and certain representatives from
advocacy groups.  The parties submitted additional evidence
through declarations and reports.  Thereafter, the Court ordered
the parties to file a joint motion for final approval of the
proposed Settlement Agreement (doc. no. 318).  The joint motion
was filed on August 5, 2005. (doc. no. 326).

II.  PROPOSED SETTLEMENT AGREEMENT

With the Court's final approval, the Settlement
Agreement will resolve--finally and completely--the case of
Gaskin v. Pennsylvania, No. Civ. A. 94-4048 (E.D. Pa. 1994).
Rather than continuing to litigate this action, the parties have
agreed to follow the terms and conditions of the proposed

Settlement Agreement fully and comprehensively to resolve all
outstanding claims in the case.

The life of the Settlement Agreement will be the five-
year period of time commencing on the date on which the Court
formally enters an order dismissing the case and ending exactly
five years later. (Settlement Agreement, Provisions II(B)-(C),
doc. no. 295.) As a foundation to the Settlement Agreement, the
parties have affirmed the following mutual goals and principles
that will guide interpretation of the Settlement Agreement.

(1)  The IDEA and related case law,
     including Oberti v. Board of
     Education, 995 F.2d 1204 (3d
     Cir. 1993), require special
     education students to be
     educated with students who do
     not have disabilities to the
     maximum extent appropriate.

(2)  It is desirable that school
     districts increase their
     capacity to provide
     appropriate specially designed
     instruction, related services,
     supplementary aids and
     services and support to
     special education students
     placed in regular education
     classrooms.

(3)  When the law requires that
     special education students
     receive supplementary aids and
     services in order to be
     educated with students who do
     not have disabilities to the
     maximum extent appropriate,
     such supplementary aids and
     services should be: (a)
     available to all students in

need of them; (b) designed to
provide meaningful educational
benefits; and (c) provided in
a manner sensitive to the need
to avoid stigmatizing special
education students who receive
them.

(4)  Pennsylvania school districts
educate all children and
welcome children with special
needs.

(Id. at Provision III(A)(1)-(4).)

A summary of certain Settlement terms and conditions
follows.


A.    Policy Development and Implementation

The overarching policies undergirding the Settlement
Agreement are divided into five categories.  (Id. at Provision
IV.1.)  First, PDE agrees to require school districts to adhere
strictly to the IDEA, and the case law construing that statute,
when making decisions regarding the placement of students with
disabilities.  To meet this condition of the Settlement
Agreement, the PDE will ensure: (1) students may not be removed
from regular education classes simply because of the severity of
their disabilities; (2) school districts have an obligation to
provide students with disabilities, including students with
significant cognitive disabilities, specially designed
instruction or other supplementary aids and services, if needed,
to benefit from participating in a regular education classrooms;

(3) before considering removal of a student with disabilities from a regular education classroom, the IEP team must first determine whether the goals in the student's IEP can be implemented in a regular education classroom with supplementary aids and services; and (4) school districts will consider the full range of supplementary aids and services, based on peer-reviewed research to the extent practicable, that can be utilized in regular education classrooms before contemplating removal of a student with disabilities from a regular classroom. (<u>Id.</u> at Provision IV.1(A).)

Second, when non-PDE Commonwealth agencies or private agencies are required to provide a free appropriate public education in the least restrictive environment, "the services will be provided, coordinated, and paid in accordance with the interagency coordination [set forth in the] <u>Memorandum of Understanding</u> entered into among PDE, the Pennsylvania Department of Public Welfare, the Pennsylvania Department of Labor and Industry, and the Pennsylvania Department of Health." (<u>Id.</u> at Provision IV.1(B).)

Third, students who are entitled to gifted support or Chapter 15 accommodations[5] will have <u>one</u> IEP that incorporates

---

[5]    As Chapter 15 of Pennsylvania's Administrative Code on Education provides:

        (a)    This chapter addresses a
               school district's

9

responsibility to comply with the requirements of Section 504 and its implementing regulations at 34 CFR Part 104 (relating to nondiscrimination on the basis of handicap in programs and activities receiving or benefiting from federal financial assistance) and implements the statutory and regulatory requirements of Section 504.

(b) Section 504 and its accompanying regulations protect otherwise qualified handicapped students who have physical, mental or health impairments from discrimination because of those impairments. The law and its regulations require public educational agencies to ensure that these students have equal opportunity to participate in the school program and extracurricular activities to the maximum extent appropriate to the ability of the protected handicapped student in question. School districts are required to provide these students with the aids, services and accommodations that are designed to meet the educational needs of protected handicapped students as adequately as the needs of nonhandicapped students are met. These aids, services and accommodations may include, but are not limited to, special transportation, modified equipment, adjustments in the student's

all specially designed instruction, accommodations, or other
support identified by the IEP team.  (Id. at Provision IV.1(C).)

Fourth, PDE agrees to create readily available,
informational materials about the types of supplementary aids and
services that children with disabilities can receive in a regular
education classroom and how parents can seek assistance in
obtaining these aids and services for their children.  PDE will
seek input from the Advisory Panel (see Part II.A below) for this
initiative.  (Id. at Provision IV.1(D).)

Finally, PDE agrees to create materials representing
that all children, including those children with disabilities,
are welcome in school.  These materials will be displayed in
school buildings.  PDE also agrees to seek input from the
Advisory Panel (see Part II.A below) for this initiative.  (Id.
at Provision IV.1(E).)


B.  Advisory Panel

PDE agrees to establish a special advocacy group, known
as the "Bureau Director's Advisory Panel on Least Restrictive

---

roster or the administration
of needed medication. For
purposes of the chapter,
students protected by Section
504 are defined and identified
as protected handicapped
students.

22 Pa. Code § 15.1.

Environment Practices" (or simply the "Advisory Panel"),[6] to engage in the following functions: (1) to review system-wide progress in the delivery of individualized, specially designed instruction in regular education classrooms to students with disabilities; (2) to analyze and report periodically on the status of implementation of the Settlement Agreement; and (3) to advise PDE on the implementation of the Settlement Agreement's terms and conditions. (<u>Id.</u> at Provision IV.2(A).) The Advisory Panel will be comprised of fifteen members, at least nine of whom will be parents of children with disabilities who are not employed by PDE, or by any school district in Pennsylvania, or by any other local education agency in Pennsylvania. (<u>Id.</u> at Provision IV.2(B).) More specifically, during the life of the Settlement Agreement, the organizational Plaintiffs will annually select twelve Advisory Panel members, and the Bureau Director will annually select three Advisory Panel members. (<u>Id.</u>) Although all Advisory Panel members will initially be appointed to a one-year term, the Settlement Agreement provides that each member is eligible for reappointment, up to a maximum of five years. (<u>Id.</u>)

The Settlement Agreement also establishes guidelines for how vacancies on the Advisory Panel will be filled, how often

_____

[6]     The "Bureau Director" refers to the Director of PDE's Bureau of Special Education.

the Advisory Panel will meet, how the Advisory Panel will operate, and what types of data will be accessible to the Advisory Panel. (Id. at Provision IV.2(C)-(M).) Notably, the Bureau of Special Education agrees to provide "a reasonable level of support, including support staff, to the Advisory Panel consistent with the PDE's budgetary resources and as determined by the Bureau Director." (Id. at Provision IV.2(K).) Two of the Advisory Panel's main initiatives will be: (1) to assist in designing a needs assessment, based on research-based practices and the supplementary aids and services available in regular education classrooms, of the school districts' and intermediate units' personnel; and (2) to aid the Director of the Bureau of Special Education in identifying school districts that have established exemplary LRE programs and practices, rewarding those districts, and creating materials to help other school districts replicate the LRE initiatives of the exemplary school districts. (Id. at Provision IV.2(L)-(M).)

     C.    Individualized Education Program or Plan ("IEP") Format

       As done previously, PDE will provide an Annotated IEP Format to guide school districts in developing IEPs. (Id. at Provision IV.3(A).) Under the Settlement Agreement, however, the LRE portion of the Annotated IEP Format will be modified to reflect the new LRE Monitoring, which is described below. (Id.

at Provision IV.3(C)-(E).)  Additionally, the Settlement
Agreement sets forth how and when the LRE portion of the IEP may
be modified during the life of the Settlement Agreement, and what
type of guidance PDE will provide to school districts concerning
the modified LRE portion of the IEP.


    D.    Compliance Monitoring

        Perhaps the most significant aspect of the Settlement
Agreement involves the provision for "compliance monitoring" by
PDE of the individual school district's performance.  Compliance
monitoring is intended to ensure, _inter_ _alia_, that local school
districts are adhering to the IDEA and other federal and state
laws that protect the rights of children with disabilities.  (Id.
at Provision IV.4(A).)

        Of the three types of compliance monitoring that PDE
agrees to conduct, one is new ("LRE Monitoring") and two are
existing, but will be modified under the Settlement Agreement
("Regular Cyclical Monitoring" and "Targeted Monitoring").  (Id.)
All types of compliance monitoring will be "data- and
information- based and verifiable."  (Id. at Provision
IV.1(B)(1)(A).)  PDE will use this data-based information as a
guide for determining how to allocate resources to address "areas
of greatest need[,]" relating to the support for children with
disabilities.  (Id. at Provision IV.1(B)(1)(B).)  "As permitted

by its resources, PDE will provide support, including focused, customized technical assistance, to school districts in need of such support." (Id. at Provision IV.1(B)(1)(C).) Moreover, parents of children with disabilities will be afforded the opportunity, on a continuous basis, to provide PDE with information. (Id. at Provision IV.4(B)(1)(e).) And for those school districts failing to take corrective action as mandated by PDE, sanctions will result. (Id. at Provision IV.4(I).)

LRE Monitoring, which is a new type of monitoring under the Settlement Agreement, will be based of five guiding principles:

> (a) LRE monitoring will be based on a limited number of priorities (goal statements) identified by PDE following input from a diverse group of stakeholders through the **Advisory Panel**. Priorities will include: (1) increasing the number of students with disabilities included in regular education classes and neighborhood schools with needed supplementary aids, services and support; and (2) developing **IEP**s capable of providing students with disabilities a meaningful benefit from education.
>
> (b) LRE monitoring will be based on a limited number of indicators (objective measures of the goal) identified by **PDE** within each priority area.

(c)    LRE monitoring will be based
                       on comparisons to state
                       averages identified by **PDE**.
                       Monitoring standards will be
                       clearly communicated to school
                       districts.

                (d)    Triggers (levels of
                       performance at which **PDE** will
                       intervene and require
                       corrective action) will be
                       clearly communicated to school
                       districts.

(Id. at Provision IV.4(A)(3)(a)-(d).)

          Under LRE Monitoring, PDE will closely monitor and

provide specialized support to half of Pennsylvania's school

districts--selected according to "LRE Index Score" rankings--that

have not been meeting the needs of children with disabilities.

(Id. at Provision IV.4(C).)  The LRE Index Score will derive from

weighted "data factors," which will be agreed to by the parties

and reviewed on an annual basis.  (Id.)  Based on the LRE Index

Score, half of all school districts in Pennsylvania will be

identified under one of three categories on an annual basis.

(Id.)  "Tier One LRE Monitoring" will be comprised of the twenty

school districts with the lowest LRE Index Scores.  (Id. at

Provision IV.4(C)(1).)  "Tier Two LRE Monitoring," also known as

the "warning list," will consist of school districts in the

bottom ten percent of the LRE Index Scores that have not been

identified for "Tier One LRE Monitoring."  (Id. at Provision

IV.4(C)(2).)  Finally, "Tier Three LRE Monitoring," also known as

                                  16

the "alert list," will be comprised of school districts in the bottom fifty percent of the LRE Index Score that have not been identified for Tier One LRE Monitoring or Tier Two LRE Monitoring. (Id. at Provision IV.4(C)(3).) The LRE Index Scores of all school districts will be made publicly available as part of the school and district report cards under the No Child Left Behind Act and the IDEA. (Id. at Provision IV.4.)

Regular Cyclical Monitoring, a pre-existing monitoring process that is mandated by the United States Department of Education ("USDOE"), involves the monitoring of each Pennsylvania school district once every six years to ensure that the district is in compliance with the state and federal special education laws and regulations. (Id. at Provision IV.4(A)(1).)

Targeted Monitoring, the other pre-existing type of compliance monitoring, is performed by the Bureau of Special Education in response to specific deficiencies within a particular school district that were identified through the Regular Cyclical Monitoring process. (Id. at Provision IV.4(A)(2).)

The parties have agreed to a five-tier process for compliance monitoring, including initial triggers for each level of intervention:

> (a) Tier One LRE Monitoring of 20 school districts (excluding any school district implementing a

Tier One **CAP**)[7] identified via
data analysis as most in need
of systemic **LRE**-related
changes.

(b)  Tier Two LRE Monitoring based
on a warning designation for
school districts identified in
the bottom ten percent
(approximately) of data
analysis (excluding any school
district implementing a Tier
One or Tier Two **CAP**).

(c)  Tier Three LRE Monitoring based
on an alert designation for
school districts identified in
the remaining bottom half
(approximately) of data
analysis.

(d)  Targeted [M]onitoring based on
referral by a **Bureau** staff
member due to extenuating
circumstances within the school
district.

(e)  Regular [C]yclical [M]onitoring
of all Pennsylvania school
districts coordinated to the
district strategic plan
process, currently on a six-
year cycle as approved in the
Pennsylvania state plan
approved by the **USDOE**.

(Id. at Provision IV.4(B)(2)(a)-(e) (emphasis in original)

(footnote added).)

---

[7]  Under the Settlement Agreement, "CAP" means "a
corrective action plan ordered by PDE as the consequence of
deficiencies identified during compliance monitoring conducted
under Section IV.4 of the Settlement Agreement." (Settlement
Agreement, Provision II(L), doc. no. 295.)

Those school districts failing to comply with PDE's corrective action plans--created to rectify deficiencies identified through <u>any</u> type of compliance monitoring--will be subject to sanctions and enforcement powers, including:

> (1) A mandatory meeting with PDE in Harrisburg in which the superintendent and chair of the school board will be obligated to participate.

> (2) Appropriate sanctions as set forth in **PDE**'s "Basic Education Circular" on enforcement, including the withholding of funds from the school district and redirecting those funds to the appropriate body to support specific expenditures (<u>e.g.</u>, hiring personnel) to implement the action required.

> (3) If appropriate, the initiation of professional disciplinary action against the superintendent or others whose conduct is found to have resulted in the school district's failure to meet its obligations under the **CAP**.

(<u>Id.</u> at Provision IV.4(I).)


E.  <u>Complaint Resolution</u>

Under the Settlement Agreement, PDE will modify and expand its present system of complaint investigation and resolution. (<u>Id.</u> at Provision IV.5.) First, the Bureau will investigate <u>all</u> complaints filed by parents or students. (<u>Id.</u> at

19

Provision IV.5(A).)  If PDE determines that the complaint was timely filed and that jurisdiction lies with PDE to investigate the complaint, pursuant to 34 C.F.R. § 300.662, then PDE will resolve the matter using its best efforts to interview: (1) the parents or student, and (2) a reasonable number of persons identified by the complainant(s) as having actual knowledge of the facts.  (Id.)

Second, when PDE finds in the course of the complaint resolution process that a school district has violated a student's right to receive supplementary aids and services in a regular education class or when such a violation is established after a due process hearing, PDE will investigate whether the offending school district has corrected the violation for all similarly situated students during the school district's next compliance monitoring.  (Id. at Provision IV.5(B).)


    F.    Financial Terms

Defendants will pay named Plaintiffs $350,000 in full, final, and complete settlement and release of Plaintiffs' claims for compensatory damages that have been asserted in this case. (Id. at Provision IV.9(A).)  Plaintiffs will be responsible for allocating the $350,000 among themselves.  Additionally, Defendants will pay Plaintiffs' counsel $1,825,000 in full, final, and complete settlement and release of all claims by

Plaintiffs or their attorneys for attorneys' fees and litigation
costs.  (<u>Id.</u> at Provision IV.9(B).)


     G.   <u>Other Components of the Proposed Settlement Agreement</u>

     Under the Settlement Agreement, PDE will "build upon
and refine its present system of review and approval or
disapproval of special education plans [that are] submitted by
the 501 school districts in Pennsylvania[.]"  (<u>Id.</u> at Provision
IV.6.)  In part, PDE will require those school districts that
failed to meet the needs of children with disabilities, as
determined by compliance monitoring, to include appropriate
corrective actions in their special education plans.  <u>Id.</u>

     Additionally, the Settlement Agreement establishes that
the Bureau of Special Education will provide extensive on-site
training, technical assistance, and professional development to
school districts to ensure that the terms of the Settlement
Agreement are being met.  (<u>Id.</u> at Provision IV.7.)  The Advisory
Panel will offer support in this initiative by recommending
content, delivery systems, and evaluation processes, <u>inter</u> <u>alia</u>,
for the training programs.  (<u>Id.</u>)

     Plaintiffs' counsel will continue to advocate for
trained, informed, and effective support to parents on issues
relating to specially designed instruction to students with
disabilities.  (<u>Id.</u> at Provision IV.8.)  As Plaintiffs' counsel

has informed PDE, part of their advocacy will include submitting grant proposals to PDE and seeking funding for programs that support their special-education goals. (Id.) During the life of the Settlement Agreement, PDE agrees to review such grant proposals. (Id.) If the proposals submitted by Plaintiffs' counsel are consistent with PDE's obligations, priorities, and goals, and do not jeopardize PDE's own grant proposals, then PDE will support such grants and take reasonable steps to assist Plaintiffs' counsel in obtaining the grants. (Id.)

III. SUMMARY OF PROOFS, AFFIDAVITS, AND TESTIMONY

Class members and their parents had the opportunity to file written objections to the proposed Settlement Agreement by June 10, 2005. Nineteen objections were either filed or received by the Court. All objectors were given the opportunity to produce evidence and be heard at the Fairness Hearing. The following proofs, affidavits, and testimony were produced by the parties to support approval of the Settlement Agreement.

A.    Experts

1.    Christopher Kliewer, Ph.D., Associate Professor of Special Education at the University of Northern Iowa

The parties submitted the declaration of Christopher Kliewer, Ph.D., Associate Professor of Special Education at the

University of Northern Iowa, to support their joint motion for
final approval of the Settlement Agreement.  Dr. Kliewer served
as an expert in an earlier phase of the litigation and is
familiar with the Settlement Agreement.  Based on a substantial
body of scholarly and empirical research, Dr. Kliewer stated that
special needs children perform better, both academically and
socially, when educated in regular classrooms then when educated
in a non-inclusive setting.  (Dr. Christopher Kliewer's Decl. ¶¶
3-8, doc. no. 302.)  Moreover, Dr. Kliewer indicated that great
disparities exist among the states in placing children with
special needs, which is evidenced by data that the United States
Department of Education collected in 2002.  (Id. at ¶ 14.)
According to that data, Pennsylvania educated only 35% of its
special education students (aged 6-21) in general education
classrooms for 80% of a day or more.  (Id.)  Comparably, Vermont
and New Hampshire educated approximately 80% and 75% of its
special education students (aged 6-21), respectively, in general
education classrooms for 80% of a day or more.  (Id.)  This
disparity helps to demonstrate that Pennsylvania's practices for
educating children with disabilities are not reflective of what
experts know about "best practices."  (Id.)

2.  Gail McGregor, Ed.D., Research Professor of
            Education at the University of Montana

        Dr. Gail McGregor, a research professor of education at

the University of Montana, testified at the Fairness Hearing.

(Fairness Hr'g Tr., 06/24/2005, at 53-77.)  With over thirty

years of experience in the area of special education, which

includes approximately twelve years working in Pennsylvania, Dr.

McGregor served as an expert witness in earlier stages of this

litigation and, if the Court gives final approval to the

Settlement Agreement, will be assisting the Bureau of Special

Education in implementing the Settlement Agreement.  (Id. at 53-

57.)

        As an expert on behalf of Plaintiffs, Dr. McGregor

studied Pennsylvania's approach to professional development for

teachers.  (Id. at 57-58.)  In Dr. McGregor's opinion, the

Settlement Agreement provides strong training, technical

assistance, and professional development.  (Id.)  Notably, the

Settlement Agreement also emphasizes "system accountability."

(Id. at 62.)  In her declaration submitted to the Court and from

her testimony at the Fairness Hearing, Dr. McGregor highlights

certain aspects of the Settlement Agreement that meet the

training and accountability directives.

        First, the Settlement Agreement establishes "policy

guidance" to the IEP teams by requiring them to consider

initially whether a special needs child can be supported in a

regular classroom with supplementary aids and services.  (Id. at
59.)  Accordingly, for this policy to be implemented, the IEP
teams must be aware of the research-based practices that allow
children with disabilities to learn in a general education
classroom.  (Id. at 58-59.)  Additionally, because the Settlement
Agreement will require PDE and the Bureau of Special Education to
provide parents of special needs children with information about
supplementary aids and services, both the parents and the IEP
teams will start "on the same page."  (Fairness Hr'g Tr.,
06/24/2005, at 60.)

Second, under the Settlement Agreement, professional
development needs will be assessed throughout the Commonwealth,
whereby actual practice will be contrasted with research- and
evidence-based "best practices" in the special education field.
(Id. at 61-62.)

Third, the LRE Monitoring created under the Settlement
Agreement, which requires the ranking of school districts
according to data factors that measure how well children with
disabilities are being included in regular classrooms, will
provide an objective mode for determining the impact of training.
(Id. at 62-67.)  According to Dr. McGregor, tiered monitoring and
corrective action create accountability.  (Id.)  And although the
LRE Index Scores will be based on data factors that have not yet
been determined by the parties, Dr. McGregor testified that the

realm of possible data factors is limited and includes information that the school districts are already required to report to PDE.  (Id. at 74.)

Fourth, the Settlement Agreement establishes system accountability by creating provisions for review and approval of each school district's special education plans, which in turn will help direct training and technical assistance.  (Id. at 62-67.)  Moreover, parents will be able to address their grievances through the complaint resolution process.  (Id. at 60.)

Based on the aforementioned and "a very, very large body of evidence that suggests that there are positive outcomes from students with disabilities" to be placed in regular classrooms, Dr. McGregor is confident that the Settlement Agreement will "absolutely" benefit Pennsylvania's special needs children.  (Id. at 66-67.)


B.   PDE Officials

Two PDE officials--Francis V. Barnes, Ph.D., Secretary of Education for the Commonwealth of Pennsylvania, and Linda Rhen, Ed.D., Director of the Bureau of Special Education of the Pennsylvania Department of Education--testified at the Fairness Hearing.  Both officials expressed, on behalf of the Commonwealth, full support for the Settlement Agreement.

1.  Francis V. Barnes, Ph.D., Secretary of Education
    for the Commonwealth of Pennsylvania

At the time the Settlement Agreement was entered into,
Dr. Barnes served as the Secretary of Education for the
Commonwealth.  In that capacity, he was the highest educational
official in Pennsylvania.  At the Fairness Hearing, Dr. Barnes
testified that he was familiar with the Settlement Agreement,
that the Pennsylvania Department of Education was entering into
the Settlement Agreement willingly and voluntarily, and that the
terms of the Settlement Agreement would be implemented
faithfully.  (Id. at 12-14.)  Additionally, Dr. Barnes stated
that the Commonwealth had both the staff support and financial
support to implement the terms of the Settlement Agreement.  (Id.
at 13.)  Although Dr. Barnes acknowledged that he planned to
leave his position as Secretary of Education within a few months
of the Fairness Hearing, he stressed that his departure would
"absolutely not" impact the commitment of the Commonwealth to
carry out the terms of the Settlement Agreement.  (Id.)  Dr.
Barnes indicated that the Settlement Agreement would not only
serve the best interests of special education children in the
Commonwealth, but also those children receiving a general
education.  (Id.)

2.    Linda Rhen, Ed.D., Director of the Bureau of
              Special Education of the Pennsylvania Department
              of Education

        As Director of the Bureau of Special Education of PDE,

and with more than thirty-four years of experience in the field

of special education, Dr. Rhen is the Commonwealth official who

will have the most direct responsibility for implementing the

terms and conditions of the Settlement Agreement.  (<u>Id.</u> at 17-

20.)  At the Fairness Hearing, Dr. Rhen defined special education

as:  "In a generic sense, special education is providing the

support[] and services to students with disabilities from the

ages 3 through 21 to help them be successful in school and

prepare them for adult life."  (<u>Id.</u> at 20.)  Also, Dr. Rhen

indicated that 255,264 students with disabilities are school-aged

in Pennsylvania, according to the most recent official data that

PDE reported to the United States Department of Education, as of

December 1, 2003.  (<u>Id.</u> at 21-22.)

        Dr. Rhen testified that she has "studied ... and

studied" the Settlement Agreement and is very familiar with its

terms.  (<u>Id.</u> at 22.)  Under the Settlement Agreement, the Bureau

will be responsible for convening the Advisory Panel and naming

three of the Panel's fifteen members.  (<u>Id.</u> at 19.)

Additionally, the Bureau will present information and

recommendations to the Advisory Panel, help devise the LRE Index

Score, and conduct compliance monitoring.  (<u>Id.</u>)  According to

                                  28

Dr. Rhen's testimony, the Bureau of Special Education is committed to implementing the terms and conditions of the Settlement Agreement, which "serves the best interests of the Commonwealth and our students." (Id. at 22.) Dr. Rhen also represented that PDE can afford the implementation costs for the five-year life of the Settlement Agreement. (Id. at 23.)

As to the life of the Settlement Agreement, Dr. Rhen testified that the five-year period gives PDE and the Bureau adequate time to "address the issues and the tasks that are in front of us in the settlement agreement. Some are more complex than others. But, I think it gives us the time to be able to identify and work with each and every issue." (Id.) Under the recently enacted federal Individuals with Disabilities Education Improvement Act of 2004, Dr. Rhen indicated that "Least Restrictive Environment Monitoring" will be required, which is very similar to monitoring that is mandated under the Settlement Agreement. (Id. at 24.) With changing laws, however, Dr. Rhen stated that it would be hard to predict what exactly would happen after the life of the Settlement Agreement, but the "five years gives us the time to implement the settlement agreement and get some sound information on which . . . to build future plans." (Id. at 24-25.)

Finally, Dr. Rhen testified about a series of town hall meetings that the Bureau participated in throughout the

Commonwealth to inform parents, school districts, intermediate units, charter schools, agencies, and other interested parties about the Settlement Agreement. (Id. at 27-30.)

C.   Plaintiffs

Three parents of individually named Plaintiffs--including Joseph Gaskin, the father of lead Plaintiff Lydia Gaskin--testified at the Fairness Hearing. These parents shared their experiences with navigating through the educational system in an effort to have their children with disabilities included in regular classroom settings. Moreover, the parents explained the litigation, mediation, and settlement phases of this case. These parents fully support the Settlement Agreement and believe that it is in the best interest of Pennsylvania students. In particular, Mr. Gaskin stated that his greatest reservation with the Settlement Agreement had been the limited five-year time frame, but determined that this provision was a better alternative than a lengthy trial without guaranteed results. (Id. at 46.) Mr. Gaskin noted, however, that with the Settlement Agreement, "we [can] start implementing it right away and start helping kids throughout Pennsylvania immediately." (Id.)

Additionally, representatives from state and regional disability advocacy groups--some named organizational Plaintiffs--testified and/or submitted declarations. These representatives

described the arms-length negotiations and expressed full support of the Settlement Agreement.

Finally, twelve parents of children with disabilities requested to speak at the Fairness Hearing, and the Court afforded them the opportunity to do so. (Id. at 91-120.) With one exception, these parents commended the efforts of the parties to the action and expressed their support for the Settlement Agreement. (Id.) One parent evinced several concerns that the Settlement Agreement would limit parents' choices in placement of their children. (Id. at 92.)

IV. LEGAL ANALYSIS

    A.   Standard of Review

"Even if [a proposed settlement agreement] has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is 'fair, reasonable, and adequate.'" In re Prudential Ins. Co., 148 F.3d 283, 316 (3d Cir. 1998) (citing In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig., 55 F.3d 768, 785 (3d Cir. 1995)); see also Fed. R. Civ. P. 23(e)(1)(C) ("The court may approve a settlement . . . that would bind class members only after a hearing and on finding that the settlement . . . is fair, reasonable, and adequate."). This determination "is left to the

sound discretion of the district court." <u>Girsh v. Jepson</u>, 521 F.2d 153, 157 (3d Cir. 1975).

Before delving into legal analysis, it is important to delineate the role of the Court in the shaping of the public policy choices that are embedded in the Settlement Agreement. Contrary to the expectations of some who object to the Settlement Agreement or who appeared at the Fairness Hearing, it is not the Court's role (or intent) to superintend from henceforth the delivery of educational services to the members of the class, or to adjudicate individual disputes between parents and the school districts, or to pick and choose among programs or policies to be implemented by the Commonwealth or its school districts. Whether the Settlement Agreement embodies optimum educational choices or strikes the proper allocation of resources among competing educational needs is not the business of the Court. The task of giving life to the statutory mandate of providing a "free appropriate public education" to children throughout the Commonwealth and to fund those mandates adequately will remain, as it should, under the stewardship of the executive and legislative branches of state government, and not the Court. 20 U.S.C. § 1412; 34 C.F.R. § 300.13. Rather, the role of the Court is focused and more modest, which is simply to ensure that the public policy choices embodied in the Settlement Agreement are not inconsistent with federal or state law.

In addition, the Court has the statutory role of
verifying that the Settlement Agreement is "fair, reasonable, and
adequate." Fed. R. Civ. P. 23(e)(1)(C). In <u>Girsh</u>, the Third
Circuit enumerated certain factors that district courts may
consider in determining whether to grant final approval of a
class action settlement. <u>Id.</u> at 157. The <u>Girsh</u> factors include:

> (1) the complexity, expense and
> likely duration of the litigation .
> . .; (2) the reaction of the class
> to the settlement . . . ; (3) the
> stage of the proceedings and the
> amount of discovery completed . . .
> ; (4) the risks of establishing
> liability . . . ; (5) the risks of
> establishing damages . . . ; (6)
> the risks of maintaining the class
> action through the trial . . . ;
> (7) the ability of the defendants
> to withstand a greater judgment;
> (8) the range of reasonableness of
> the settlement fund in light of the
> best possible recovery . . . ; (9)
> the range of reasonableness of the
> settlement fund to a possible
> recovery in light of all the
> attendant risks of litigation . . .
> .

<u>Id.</u> (quoting <u>City of Detroit v. Grinnell Corp.</u>, 495 F.2d 448, 463
(2d Cir. 1974)).

These factors, however, are not exclusive. Nor are
they all relevant to every class action. <u>Id.</u> at 156 (stating
"[s]ome of the factors which are relevant to a determination of
the fairness of a settlement [are] . . . as follows."). In fact,
the Third Circuit has suggested that district courts consider

additional factors given the "sea-change [which has occurred] in the nature of class actions." Prudential, 148 F.3d at 323. These additional factors include:

> [1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

Id.

As this Court recognized in Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561 (E.D. Pa. 2001) (Robreno, J.),

> Distilled to their essence, Girsh-Prudential compels courts to obtain satisfactory answers to the following questions:
>
> 1. What benefit did the litigation confer upon the putative class

members either by way of financial
compensation or by [structural]
relief?

2. What past, present or future
claims are surrendered by the class
members by settling the case?

3. Do the administrative costs,
including attorneys fees, reflect
the market value of the services
performed and are they commensurate
with the results achieved?

4. Are the terms of the Settlement
Agreement consistent with the
public interest and is the public's
confidence in the administration of
justice and the integrity of the
class action process enhanced or
impeded by the settlement?

5. What are the prospects that, if
the Settlement Agreement is
rejected, further litigation would
enlarge the recovery of the class
and, if so, at what financial cost?

Id. at 572.  It is within this framework that the Court will

consider the pending Settlement Agreement.


    B.    Analysis of the Settlement Agreement

        1.    What benefit did the litigation confer upon the
              class members?

        While the Settlement Agreement does not create new

norms of conduct for the PDE or the school districts, it does

provide for systematic changes in the manner in which PDE

monitors, advises, and trains the local school districts in

supporting children with disabilities.  Significant impacts in

monitoring will be implemented.  Improved measuring instruments
will permit closer monitoring, and a more efficient and effective
delivery of student services.  This focus on how better to meet
the needs of children with disabilities in Pennsylvania will
greatly benefit more than 255,000 students.

     2.    What past, present or future claims are
surrendered by the class members by settling
the case?

As set forth in Provision IV.9(E) of the Settlement
Agreement,

> the payments . . . of the
> Settlement Agreement are intended
> by the parties to constitute, and
> will be construed by the parties to
> constitute, consideration exchanged
> by the defendants for a full,
> final, and complete release of all
> claims that the plaintiffs asserted
> or could have asserted against any
> and all of the defendants arising
> out of or relating directly or
> indirectly to the causes of action
> asserted in Gaskin v. Commonwealth
> of Pennsylvania, No. 94-CV-4048
> (E.D. Pa.).

(Settlement Agreement, Provision IV.9(E), doc. no. 295.)
Therefore, the sweep of the release is not overly broad and does
not extinguish the rights of parents to otherwise vindicate
federal- or state-provided rights through due process hearings.

3. Do the administrative costs, including
   attorneys fees, reflect the market value
   of the services performed and are they
   commensurate with the results achieved?

Under the Settlement Agreement, Plaintiffs' counsel
will receive $1,825,000 for attorneys' fees and litigation costs.
"In determining the appropriate amount of attorneys' fees to be
paid to class counsel, the principal consideration is the success
achieved by the plaintiffs under the terms of the settlement."
Schwartz, 157 F. Supp. 2d at 578; see also Prudential, 148 F.3d
at 338 ("'[N]umerous courts have concluded that the amount of the
benefit conferred logically is the appropriate benchmark against
which a reasonable . . . fee charge should be assessed.'")
(quoting Conte, 1 Attorney Fee Awards § 2.05, at 37).

After litigating for over eleven years, Plaintiffs
represent that the Settlement Agreement provides them "with a
remedy that addresses virtually every form of relief that was
requested in the Complaint." (Joint Mot. for Final Approval of
Settlement Agreement at 56.) In their complaint, Plaintiffs
requested that PDE: (1) provide comprehensive development and
training to regular and special education personnel concerning
provisions for supplementary aids and services to students with
disabilities in regular classrooms; (2) monitor local school
districts to determine whether they are improperly removing class
members from regular education classrooms and whether the local
school districts are providing specialized instruction and

37

supplementary aids and services that could enable students with
disabilities to be educated satisfactorily in a regular
classroom; and (3) require local school districts to take
corrective action when failure to provide the aforementioned
services occurs.  (Id.)  These requests have been met under the
Settlement Agreement.

Moreover, the Settlement Agreement provides for policy
development and implementation that will require school districts
to adhere to the standards for placing students in regular
education classrooms; to change the IEP format to include
additional guidance to IEP teams in making placement decisions;
and to implement a complaint resolution process that is
responsive to parental complaints.

Plaintiffs' counsel has filed an itemized listing of
all attorneys' costs and fees associated with this litigation.
The actual fees and costs amount to $2,651,000.  (Michael
Churchill's Decl. ¶ 4, doc. no. 302.)  Plus, an estimated
$90,000, which reflects over 300 hours of attorney time during
negotiations, is excluded from the actual fees and costs.  (Id. ¶
8.)

The $1,825,000 sought by counsel reflects only 62% of
counsel's actual fees and costs, as of June 1, 2004.  This
reduced amount is lower than the lodestar method would command.
See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab.

Litig., 55 F.3d 768, 821 (3d Cir. 1995) [hereinafter General

Motors].[8]

---

[8]    In General Motors, the Third Circuit determined that "a
court making or approving a fee award should determine what sort
of action the court is adjudicating and then primarily rely on
the corresponding method of awarding fees[, either the lodestar
or the percentage of recovery methods]."  55 F.3d at 821.  The
Third Circuit recognized:

> Courts generally regard the
> lodestar method, which uses the
> number of hours reasonably expended
> as its starting point, as the
> appropriate method in statutory fee
> shifting cases.  Because the
> lodestar award is de-coupled from
> the class recovery, the lodestar
> assures counsel undertaking
> socially beneficial litigation . .
> . an adequate fee irrespective of
> the monetary value of the final
> relief achieved for the class.

Id.  On the other hand, a percentage of recovery method is
used in common-fund cases, based on "the theory that the class
would be unjustly enriched if it did not compensate the counsel
responsible for generating the valuable fund bestowed on the
class."  Id.

       As this Court recognized in Lake v. First Nationwide
Bank, 900 F. Supp. 726 (E.D. Pa. 1995), "[n]either the lodestar
method nor the percentage of recovery method, however, is
mandatory.  Thus, the district court has wide discretion to
decide which method of fee calculation to apply."  Id. at 734
(citing General Motors, 55 F.3d at 821).

       Here, Plaintiffs secured substantial changes in the
monitoring, training, and delivery of special-education services.
While the exact value of these changes is difficult, if not
impossible, to quantify, the Court can consider these changes in
normative terms.  That is, the provisions of the Settlement
Agreement will presently affect approximately 255,264 children
and thousands more over the life of the Settlement Agreement.
The extent of counsel's recovery is not disproportional to the
equitable relief obtained.

Most of the work for which compensation is sought
appears to have been necessary and diligently performed.  The
attorneys' hourly rates are not unreasonable, and, in the Court's
experience, are consistent with market rates.  Therefore, the
attorneys' fees and costs under the Settlement Agreement are fair
and reasonable.

      4.    Are the terms of the Settlement Agreement
           consistent with the public interest and is
           the public's confidence in the administration
           of justice and the integrity of the class
           action process enhanced or impeded by
           <u>the Settlement?</u>

The Settlement Agreement is the product of lengthy and
arms-length litigation and negotiations conducted by experienced
counsel with the assistance of well-qualified experts and a
skilled mediator.  All policies embodied in the Settlement
Agreement have been fully endorsed at the highest levels of the
Commonwealth's educational decision makers.  The objections to
the Settlement Agreement are <u>de</u> <u>minimis</u>.  The Court is also
satisfied that the terms of the Settlement Agreement are not
inconsistent with federal or state law.  Nor does the Settlement
Agreement entangle the judiciary in the future management or
delivery of state services.  The attorneys' fees and costs are
reasonable, particularly in light of the results achieved.  Under
these circumstances, public confidence in the administration of

justice and the integrity of the class system will not be undermined.

> 5.  What are the prospects that, if the Settlement Agreement is rejected, further litigation would enlarge the recovery of the class and, if so, at what financial cost?

As this Court has previously recognized, in this final step of the analysis,

> the sole reason for approving the Settlement Agreement must be that, in the opinion of counsel, further litigation will generate significant expenses and is unlikely to result in greater recovery for the class members. The opinion of experienced counsel, particularly one with knowledge of this area of the law, is entitled to substantial weight.

Schwartz, 157 F. Supp. 2d at 580.

Both parties maintain that the costs and time associated with further litigation, which would most likely result in a trial, would be large. The Court agrees. As the parties contend in their joint motion for final approval of the Settlement Agreement, this case involves novel issues concerning, generally, the responsibility of state agencies for the education of special needs children. If this case were to proceed to summary judgment and/or to trial, the result would be uncertain. An appeal would almost be certain to follow. Consequently, the

parties would most likely have to wait years for resolution of
the case.

As it currently stands, this case has been before the
Court for over eleven years.  Most of the individually named
Plaintiffs have graduated from public high school and will not
directly benefit from the new procedures being implemented under
the Settlement Agreement.  Moreover, Plaintiffs initiated this
action to effectuate change in the future policies and practices
of PDE and other Commonwealth agencies, all of which are achieved
by the Settlement Agreement.  Considering these factors, the
Court finds that further litigation is not likely to result in a
greater recovery for the class and would entail significant
financial costs and risks.

In light of the above discussion, the Court concludes
that the terms and conditions of the Settlement Agreement are
fair, reasonable, and adequate.


V.    OBJECTIONS TO THE PROPOSED SETTLEMENT AGREEMENT

The Court received nineteen objections to the
provisionally approved Settlement Agreement.[9]  Although the Court
directed objectors to file their concerns with the Clerk's

_____

[9]    The Court prepared a summary of all objections that
were either filed with the Clerk's Office or submitted to the
Court prior to the Fairness Hearing.  This summary was filed
after the Fairness Hearing so that the parties could comment on
them in post-Fairness Hearing briefs (doc. no. 320).

Office, only three objectors followed this directive.  One of those three objectors later sought leave from the Court to withdraw the objection, which the Court granted (doc. no. 313). Out of the nineteen objections, three were submitted by non-class members, which included identical objection letters from twelve school districts, one objection by a former teacher, and one objection by the Berks County Intermediate Unit and Chester County Intermediate Unit.  The Court will not directly entertain objections from non-class members.  <u>See</u> Fed. R. Civ. P. 23(e)(4)(A).  Notably, some of the objections submitted by non-class members have also been asserted by class members.

First, of the 255,264 members of the class, only sixteen class members (or parents of class members) filed objections.  These objections to the Settlement Agreement can be broken down into eight categories, each of which will be discussed in turn.[10]

---

[10]    The Berks County Intermediate Unit and Chester County Intermediate Unit (the "Intermediate Units")--non-parties to this action--filed a motion to intervene for purposes of filing a motion to strike the proposed Settlement Agreement (doc. nos. 303 and 304), which the Court denied.  Although the Intermediate Units have no standing to object to the Settlement Agreement, they did assert a procedural issue that is worth comment.  Under the Commonwealth Documents Law, 45 Pa. Stat. Ann. §§ 1102-1602, administrative agencies must follow specialized procedures for implementing a new standard of conduct.  The parties to the action vehemently deny that the Settlement Agreement creates new or modified standards of conduct.

As one Pennsylvania Commonwealth Court stated:

> Administrative agencies often
> devise rules or regulations, some
> of which create a controlling
> standard of conduct, while some do
> not.  In order for an agency 'to
> establish a substantive rule
> [thereby] creating a controlling
> standard of conduct, it must comply
> with the provisions of the
> Commonwealth Documents Law.'  These
> 'substantive regulations . . . when
> properly enacted under the
> Commonwealth Documents Law, have
> the force of law.'  Agencies also
> devise rules, known as
> 'interpretive rules,' which do not
> establish a binding standard of
> conduct.  These interpretive rules
> 'need not be promulgated in
> accordance with the Commonwealth
> Documents Law.'  For an
> interpretive rule to be viable,
> however, it 'must genuinely track
> the meaning of the underlying
> statute, rather than establish an
> extrinsic substantive standard.

Lowing v. Public Sch. Employees' Retirement Bd., 776 A.2d 306,
308-09 (Commonwealth Court of Penn. 2001) (internal citations
omitted) (alteration in original); see also Giant Food Stores,
Inc. v. Commonwealth of Pa., Dep't of Health, 713 F.2d 177, 180
(Pa. Commw. Ct. 1998) ("The [Commonwealth Documents Law, or
"CDL,"] establishes a process for issuing regulations that
includes public notice of a proposed rule, receiving comments
from interested parties, and holding hearings when
appropriate.").

        By entering into the Settlement Agreement, neither PDE
nor any Commonwealth agency is creating a new substantive rule.
No obligations are directly imposed on the Intermediate Units.
Rather, the Settlement Agreements provides for increased
monitoring, inter alia, to ensure that school districts are
following both federal and state educational laws, such as the
IDEA.  This monitoring does not substantively change the state of
education law in Pennsylvania.  On the contrary, the monitoring
created under the Settlement Agreement provides a means to better

A.   Failure to Compensate Absent Class Members for Past Wrongs

Four class members questioned why only the named Plaintiffs, as opposed to all class members, were receiving compensation under the Settlement Agreement.  According to the parties, Plaintiffs initiated this action to effectuate change in the future policies and practices of PDE and other Commonwealth agencies, and not to receive compensation for previous harm. Moreover, most of the individually named Plaintiffs have graduated from public school and will not directly enjoy the benefits created under the Settlement Agreement.

The Court agrees with the parties.  This lawsuit was not about compensatory damages.  The compensation to Plaintiffs is appropriate considering the time and effort spent in prosecuting this lengthy and complex litigation.  Accordingly, the Court will overrule this objection.


B.   Failure to List "Brain Injury" Among the Specific Injuries in the Definition of "Eligibility"

Two objectors requested that "brain injury" be added to the list of conditions requiring training and technical assistance under the Settlement Agreement.  According to the

---

determine whether school districts are following federal and state educational law.  In fact, it appears that the Commonwealth has the power to implement the provisions of the Settlement Agreement, whether or not the Settlement Agreement is approved by the Court, without violating the Commonwealth Documents Law.

parties, students with brain injury who are eligible for special
education services are included in the category of "students with
significant disabilities," under Provision IV.7 of the Settlement
Agreement.  Additionally, the list of disabilities following the
definition of "students with significant disabilities" is not
exhaustive and cannot be used to exclude students with brain
injury from benefitting under the Settlement Agreement.  The
parties also comment that if a needs assessment required under
Provision IV.2(L) of the Settlement Agreement reveals that
teachers lack knowledge and experience in teaching children with
brain injury in a regular classroom, then training will be
provided in response to the assessment.

     The Court finds that brain injury is addressed under
the Settlement Agreement, as argued by the parties.  As such, the
Court will overrule this objection.

     C.   <u>Inadequate Length of the Settlement Agreement</u>

     Two class members opposed the length of the Settlement
Agreement, arguing that a five-year time frame is inadequate.
The parties, however, have indicated that this duration was a
necessary compromise to reach a Settlement Agreement.
Additionally, as the parties appropriately point out, "[m]any of
the provisions of the settlement, when implemented, will have an
impact lasting far longer than the agreement terms and will build
the Commonwealth's capacity for inclusive practices."  (Joint

Motion for Final Approval of Settlement Agreement at 30-31; <u>see also</u> Gaskin Decl. ¶ 10.)  In fact, at the Fairness Hearing, Dr. Rhen testified that the "five years gives us the time to implement the settlement agreement and get some sound information on which . . . to build future plans." (Fairness Hr'g Tr., 06/24/2005, 24-25.)

The Court concludes that any period lengthier than five years will require Court entanglement in the delivery of state educational services for longer than necessary to fulfill the objectives of the Settlement Agreement.  Accordingly, the objection will be overruled.


D.    Large Compensation to the Individual Plaintiffs and Attorneys

Two class members object to the compensation that the individually named Plaintiffs and Plaintiffs' counsel will receive under the Settlement Agreement.  As previously addressed in Part IV.B.3 of this decision, the Court finds that the compensation is fair and reasonable.  Therefore, this objection will be overruled.


E.    Potential Effects of Provisions for Training and Technical Assistance

One parent expressed concern that the school districts would use Provision IV.7 of the Settlement Agreement, which

concerns training, "to argue against the provision of training and consultation with respect to individual students rather than to 'school districts.'" (Joint Motion for Final Approval of Settlement Agreement at 31.)  According to the parties, Provision IV.7 does not prevent training and technical assistance with respect to individual students, but rather requires such training and assistance identified by a needs assessment.

The Court finds the parties' argument to be persuasive. When considering the parties' position in light of Dr. McGregor's testimony at the Fairness Hearing, the Court determines that training and technical assistance are adequately addressed in the Settlement Agreement, as driven by the educational policy of the Commonwealth.  Thus, the Court will overrule this objection.

F.    Failure to Increase State Funding to Local School
      Districts

Parents of a child with a disability objected that the Settlement Agreement did not guarantee increased state funding to assist the school districts in meeting their obligations.  First, Plaintiffs did not seek increased state funding in their complaint.  Second, it is doubtful that the Court has the power to require any specific expenditures of state funds under the circumstances of the case.  Third, to the extent that moneys are needed to fund the Settlement Agreement, both the Secretary of Education and the Director of PDE's Bureau of Special Education

testified at the Fairness Hearing that the Commonwealth had the
funds and resources to implement the provisions of the Settlement
Agreement.  (Fairness Hr'g Tr., 06/24/2005, 13, 23.)
Accordingly, the Court will overrule this objection.


      G.    <u>Need for a Change in Placement Practices</u>

        One parent proposed that children who have not met
certain testing and grading standards should immediately be
placed in a learning support program, while the school districts
and parents arrange for appropriate testing to determine the
specific learning disability and then tailor the IEP to address
each child's specific needs.  According to the parties, the
Settlement Agreement does not--and cannot--change the provision
in the IDEA that requires evaluation and development of an IEP
<u>before</u> a student's placement can be changed.  20 U.S.C. § 1414.
The parties note, however, that the Settlement Agreement provides
for professional development, which may help teachers identify
students in need of supplementary aids and services, but who have
not been identified as having a disability because they can be
clearly included in a regular classroom.  The Court concurs with
the parties and will overrule this objection.

H.   Lack of Time Between Notice of Proposed Settlement and
     Deadline for Filing Objection

Two class members take issue with the amount of time in which they had to file objections to the Settlement Agreement. As this Court set forth in its provisional approval of the Settlement Agreement (doc. no. 305), notice of the proposed Settlement Agreement was to be published to certain Pennsylvania newspapers and distributed to educational agencies, entities, and known parents of children with disabilities by May 20, 2005.  The Court determined that class members and their parents could file written objections to the proposed Settlement Agreement no later than June 10, 2005.  Thus, objectors should have had approximately twenty-one days, give or take, to file objections. In any event, at the Fairness Hearing, the Court heard from any individual wanting to share his or her thoughts about the Settlement Agreement, whether or not that individual filed a written objection.  There is no evidence that the parties did not meet the notice requirements established by the Court, or that any member of the class lacked notice or the opportunity to object.  Accordingly, the Court will overrule this objection.


VI.  CONCLUSION

For the foregoing reasons, the Court will grant the parties' motion, approve the Settlement Agreement, and dismiss the case with prejudice.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


GASKIN, ET AL.,                    :    CIVIL ACTION
                                   :    NO. 94-4048
            Plaintiffs,            :
                                   :
      v.                           :
                                   :
COMMONWEALTH OF                    :
PENNSYLVANIA, ET AL.,              :
                                   :
            Defendants.            :

### O R D E R

AND NOW, this **16th** day of **September, 2005,** it is hereby ordered that this case shall be **REMOVED FROM SUSPENSE** and **PLACED ON ACTIVE STATUS.**

IT IS FURTHER ORDERED, upon consideration of the Joint Motion for Final Approval of the Settlement Agreement (doc. no. 326) and objections from class members and interested parties at the Fairness Hearing, that the motion is **GRANTED** and the parties' Settlement Agreement is **APPROVED** in the form submitted to this Court.

IT IS FURTHER ORDERED that the case is **DISMISSED WITH PREJUDICE.** The court shall retain jurisdiction to enforce certain aspects of the Settlement Agreement as provided therein.

AND IT IS SO ORDERED.


_____
**EDUARDO C. ROBRENO, J.**